# FILED UNDER SEAL

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

Bruce Cohn,

     *Plaintiff*,

    v.

Anna Popescu, Zedxion Exchange Ltd., Elizabeth Newman, █████, and John Doe,

    *Defendants,* In Personam

896,472 USDC in blockchain address ███████████████████████████,
896,461 USDC in blockchain address ███████████████████████████,
894,868 USDC in blockchain address █████████████████████████,
894,669 USDC in blockchain address ████████████████████████,
431,932 USDC in blockchain address ██████████████████████████,
and 896,233 USDC in blockchain address █████████████████████,

    *Defendants*, In Rem

Case No. 1:24-cv-00337

**Plaintiff's Opposition to Defendant John Doe's Motion to Dismiss**

- 1 -

Plaintiff Bruce Cohn hereby responds in opposition to the Motion to Dismiss filed by Defendant Wei-Ning Sun.[1] In support, he respectfully shows the Court as follows.

## Preliminary Statement

Plaintiff Bruce Cohn lost more than $2.4 million to a pig-butchering scam. In this suit, he brings civil RICO claims against defendants who, he alleges, are members of the criminal syndicate responsible for that loss. These defendants include Wei-Ning Sun, the self-identified owner of six blockchain addresses that are currently frozen under this Court's preliminary injunction. Sun now moves to dismiss the claims against him, arguing that (i) the Court lacks personal jurisdiction, (ii) venue is improper, and (iii) Mr. Cohn has failed to state a RICO claim or any pendent state-law claim.

RICO's jurisdictional provisions and the venue statute foreclose Sun's first two arguments. Under RICO, the personal-jurisdiction inquiry focuses on the defendants' contacts with the United States as a whole—not with the forum state, as Sun mistakenly contends. Those nationwide contacts are more than sufficient here. Venue is equally straightforward: "[A] defendant not resident in the United States may be sued in any judicial district."[2] Because

---

[1] At the time he filed the Third Amended Complaint, Mr. Cohn did not yet know Wei Ning-Sun's name. Because Sun has now (partially) emerged from cyber-anonymity, Mr. Cohn will refer to him by name throughout.

[2] 28 U.S.C. § 1391(c)(3).

Sun's own Motion admits that he resides in Taiwan,[3] Mr. Cohn was entitled to bring this action in any federal district, including this one.

Sun's Rule 12(b)(6) arguments fare no better. The operative Complaint alleges in clear, specific terms that each Defendant—including Sun—is an operator or participant in a coordinated pig-butchering scam syndicate. It sets out (i) the who, what, when, where, and why of the fraud; (ii) Sun's role in receiving, holding, and concealing the stolen assets; and (iii) concrete allegations connecting Sun to the broader criminal enterprise. These allegations more than suffice to state civil RICO claims and the related state-law aiding-and-abetting claims.

## Facts & Background

This section sets out (i) background about the pig-butchering "scamdemic" of which this case is a part and (ii) relevant factual background about Mr. Cohn's case.

### I.    The Pig-Butchering Scamdemic

Pig-butchering scams are a national crisis. In 2024 alone, foreign crypto-scam syndicates stole more than $5.8 billion from more than 40,000 Americans using romance lures, fake trading platforms, and sophisticated cryptocurrency laundering techniques.[4] Researchers have warned that these

---

[3] Defendant John Doe's Motion to Dismiss (henceforth the "Motion" or "MTD"), Dkt. 85, p. 1.

[4] TAC, at ¶¶ 1 – 3 (describing pig-butchering scam epidemic); Ex. 1, Affidavit of Evan Cole ("Cole Aff."), at ¶ 6 (same). Mr. Cohn offers the Cole Affidavit solely in rebuttal to Sun's argument that the Court lacks personal

schemes are well-structured, industrialized fraud operations involving coordinated roles: the 'hunters' who chat with and groom victims, the software developers who build and operate fraudulent investment platforms, and the 'cash-out' specialists who launder the stolen funds.[5]

The Federal Bureau of Investigation ("FBI") and United States Secret Service ("USSS") have seized and forfeited hundreds of millions of dollars' worth of cryptocurrency from the "pooling addresses" that pig-butchering syndicates use to store to their stolen bounties.[6] In case after case, these agencies have described the syndicates' theft and money-laundering model, in which the pig-butcherers (i) steal digital assets from numerous victims, (ii) then hop those assets from blockchain address to blockchain address, (iii) eventually deposit those assets at a non-U.S. cryptocurrency exchange like Binance, and, finally, (iv) send the assets out of those exchange accounts to *pooling addresses* where they are held for the use and enjoyment of the pig-butchering syndicate's participants.[7] These criminal syndicates have found a

---

jurisdiction over him. In response to a motion to dismiss for lack of personal jurisdiction, the plaintiff entitled to introduce evidence. *See Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000) (noting that when defendant moves to dismiss for lack of personal jurisdiction, the party seeking to asset jurisdiction may submit "affidavits and other documentation" to establish jurisdictional facts).

[5] Cole Aff., at ¶ 9.

[6] Cole Aff., at ¶¶ 25 − 29.

[7] *Id.*

business model that works, and thus for years they have continued to run the same playbook.[8] And they are continuing to do so, even as we speak.[9]

## II.    Mr. Cohn's experience

Plaintiff Bruce Cohn is one amongst tens of thousands of these foreign criminal syndicates' victims. His case fits the pig-butchering paradigm exactly. In June 2024, he matched with Anna Popescu on the dating site Millionaire Match.[10] The two struck up a connection and began messaging daily.[11] Popescu eventually told Mr. Cohn about her success trading cryptocurrencies and introduced him to a platform called TrustHFTwallet.[12] Popescu told Mr. Cohn that she knew how to make profits using TrustHFTwallet and would teach him how to do the same.[13] She encouraged Mr. Cohn to make a TrustHFTwallet account, which he soon did.[14]

Over the next several months, Popescu 'trained' Mr. Cohn in cryptocurrency trading using the TrustHFTwallet platform.[15] When Mr.

---

[8] *Id.*

[9] *Id.*

[10] TAC, at ¶ 14; Ex. 2, Affidavit of Bruce Cohn ("Cohn Aff."), at ¶ 2. Like the Cole Affidavit introduced above, the Cohn Affidavit is being offered in support of this opposition solely in rebuttal to Sun's argument that the Court lacks personal jurisdiction.

[11] TAC, at ¶¶ 14 – 17; Cohn Aff., at ¶¶ 2 – 6.

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] *Id.*

Cohn was ready to make a deposit on TrustHFTwallet, the platform provided him asset-transfer instructions via the platform's customer-service chat or on its "deposit" page.[16] Mr. Cohn completed the transactions as instructed. Each time, the amount of the funds he 'deposited' would then be reflected in his transaction history and account balance on the TrustHFTwallet platform.[17] Over time, he sent assets to TrustHFTwallet with a dollar-denominated value of more than $2,400,000.00.[18]

Mr. Cohn's balance on the TrustHFTwallet platform appeared to grow rapidly—eventually showing that he had crypto assets worth more than $4.5 million in his account.[19] But when he attempted to withdraw his funds, TrustHFTwallet informed him that him that he could not do so in significant quantities without 'leveling up' his account by depositing more money.[20] Mr. Cohn soon realized that he had been scammed. Every aspect of this process was textbook pig-butchering.[21]

Mr. Cohn's investigator soon performed blockchain tracing, following the digital assets Mr. Cohn had sent to the TrustHFTwallet scammers from address to address, to determine where they had ended up.[22] As relevant here,

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] TAC, at ¶¶ 1 − 4; Cole Aff., at ¶¶ 10 − 19.

[22] TAC, at ¶¶ 19 − 28; Cole Aff., at ¶ 20.

this tracing showed that the scammers had transferred a substantial portion of Mr. Cohn's assets to an account at the international cryptocurrency exchange Binance.[23] Mr. Cohn then filed this lawsuit and sought an order requiring Binance to freeze this account and produce account and transaction records, which it soon did.[24] Those records revealed the Binance accountholder to be ████████, an individual residing in ██████.[25] ████████ Binance account received over $39 million worth of deposits in less than six months in 2024.[26] The majority of incoming transactions to ██████ account were worth between $80,000 and $100,000.[27]

████████ account record showed a pattern of receiving large incoming transactions in one form of cryptocurrency, then "swapping" that cryptocurrency for another one, and then sending out similarly large transactions to other accounts at non-U.S. cryptocurrency exchanges or "self-hosted" blockchain addresses.[28] By following these outgoing transactions, Mr. Cohn identified the six addresses that the Court ultimately ordered frozen, containing nearly $5 million of the crypto token USDC.[29]

---

[23] *Id.*

[24] TAC, at ¶ 28 – 32; Cole Aff., at ¶¶ 21 – 22.

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *Id.*

The tracing path from Mr. Cohn to ███████s Binance account, and then on to the now-frozen USDC addresses, is straightforward and indicative of large-scale money laundering.[30] After Mr. Cohn transmitted his assets to the "Initial Receiving Address" provided to him by Anna Popescu and TrustHFTwallet, those assets were "hopped" through six blockchain addresses that served as passthroughs for millions of dollars of assets stolen from pig-butchering victims.[31] At the end of this series of hops, Mr. Cohn's assets were deposited in ██████s Binance account in July 2024.[32] A week later, ██████ made a series of transfers of approximately $300,000.00 worth of USDC to a series of thirteen blockchain addresses.[33] Those thirteen addresses immediately transferred those assets on to the six USDC addresses that are now frozen pursuant to the Court's preliminary injunction.[34]

After the six USDC addresses were frozen, Wei-Ning Sun emerged and claimed ownership, identifying himself as a Taiwanese individual residing in Taipei.[35] Wei-Ning Sun has not revealed any further information about himself. Instead, he filed the instant motion, seeking to have Mr. Cohn's

---

[30] Cole Aff., at ¶¶ 20 − 24.

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.*

[35] MTD, at p. 1 (identifying Sun's home as Taipei).

claims against him dismissed—and thereby avoid explaining why he received millions of dollars from a pig-butchering scam syndicate.

While Wei-Ning Sun and the other members of the TrustHFTwallet Enterprise are foreign nationals, their scheme was replete with purposeful and sustained contacts with the United States.

- Popescu matched with Mr. Cohn on Millionaire Match. Mr. Cohn was located in the United States when this match occurred, and the Millionaire Match platform is owned by a U.S. company and operated from the U.S.[36]

- Mr. Cohn and Popescu exchanged thousands of messages by cell phone. Throughout, Mr. Cohn was located on U.S. soil, and Popescu used (i) U.S. phone number with a Los Angeles area code and (ii) a cell-service provider owned by a U.S. company operated from the U.S.[37]

- Mr. Cohn and Popescu exchanges thousands of messages by WhatsApp. Mr. Cohn was located in the U.S. throughout.[38] The WhatsApp messaging service owned by a U.S. company and operated from the U.S.[39]

- Popescu emailed with Mr. Cohn from a Google email address. Mr. Cohn was on U.S. soil when he received these emails.[40] Google is a U.S. company and operates its email service from the U.S.[41]

- Mr. Cohn made an account on and transferred more than $2.4 million dollars to the TrustHFTwallet website while he was in the U.S.[42] The

---

[36] Cohn Aff., at ¶ 2; Cole Aff., at ¶ 30.

[37] Cohn Aff., at ¶ 3; Cole Aff., at ¶ 31.

[38] Cohn Aff., at ¶ 3.

[39] Cole Aff., at ¶ 32.

[40] Cohn Aff., at ¶ 3.

[41] Cole Aff., at ¶ 33.

[42] Cohn Aff., at ¶ 5.

TrustHFTwallet website used Amazon Web Services, another U.S. company operating from U.S. soil, for its Domain Name Service.[43]

- Popescu specifically instructed Mr. Cohn to make transfers to the TrustHFTwallet platform from his accounts at Coinbase and Kraken, which he ultimately did.[44] Both Coinbase and Kraken are U.S.-based cryptocurrency exchanges.[45]

- The asset held at the six frozen addresses owned by Sun is called *United States Dollar Coin*. Circle Internet Group, Inc. ("Circle"), a Delaware corporation, created USDC in 2018, and has managed USDC's operations from its headquarters in New York ever since.[47] USDC is a "stablecoin" whose value is pegged to the U.S. Dollar.[48]

## Argument

Sun argues that (i) this court lacks personal jurisdiction over him, (ii) venue was improperly laid, and (iii) Mr. Cohn has failed to state RICO and pendent state-law claims against him. For the reasons set out below, each of these arguments fails.

### III.   The Court has personal jurisdiction over Sun.

Sun's Motion misstates the governing standard for personal jurisdiction. Under RICO, the relevant inquiry is whether there were sufficient contacts with the United States *as a whole* to satisfy Fifth

---

[43] Cole Aff., at ¶ 34.

[44] Cole Aff., at ¶¶ 36 – 37.

[45] *Id*.

[46] *Id*.

[47] TAC, at ¶¶ 31 – 32; Cole Aff., at ¶ 35.

[48] Cole Aff., at ¶ 24.

Amendment due process—not whether Sun himself has contacts with Texas. The correct standard is met here.

       i.    *Mr. Cohn need only make a prima facie showing of contacts with the United States as a whole.*

At this stage of the litigation, Mr. Cohn need only make a *prima facie* showing of personal jurisdiction.[49] When a defendant challenges jurisdiction under Rule 12(b)(2), the plaintiff is entitled to introduce affidavits and other materials outside the pleadings.[50] A court must accept as true the plaintiff's uncontroverted allegations and construe any conflicts in the evidence in the plaintiff's favor.[51]

Civil RICO provides for nationwide service of process.[52] When Congress authorizes nationwide service, the due-process analysis shifts from the Fourteenth Amendment to the Fifth Amendment, and the relevant sovereign is the United States—not the forum state.[53] The jurisdictional question is thus whether there are minimum contacts with the *United States*, not Texas.[54] Other courts applying RICO agree. In *Republic of Panama v.*

---

[49] *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999).

[50] *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990).

[51] *Id.*

[52] *Hernandez v. Vanderbilt Mortg. & Fin., Inc.*, No. CIV. A. C-10-67, 2010 WL 1875796, at *4 (S.D. Tex. May 6, 2010) (concluding that "RICO provides for nationwide service of process," and collecting cases).

[53] *Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1255, 1258 (5th Cir. 1994) (noting that the relevant sovereign "defines the scope of the due process analysis").

[54] *Id.* (holding that "when a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute

*BCCI Holdings*, the Eleventh Circuit held that civil RICO's nationwide service provision permits jurisdiction over foreign defendants based solely on their national contacts.[55] As the court wrote there, "a defendant's contacts with the forum state play no magical role in the Fifth Amendment analysis," and courts must "examine a defendant's aggregate contacts with the nation as a whole" when conducting the personal-jurisdiction analysis under RICO.[56] The Tenth Circuit has adopted the same rule.[57] And district courts in this Circuit have applied the same principle.[58]

The Supreme Court's blockbuster decision in *Fuld* eliminated any doubt that RICO personal jurisdiction is governed exclusively by the Fifth

---

providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States").

[55] 119 F.3d 935, 942–49 (11th Cir. 1997).

[56] *Id.*

[57] *CGC Holding Co. v. Hutchens*, 974 F.3d 1201, 1210–13 (10th Cir. 2020) (noting that "[t]o determine whether the exercise of federal jurisdiction over [the defendant] satisfies due process, we must determine whether [she] had minimum contacts with the *United States*," and ultimately holding that personal jurisdiction under RICO was established by U.S.-directed fraud and use of U.S. financial channels (emphasis added)).

[58] *Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 782 (N.D. Tex. 2008) ("[W]hen a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has had minimum contacts with the United States." (quoting *Busch*, 11 F.3d at 1258)); *Oblio Telecom, Inc. v. Patel*, 711 F. Supp. 2d 668, 675 (N.D. Tex. 2008) (RICO "does provide for nationwide service of process"); *Hernandez*, 2010 WL 1875796, at *3 ("[I]n any suit brought under a statute providing for nationwide service of process, a court need only conclude that Defendant has sufficient minimum contacts with the United States as a whole, not with any state in particular.").

Amendment's nationwide-contacts test. There, the Court squarely held—for the first time—that when Congress authorizes nationwide service of process, the Fifth Amendment governs personal jurisdiction, and the Fourteenth Amendment's minimum-contacts test does not apply.[59] Instead, because the relevant sovereign is the United States, the only question is whether the defendant has constitutionally sufficient contacts with the nation as a whole.[60] The Court emphasized that the interstate-federalism limits that constrain state courts have no application to federal courts, and explicitly rejected the Second Circuit's insistence on forum-state contacts in federal-statute cases.[61] *Fuld* therefore confirms that Sun's briefing applies the wrong constitutional test and thus, for the reasons set out further below, that his jurisdictional challenge fails.

ii.    *Sun and his co-conspirators' numerous contacts with the United States establish jurisdiction.*

Under the nationwide-contacts standard, the Court has personal jurisdiction over Sun for three independent reasons.

First, Sun's contacts with the United States establish jurisdiction under RICO. The Complaint alleges that Sun intentionally laundered the proceeds of an industrial-scale fraud directed at U.S. victims—a fraud whose

---

[59] *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 18 (2025) (holding for the first time that the Fourteenth Amendment's minimum-contacts framework does not apply to the Fifth Amendment).

[60] *Id.*

[61] *Id.*

structure, laundering methods, and transaction patterns precisely match the "pig-butchering" architecture repeatedly identified in law-enforcement seizure affidavits.[62] The United States Secret Service and the FBI have repeatedly seized assets using the same tracing logic and the same laundering signatures that appear here.[63]

Most importantly, Sun admits that he is the owner of the nearly $5 million in USDC held at the frozen addresses. That admission establishes purposeful contact with the United States on its own: USDC is a U.S.-created, U.S.-managed, dollar-pegged digital asset issued and administered by a U.S. company.[64] And when that admission is combined with the well-pleaded allegations tying Sun to the coordinated laundering pipeline used by the TrustHFTwallet syndicate, the Fifth Amendment's nationwide-contacts standard is met. Anything less would defeat Congress's purpose in enacting civil RICO and would immunize the very foreign cybercriminals—like those who victimized Mr. Cohn and tens of thousands of Americans each year—whom RICO was designed to reach.

Second, even were the Court to take a different view of RICO's personal-jurisdiction requirements, Federal Rule of Civil Procedure 4(k)(2)—the "federal long-arm statute"—provides an independent basis for

---

[62] Cole Aff., at ¶¶ 25 – 29.

[63] *Id.*

[64] Cole Aff., at ¶¶ 24, 35.

jurisdiction. Rule 4(k)(2) applies where (i) the plaintiff's claims arise under federal law, (ii) the defendant is not subject to jurisdiction in any one state, and (iii) exercising jurisdiction is consistent with the Constitution. All three conditions are satisfied here.

The first prong is satisfied because this is, of course, is a federal RICO action. The second prong is satisfied under the "switching test" applied in the Fifth Circuit. Under this test "so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction."[65] Sun affirmatively denies being subject to jurisdiction in Texas and identifies no other state in which he concedes jurisdiction, thereby triggering the switching mechanism here. As to the third prong, as *Fuld* confirms, the constitutional inquiry under Rule 4(k)(2) mirrors the Fifth Amendment test discussed above: the question is whether Sun purposefully directed conduct at the United States as a whole. For the reasons already noted—his admitted ownership of millions in U.S.-issued USDC, his alleged receipt of assets stolen from a U.S. victim, and his alleged role as the laundering endpoint of a fraud aimed squarely at U.S. citizens—that standard is met. Rule 4(k)(2) therefore independently establishes personal jurisdiction.

---

[65] *Adams v. Unione Mediterranea Di Sicurta*, 364 F.3d 646, 651 (5th Cir. 2004) (finding jurisdiction under Rule 4(k)(2) where defendant "challenged the existence of minimum contacts with the United States as a whole," "ha[d] not offered other venues in [the U.S.] where personal jurisdiction would attach," and argue[d] that it [could not] be sued in the United States").

Third, and finally, personal jurisdiction over Sun should be established under *Fuld*'s new framework on a novel theory. The *Fuld* decision makes clear that, in federal-question cases involving foreign defendants, personal jurisdiction must reflect the "more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority."[66] The *Fuld* decision further notes that the reasonableness of the exercise of jurisdiction was measured in part by the United States' "compelling interest" in the prevention of terrorist violence against Americans—conduct that, by design, often originates abroad and would evade traditional Fourteenth Amendment minimum-contacts analysis.[67]

The same logic applies here. Pig-butchering syndicates inflict staggering economic harm on tens of thousands of Americans each year, using deliberately transnational structures to avoid accountability. Protecting Americans from losing their savings to coordinated, foreign cyber-fraud syndicates is no less compelling than protecting them from physical injury, and due process must be interpreted in a manner that permits meaningful redress. Under *Fuld*'s flexible national-contacts framework, this Court should hold that in international cyber-scam cases, under RICO, the nationwide contacts of the *entire syndicate* may be imputed to each member for jurisdictional purposes—particularly where, as here, the enterprise functions

---

[66] *Fuld*, 606 U.S. at 3.

[67] *Id.* at 23-24.

as a coordinated criminal unit and one member (here, Popescu) served as the "tip of the spear" targeting a United States citizen. This approach accords with *Fuld*'s recognition that federal courts must be able to reach foreign actors who injure Americans from abroad, and it is the only way to prevent the precise injustice *Fuld* sought to avoid.

If this standard were applied here, Popescu's contacts with the United States would easily satisfy that threshold as to the entire TrustHFTwallet syndicate. Popescu (i) matched with Mr. Cohn on a U.S.-based dating platform; (ii) exchanged thousands of messages with him using a U.S. phone number, U.S.-based messaging applications, and a Google email account; (iii) directed him to "invest" through the TrustHFTwallet platform, which itself used U.S.-based web services; and (iv) instructed him to send funds from his U.S.-based accounts on Coinbase and Kraken.[68] Throughout, Mr. Cohn was physically present in the United States.[69] These are classic instances of purposeful availment under the Fifth Amendment, and, under *Fuld*, they should are enough to confer personal jurisdiction over all alleged members of the TrustHFTwallet Enterprise, including Sun.

Novel technologies demand novel responses, and *Fuld* confirms that the Constitution permits federal courts to adapt their jurisdictional reach to

---

[68] See nn. 37 − 48, *supra* (setting out Popescu's U.S. contacts, with citations to evidentiary submissions).

[69] Cohn Aff., at ¶ 11 ("At all times during my interactions with Ms. Popescu, my use of TrustHFTWallet, and the transfers I made to TrustHFTWallet, I was physically present within the United States.").

meet the threats of the digital era—ensuring that victims of international pig-butchering schemes, no less than victims of terrorism, have a clear and effective path to justice. Against this backdrop, Sun's claims of inconvenience ring hollow. As the Eleventh Circuit noted, "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern," and "modern means of communication and transportation have lessened the burden of defending a lawsuit in a distant forum."[70] Should the Court find that Sun's and his co-conspirators' contacts with the United States are sufficient for the assertion of federal jurisdiction, issues of convenience will be handily addressed by the use of remote-communications technologies, electronic document discovery, and the like.

### IV. Venue is proper because a foreign defendant "may be sued in any judicial district."

Sun's venue argument fails at the threshold because he and his co-defendants are foreign nationals. Under 28 U.S.C. § 1391(c)(3), "a defendant not resident in the United States may be sued in any judicial district." Courts have repeatedly "reaffirmed the 'long-established rule that suits against aliens are wholly outside the operation of all the federal venue laws, general and special.'"[71] This is true regardless where the events occurred, the

---

[70] *Republic of Panama*, 119 F.3d at 947-48.

[71] *Endo Pharms. Inc. v. Lupin Atlantis Holdings SA*, No. 2:17-CV-00558-JRG, 2018 WL 11474182, at *2 (E.D. Tex. May 30, 2018) (quoting *In re HTC Corporation*, 889 F.3d 1349 (Fed. Cir. 2018)).

defendant's personal contacts, or where the plaintiff resides.[72] Sun's Motion admits that he resides in Taipei, Taiwan.[73] Accordingly, Mr. Cohn was and is free to proceed with this lawsuit in any federal court, including this one. The Court's inquiry on this point need not go further.

Again, here, Sun fails to grapple with the operative rule. His Motion does not mention Section 1391(c)(3). And while Sun notes that Judge Crone previously transferred one of counsel's pig-butchering cases to the Southern District of Texas, this has no bearing. That was a *sua sponte* transfer, without briefing, pursuant to discretionary transfer statute. Section 1391(c)(3) is dispositive of the question here.

## V. Mr. Cohn has stated RICO claims against Sun and his criminal co-defendants.

Sun's Rule 12(b)(6) arguments ignore the allegations and forensic evidence demonstrating his role as a money launderer in a coordinated pig-butchering syndicate. At the pleading stage, Mr. Cohn need only allege facts that "state a claim to relief that is plausible on its face," and all reasonable inferences must be drawn in Mr. Cohn's favor.[74] He has exceeded the applicable threshold.

---

[72] *Id.*

[73] MTD, at p.1.

[74] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

      *i.*    *Mr. Cohn plausibly alleges that the Defendants are the operators of a pig-butchering scam, the archetype of a RICO enterprise.*

RICO empowers victims of organized crime by creating a civil cause of action for "[a]ny person injured in his business or property by reason of a violation of section 1962."[75] To prevail on a RICO claim under Section 1962, the plaintiff must plead and ultimately prove that the defendant is: (1) a person who engaged in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise.[76]

Taken as true, the Complaint satisfies each of these elements because it plausibly alleges that Sun knowingly participated in the conduct of a racketeering enterprise by serving as the laundering endpoint of a coordinated pig-butchering syndicate.[77] The Complaint identifies a multi-actor enterprise with a unified purpose—recruiting victims, stealing digital assets through a fraudulent trading platform, and laundering the proceeds through intermediaries and ultimately into Sun's six wallets.[78] It alleges a pattern of racketeering activity through repeated acts of wire fraud and

---

[75] 18 U.S.C. § 1964(c).

[76] *Torrey v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at *12 (E.D. Tex. Sept. 27, 2018) (quoting *Abraham v. Singh*, 480 F.3d 351, 354–55 (5th Cir. 2007)).

[77] *See* TAC, at ¶¶ 1–4, 10, 14–22, 28–32 (alleging Sun's participation in pig-butchering scam syndicate, his ownership of the six frozen wallets, and detailing the enterprise's coordinated theft and laundering scheme).

[78] *See id.*, at ¶¶ 14–22, 30–31 (detailing Popescu's recruitment of Cohn, the fraudulent TrustHFTWallet platform, and the movement of stolen funds through intermediaries into Sun's wallets).

international money laundering carried out in a scripted manner against multiple victims, demonstrated by the approximately $5 million in pooled proceeds residing in Sun's wallets.[79] And it alleges Sun's participation in the enterprise by showing that his addresses were the designated destination for the laundered funds, enabling the syndicate to conceal and retain stolen assets.[80] These allegations satisfy all three components of Section 1962.[81]

> ii. *Mr. Cohn has alleged the existence of an enterprise and satisfied the "distinctness" requirement.*

Sun argues that Mr. Cohn failed to allege the existence of an enterprise because (i) he did not satisfy the "separateness" requirement and (ii) he engaged in impermissible "group pleading." Both arguments fail.

*First*, Sun misstates the "separateness" requirement. An association-in-fact enterprise includes "a group of persons associated together for a common purpose of engaging in a course of conduct," and that enterprise can be proved with "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit."[82] Three

---

[79] *See id.*, at ¶¶ 21, 31, 35–41 (alleging repeated wire-fraud communications, multi-layer laundering, and the approximately $5 million in pooled USDC in Sun's addresses, far exceeding Plaintiff's individual loss).

[80] *See id.*, at ¶¶ 20, 27–32, 56–59, 66–70, 72 (alleging Sun's role as the laundering endpoint for the enterprise, his control over the frozen addresses, and his knowing participation in concealing and retaining the proceeds).

[81] *Abraham*, 480 F.3d at 354–55 (enterprise sufficiently alleged where plaintiffs detailed "systematic victimization" campaign by defendants).

[82] *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 673 (5th Cir. 2015).

structural features suffice to show an association-in-fact enterprise: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[83] The Supreme Court and the Fifth Circuit have rejected the notion that a RICO plaintiff must show that the enterprise was formed for some reason *other than* to carry out criminal activity to plead a RICO enterprise.[84]

The Complaint satisfies the enterprise requirement by alleging a coordinated pig-butchering syndicate with defined roles, shared objectives, and sustained, repeated conduct culminating in Sun's laundering of nearly $5 million in victim proceeds.[85] And unlike in *Whelan*—the summary-judgment case cited by Sun involving no evidence of organization—Plaintiff's detailed allegations describe a structured, continuing unit that meets *Boyle*'s enterprise test at the pleading stage.[86]

---

[83] *Id.* (quoting *Boyle v. U.S.*, 556 U.S. 938, 946 (2009)).

[84] *Id.* (noting that "an association can satisfy the enterprise requirement under RICO even if its sole purpose is to carry out a pattern of racketeering," and noting that the Supreme Court has rejected an interpretation of RICO that would "exclude[] from 'enterprise' those entities pursuing solely unlawful ends").

[85] Compl. ¶¶ 10, 14–22, 30–32, 56–59, 61, 66–70, 72.

[86] *See Whelan v. Winchester Prod. Co.*, 319 F.3d 225, 232–33 (5th Cir. 2003) (affirming summary judgment where, after full discovery, plaintiffs produced no evidence of an ongoing organization or coordinated unit).

*Second*, Sun's "group pleading" argument relies solely on *Walker*, a facially distinguishable case.[87] *Walker* involved a sprawling, 35-defendant political-retaliation theory supported by vague accusations that all defendants were part of a "conspiracy."[88] The Fifth Circuit affirmed dismissal because the complaint offered no factual allegations showing that those disparate actors "function[ed] as a continuing unit" or shared any coherent organizational structure—its enterprise allegations were "wholly conclusory and unsupported by facts."[89] Unlike the plaintiff in *Walker*, Mr. Cohn does not "lump together" defendants, but pleads Sun's precise role as the laundering endpoint of a structured, continuing criminal unit.[90] These allegations satisfy *Boyle*'s enterprise standard and bear no resemblance to the conclusory group-pleading rejected in *Walker*.

iii.    *Mr. Cohn has alleged a pattern of racketeering activity.*

Sun's argument that the operative Complaint alleges only "one act" and therefore no pattern is flatly inconsistent the allegations pleaded. The Complaint alleges a multi-stage pig-butchering scam executed through numerous acts of wire fraud—the grooming, inducement, repeated communications, false representations of profits, and successive extraction of

---

[87] *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 738 (5th Cir. 2019).

[88] *Id.* at 731.

[89] *Id.*

[90] *See* TAC, at ¶¶ 1–4, 14–22, 27–32, 45–48.

deposits through TrustHFTwallet, WhatsApp, and other digital channels—as well as distinct money-laundering offenses under 18 U.S.C. §§ 1956 and 1957, when the enterprise off-ramped the stolen funds through Binance and then funneled them through a series of blockchain transactions into the Target Addresses controlled by Sun.[91]

Nor is it accurate that this case concerns only a "single endeavor to defraud one individual." The Complaint alleges precisely the opposite: that the Pig Butchering Enterprise operated on a large scale, using standardized scripts and methods to defraud "dozens of persons" and launder "millions of dollars" of victim assets.[92] These allegations describe an enterprise engaged in ongoing, repeatable, continuing criminal conduct, precisely the kind of "systematic victimization" that has been found to satisfy the pattern and continuity requirements in past cases.[93]

### iv. Mr. Cohn has alleged Sun's participation in the enterprise.

Sun's claim that Plaintiff fails to allege his "participation" in the RICO enterprise misstates both the Complaint and the governing Fifth Circuit standard. Here, Sun relies on *Davis–Lynch, Inc. v. Moreno*.[94] But that case involved a summary judgment record where the plaintiff offered "only broad generalizations" and no evidence at all tying the defendants to the

---

[91] *See* TAC, at ¶¶ 1–4, 14–22, 27–32, 45–48.

[92] *See* TAC, at ¶¶ 1–4, 14–22, 27–32, 45–48.

[93] *Abraham*, 480 F.3d at 356.

[94] 667 F.3d 539 (5th Cir. 2012).

enterprise's control or operation.[95] By contrast here, at the pleading stage, Mr. Cohn alleges far more than "receipt of funds": the Complaint identifies six specific blockchain addresses that Sun owns and controls, alleges that more than $5 million in victim proceeds were funneled into those addresses through a coordinated laundering pipeline, and details how Sun's wallets served as the terminal repository through which the Pig Butchering Enterprise concealed, pooled, and retained stolen assets.[96]

## VI. Mr. Cohn has stated claims against Sun for aiding & abetting fraud and conversion.

Sun argues that the aiding-and-abetting claims fail because he is not alleged to have had direct interactions with Mr. Cohn.[97] But California law imposes aiding-and-abetting liability under the Restatement (Second) of Torts § 876(b), which does not require the secondary tortfeasor to personally commit the fraud or conversion, communicate with the victim, or be involved at the inception of the scheme. Instead, a defendant is liable where he (1) knew that another's conduct constituted a tort, and (2) provided substantial assistance or encouragement to the primary wrongdoer.[98] Courts applying

---

[95] *Id.*

[96] TAC, at ¶¶ 10, 20–22, 30–32.

[97] Mr. Cohn voluntarily dismisses his direct fraud and direct conversion claims against Defendant Sun without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). This dismissal does not affect Mr. Cohn's civil RICO claims, aiding-and-abetting claims, or in rem claims, all of which remain fully asserted.

[98] *See, e.g.*, *Stueve Bros. Farms, LLC v. Berger Kahn*, 222 Cal. App. 4th 303, 324 (Cal. App. 2013) ("Liability may also be imposed on one who aids and

California law routinely sustain such claims where the defendant's assistance consists of receiving, holding, moving, or concealing stolen funds, because such conduct substantially furthers both fraud and ongoing conversion.[99]

The Complaint comfortably satisfies this standard. It alleges that Sun exercised dominion and control over six blockchain addresses containing nearly $5 million in commingled pig-butchering proceeds, permitting the strong inference that Sun knew the assets he received were stolen or fraudulently obtained and in fact intended to receive them.[100] It further alleges that the funds were routed to Sun only after passing through a multi-layered laundering pipeline, typical of pig-butchering schemes, and that Sun's wallets served as the terminal repository for the stolen proceeds, enabling the enterprise to retain, conceal, and deploy its criminal revenue. Here, Sun's alleged conduct not only completed the fraud by acting as the destination for Mr. Cohn's stolen digital assets; it also substantially assisted the ongoing conversion by attempting to place the assets beyond Mr. Cohn's

---

abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person.").

[99] *See, e.g.*, *id.*; *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995–96 (9th Cir. 2006) (liability for aiding and abetting fraudulent scheme where defendant knowingly helped facilitate the retention of ill-gotten gains).

[100] TAC, at ¶¶ 27-32.

reach and prevent him from recovering the identifiable USDC tokens traced to Sun's addresses.

## VII.    Alternative Relief

For all the reasons set out above, Sun's Motion should be denied. If, however, the Court finds any of Sun's arguments persuasive, Plaintiff respectfully requests alternate relief to ensure that this case is resolved on the merits and not on an undeveloped or incomplete factual record.

### i.    *Mr. Cohn is entitled to jurisdictional discovery.*

If the Court has any doubt about personal jurisdiction, Plaintiff should be permitted to conduct jurisdictional discovery. The Fifth Circuit authorizes jurisdictional discovery where, as here, the defendant challenges the Court's jurisdiction, and the relevant facts are controverted or unknown.[101]

Sun relies on self-serving factual assertions—for example, that he has never been to the United States, never transacted here, and has no U.S. connections—that the Court cannot credit at this stage. These statements go to the core of the jurisdictional analysis, yet they are entirely untested. Plaintiff has no independent way to verify Sun's identity, his location, or the extent of his business activities and financial ties to the United States or U.S.

---

[101] *Matter of Am. River Transp. Co. LLC*, 533 F. Supp. 3d 355, 362 (E.D. La. 2021) ("If a plaintiff presents factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts[,] plaintiff's right to conduct jurisdictional discovery should be sustained.") (quoting *Fielding v. Hubert Burda Media, Inc*., 415 F.3d 419, 429 (5th Cir. 2005)).

financial infrastructure. These are precisely the types of issues for which jurisdictional discovery is designed. Moreover, the forensic tracing shows that Sun controlled wallets holding nearly $5 million in commingled proceeds of a U.S.-targeted criminal enterprise. Whether Sun used U.S. exchanges, U.S.-based stablecoin infrastructure, U.S. intermediaries, or other domestic channels is highly relevant—and discoverable. At a minimum, Plaintiff should have the opportunity to test the truth of Sun's assertions.

     *ii.*    *In the alternative, leave to amend should be freely granted.*

If the Court identifies any deficiency in the Third Amended Complaint, Plaintiff respectfully requests leave to amend under Rule 15(a)(2). The Rule 15 standard is generous: courts "should freely give leave when justice so requires," and the Fifth Circuit repeatedly emphasizes that leave should be granted absent futility or bad faith.

Neither is present here. While Sun argues that Mr. Cohn has had "three bites at the apple," this ignores the reality of this and other pig-butchering scam cases. Scam victims must fight to identify those who stole from them by issuing subpoenas and tracing their assets through blockchains and around the world. This of course necessitates amendment as additional parties are identified, and the facts are more fully understood.

Since filing the Third Amended Complaint, Plaintiff has obtained additional tracing data, expert analysis, and documentary evidence that could support substantial further allegations. If necessary, Plaintiff could add twenty or more pages of detailed allegations deepening the enterprise

structure, Sun's role in the laundering chain, the movement of funds through U.S. platforms and intermediaries, and the full extent of coordination among enterprise members. If the Court believes additional detail would assist the analysis, Plaintiff can and will amend promptly.

## <u>Conclusion</u>

This Court has personal jurisdiction under RICO's nationwide-contacts framework, Rule 4(k)(2), and the Supreme Court's decision in *Fuld*. The Complaint plausibly alleges Sun's knowing participation in a coordinated pig-butchering enterprise that targeted U.S. victims, stole millions, and funneled the proceeds into the six blockchain addresses he admits he controls. Sun's motion should therefore be denied in its entirety. In the alternative, Plaintiff respectfully requests jurisdictional discovery or leave to amend.

## <u>CERTIFICATION FOR FILING UNDER SEAL</u>

Pursuant to Local Rule CV-5(a)(7), counsel for Plaintiff certifies that a

motion to seal this document was filed on December 9, 2025.


Dated:  December 9, 2025                    Respectfully submitted,

                                           THE HODA LAW FIRM, PLLC


                                           Marshal J. Hoda, Esq.
                                           Tx. Bar No. 2411009
                                           3120 Southwest Fwy. Ste. 101
                                           PMB 51811
                                           Houston, TX 77098
                                           o. (832) 848-0036
                                           marshal@thehodalawfirm.com

                                           *Attorney for Plaintiff*