## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | |
|---|---|
| Bruce Cohn,<br><br>*Plaintiff*,<br><br>v.<br><br>Anna Popescu, *et al.*,<br><br>*Defendants*. | Case No. 1:24-CV-00337<br><br><br><br>**Affidavit of<br>Evan Cole** |

I, Evan Cole, state and swear as follows.

**I.      Introduction**

1.      My name is Evan Cole. I am of sound mind and capable of making this Affidavit. I have personal knowledge of the facts stated herein.

2.      I am the Head of Investigations at The Hoda Law Firm, PLLC. I am experienced in blockchain investigations and am knowledgeable about the pig-butchering scam epidemic. I hold the Chainalysis Cryptocurrency Fundamentals and Chainalysis Reactor Certifications, and the Lukka Crypto Asset Investigation I Certification.

**II.      Pig-Butchering Scams**

3.      Pig-butchering scams are a type of online investment fraud in which the perpetrators convince the victim to 'trade' in cryptocurrencies using

fake-but-realistic-looking online platforms that the perpetrators control. But no 'trading' ever occurs. The perpetrators simply steal the victim's money, then disappear.

4.    Pig-butchering scams follow common patterns that are immediately recognizable to experienced investigators. These patterns are examined in a recent academic article titled *Deconstructing a Form of Hybrid Investment Fraud: Examining 'Pig Butchering' in the United States*.[1] This study's authors reviewed the tactics, tools, and methods of operation on display in a database of more than 1,300 news articles and court documents they compiled. The result is what I believe to be the most comprehensive academic study of the pig-butchering epidemic to date.

5.    There is no doubt that Mr. Cohn was the victim of a pig-butchering scam. The Defendants' methods of contact and communication with Mr. Cohn, the transactional structure they employed, and the false reasons they claimed Mr. Cohn's assets could not be returned are all an exact match for the common tactics that I have observed in my own work and that are reflected in the comprehensive typology set out in *Examining Pig Butchering*. A direct comparison between Mr. Cohn's experience and the

_____

[1] Marie-Helen Maras, Emily R. Ives, *Deconstructing a Form of Hybrid Investment Fraud: Examining 'Pig-Butchering' in the United States*, Vol. 5 JOURNAL OF ECONOMIC CRIMINOLOGY 1-19 (2024) (henceforth "*Examining Pig Butchering*"). I have attached a true and correct copy of this study as <u>Attachment 1-A</u> to this Affidavit.

typology developed by the authors of *Examining Pig Butchering* is described in detail below.

6.      Pig-butchering scams are epidemic. Last year, the FBI received 41,557 reports of cryptocurrency-related investment fraud.[2] These victims collectively reported $5.8 billion in losses in a single year.[3]  The FBI has reported a 29% increase in pig-butchering victim complaints and a 47% increase in losses from 2023 to 2024.[4] This reporting is consonant with my own professional experience.  My firm receives dozens of inquiries from pig-butchering victims each month. Our experience is that law-enforcement resources have been overwhelmed by the scale of this epidemic, such that most victims receive no response to their law-enforcement reports. For thousands or tens of thousands of pig-butchering victims, private investigation and civil lawsuits are their only hope for recovery.

7.      In addition to detailing scammers' common tactics, *Examining Pig Butchering* collects information about the identities, locations, and organizational structures of pig-butchering perpetrators and their criminal syndicates. The criminal bosses who control these syndicates force human-trafficked victims to carry out pig-butchering scams in Cambodia, Laos,

---

[2] Federal Bureau of Investigation Internet Crime Complaint Center, *2024 Internet Crime Report* (henceforth "*2024 IC3 Report*"), p. 36. A true and correct copy of this report is attached as <u>Attachment 1-B</u> to this Affidavit.

[3] *Id.*

[4] *Id.*

Thailand, Malaysia, and other locations in Asia, where the pig-butchering business model originated.[5]

8.    These criminal bosses have become rich by stealing from the American middle class.[6] These foreign criminals specifically target American victims and relish the opportunity to steal from them.[7] Human-trafficking victims released from the pig-butchering scam compounds have reported that each day, before their 'work' began, their bosses urged them to "cripple the U.S. economy," and to conceive of their campaign against U.S. citizens as "World War III."[8]

9.    These enterprises take a corporatized structure with well-defined roles.[9] Suppliers use legal and illegal data channels to procure

---

[5] *Examining Pig Butchering*, p.8 (describing geographic dispersion of pig-butchering organizations).

[6] Poppy McPherson & Tom Wilson, *Crypto Scam: Inside the Billion-Dollar 'Pig-Butchering' Industry*, REUTERS, available at: https://www.reuters.com/investigates/special-report/fintech-crypto-fraud-thailand/ (published Nov. 23, 2023).

[7] THE ECONOMIST, *Opportunity of a Lifetime*, Scam Inc. (podcast), Season 1, Episode 2, available at: https://podcasts.apple.com/lt/podcast/2-opportunity-of-a-lifetime/id1785226676?i=1000689590456 (published February 6, 2025), at timestamp 17:30.

[8] *Id.*

[9] Bella Yu, *Pig Butchering Scams Are Spreading*, AML Rightsource, available at: https://www.amlrightsource.com/resources/pig-butchering-scams-are-spreading (published December 20, 2023); Alastair McCready, *From Industrial-Scale Scam Centers, Trafficking Victims Are Being Forced to Steal Billions*, Vice, available at: https://www.vice.com/en/article/pig-butchering-scam-cambodia-trafficking/ (published July 13, 2022); California Department of Financial Protection and Innovation, "Pig Butchering Scam

personal information used to identify potential scam targets.[10] The suppliers provide this information to the communicators, who use social media or text message to develop lines of communication and personal relationships with their victims.[11] The sophisticated technological infrastructure that the scammers use to perpetrate fraud is developed and maintained by technicians responsible for renting servers, building websites and investment platforms, and deploying fraudulent mobile apps.[12] Finally, the organizations' laundering departments move victims' funds through the blockchain to obfuscate their source and attempt to place them beyond the reach of law enforcement.[13]

### III.    The TrustHFTWallet Scam

10.    *Examining Pig Butchering* lays out a general pattern of events common to pig-butchering scams in which the scammers (i) make contact with their victims on dating apps, through social media, or by unsolicited text message; (ii) spend time (usually weeks or months) developing a close personal or romantic relationship with their victims; (iii) introduce their victims to fraudulent "trading platforms" and coach them in their use; and

---

Playbook"    infographic,    available    at:    https://dfpi.ca.gov/wp-content/uploads/2025/03/Pig-Butchering-Scam-Playbook.pdf

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

finally (iv) abscond with their victims' invested assets.[14] It is notable that no trading or investment every occurs on these scam platforms. They are meticulously designed by the scammers to give the illusion of trading activity, but in reality, the victims' transferred funds are sent straight into the scammers' crypto wallets.

11. The matter currently before the Court is a direct analog to the cases discussed in *Deconstructing Pig Butchering*, as detailed below.

12. <u>*Method of Initial Contact*</u>. In *Deconstructing Pig Butchering*, the authors note that many pig-butchering scams originate on dating apps and websites, before the scammer quickly moves "the conversation to an encrypted chat site."[15] Then, "after a few weeks of developing a relationship, the scammer will begin asking about the victim's finances."[16] The same pattern is on display here. I personally reviewed Mr. Cohn's and Popescu's communications, where I observed the above sequence of events play out exactly as described. Mr. Cohn and Popescu met on Millionaire Match, a popular online dating service for high-net-worth individuals. At Popescu's urging, they soon moved their conversation to WhatsApp, an encrypted messaging application. After messaging regularly and developing a rapport,

---

[14] *Id., passim*.

[15] *Id.*, p. 3, § 2.3 (quoting AUSTRALIAN COMPETITION AND CONSUMER COMMISSION, *Targeting scams: report of the ACCC on scams activity 2022,* 2023 (p. 32). Accessible at: https://www.accc.gov.au/system/files/Targeting+scams+2022.pdf

[16] *Id.*

Popescu used Mr. Cohn's interest in cryptocurrency investment opportunities to introduce him to the TrustHFTWallet platform.

13.    *"Training" of Victim*. The authors of *Deconstructing Pig Butchering* note that pig-butchering scammers often invest considerable time in "training" their victims on the fraudulent trading platforms. Their analysis found that scammers "walked victims through the process of investing (e.g., by providing screenshots of their screens or assisting them through videos)," even allowing victims to withdraw small amounts initially in order to build trust in the platform.[17]

14.    In reviewing Mr. Cohn's communications with Popescu, I observed that she sent him numerous screenshots over the course of several days showing him how to establish an account on the legitimate TrustWallet platform and how to navigate the platform's in-app browser to the fraudulent TrustHFTWallet platform, and provided precise instructions for how to transfer his cryptocurrency assets to blockchain addresses provided by the TrustHFTWallet platform's customer service. Popescu claimed that these transfers would be used to fund Mr. Cohn's investment account. At every step of the process, Popescu personally and in great detail instructed Mr. Cohn exactly how to transfer his assets to blockchain addresses associated with the fraduent TrustHFTWallet trading platform.

---

[17] *Id.,* p. 11, § 4.4.4.1.5.

15.    _Legitimizing the Platform._ One of the tactics of pig-butchering scammers detailed in _Deconstructing Pig Butchering_ is the use of fraudulent domains or websites that mimick legitimate financial services platforms. This appearance of authenticity obscures the scammers' criminal intentions and quells apprehensions victims may have about investing on the platforms.[18] The Defendants employed this same tactic here.

16.    Mr. Cohn was induced to invest on a fraudulent trading website that bore all the trappings of a legitimate money services platform. I have attached a capture of the TrustHFTWallet application used by Mr. Cohn as Attachment 1-C to this Affidavit. This platform was accessed through the legitimate TrustWallet's in-app browser, which enables users to connect to "dApps," or decentralized applications, programs which operate on a blockchain rather than on websites hosted on centralized web servers. Users can use in-app browsers like TrustWallet's to access legitimate dApps, like Uniswap or Ethereum Name Service, but they can also be directed to malicious applications like the TrustHFTWallet platform. Mr. Cohn was instructed to use TrustWallet's in-app browser to access the TrustHFTWallet platform, which was designed to look and function the same as the legitimate TrustWallet platform, using a similar domain name and even using the same shield logo as the legitimate TrustWallet platform.

---

[18] _Id._, p. 12, § 4.4.4.4.

17.    _Pulling the Rug._ Mr. Cohn transferred over $2,400,000 to the TrustHFTWallet platform before attempting to withdraw a substantial portion of the profits that the platform led him to believe he had earned. Upon doing so, he was told that he would have to upgrade his account to "VIP2" status to avoid his account being flagged as high-risk when conducting large withdrawals. He was informed that, if he didn't complete the VIP2 upgrade within one month, his account would be prevented from performing further transactions, and that he would then be required to complete the VIP2 upgrade to close his account and withdraw all the funds in it.

18.    This is, again, analogous to the many cases surveyed in _Deconstructing Pig Butchering_. The authors describe how after victims have invested in the fraudulent trading platform, and then attempt to withdraw their purported earnings, they encounter customer service issues and, "to obtain as much money as possible from victims, they are asked to pay fees, penalties, taxes and/or other charges when they attempt to withdraw."[19] In one case, a victim was "asked to pay a 'risk deposit' fee after requesting to withdraw. . . his funds. Once this was paid, he attempted to withdraw the money, only to be asked to pay another fee."[20] Another victim was told to pre-

---

[19] _Id.,_ p. 13.

[20] _Id._, p. 14, § 4.4.5.5.

- 9 -

pay taxes on her requested withdrawal, but was not allowed to deduct the required taxes from the purpoted gains in her account.[21]

19.    In sum, I have reviewed the allegations in Mr. Cohn's Third Amended Complaint, the evidence provided by Mr. Cohn in the course of investigating his loss, and the cases discussed in *Examining Pig Butchering*. Based on these materials and my professional experience investigating dozens of pig-butchering fraud cases, I have concluded beyond any doubt that Mr. Cohn's loss was the result of a textbook pig-butchering scam.

## IV.    Blockchain Investigation

20.    I performed a blockchain investigation into the flow of Mr. Cohn's funds. After making an initial transfer of $99,801 USDT on June 20, 2024, to the receiving address provided to him by the TustHFTWallet scammers, Mr. Cohn's assets were funneled through a series of transfers that terminated at a Binance deposit address (the "Binance Receiving Account"). I have attached a graph prepared using Chainalysis Reactor showing this flow of funds as Attachment 1-D.

21.    The Court subsequently authorized Mr. Cohn to issue a subpoena to Binance requesting information about the Binance Receiving Account. Binance's production in response to this subpoena revealed that an individual named ████ owned the Binance Receiving Account. Binance's production identifying ███ is attached as Attachment 1-E to this Affidavit.

---

[21] *Id.*

Based on my knowledge of the strategies of pig-butchering scammers and my experience investigating pig-butchering cases, I believe ███ is a member of the criminal syndicate that victimized Mr. Cohn. ███'s Binance account received almost $40 million in deposits in a three-month period in 2024, the majority of which were round-number deposits of between $80,000 and $100,000.[22] These deposits occurred in clusters of around four to six $80- to $110,000 deposits on average, on the same day, within the span of a few minutes. These hundreds of deposits correspond to hundreds of internal swaps from one cryptocurrency token for another, and immediate withdrawals to private, non-exchange-affiliated cryptocurrency addresses. This account activity mirrors the patterns and money-laundering red flags noted in the Financial Action Task Force's 2020 report on indicators of money laundering and terrorist financing using virtual assets.[23]

22.    Particularly significant is the fact that ███ provided a Macau identification card to Binance. Macau is known to be a hotspot for the laundering of the proceeds of pig-butchering scams.[24] One of the few pig-

---

[22] Attachment 1-E.

[23] FATF (2020), *Money Laundering and Terrorist Financing Red Flag Indicators Associated with Virtual Assets*, FATF, Paris, France, https://www.fatf-gafi.org/publications/fatfrecommendations/documents/Virtual-Assets-Red-Flag-Indicators.html

[24] Feliz Solomon, *The Elusive Crime Boss Linked to Billion-Dollar 'Pig-Butchering' Scams*, The Wall Street Journal, available at: https://www.wsj.com/world/china/china-mafia-broken-tooth-wan-kuok-koi (published Dec. 29, 2024).

butchering "bosses" who has been identified publicly is a Macau native, and is known to transact business there.[25]

23.    Binance's production detailed ██████s transaction history in the period following his receipt of Mr. Cohn's assets. I analyzed and traced ██████s outgoing transactions during this period using the Chainalysis Reactor and Lukka Investigator blockchain tracing programs. I determined that portions of Mr. Cohn's USDT assets were "swapped" for USDC by ██████ in his Binance account. ██████ subsequently proceeded to transfer USDC outward from his account to thirteen intermediate addresses, and from there the assets were consolidated in six USDC addresses, where they remained as of the date of my investigation (the "Target Addresses").[26] The Lukka Investigator tracing report analyzing ██████'s outgoing transactions is attached as Attachment 1-F to this Affidavit. The Target Addresses collectively hold USDC worth over $4.9 million. The Target Addresses are:

- ████████████████████████
- ████████████████████████
- ███████████████████████
- ████████████████████████
- ████████████████████████
- ████████████████████████

---

[25] *Id.*

[26] Attachment 1-D.

24.    USDC has unique characteristics that are relevant here. It is a "stablecoin," a cryptocurrency asset the value of which is tied to the value of the U.S. dollar. In essence, one USDC token will always equal approximately $1. Crucially, unlike well-known crypto "coins" such as Bitcoin or Ethereum, USDC is a "token" that is issued and managed by a central authority: Circle Internet Group, Inc. ("Circle"), a United States business entity. Circle has the ability to freeze any USDC asset at any address with the click of a button. Circle has done so in this case in response to the Court's prior freezing order and preliminary injunction.

## V.    Parallels with Ongoing Seizure Cases

25.    At a high level, Mr. Cohn's assets at issue here moved in a series of four primary steps: the initial transfer from Mr. Cohn to the scammer-provided blockchain address (the "Initial Receiving Address"), the ensuing "hops" in which the scammers moved those assets through a series of further blockchain addresses, the arrival of those funds at the Binance Receiving Account, and the transfer of those funds from Binance to a group of "pooling addresses," addresses that received large sums of assets and held them there with no other activity.

26.    This same pattern of laundering recurs in pig-butchering cases, as illustrated in seizure cases initiated by the U.S. government. To take one example, in June 2025, the United States filed a forfeiture action against more than $225,000,000 worth of USDT, a cryptocurrency token created and

issued by Tether.[27] The government's Complaint details the investigative process which led to the identification of these funds. Relevant to this Affidavit is the movement of stolen funds identified by investigators in the San Francisco Field Office of the United States Secret Service. The funds the victims sent to the Initial Receiving Addresses were initially transferred by the scammers through a series of intermediary addresses, before arriving at accounts at OKX, a leading cryptocurrency exchange.[28] The OKX accounts then transferred consolidated groups of illicit funds through a final layer of intermediary addresses into seven aggregating addresses that between them held the more than $225,000,000 worth of USDT. The balance of each address ranged from $2.1 million USDT to $87.5 million USDT.[29] Law enforcement investigators specifically noted this "pattern of activity where funds were thoroughly laundered through exchanges … before being withdrawn and then left unspent or idle at un-hosted virtual currency addresses."[30]

27.    To take another example, in January 2025, the United States issued a seizure warrant for approximately $1.3 million worth of USDT representing proceeds from an alleged pig-butchering scam.[31] USSS Special

---

[27] *United States v. Approximately 225,364,961 USDT*, No. 1:25-cv-01907 (D.D.C.), Dkt. 1.

[28] *Id.*, ¶ 51.

[29] *Id.*, ¶ 52.

[30] *Id.*, ¶ 168.

[31] *United States v. 1,285,540.357235 USDT*, No. 2:25-sw-00032 (E.D. Cal.), Dkt. 1.

Deputy U.S. Marshal David Berry submitted an affidavit supporting the issued seizure warrant, in which he detailed his findings as to the flow of victims' funds once transferred to the scammer-provided blockchain addresses. Berry conducted a blockchain investigation into the transfer of victim RB's assets and encountered a similar pattern. Here, RB transferred bitcoin to addresses provided by the fraudulent trading platform. Those assets were then transferred to an address associated with an account at the ChainUp cryptocurrency exchange, where they were swapped for USDT, transferred out of the ChainUp account on the Tron network into an address and pooled with other assets, then transferred in two hops to a final pooling address, which the USSS identified and froze in cooperation with Tether.[32]

28.    The parallels to Mr. Cohn's case are clear. In both instances described above, the subject funds were transferred by the scammers through a series of initial intermediary addresses into accounts at cryptocurrency exchanges located outside of the United States. Like ████████s, these accounts showed activity involving high transaction values, volumes, or both; swaps from one virtual asset to another; and large withdrawals occuring within minutes of the receipt of large deposits.[33] From those cryptocurrency

---

[32] *Id.*

[33] *United States v. Approximately 225,364,961 USDT*, No. 1:25-cv-01907 (D.D.C.), Dkt. 1; *United States v. 1,285,540.357235 USDT*, No. 2:25-sw-00032 (E.D. Cal.), Dkt. 1.

exchange accounts, the funds were then moved into clusters of aggregating addresses where large amounts of assets were held without further activity.

29.    This pattern of tracing, combined with the known recurring structures that pig-butchering syndicates take as described above, show that the six Target Addresses that have been frozen in this case were very likely pig-butchering "pooling" addresses that Wei-Ning Sun controlled for the benefit of the TrustHFTWallet syndicate.[34]

## VI.    Location of Contacts

30.    Millionaire Match is a service offered by SuccessfulMatch.com, Inc., a Delaware-based corporation.[35] Millionaire Match's headquarters are located at Mountain View, California.

31.    The phone number used by Anna Popescu is (818) 275-8089, a Los Angeles area code. The phone service provider used by Popescu was

---

[34] Bella Yu, *Pig Butchering Scams Are Spreading*, AML Rightsource, available at: https://www.amlrightsource.com/resources/pig-butchering-scams-are-spreading (published December 20, 2023); Alastair McCready, *From Industrial-Scale Scam Centers, Trafficking Victims Are Being Forced to Steal Billions*, Vice, available at: https://www.vice.com/en/article/pig-butchering-scam-cambodia-trafficking/ (published July 13, 2022); California Department of Financial Protection and Innovation, "Pig Butchering Scam Playbook" infographic, available at: https://dfpi.ca.gov/wp-content/uploads/2025/03/Pig-Butchering-Scam-Playbook.pdf

[35] Attachment 1-G, Millionaire Match service agreement and SuccessfulMatch.com, Inc. Delaware corporate registry information

- 16 -

Bandwidth.com.[36] Bandwidth.com is a Delaware corporation whose headquarters are located in Raleigh, North Carolina.[37]

32.    WhatsApp Messenger is a service of WhatsApp LLC, a subsidiary of Meta Platforms, Inc. WhatsApp LLC is a Delaware corporation[38] whose headquarters are in Menlo Park, California.

33.    Gmail is an email service offered by Alphabet, Inc. Alphabet, Inc. is a Delaware corporation[39] headquartered in Mountain View, California.

34.    TrustHFTWallet.com used Amazon Web Services as its Domain Name Service provider. Amazon Web Services, Inc. is a Delaware corporation.[40] Its headquarters are in Seattle, Washington.

35.    Circle Internet Group, Inc. is a Delaware corporation[41] headquartered in New York, New York.

---

[36] Attachment 1-H, CarrierLookup and Spokeo reports for Popescu's phone number

[37] Attachment 1-I, Bandwidth Inc. SEC Form 8-K

[38] Attachment 1-J, WhatsApp LLC Delaware corporate registry information

[39] Attachment 1-K, Alphabet, Inc. Certificate of Incorporation

[40] Attachment 1-L, Amazon Web Services, Inc. Delaware corporate registry information

[41] Attachment 1-M, Circle Internet Group, Inc. Delaware corporate registry information

36.    Bruce Cohn used Coinbase to send crypto assets to TrustHFTWallet at Anna Popescu's direction.  Coinbase is a Delaware corporation headquartered in California.[42]

37.    Bruce Cohn used the Kraken cryptocurrency exchange to send crypto assets to TrustHFTWallet at Anna Popescu's direction. Kraken is a Delaware corporation headquartered in Cheyenne, Wyoming.[43]

38.    Bruce Cohn used Strike.me to send crypto assets to TrustHFTWallet at Anna Popescu's direction. Strike.me is a service offered by Zap Solutions, Inc., a Delaware corporation[44] whose headquarters are in Chicago, Illinois.

---

[42] <u>Attachment 1-N</u>, Coinbase Global Inc. Delaware corporate registry information

[43] <u>Attachment 1-O</u>, Kraken (Payward Inc.) Delaware corporate registry information

[44] <u>Attachment 1-P</u>, Zap Solutions Inc. Delaware corporate registry information

# VERIFICATION

I, Evan Cole, hereby verify and declare under penalty of perjury that

the foregoing is true and correct.

_____
Evan Cole

December 9, 2025
_____
Date

State of Florida

County of Broward

Sworn to (or affirmed) and subscribed before me by means of online notarization,

this 12/09/2025 by Evan Cole.

Notarized remotely online using communication technology via Proof.

Abigail Louise Miller

___ Personally Known OR ___✔ Produced Identification

Type of Identification Produced __DRIVER LICENSE

ABIGAIL LOUISE MILLER
Notary Public - State of Florida
Commission # HH 308468
Expires on September 5, 2026

- 19 -

**Attachment 1-A**

Journal of Economic Criminology 5 (2024) 100066



Contents lists available at ScienceDirect

## Journal of Economic Criminology

journal homepage: www.journals.elsevier.com/journal-of-economic-criminology

---

# Deconstructing a form of hybrid investment fraud: Examining 'pig butchering' in the United States ☆



Marie-Helen Maras [a,*,1], Emily R. Ives [b,2]

[a] Department of Security, Fire and Emergency Management and Center for Cybercrime Studies, John Jay College of Criminal Justice, City University of New York, 524 W. 59th Street, Haaren Hall, Room 43311, New York, NY 10019, United States
[b] Program in Cognitive Psychology, University of Virginia, United States

| ARTICLE INFO | ABSTRACT |
|---|---|
| *Keywords:*<br>Pig butchering<br>Hybrid investment fraud<br>Cryptocurrency<br>Cyber-enabled crime<br>Cyber-enabled fraud | Cyber-enabled fraud has transformed, becoming more complex and making it harder for targets and law enforcement to detect its occurrence. This study aims to recontextualize a major manifestation of this transformation, a crime called hybrid investment fraud, colloquially known as pig butchering. Hybrid investment fraud describes a cyber-enabled fraud whereby criminals gain the trust of victims by forming connections and relationships, and then exploit this trust by using a series of confidence building and coercive measures designed to encourage victims to continuously invest in securities or commodities until they become unable or unwilling to continue to make payments or the offenders become unreachable. This study further aims to address the existing knowledge gap by focusing on understudied elements of this fraud, such victim and offender characteristics and the ways hybrid investment fraud is perpetrated. To achieve this, we conducted an in-depth analysis of more than 1,300 news articles and court documents between January 1, 2018, and November 1, 2023, to identify 59 cases of hybrid investment fraud targeting victims in the United States. This article both situates hybrid investment fraud within the broader fraud literature and conducts a comprehensive of analysis of hybrid investment fraud cases to identify the types of hybrid investment fraud committed, their impact, victim and offender demographics, and offenders' tactics, tools, and methods of operation. The findings from this study can inform criminal justice practices and future research of this fraud. |

---

## 1. Introduction

Online deceptive practices are perpetrated for various reasons. As Levine et al. (2010) identified in their study on deception, "people lie for a reason" (p. 272). While lying is not illegal, lies could strategically be used to facilitate the commission of a crime. The deceptive tactics used online are strategically designed with particular ends in mind, often, but not exclusively, financial in nature.

Countries all over the world have experienced cyber-enabled fraud, which involves the use of information and communication technology (ICT) to engage in illegal acts that result in a loss of property. A relatively new term that has been used to describe a specific form of cyber-enabled fraud in the United States is 'pig butchering.' According to the Financial Crimes Enforcement Network (hereafter FinCEN), this fraud

resemble[s] the practice of fattening a hog before slaughter. The victims in this situation are referred to as 'pigs' by the …[offenders] who leverage fictitious identities, the guise of potential relationships, and elaborate storylines to 'fatten up' the victim into believing they are in trusted partnerships. The …[offenders] then refer to 'butchering' or 'slaughtering' the victim after victim assets are stolen, causing the victims financial and emotional harm (FinCEN, 2022, p. 1).

While the term itself is not new in the country in which it originated – China (the term in Chinese is Shā Zhū Pán), it has recently become used with more frequency in U.S. news reports, court documents, and government publications. There is currently a dearth in academic literature studying this form of fraud, especially in the United States. This

---

☆ Funding for this project has been provided by the Center for Cybercrime Studies, John Jay College of Criminal Justice, City University of New York.
* Corresponding author.
*E-mail addresses:* mmaras@jjay.cuny.edu (M.-H. Maras), xby5us@virginia.edu (E.R. Ives).
[1] ORCID: 0000-0003-3428-4622
[2] ORCID: 0009-0006-1494-5461

https://doi.org/10.1016/j.jeconc.2024.100066
Received 29 December 2023; Received in revised form 21 April 2024; Accepted 15 May 2024
2949-7914/© 2024 The Author(s). Published by Elsevier Ltd. This is an open access article under the CC BY-NC-ND license (http://creativecommons.org/licenses/by-nc-nd/4.0/).

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

research seeks to fill this gap by engaging in an exploratory study of pig butchering incidents in the United States. Specifically, this article first situates the cyber-enabled fraud of pig butchering in the broader academic literature on fraud. It then conducts an in-depth analysis of court documents and new articles to identify the elements of this fraud, impact of the fraud, victim and offender characteristics, and tactics, tools, and methods of operation of offenders. The motivating research questions for this analysis are: Who are the offenders and targets in pig butchering? Is pig butchering committed by lone actors, dyads, or by organized criminal groups? What are offenders' tactics, tools, areas of operation, and modus operandi? The findings can be used to inform criminal justice practices and future research.

## 2. Fraud literature

Fraud is a crime that involves the use of tactics designed to misrepresent facts with the intention of persuading targets to provide offenders with something that is considered of value to the offenders. Fraud that involves the use of ICT to enhance and/or facilitate a fraud is known as cyber-enabled fraud. Offenders who engage in cyber-enabled fraud adopt various online personas, identities, and backstories to target individuals across demographics (Button and Cross, 2017). Frauds, including cyber-enabled frauds (i.e., frauds facilitated and enhanced by ICT) have evolved over the years, particularly perpetrators' tactics, targets, and methods of operation.

### 2.1. Cyber-enabled fraud

Cybercrime is frequently defined by taxonomies aimed at identifying and distinguishing features of crimes targeting and/or committed using ICT. There is no universal definition of cybercrime and no universally accepted taxonomy. Various definitions and typologies have been proposed (for a detailed review and critique of these typologies, see Sarkar and Shukla, 2023). Due to the breadth of crimes considered as cybercrime, Gordon and Ford (2006) proposed a continuum of cybercrime, whereby on one end, crimes only have peripheral technological aspects, and on the other end, crimes are entirely or "almost entirely technological in nature" (p. 3). Gordon and Ford (2006) divided cybercrime into two types - Type I and Type II. Type I includes cybercrimes such as "phishing attempts, theft or manipulation of data or services via hacking or viruses, identity theft, and bank or e-commerce fraud based upon stolen credentials," among others (Gordon and Ford, 2006, p. 2). Type II includes cybercrimes like "cyberstalking and harassment, child predation, extortion, blackmail, stock market manipulation, complex corporate espionage, and planning or carrying out terrorist activities online" (Gordon and Ford, 2006, pp. 2–3).

McGuire and Dowling (2013) view cybercrime as an "umbrella term" that includes cybercrimes that fall under two overarching categories: cyber-dependent crime and cyber-enabled crime (p. 5). Cyber-dependent crime includes crimes that target "the confidentiality, integrity, and availability of systems, networks, and data that would not be possible without the use of technology" (Maras, 2024, p. 9). Cyber-enabled crime is a term used to describe crime that is typically perpetrated in the physical world but is enhanced by "technological integration" and facilitated by technology (Sarkar and Shukla, 2023). McGuire and Dowling's (2013) categorization of cybercrime, which is based on the role of technology in crime, is most widely used. Europol (2018), Interpol (see Cross et al., 2021), and other national, regional, and international agencies and organizations commonly use these terms to broadly describe the acts of cybercrime based on whether the criminal acts would not have been possible without the advent of ICT (*cyber-dependent crime*) and whether the criminal acts represent traditional crimes that are enhanced and facilitated by ICT (*cyber-enabled crime*). The United Nations Office on Drugs and Crime (UNODC) also uses these cybercrime categories in documents (e.g., UNODC, 2022) and has used alternative categories of cybercrime, such as "acts against

the confidentiality, integrity and availability of computer data or systems" (i.e., cyber-dependent crime); "computer-related acts for personal or financial gain or harm" (i.e., cybercrime committed "for personal or financial gain or harm" (UNODC, 2013, p. 16); and "computer-content related acts" (i.e., cybercrime that "involve[s] illegal content"; UNODC, 2019) (see also UNODC, 2013). The latter two categories of cybercrime are considered subcategories of cyber-enabled crime.

By contrast, Wall (2007) proposed three categories of cybercrime: *computer integrity crime* (which encompasses cyber-dependent crime, such as hacking and distributed denial of service attacks); *computer associated crime* (covering cyber-enabled crime, such as cyber theft); and *computer content crime* (covering cyber-enabled crime, such as child sexual abuse material). The latter two categories are similar to the subcategories of cyber-enabled crime that UNODC used in 2013, "computer-related acts for personal or financial gain or harm" and "computer-content related acts," respectively (UNODC, 2013; see also UNODC, 2019). In his later work, Wall (2015) identified cybercrimes as occurring over a spectrum, with cyber-dependent crimes on one end of the spectrum and cyber-assisted crimes (i.e., crimes whereby ICT plays an incidental or ancillary role in the crime) on the other end of the spectrum. Between these two ends of the continuum are a range of cyber-enabled crimes (e.g., various forms of cyber-enabled fraud). In this work, he rightly pointed out that these categories merely described the "level of mediation of technology" and further differentiation was needed to identify the method of operation (modus operandi or M.O.) of offenders (Wall, 2015). For this reason, he identified the need to distinguish between *crimes against the machine* (i.e., cyber-dependent crimes), *crimes using the machine* (i.e., cyber-enabled crimes consisting of "computer-related acts for personal or financial gain or harm"), and *crimes in the machine* (i.e., cyber-enabled crimes that are "computer-content related acts"). Wall (2015) further noted that beyond the consideration of the M.O. of offenders, the victim group (i.e., nation state, business, or individual) targeted by the cybercrime needs to be considered as well.

Echoing Wall's (2015) sentiment for the need to create a more robust typology that moves beyond the role of ICT in crime, the development of cybercrime classifications based on offender motivation and intent have been proposed by various scholars who criticized Gordon and Ford's (2006) and McGuire and Dowling's (2013) categories as employing "arbitrary attributes" (Lazarus et al., 2022, p. 384) and "obscur[ing] the meaning of each cybercrime they represent" (Lazarus, 2019, p. 18, citing Ibrahim, 2016). To better understand the underpinnings and context of specific cybercrimes, while Lazarus (2019) argues serve as a "resource in understanding connections between gender and" cybercrime (p.19, citing Citron, 2014; Jane, 2016; Lazarus and Okolorie, 2019), the Tripartite Cybercrime Framework (TCF) was created by Ibrahim (2016). This framework takes into consideration offender motivation that categorizes cybercrime into (Lazarus et al., 2022, pp. 385–386):

- *socioeconomic cybercrime* (i.e., "the computer or/and Internet-mediated acquisition of financial benefits by false pretense, impersonation, manipulation, counterfeiting, forgery, or any other fraudulent representation of facts such as online fraud");
- *psychological cybercrime* (i.e., "digital crimes that are primarily psychologically driven to cause shock, distress or harm to a person, where monetary gain is not the primary objective," such as cyberstalking, cyberharassment, and cyberbullying); and
- *geopolitical cybercrime* (i.e., "cybercrimes that are fundamentally political in nature and involve agents of the state…and/or their representatives engaged in acts;" for example, cyberespionage).

Ibrahim (2016) acknowledged that specific types of cybercrime could fit into two or three of the above-mentioned categories. Other scholars also acknowledge that the "apparent boundaries between the TCF categories are somewhat blurred" and thus the framework can be

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

viewed "as a loose grouping of cybercrime types" (Lazarus et al., 2022, p. 393). For example, image-based sexual abuse perpetrated using artificial intelligence (AI) manipulated media (e.g., deepfakes) can be perpetrated for a myriad of reasons, including personal, social, economic, and political reasons. The same holds true for fraud. The motivations for fraud vary by fraud type and offender. Even romance frauds, which have been predominantly associated with economic motivations in the literature, could be primarily psychologically motivated (e.g., catfishing where offenders primarily seek to form emotional bonds with others under false pretenses; not driven by monetary reasons) or geopolitically motivated (e.g., targeting politicians to impact elections; Michaelson, 2023). Like the aforementioned examples, hybrid frauds, which combine one or more types of frauds, do not necessarily fit neatly into one of these categories, unless the offenders are motivated for the same reasons (i.e., socio-economic, psychological or geopolitical).

Fraud, like cybercrime, is an umbrella term that encompasses numerous forms of illicit activities committed for a myriad of reasons against various victim groups. For this reason, to better understand pig butchering, we situate this cyber-enabled fraud in existing fraud literature.

### 2.2. Fraud taxonomy

The fraud taxonomy that is used to identify and classify fraud was created in 2015. This typology, developed by the Financial Fraud Research Center at the Stanford Center for Longevity and the Financial Industry Regulatory Authority (FINRA) Investor Education Foundation, classified fraud based on three elements (Beals et al., 2015). First, fraud is classified based on the target of the fraud: individual or organization. The fraud taxonomy only focuses on frauds committed against individuals. The second element of the taxonomy is expected benefit/outcome (i.e., the fraud category). Particularly, fraud committed against individuals is subdivided into several general categories of fraud: consumer investment fraud; consumer products and services fraud; employment fraud; prize and grant fraud; phantom debt collection fraud; charity fraud; and relationship and trust fraud (Beals et al., 2015). These general categories of fraud are further subdivided by the specific type of fraudulent item/transaction/relationship (i.e., the type of fraud). According to Beals et al. (2015), the seven general categories of fraud are considered "comprehensive and mutually exclusive, such that all possible examples of individual financial fraud committed against persons … should fall into one and only one of the …seven categories" (p. 11).

However, hybrid frauds do not fit neatly into one of the existing categories included in the fraud typology. One such hybrid fraud involves the convergence of romance fraud and investment fraud. Romance fraud is a form of fraud where offenders foster online relationships with victims "for the purpose of deceiving unsuspecting victims to extort money from them" (Coluccia et al., 2020, p. 25 cited in Cross, 2023, p. 2). Romance fraud, a subcategory of relationship and trust fraud that exploits a personal relationship with the target, has the expected outcome of creating a fake relationship with the target and exploiting this relationship (Beals et al., 2015). Offenders perpetrating romance fraud create fake online personas or profiles (complete with fake image and fraudulent personal narratives) and identify targets to engage in a tactic known as 'catfishing,' whereby offenders prey on targets' desire for emotional connections and companionship (Whitty and Buchanan, 2016; Buchanan and Whitty, 2013), and lure them into fake relationships (Maras, 2017). The goal is often – but not always – to obtain something of value from targets (value, however, is determined by the offenders on an individual basis). In the United States, the forging of online romantic relationships is increasingly common (Wiederhold, 2020), which exposes individuals to various forms of romance fraud. Exposure to investment fraud is also quite common in the U.S. (Fletcher and Consumer Protection Data Spotlight, 2023).

Investment frauds are defined as "[d]eceptive practice[s] that induce… investors to make purchases based on false information. These … [frauds] usually offer the victims large returns with minimal risk" (IC3, 2021, p. 31). These investments involve a range of commodities and securities. Several terms have been used to describe the convergence between romance fraud and cryptocurrency investment fraud, including pig butchering, cryptorom, and romance baiting.

### 2.3. Pig butchering

The range of frauds that are considered pig butchering vary by definition and origination. China, where the term pig butchering originated, considers it (Shā Zhū Pán) as

> a form of online fraud, in which scammers gain the trust of victims through making friends and dating online. Through gaining victims' trust, scammers then wait for the opportunity to pull victims into scams such as gambling or financial management to defraud their money. The biggest feature of *Shā Zhū Pán* is to cast a long-term plan for a major return. This process is like fattening pigs and then slaughtering them (China News, 2019, cited in Wang and Zhou, 2023, p. 915).

This definition was broader than the types of fraud identified in the 2021 Internet Crime Complaint Center (IC3) Annual Report as pig butchering. This report identified the incidents where victims reported being subjected to cryptocurrency fraud and 'confidence/romance scams' as pig butchering (IC3, 2021).

Other definitions also view pig butchering as involving the convergence of romance fraud and investment fraud, such as cryptorom and romance baiting. The term cryptorom "is an amalgamation of crypto- from 'cryptocurrency' and -rom from 'romance scam'" (Ducklin, 2021; see also Chandriaiah and Wu, 2021)" (Cross, 2023, p. 5). In Australia, the term "romance baiting" is used to describe frauds that involve the convergence of romance fraud and investment fraud (Cross, 2023; Australian Competition and Consumer Commission, 2023). The Australian Competition and Consumer Commission's (2023) definition of romance baiting describes it as originating from contact via online dating apps. According to their definition, the offender "initially contacts a victim via a dating app, then quickly moves the conversation to an encrypted chat site. After a few weeks of developing a relationship, the scammer will begin asking about the victim's finances and encourage them to participate in an investment opportunity" (p. 32). However, hybrid romance fraud and investment frauds can originate outside of online dating apps. In fact, offenders look for and/or contact targets on social media platforms (Facebook/Meta, Instagram), professional networking sites (e.g., LinkedIn), dating sites (e.g., Hinge, Tinder, and OurTime), and communication platforms (e.g., WhatsApp, Telegram, and WeChat) (Access Wire, 2022; GASO, 2021b; FinCEN, 2023), as well as send unsolicited calls and/or text messages (SMS) to targets (see Image 1).

Targets may also be invited or added to groups and/or sent group messages on social media and communication platforms (GASO, 2021c) (see Image 2 for an example of a group chat invite). GASO (2021c)



**Image 1.** Unsolicited text messages. *Source*: Authors.

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

### Image 2 - Group chat invite



**Image 2.** Group chat invite. *Source:* Authors.

explained how frauds via group chat worked, where a fraudulent 'investment lecturer,' who claimed to be teaching those in the group chat how to invest effectively, engaged with victims in group chats. This 'instructor' used hybrid investment fraud tactics, with the added false sense of security of being in a group setting, to encourage investments under the guise of providing professional advice (GASO, 2021c). Usually, the purpose of these groups is to place targets in an environment that promotes offenders' cryptocurrency investments. The offenders may even have multiple numbers, run multiple accounts, and/or have accomplices who answer targets' questions and falsely claim to have positive experiences with the promoted cryptocurrency investment. These group chats are designed to be environments that make targets feel more at ease since they are led to believe that 'others' are also investing.

While the terms 'cryptorom' and 'romance baiting' emphasize the romance elements of the fraud, the original conception of pig butchering ('Shā Zhū Pán') does not necessarily require that the relationships developed are romantic. The Australian Competition and Consumer Commission's (2023) uses the term 'relationship baiting scam' to refer to investment fraud perpetrated by new online friends. The Global Anti Scam Organization (GASO), which was developed in 2021 in direct response to pig butchering outside of China, also highlighted that not all pig butchering instances describe frauds that began with a romantic relationship between a victim and offender (GASO, 2021b).

#### 2.3.1. Impact of fraud

In the United States, cyber-enabled crime, including various frauds, are reported to the IC3. In 2021, IC3 received 24,299 'confidence fraud/romance scams' reports with an estimated $956 million in losses (IC3, 2021, p. 12). The following year, IC3 (2022) received 19,021 reports of this form of cyber-enabled fraud (Table 1). While there were fewer confidence/romance scams reported in 2022 than in 2021, the number of investment frauds increased that year (Table 1). In 2022, IC3 received 30,529 reports of investment fraud, having increased from 20,561 in 2021, and 8,788 reports in 2020 (see Table 1). The financial losses reported for investment fraud have exponentially expanded from more than $336 million in 2020 to more than $3.3 billion in 2022 (see Table 2). In 2021, IC3 reported that over 4,325 of the reports they received for confidence/romance frauds also included investment and cryptocurrency fraud (IC3, 2021, p. 12).

IC3 does not record pig butchering under the label 'pig butchering' in its reports and does not record hybrid romance fraud and investment fraud as a romance fraud and an investment fraud. Hybrid fraud, rather, is recorded based on the ends sought – that is, the ultimate goal of the hybrid fraud. Because the ends sought are investments, IC3 reports them as an investment fraud.

Specific financial losses for victims of pig butchering were provided in a couple of studies. Wang and Zhou (2023) identified the minimum

and maximum financial loss of the 40 victims identified from their online testimonials at an estimated maximum of $410,000 USD and an approximate minimum loss of $714 USD, and the four victims identified from police reports at a minimum of an estimated $1500 USD and a maximum of approximately $15,000 USD. GASO's (2022) survey revealed an average loss of $155,117 USD experienced by victims internationally (this amount excludes 38 cases where victims reported a fraud loss under $2,500 USD) and average fraud loss experienced by surveyed victims from the United States was $210,760 USD. GASO's (2022) survey results further revealed that over 75% of victims in their sample reported losing "more than half their net worth," while one third accumulated debt because of the fraud.

#### 2.3.2. Victims and offenders

There is limited work that identifies offender and victim data and the average length of hybrid frauds. One study was conducted on Chinese victims who experienced Shā Zhū Pán. For this study data was gathered from 40 online testimonials from Chinese individuals who experienced Shā Zhū Pán and posted about it on a forum, Zhihu. Their sample consisted of 36 women and 4 men. The victims' relationship status included single (21), married (7), and divorced (3) (Wang and Zhou, 2023, p. 924).[3] The victims' online posts revealed that the shortest duration of the relationship between a victim and offender was 2 days, and the maximum duration was 8 months (Wang and Zhou, 2023, p. 924). The study also included four (4) police reported incidents of pig butchering. These cases involved three (3) women, one (1) man and a minimum and maximum duration of the relationship (min. 5 days; max. 29 days) (Wang and Zhou, 2023, p. 924). The age of the victims was not included in the analysis (as it was missing from the online testimonials).

The age group, gender, and relationship status of the targets of pig butchering have been identified in limited academic, governmental, and/or non-governmental works.[4] In Australia, individuals under the age of 35 experienced "almost half of all reported losses to romance baiting" in 2020 (Scamwatch, 2021), which was comparable to findings in China, where victims in their "twenties and thirties" were the primary targets of the fraud (Zuo, 2021, cited in Cross, 2023, p. 6). GASO's (2022) survey of 550 pig butchering victims from around the world revealed a relatively higher concentration of targets between the ages of 25 and 40. GASO's (2022) survey sample included men and women, though women predominantly made up the sample (at 65%). The relationship status of the victims primarily targeted by pig butchering schemes was single (66%), followed by 21% who were married and 12% who were divorced/separated.[5]

The term 'vulnerable' has been used to describe the populations often targeted by perpetrators engaging in pig butchering. We use the term not only to include vulnerable age groups, such as the elderly, but also a wider range of individuals, including those who are emotionally

**Table 2**
Financial Losses for Confidence Fraud/Romance Fraud and Investment Fraud Reported to IC3 (2020–2022).

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Confidence/Romance** | $735,882,192 | $956,039,739 | $600,249,821 |
| **Investment** | $3,311,742,206 | $1,455,943,193 | $336,469,000 |

*Source:* IC3 (2022).

**Table 1**
Number of Confidence Fraud/Romance Fraud and Investment Fraud Reports Received by IC3 (2020–2022).

|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Confidence/Romance** | 19,021 | 24,299 | 23,751 |
| **Investment** | 30,529 | 20,561 | 8,788 |

*Source:* IC3 (2022).

---

[3] Some victims in the study reported their relationship status as uncertain (Wang and Zhou, 2023, p. 924).

[4] IC3 data is not included here as IC3 does not distinguish between pig butchering and traditional investment fraud in victim and offender demographics.

[5] GASO did not explain the missing 1% in the sample.

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

vulnerable (i.e., recently divorced or having marital/familial difficulties), medically vulnerable, and those who are technologically vulnerable (e.g., those who are not well versed in cryptocurrency). This term also includes those who are socially or geographically isolated and cannot facilitate interpersonal interaction through means other than social media. As "Sean Gallagher, a senior threat researcher at the security firm Sophos who has been tracking pig butchering as it has emerged over the past three years…[stated:] 'They go after people who are vulnerable. Some of the victims are people who have had long-term health problems, who are older, people who feel isolated'" (Newman, 2023). Moreover, it is important to note that "the same types of stories and profiles used by romance fraud offenders," which can be used in hybrid investment fraud, continue to be successful, indicating an inability to identify these schemes and an inability for targets to identify themselves as victims (Drew and Webster, 2024).

Nevertheless, victims of pig butchering may not be the only ones who are vulnerable. Specifically, government announcements, alerts, and press releases have stated that pig butchering is "largely perpetrated by criminal organizations based in Southeast Asia who use victims of labor trafficking to conduct outreach to millions of unsuspecting individuals around the world" (FinCEN, 2023, pp. 1–2; see also FBI and IC3, 2023). Further, a report by the United Nations Human Rights Office of the High Commissioner (2023) revealed that human trafficking victims are held in facilities that run online fraud operations in Southeast Asia and forced to engage in online fraud. These documents suggest that the perpetrators of pig butchering may also be victims of a crime and part of a vulnerable population.

### 2.3.3. Stages of pig butchering

Pig butchering transpires in stages. According to Wang and Zhou (2023), pig butchering occurs in three stages: pig hunting, nurturing/grooming, and pig harvesting (pp. 925–934).

- In the *pig hunting phase*, perpetrators identify victims to target. Wang and Zhou (2023) findings revealed that during this stage, perpetrators conduct research with the intention of planning out effective strategies to employ to reap maximum profit, including collecting background information before initiating contact and by inquiring more about the victim within their first few interactions.

- In the second phase, the *nurturing/grooming phase*, Wang and Zhou (2023) identified that perpetrators use pre-written scripts on relationship expectations and resonance techniques that are designed to increase the victim's emotional dependence on the perpetrators. The use of pre-written scripts has also been identified in romance fraud. According to Lazarus et al. (2023), these scripts are frequently obtained "from underground forums" and "are categorized based on the age, ethnicity, and gender of the targets" (p. 13).

Wang and Zhou (2023) identified three "visceral influences" perpetrators target by using resonance techniques to increase the victim's emotional dependence on the perpetrators, and ultimately, persuade them for eventual investment. These visceral influences are a target's "desire to know a stranger show[s]… interest... in them (victims), desire to have a romantic relationship, and desire to be liked by someone with commonalities" (Wang and Zhou, 2023, p. 926). Tactics used to elicit the desired influences include "sharing fabricated personal life details," "increasing the victims' expectations of future romantic relationships," and relating interpersonally to the victim (Wang and Zhou, 2023, p. 926). At this stage, the perpetrators discuss investments and introduce investment opportunities. Moreover, Wang and Zhou (2023) found that perpetrators will also elicit a higher degree of trust from the victim during this stage by invoking "authoritative figures" by way of professional or seemingly professional investment applications/websites and attributing knowledge to professional affiliations. This is similar to the techniques that perpetrators of romance fraud use to establish authority and credibility (Lazarus et al., 2023).

- In the final phase, the *pig harvesting phase*, perpetrators actively encourage victims to invest, often allowing them to invest on the offender's behalf initially or providing a small allowance to begin investing, increasing their confidence and comfort with the process and technology. Wang and Zhou (2023) note that rewards are also used to positively reinforce a target's behavior - particularly, their continued investment of funds.

Throughout the three stages, Wang and Zhou (2023) also found evidence of emotional manipulation by way of alteration in relational attitude or use of contrasting "representational redescription" techniques (i.e., changing tone of the conversation depending on the stage of the fraud) before and after investments are made.

Cross (2023), who focused her research on the convergence of romance fraud and investment fraud (i.e., romance baiting), applied Whitty's (2013) "persuasive techniques model" that "outlines seven stages of romance fraud" and identified which stages are consistent with romance baiting (see , pp. 3 and 5). The seven stages of romance fraud identified by Whitty (2013) and covered by Cross (2023) are as follows:

1. *Motivated to find the ideal partner.* Perpetrators find a victim that is looking for a romantic engagement.
2. *Presented with the ideal profile.* Perpetrators present the victim with a fake and desirable profile.
3. *Grooming process.* Perpetrators use rapport building techniques to establish trust and confidence, ultimately grooming the victim.
4. *The sting.* Perpetrators make a financial request.
5. *Continuation of the scam.* Perpetrators continue the fraud and increase financial requests for various reasons.
6. *Sexual abuse.* Victims are sexual abused. According to Cross et al. (2022), this stage does not always occur.
7. *Re-victimization.* Targets may experience "recovery fraud," a form of re-victimization from a different offender or different fraud (Button and Cross, 2017).

Cross (2023) pointed out that the initial stages of a romance fraud pertain to romance baiting. She specifically highlighted differences in the reasons for requesting money, where unlike romance fraud, requests for money are not premised on emergency situations (e.g., hospital expenses). Cross (2023) further pointed out that romance baiting was not only harder to detect and investigate than romance fraud, but also that 'red flags' were reduced with romance baiting by offering investment opportunities rather than asking for money directly.

Non-governmental and governmental organizations have also identified the stages of pig butchering. GASO (n.d.) also broke down pig butchering in various stages: *packaging* (i.e., perpetrators falsely represent themselves and gain the interest of the victim); *raising* (i.e., perpetrators build and invest time in the relationship with the victim while grooming them to invest); *killing* (i.e., incentives offered to invest money, victims attempt to withdraw their funds and are unable to do so, excuses are given as why payments are needed to obtain funds, and coercive measures used to get victim to invest); and the *killed* stage (i.e., often try to coerce victims into giving them more money that is 'owed to them' and ultimately block the victim). In the U.S., the FinCEN (2023) identified the following methods used by perpetrators of pig butchering: *initial contact with the victim* (to gain victim's confidence and trust); *the investment 'sales' pitch* (convincing the target to invest); *the promise of greater returns* (accumulating victims' funds); and the *'point of no return'* (i.e., stealing the funds once a substantial sum or a target sum is received, and ultimately becoming unreachable and ceasing communications with the targets).

### 2.3.4. What's in a name

The term pig butchering has been criticized both for its lack of sensitivity towards victims but also because it does not adequately

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

conceptualize the crime it aims to describe (Cross, 2023; Whittaker et al., 2024). In solidarity with Cross' (2023) assessment of the crudeness of the term 'pig butchering' and Whittaker et al.'s (2024) assessment of this term as degrading and harmful to victims, we argue against its continued use and propose the use of the term *hybrid investment fraud*, as it: 1) better represents the multifaceted nature of this fraud; 2) encompasses the ultimate goal of this fraud (i.e., investments), which is the way this cyber-enabled fraud is recorded in the United States by IC3; 3) uses the word fraud to describe the crime instead of the widely used 'scam' because a scam is, by definition, not a crime; 4) uses the term fraud to underscore the seriousness of the crime and not minimize or trivialize it (Lazarus et al., 2023); and 5) does not dehumanize victims by equating them to 'pigs' and what happens to them as a 'pig slaughter.' For these reasons, we will refer to 'pig butchering' as hybrid investment fraud hereafter.

### 3. Methods

#### 3.1. Data sources

Hybrid investment fraud is a relatively new phenomenon and has not been reported on extensively. Thus, we cast a wide net to gather a robust data set. We triangulated several diverse sources to obtain the most complete picture possible about hybrid investment fraud. To achieve this, we reviewed news reports and court documents that described instances of hybrid investment fraud. We specifically examined documents between January 1, 2018, and November 1, 2023, as the colloquial term 'pig butchering' started to appear in online reports in 2018. To find documentation of hybrid investment fraud cases with victims in the United States, a private case law database (NexisUni) was used. On NexisUni, we used the following search terms: pig butchering; Shā Zhū Pán; Shāz Hū Pán; and a combination of the terms 'romance scam' and 'investment scam;' 'romance scam' and 'cryptocurrency;' 'investment scam,' 'romance scam' and 'cryptocurrency;' 'trust-based,' 'investment,' and 'scam;' 'cryptocurrency,' 'confidence,' and 'scam;' and 'crypto' and 'catfishing.' As two transliterations for "Shā Zhū Pán" were used in documents, both were searched for, as described above (however, we note the correct term is Shā Zhū Pán). Moreover, results were limited to content from North America and documents written in English. We reviewed the results from our searches, particularly examining news reports under the "news" section and court documents from the "briefs, pleadings, and motions" section of the platform. In the news results, "group duplicates" was turned on. We did not use any web scraping tools as NexisUni does not allow scraping as part of its terms of use. Utilizing this search process, we identified over 1,314 documents that contained combinations of our relevant keywords.

#### 3.2. Data analysis

We reviewed 1,314 documents to identify cases of hybrid investment fraud. Our review was limited to incidents involving victims based in the United States, thus, any article that described hybrid investment fraud but included victims who lived outside of the U.S. were removed. We also removed documents that only provided warnings and tips to avoid hybrid investment fraud and any documents that did not have details about an actual case. To ensure intercoder reliability, the authors reviewed the documents separately, coded the cases separately (i.e., whether the case was a hybrid investment fraud or not), then reviewed their results together. We disagreed on 34 documents and discussed our respective coding to resolve these disagreements. Ultimately, we were able to identify 59 distinct hybrid investment fraud cases with victims in the United States that occurred between January 1, 2018, and November 1, 2023 (see Table 3). Of these incidents, we found court documents for 24 cases, and 35 cases from newspaper articles covering unique instances of hybrid investment fraud carried out on victims within the United States. For the cases we identified in

newspapers, we conducted clearnet searches to find supplemental information about these cases.

Once we identified 59 cases, we conducted a comprehensive qualitative case study analysis. This analysis was motivated by the following research questions: Who are the offenders and targets in pig butchering? Is pig butchering committed by lone actors, dyads, or by organized criminal groups? What are offenders' tactics, tools, areas of operation, and modus operandi?

We developed a codebook with our findings. This codebook included information about the type of fraud, loss associated with the fraud, length of the fraud, victim and offender, and the tools, tactics, and methods of operation of perpetrators of this fraud. To ensure intercoder reliability, the cases were coded and discussed to verify consistency and resolve any disagreements. The authors also reviewed the final coding and conducted a final quality check.

### 4. Findings and discussion

Our in-depth analysis of the cases in our dataset revealed variations in the type of hybrid investment fraud perpetrated, the impact of the fraud, victim and offender demographics, and the methods of operation, including, the tools, and tactics perpetrators used to commit this cyber-enabled crime.

#### 4.1. Type of hybrid investment fraud

Our cases revealed various complex, multidimensional frauds that do not fit within Beals et al. (2015) fraud typology, representing a departure from the one-dimensional conceptions of fraud in this typology, and demonstrating that certain frauds today do not fit neatly into singular categories as required by these designations. Instead, our findings revealed various forms of hybrid investment fraud.

One of these hybrid investment frauds involved romance fraud and cryptocurrency investment fraud. This finding is in line with the literature that identifies this form of fraud as the convergence of romance fraud and investment cryptocurrency fraud (Cross, 2023). Nonetheless, our dataset also included cases that did not involve romance fraud, where only friendships and/or professional relationships were developed. This designation differs slightly from the original conception of Shā Zhū Pán, but cases that are more in line with the original conceptualization were also represented. Specifically, our dataset included cases where the relationship fostered between a victim and offender was friendship, and cases that involved only a professional relationship. These cases illustrate the multidimensional nature of hybrid investment fraud, whereby contacts and connections are made to achieve the end goals - the maximum number of investments to obtain as much money as possible from the victim.

#### 4.2. Fraud impact

The exact amount of the targets' financial losses was not always included in the cases in our dataset. In the cases where this information was included, the financial losses ranged from $22,000 USD to 9.6 million USD. In the case of the smallest reported fraud loss, a man was defrauded out of $22,000 USD by someone he met on the MeetMe dating app (C36, Sophos, 2023). The case with the largest amount of reported financial loss involved a victim who invested 9.6 million USD over four months on what they were led to believe was a legitimate cryptocurrency investment platform (C21). Most of our cases involved victims who invested hundreds of thousands of dollars, which is much higher than the average loss reported internationally (see, for example, GASO, 2022). While GASO (2022) reported an average loss for U.S. victims in the low hundreds of thousands USD, the cases we identified predominantly reported losses in the mid to high hundreds of thousands USD. Our dataset also included multiple cases where the fraud loss to victims was in the millions. While there were two cases (C44 and C40)

M.-H. Maras and E.R. Ives                                                                 Journal of Economic Criminology 5 (2024) 100066

**Table 3**
Cases (*Full citations included in the reference list).

| Case | Citation | Case | Citation | Case | Citation | Case | Citation | Case | Citation |
|------|----------|------|----------|------|----------|------|----------|------|----------|
| C1 | In the Matter of Application by the United States for Seizure Warrant, 2022 | C13 | Leonard Terry Licht v. Tina Ling and Luskey, 2023 | C25 | U.S. Attorney's Office and Central District of California, 2023 *a | C37 | Podkul, 2022**; Farivar, 2022 | C49 | Middle East North Africa Financial Network, 2022 |
| C2 | United States of America v. Approximately 1,360,000.748 Tether et al., 2023 | C14 | United States of America, v. 12,324.84 USDT et al., 2023 | C26 | Kelly, 2023** | C38 | Pawson, 2023b | C50 | Falcon, 2022b |
| C3 | United States of America v. Hailong Zhu, 2023a; United States of America v. Hailong Zhu, 2023b; United States of America v. Hailong Zhu, 2023c; United States of America v. Hailong Zhu, 2023d | C15 | Commodity Futures Trading Commission, v. Cunwen Zhu and Justby International Auctions, 2023 | C27 | Kelly, 2023** | C39 | Middle East North Africa Financial Network, 2023 | C51 | Wang, 2021**,d |
| C4 | United States of America v. 5,012,294.90 in TetherUS et al., 2023 | C16 | State of Indiana v. Xu Xiongju et al., 2023 | C28 | Bartlett, 2023 | C40 | Lee, 2022 | C52 | In the Matter of the Seizure of Funds not to Exceed $351,000.00 et al., 2022 |
| C5 | Gurung, Anjita v. Metaquotes et al., 2023 | C17 | United States of America v. Jin Hua Zhang et al., 2022 | C29 | In the matter of Cresttradenmining Limited ** | C41 | Alabama Securities Commission, 2022 | C53 | In Re Bien, 2022 |
| C6 | United States of America v. 56,382.9700 Tether et al., 2023 | C18 | OKCoin, Elaine Kim Chen Yu et al., 2023f | C30 | In the matter of Forex Market Trade *,g | C42 | Federal Trade Commission FTC, 2021b | C54 | United States of America vs. $811,549.41 et al., 2023 |
| C7 | United States of America v. Approximately 503,349.86 Tether et al., 2022 | C19 | United States of America v. Adebayo, 2023 | C31 | In the matter of MetaCapitals Limited *,i | C43 | Sophos, 2023b | C55 | Albert Abed v. Wei Lin et al., 2023 |
| C8 | United States of America, v. 86,766.00 USDT et al., 2023 | C20 | Zimwara, 2023j | C32 | Armstrong, 2023 | C44 | Faux, 2023 | C56 | United States of America, vs. Zeshawn Stanley, 2023*** |
| C9 | Michael Bullock v. Jessica Doe et al., 2023 | C21 | In the matter of seizure of the domain names simexchr.com et al., 2022; U.S. Attorney's Office, Eastern District of Virginia, 2022*k | C33 | Sophos, 2023a l | C45 | U.S. Attorney's Office, District of New Jersey, 2022* | C57 | U.S. Department of Financial Protection and Innovation, 2022a,m |
| C10 | In the matter of the seizure of up to 489,269.52 Tether et al., 2023 | C22 | Schoeff, 2023 | C34 | Podkul, 2022** | C46 | Lin, 2022 | C58 | U.S. Department of Financial Protection and Innovation, 2022b,n |
| C11 | Brian Hony v. Emma Doe and John Does I-XX et al., 2023 | C23 | Owczarzak, 2023 | C35 | Podkul, 2022** | C47 | Allen, 2021 | C59 | U.S. Department of Financial Protection and Innovation, 2022c,o |
| C12 | Divya Gadasalli v. Jerry Bulasa et al., 2022 | C24 | CE Noticias Financieras English, 2022b | C36 | Podkul, 2022** | C48 | Roose, 2022 | | |

*Court document of case used that the Nexis|Uni news report mentioned details about or referenced.

**More than one case included in the source.

***Other document of case used based on information obtained from Nexis|Uni news report (Sandhu-Longoria, 2023).

a Other document used, which was found based on information from the Nexis|Uni news report (Crypto Breaking News, 2023b; In the Matter of Seizure of any and all funds 2023).

b Other document used, which was found based on information from the Nexis|Uni news report (Anuforo, 2022).

c Other document used about case Nexis|Uni news report (CE Noticias Financieras English, 2022a) referenced.

d Other document used about case Nexis|Uni news report (CE Noticias Financieras English, 2022a) referenced.

e Other document used about case Nexis|Uni news report (Governance, Risk & Compliance Monitor Worldwide, 2023) referenced.

Court document about case the Nexis|Uni news report (U.S. Fed News, 2023) referenced.

g Other document used about case Nexis|Uni news report (Governance, Risk & Compliance Monitor Worldwide, 2023) referenced.

h Other document used that was identified based on information included in Nexis|Uni news report (Podkul, 2022).

i Other document used about case Nexis|Uni news report (Governance, Risk & Compliance Monitor Worldwide, 2023) referenced.

j Other document used about case Nexis|Uni news report rt (Crypto Breaking News, 2023a) referenced.

k Other documents used, which were identified based on information provided by the Nexis|Uni report (Pepper, 2023).

l More information about this case was obtained from the original Sophos news report referenced in the Nexis|Uni news report.

m Other document used about case Nexis|Uni news report (Governance and Compliance Monitor Worldwide, 2022) referenced.

n Other document used about case Nexis|Uni news report (States News Service, 2022b) referenced.

o Other document used about case Nexis|Uni news report (States News Service, 2022a) referenced.

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

where targets invested only $100 USD, these cases were not included as the lowest amount of investment because the targets were journalists and knew they were being defrauded. For example, in one of these cases (C44), an investigative journalist followed the instructions of the offender and made a modest deposit only to learn more about how this fraud worked (Faux, 2023).

Our findings revealed significant financial losses that extended beyond the initial target of the fraud. In several cases, victims requested help from family and/or enlisted family and friends to 'invest' in the scheme. Victims invested their inheritance, savings and/or retirement money, borrowed from retirement investment accounts, liquidated stocks, refinanced, or obtained a second mortgage on their homes, used parents' home as collateral for loans, as well as money obtained from banks in the form of loans, and borrowed private funds from family members (e.g., parents). In one case, a victim liquidated his own and his wife's retirement accounts, obtained a second mortgage on their home, sold their rental home, and recruited five (5) friends to invest in the scheme (C4). The total investments from the victim, his wife, and his friends were about $4.3 million USD. Nevertheless, like other forms of fraud (Bilz et al., 2023), the losses associated with hybrid investment fraud are not just financial. Some victims reported adverse psychological and physical consequences of the fraud, including suicidal thoughts, psychiatric distress, admittance to hospital and/or emergency room, and the dissolution of and harm to interpersonal relationships (e.g., separation and/or divorce after fraud revealed and harm to relationships because they enlisted family and/or friends to invest in schemes). These results are consistent with those found in meta-analyses examining the outcome of romance fraud as several studies cite victim reports of "shame, embarrassment, shock, anger, worry and stress (Whitty and Buchanan, 2016)" that "can be associated with subsequent physical and mental health problems… (Cross, 2019)" (Bilz et al., 2023, p. 8). While monetary loss is often a focus of legal intervention, emotional devastation frequently compounds the effects of various forms of cyber-enabled fraud.

### 4.3. Offenders and victims

#### 4.3.1. Offender demographics

Offender gender demographics were not included for all offenders in all cases in our dataset. This information predominantly denoted the gender of offenders' online personas rather than their real identity (except for offenders who were identified in court documents by their real names). Where gender identity related information was included (gender and gender pronouns included and/or offenders identified), we observed that offenders predominantly pretended to be a woman and targeted a man, or an offender pretended to be a man and targeted a woman. This tactic, known as gender swapping, is used to encourage the development of a romantic relationship and a reported manipulation tactic in romance fraud studies (see, for example, Lazarus et al., 2023).

Many cases identified at least one offender - either their real name or the fake name they used for the fraud, the person who contacted the victim, formed a relationship with the victim, and convinced and pressured the victim to invest in an opportunity. However, this does not necessarily mean that only one offender was involved in the fraud. Many of the cases mention a customer service representative, broker, account manager, platform administrator, support, or other contact from a fraudulent investment company. Certain cases also mention others, such as contacts or relatives who offer investment assistance to the victim at the request of the person who initiated contact with the victim; however, this does not necessarily mean that more than one person was communicating with the victim. We did not have complete data in most of the cases in our dataset to identify the number of offenders involved in the fraud (e.g., the same offender could have potentially initiated contact with the victims and served as the customer service or other representative from the investment platform). Court documents provided more robust information than the news articles,

but some of the documents involved civil actions where offenders were not named. In certain cases, the number of offenders were identified (though not always with the names of offenders). For instance, civil court documents named individual defendants as Jessica Doe (C9), John Does (C9, C11), Emma Doe (C11), and Does (C18).

Our dataset also identified the existence of organized criminal groups, which are defined as "a structured group of three or more persons, existing for a period of time and acting in concert with the aim of committing one or more serious crimes or offenses established in accordance with …[the UN Convention Against Transnational Organized Crime (UNTOC)], in order to obtain, directly or indirectly, a financial or other material benefit" (Article 2(a), UNTOC). In our dataset, words such as 'enterprise,' 'syndicate,' or group were used to identify the involvement of three or more persons in the fraud. For example, the word 'syndicate' was used to describe groups engaging in hybrid investment fraud (C3) and groups engaging in hybrid investment fraud have been accused of running criminal enterprises (C5) and engaging in a "pattern of racketeering activity" (C16, p. 183). In one case, 11 members of the group were mentioned, each with their own roles in facilitating or assisting the hybrid investment fraud, committing wire fraud, money laundering, bank fraud, passport fraud, identity theft and other criminal activities (C17). In this case, we identified a familial connection between perpetrators - two brothers ran their hybrid investment fraud operation out of New York and New Jersey (United States of America v. Jin Hua Zhang et al., 2022).

Moreover, our dataset revealed organized criminal groups operating in concert to commit hybrid investment fraud. Specifically, one case (C15) identified three groups operating together to commit this cyber-enabled crime: solicitors (i.e., contacted victims, formed relationships, and convinced them to invest); trading firms (i.e., opened trade accounts on behalf of victims); and shell companies (i.e., accounts used to obtain fraud and misappropriate funds from victims). Solicitors pretended to be experts with insider knowledge and contacts that helped them be successful investors and introduced victims (known as "scheme customers") to trading firms. Trading firms directed scheme customers to download fraudulent apps, and victims and others transferred money (for investment, fees, taxes, or other reasons) to shell companies.

Our dataset further revealed fraudulent companies, which played a role in the hybrid investment fraud. For instance, the New Jersey Bureau of Securities ordered three companies to cease and desist operations as they were found in violation of the state's securities laws for their involvement in hybrid investment fraud schemes (C29, C30, and C31). Furthermore, in certain cases, companies were listed alongside individuals as defendants (e.g., C9 and C11).

The offenders were located both in the United States and abroad. In one case, one group was identified as operating in the same area in the United States (United States of America v. Jin Hua Zhang et al., 2022). Another case identified an organized criminal group made up of Chinese and Namibian nationals that targeted U.S. victims operating in Namibia (C20). In other cases, perpetrators stated they were and/or were believed to be in Canada, Cambodia, China, Laos, Thailand, Malaysia, and Vietnam. Countries in Southeast Asia have been identified in government documents as source countries for hybrid investment fraud (FinCEN, 2023) Particularly, in one case (C4), cryptocurrency exchange accounts identified in the fraud were registered from countries where hybrid investment fraud schemes originate (i.e., Thailand and Malaysia) (United States of America v. 5,012,294.90 in TetherUS et al., 2023). Reports have shown that human trafficking organizations in Cambodia, Laos, Thailand, and Malaysia have forced trafficked victims to conduct hybrid investment fraud (Keaton, 2023). Nonetheless, in many of our cases, the real and/or perceived actual location of the offenders was not identified.

#### 4.3.2. Victim demographics

Predominantly, the names and demographic information of victims were not included. Many cases included initials of victims instead of

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

**Table 4**
U.S. States where victims are located.

| | |
|---|---|
| Alabama | Michigan |
| Arizona | Minnesota |
| California | New Jersey |
| Colorado | New York |
| Connecticut | Ohio |
| Delaware | Pennsylvania |
| Illinois | South Carolina |
| Indiana | Tennessee |
| Iowa | Texas |
| Georgia | Virginia |
| Maryland | Washington |
| Massachusetts | Wisconsin |

their names to protect their privacy. In those cases, we were only able to identify gender based on the pronouns used. Where gender information about victims was included, the number of victims that were men were more than double the number of victims that were women. Only thirteen (13) cases identified the age of the victim. The ages identified in these cases ranged between 20 s and 60 s: ages 22 (C47), 24 (C50), 33 (C48), 37 (C28), 41 (C27), 42 (C26), 46 (C46), 52 (C37 and C51), 61 (C2), 62 (C1 and C32), 68 (C18). The ages identified in our cases differed from the victim age group of hybrid investment fraud that the Global Anti Scam Organization (GASO) identified: ages 25–40. Only a couple of cases included words relating to age groups (i.e., 'retired'; C25) and/or age ranges to identify the relative and/or approximate age of the victims (i.e., age range of 30 – 39; C42). When the relationship status of a victim was provided in the case documents, victims in the cases were identified as single, married, divorced, and/or widowed. Further, our dataset, which focused on U.S states, revealed that the victims were from various U.S. states (see Table 4).

Certain cases included information about the employment of victims. In these cases, the victims who were targets of this cyber-enabled fraud included (but were not limited to) a lawyer, life coach, trade manager, investigative journalist, technology executive, software engineer, marketing executive, financial advisor, real estate agent, hiring manager, business owner, and caretaker. Our dataset also revealed that vulnerable populations were targeted. Specifically, in our dataset, we identified victims who were emotionally vulnerable (e.g., isolated, loss of a loved one, recently divorced, or having marital/familial difficulties), medically vulnerable (e.g., long-term health problems and terminal diseases), and those who were technologically vulnerable (i.e., those who are not well versed in cryptocurrency and investing cryptocurrency). For example, when one victim met the perpetrator, she had been diagnosed with terminal cancer and was getting a divorce after 16 years of marriage (C24), another had lost his wife of 40 years to cancer (C13). In another case, an elderly woman suffering from early onset dementia and multiple sclerosis became the target of a hybrid investment fraud (C52). In addition, one victim was a political refugee from Nepal, who came to the U.S. because she was targeted by the Communist Party of Nepa (C5). This victim struggled with severe health issues from her loneliness and separation anxiety from her family, who were still in Nepal and experiencing threats and violence. Moreover, a hearing-impaired immigrant, who fled Iran because of religious persecution, became a target of this cyber-enabled fraud (C55).

### 4.4. Hybrid investment fraud stages: Offenders' M.O

Our dataset revealed that hybrid investment fraud includes various stages: approaching the target; cultivating a relationship with the target; discussing and promoting investments; getting victims to invest; and revealing the fraud. In what follows, we identify the stages and the tools and tactics used by offenders in each stage.

### 4.4.1. The approach

At this stage, like FinCEN's (2023) "initial contact with the victim" stage, a target receives an unsolicited call, message or connection

request and a connection is made between the target and the offender. Our dataset revealed that various forms of telecommunications and electronic communications were used to send unsolicited communications to targets. In the cases in our dataset that included this information, targets were first contacted by offenders via text messages (SMS) or calls; communications platforms (i.e., WhatsApp, Telegram, and Line); through social media platforms (i.e., Twitter, LinkedIn, Facebook/Meta, Snapchat, and Instagram); on online dating platforms (i.e., Tinder, Hinge, MeetMe, and Zoosk); and other online platforms (i.e., Homesnap, Airbnb, Hello Talk, and Tandem). Two language apps, HelloTalk and Tandem, which were designed to connect individuals seeking to improve language skills, were identified in our dataset as platforms individuals may repurpose and use to connect romantically.

The way offenders approached targets varied by the type of telecommunications and electronic communications used. When the methods used to connect to targets were calls, texts, and messaging applications, offenders used various excuses to explain why targets were contacted. These unsolicited communications often occurred under the pretext that offenders accidentally contacted them, were reaching out to someone they purportedly knew, or were reaching out pursuant to the direction of a third party. For example, in one case with multiple victims (C25), one of the victims was contacted via text message by a Chinese woman claiming that her mother supposedly encouraged her to contact him for the purpose of discussing marriage. On dating and social media platforms, offenders connect with targets under the guise of forming relationships, friendships, and/or professional connections. A couple of our cases involved offenders contacting targets to request a service they were providing (e.g., life coaching services, real estate assistance, and short-term rental assistance).

Initial contact also occurred in online group chats. In our dataset, one victim, while participating in a group chat on Twitter, was introduced to a fraudulent trading platform, known as Bitkam (C54). FINRA (2024) recently published an alert about fraudulent investment groups on social media. Individuals posing as legitimate investment advertisers are giving investment recommendations in these groups, which start on social media platforms and then often move their communications to encrypted communications platforms (e.g., WhatsApp) (FINRA, 2024).

Following initial contact, most cases in our dataset revealed that offenders encouraged communications to continue off social media and online dating platforms to other messaging platforms (e.g., WhatsApp, WeChat, Line, Skype, and Telegram). Victims are encouraged to move off social media and dating platforms as these platforms have algorithms that could detect suspicious and fraudulent activity. For example, the Match Group, which includes dating apps, such as Match, Hinge, Tinder, and Our Time, among others, has measures in place to help users identify fraudsters and fraud, by, for example, having user verification tools on their platforms, urging users to keep communications on the platforms and to use existing verification tools, sending messages and alerts to users with online safety dating tips, and using machine learning to identify fraudulent accounts based on activity (Skores, 2023; Goode, 2023). Nevertheless, these platforms are still used to initially engage the victim, and then move communications off these platforms to avoid detection of the fraud and deletion or blocking of their accounts.

### 4.4.2. Cultivating the relationship

Once a connection is made, the perpetrator initiates conversation to ultimately build rapport, trust, and a relationship with the target. At this stage, the offenders adopt various storylines and personas to successfully cultivate a relationship with victims. In our dataset, the offenders posed as entrepreneurs, asset managers, cryptocurrency investors or traders, employees at technology companies, architects, and business owners in the United States and abroad (e.g., a wine trader in France). The offenders claimed to have made money from investments and have expertise in cryptocurrency investments or gold trading.

*M.-H. Maras and E.R. Ives*

*Journal of Economic Criminology 5 (2024) 100066*

Furthermore, one offender in our dataset fraudulently posed as a military veteran (C56).[6] Fake personas that include persons of authority or credibility, like military members, are used to gain the victim's trust (Cross and Holt, 2021; Lazarus et al., 2023).

When offenders' profiles on online platforms and apps included pictures and/or offenders shared images with the targets, the offenders used images of attractive men and women and displayed wealth. The use of seductive images and visual portrayal of wealth are also common tactics used in romance fraud more generally (Bilz et al., 2023; Lazarus et al., 2023). The offenders' affluent lifestyles were purportedly made possible by their investments in securities and/or commodities. A couple of the cases revealed storylines where the offenders claimed to be Ivy League educated (e.g., Harvard University and University of Pennsylvania). An offender in one case posed as a graduate from the University of Pennsylvania, with expertise in gold trading and a history of extremely successful real estate and financial investments (C25).

Offenders in our dataset feigned empathy for victims experiencing hardships and provided emotional support. In one case, the offender connected with the victim by consoling him over his father's deteriorating health and placement in hospice (C37). Other offenders cited personal hardship as the reason for investing in commodities. For example, in one case, the offender, posing as a man, told the target that when his family business closed during the COVID-19 pandemic, he turned to cryptocurrency investments for income (C24).

Additionally, offenders in our dataset sought to establish personal bonds with victims and develop stronger connections with them. To do so, offenders frequently furthered false emotional connections with victims by incorporating shared trauma into newly developed narratives, or by establishing common personality traits, aimed at solidifying their relationship. This tactic is like what is described by Whitty (2013) in the "grooming process," GASO (n.d.) in the "packaging" and "raising" stage, and Wang and Zhou (2023) in the "nurturing/grooming" stage. Specifically, what we observed was the use of persuasion techniques (i.e., resonance techniques), such as "liking and similarity" to groom the victim (Wang and Zhou, 2023, p. 926). For example, in one case, the victim stated: "He looked very legitimate, started talking business with me, knew the company I work at. He had a friend who went to the same university as me years ago, and so we really connected that way" (C46). Persuasion techniques such as "visceral appeals, the creation of urgency, fast-moving relationships, appeals to strong emotions and even isolation and monopolization" are often used alongside linguistic devices to distract and disguise criminal intent from the victim by pushing clues indicating fraud to the periphery of the victims' thoughts and forefronting a connection and relationship (Bilz et al., 2023, p. 12).

We also identified the use of other resonance techniques identified by Wang and Zhou (2023) in their study. More precisely, offenders shared false personal information and experiences with victims. For instance, in one case (C35), an offender feigned a similar situation to the victim who informed him that she had a brother with special needs that she cared for (i.e., cerebral palsy), while in another (C48), the offender claimed to be from the same province in China as the victim's birth family, even going so far as to jokingly claim that they are siblings.

### 4.4.3. Making the 'case' for the investment

In this stage, the offender turns conversations towards investments. The offender then discusses expertise and/or prior success with investments. The goal of these conversations is to introduce the target to a lucrative investment opportunity, and then entice them to invest (which is the next stage). This can be likened to the FinCEN's (2023) "investment 'sales' pitch" stage and Wang and Zhou's (2023) "nurturing/grooming phase," where the investments are discussed, and investment opportunities are introduced and encouraged.

#### 4.4.3.1. Securities and commodities.
Real and fake securities and commodities and associated technologies are the primary tools offenders, co-conspirators, and/or associates use to commit hybrid investment fraud. These tools are used by criminals to further their illicit ends and launder the proceeds of their crimes. Our dataset revealed the use of cryptocurrency for these purposes. Specifically, offenders encouraged victims to purchase cryptocurrencies, such as Binance Coin (BNB), Bitcoin (BTC), USD Coin (USDC), Tether (USDT), and Ethereum, and deposit them into accounts, apps, and/or online platforms, controlled by the offender(s) and/or associates. Offenders also directed victims to purchase/invest in Decentraland's virtual world cryptocurrency, such as Mana (C4). Nevertheless, not all investments in our dataset involved cryptocurrency. Unlike existing work that reduces hybrid investment fraud to frauds that involve cryptocurrencies, our dataset revealed five (5) cases where victims were not directed to invest in cryptocurrencies, but instead were directed to invest in a commodity, gold. In one case (C36), the victim fostered a romantic relationship with a man claiming to make money in the gold trade and asked him to teach her about this trading. The perpetrator taught her how to invest using MetaTrader – a fake brokerage. Other cases (C25, C42, C43, and C55) similarly involved the same fake brokerage.

#### 4.4.3.2. Length of fraud.
The length of the fraud was not always clearly delineated in the cases in our dataset. In the cases where the length of fraud was included, it was variable. Our dataset showed that some frauds lasted a little over a month until about six months (from initial contact to the ceasing of communications between victim and offenders), while other cases lasted much longer. This does not exactly reflect Wang and Zhou's (2023) findings, but also does not drastically differ from them. Moreover, it is possible that lengthier frauds are reported with more frequency. The lengthiest fraud in our dataset lasted for over two years (C5). In this case, over the course of two years, an unidentified offender (John Doe) convinced Anjita Gurung (a caretaker who was a native of Nepal living on the North Coast) to invest about $597,000 USD.

The amount of time between the offender initially contacting the target to the time it took to switch to friendly, professional, or romantic conversations to discussions of investment opportunities also varied. In one case (C22), "[a]fter a couple of days of communicating, the suspect started to ask questions about the investor's financial background and investing habits" (In the matter of: www.batcipe.vip, James Yeh, www.batcnap.vip, Kenju Go, 2023), while in another case (C46), the offender and the target were communicating for only two weeks before the conversation turned towards investments. In another case (C1), after matching on a dating platform and moving their conversations the same day, the offender, within five hours of communicating switched conversations to cryptocurrency, by "stat[ing], in an inorganic way to explain a five-minute delay in her response, 'Sorry, I was just analyzing the cryptocurrency blockchain market with my teacher'" (In the Matter of Application by the United States for Seizure Warrant, 2022, p. 10). What was consistent throughout the cases in our dataset was that, despite the variation in the length of time between initial contact and discussion of investment opportunities, the speed of this stage of the hybrid investment fraud was relatively slow (with a few exceptions) – at least when compared to the next part of the process, which involves the target's investment.

### 4.4.4. The fraudsters' toolkit for investments

At this stage, the offender exploits the relationship and uses a series of confidence-building techniques to gain the target's trust in the investment and/or coercive techniques to get the offender to invest and/or continue to invest. This stage is equivalent to GASO's (n.d.) "killing" stage, FinCEN's (2023) "promise of greater returns" stage, and the "pig harvesting phase" of Wang and Zhou's (2023).

#### 4.4.4.1. Confidence building measures.
In a handful of the cases, victims described measures taken by perpetrators to establish confidence in

---

[6] In the case, the offender predominantly engaged in romance fraud (except for one case of hybrid investment fraud).

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

their relationship and investment opportunities. These confidence building tactics ranged from offering financial assistance to victims for investments, to feigning insider knowledge of and connections to investment platforms, to providing false documents and information verifying and authenticating investments and investment platforms, to promoting the illusion that victims have control over their funds, to educating the victims.

*4.4.4.1.1. Offers of financial assistance.* To encourage further investments, certain offenders even offered to contribute money to victims' investments so victims could reach a higher investment goal and/or when victims could not invest more money and/or could not obtain all the funds requested by the platform to withdraw their funds. This is unique to hybrid fraud as this action is only possible due to the trust established by the intimacy of interpersonal relationships and the tactics used in investment fraud. In one case (C42), the offender offered to co-deposit money into the victim's trading account (she was told to deposit $410,000 USD to her account and he claimed we would deposit $700,000 USD to her account). In the cases where offenders purportedly financially contributed to victims' investments, they requested money from victims for personal expenses and demanded more investments from victims, and the investment platforms notified victims that third parties were not allowed to contribute to victims' investments and financial and personal information from these contributors was needed to verify the lawfulness of the transactions (i.e., to rule out money laundering). In the cases where the fraudulent investment platforms notified the victims of the issues associated with third party contributions, the victims had their accounts frozen and/or were charged fees as a penalty and for other reasons.

*4.4.4.1.2. Insider knowledge and connections.* Some offenders claimed to have insider knowledge and connections. In several cases, offenders who promoted investment opportunities to victims pretended to have a familial connection, most frequently an uncle, to the investment platform and/or someone with expertise in investment trading. In one case (C55), an uncle was mentioned during the initial interactions ("only child and lucky to have a great uncle who treats her as his biological daughter" p. 2). This initial introduction made the segue into later discussions about her uncle's connections to investment claiming that he is a "senior financial analyst at Blackstone Group and had been giving her financial advice" (p. 2). In another case (C4), the offender, who used a female persona ('Gracie'), claimed her uncle had a direct relationship with the management of the cryptocurrency exchange platform (NTU Capital) to encourage the victim to open an account there. Moreover, another offender in our dataset mentioned that her uncle, who ran an investment analysis team, would inform her of trades she should make (C25). Similarly, a victim in Wang and Zhou's (2023) dataset revealed that an offender mentioned an experienced uncle who taught him how to invest and conduct the requisite "financial statistical analysis" needed to profit from investments (p. 929).

Other cases identified relatives as having insider information and contacts within investment platforms. In one case, an offender with a female persona claimed to have an uncle that could obtain insider information about trading (C59). In another case (C9), an offender named Jessica told the victim that she had a godmother, who was "a purported insider and analyst at an options trading firm," and provided her with information that helped her successfully trade cryptocurrency options (p. 7). Apart from cases that revealed a familial connection, an offender from a case in our dataset (C25) claimed her best friend served as the Chief Financial Officer of the investment platform.

In their study, Wang and Zhou (2023) found that fraudsters "appeal to individual figures that have authoritative backgrounds, such as a family member working in a financial sector or an investment mentor, who either teaches fraudsters the investment skill or informs them how to earn quick money" (p. 929). These connections with 'authoritative figures' help build trust in the offender, the platform, and the investment process (Wang and Zhou, 2023).

*4.4.4.1.3. Fake supporting documentation.* In the cases we gathered for this study, we identified cases where offenders procured fake financial information and documents (including fake financial charts)

to establish legitimacy of false narratives, which were shared to inspire confidence in investment opportunities (e.g., C46; Lim, 2022). For example, perpetrators often falsely depict invested funds increasing on fake online platforms and apps or via screenshots.

*4.4.4.1.4. Control over funds.* In several cases in our dataset, victims could withdraw some of their deposited funds from their investments, at least initially. In another case, one victim mentioned that in order to test his control over funds he invested (and to check the legitimacy of the platform), he withdrew money and then deposited it again in his 'investment' account (C23). To this victim and others in our dataset, the success of this test (or tests, as certain victims were able to make more than one withdrawal) alleviated concerns and served as proof of the app and/or platform's legitimacy. This is similar to the tactic Wang and Zhou (2023) describe where perpetrators ask victims to make initial investments on their secondary accounts to inspire victim confidence and reinforce their perceived control over the situation. This method also contributes to another related tactic that perpetrators employ; educating victims on investment (see next section).

*4.4.4.1.5. Served as teachers.* A comfort level was established with investing to encourage victims to invest more over time. This was achieved by offenders offering to teach victims how to trade. Offenders walked victims through the process of investing (e.g., by providing screenshots of their screens or assisting them through video) and in limited cases, if assistance was needed, offenders requested remote access to victim devices to register them, registered virtual currency service provider or virtual asset provider accounts on behalf of the victim, and took control over the victim's account and/or made the investments on the victim's behalf. In one case (C9), the offender sent "screenshots of her phone with boxes (made using a hand-drawn feature to superimpose lines and shapes onto photos and screenshots) showing [him] which buttons she wanted him to click" (Michael Bullock v. Jessica Doe et al., 2023, p. 10). Offenders also walk certain victims through the successful withdrawal of some money they invested to show that the site or platform can be trusted.

Perpetrators provided education regarding cryptocurrency to build a false sense of financial literacy, which they could then exploit. An example of this tactic was seen in cases where perpetrators encouraged victims to invest using Tether, because it was a 'stable coin,' meaning that this cryptocurrency had a more stable value. This trust in the cryptocurrency used imbues victims with confidence to invest in high-risk markets without considering other risks associated with new investments, including potential fraud.

*4.4.4.2. Love bombing.* Love bombing, which involves overwhelming a person with attention, affection, and constant communication via call, messages, emails, and other forms of communication, is another tactic that may be used by an offender in hybrid investment frauds. In the cases where romantic relationships (albeit false) are cultivated between victim and offender, the offender rapidly professes their love for the victim and discusses major life events with them, such as marriage and children. In one case (C1), the offender professed her love for the victim in less than 24 hours of initial contact. The purpose of the use of this tactic is to create a connection with and dependency on the offender to enable the offender to engage in manipulation and control tactics. In one case of love bombing (C40), the offender immediately started to engage in love bombing through repeated flattery and the sending of romantic messages. In another case (C2), one offender, who professed love for the target only after two days of communicating, demanded that the victim delete the messages of the perpetrator and the link the offender provided to the fraudulent investment application to prove that the victim was dedicated to him, thus forcing a more intimate connection between the two, through a display of devotion.

*4.4.4.3. Threats.* Offenders in our dataset used coercive measures to establish relationships and pressure victims to invest and provide additional funds to their original investments. When victims could no

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

**Table 5**
Examples of types of taxes, fees, penalties, and other charges to withdraw funds.

| | |
|---|---|
| account guarantee | risk deposit fee |
| annual fee encumbrance | risk verification fund |
| blockchain congestion | security deposit |
| capital verification | service fee |
| credit enhancement guarantee | transfer funds |
| expediting the withdrawal | unfreeze account |
| margin loan fee | verification |
| management review | VIP member |
| profit tax | withdrawal fee |
| reflection fee | withdrawal processing |

longer invest funds and/or obtain the necessary amounts needed to pay fees, penalties, taxes and/or other charges (see Table 5), the victims were threatened with the loss of the entire amount of their investment, further fees, freezing of their account, and/or criminal prosecution (i.e., for insider trading or money laundering). In one case with multiple victims (C25), one of the victims, after seeing profits on the platform, attempted to withdraw money from the account. A 'representative' from the platform notified the victim that money could not be withdrawn. In particular, the victim was notified that his account was frozen because the platform believed that some of the transactions of the victim might be illegal. The victim was informed that to lift the freeze on the account he had to pay 15% of the amount in the account to have the account reviewed. The victim was also informed that if he did not pay this money his account would be terminated. Furthermore, the victim was informed that nonpayment would result in his blocklisting and reporting to financial institutions and banks around the globe. In another case, an offender threatened to harm the victim's consumer credit score (C9).

Certain offenders who fostered relationships with victims engaged in intimidation tactics, verbal abuse, blackmail, and threats of physical violence and harm. In one case (C11), when the victim refused to pay more money, the offender (who identified as 'Emma') became furious, attempted sextortion (i.e., threatening release of intimate messages and images if remuneration not provided) and informed the victim that she hired people to kidnap and torture him and have his organs harvested. Similarly, in one case (C5), after investment payments were terminated, the victim was harassed with threatening and sexually vulgar telephone calls via Viber and Telegram, aimed at encouraging her to reinstate her payments or to punish her for refusing to engage further. Such fear and intimidation are cited as common tactics used to coerce targets into complying with offenders' demands (Buchanan and Whitty, 2013; Carter, 2020; Lazarus et al., 2023).

*4.4.4.4. Tactics to obscure the fraud.* There were several tactics used by offenders to obscure the fraud, making it harder for victims to identify the fraud. In most cases that involved cryptocurrencies, victims were directed to legitimate cryptocurrency exchanges (e.g., Binance, Bitstamp, Coinbase, Crypto.com, Gemini, Kraken, OKX, and Poloniex) to create a cryptocurrency account, and then directed to investment apps and platforms controlled by offenders. The actions taken thereafter were designed to confuse targets and trick them into providing offenders with control over the cryptocurrency account and/or transferring money to accounts, platforms or apps controlled by offenders.

One of the tactics identified in the dataset was domain spoofing, which is used to trick targets into downloading apps and/or accessing and using fraudulent websites designed and controlled by offenders. The spoofed website is designed to convince individuals that the site is legitimate and trustworthy, but it is actually a fake domain masquerading as a legitimate domain. For example, the spoofed website, by-bit.us, which the victim was directed to, mimicked the legitimate cryptocurrency exchange site Bybit.com (C18). To appear authentic,

spoofed websites also falsely claim to be award winning, affiliated with the legitimate cryptocurrency exchanges, U.S. Financial Crimes Enforcement Network (FinCEN) compliant, and regulated by the "United Stated (sic) Money Services Business" (see, for example, C4, United States of America v. 5,012,294.90 in TetherUS et al., 2023).

With a few exceptions in our dataset, targets did not have prior history, knowledge, or experience with the securities and commodities investments promoted by the offenders. Our dataset included cases where the investment promoted was liquidity pool mining, which is a legitimate but complex trading process. This form of mining works as follows:

A liquidity pool is a crowdsourced pool of cryptocurrencies or tokens locked in a smart contract that is used to facilitate trades between the assets on a decentralized exchange (DEX). Instead of traditional markets of buyers and sellers, many decentralized finance (DeFi) platforms use automated market makers (AMMs), which allow digital assets to be traded in an automatic and permissionless manner through the use of liquidity pools. Crypto liquidity providers are incentivized by earning trading fees and crypto rewards (new cryptocurrencies which can in turn be traded for other cryptocurrency or fiat currencies) (Seizure warrant, REACT Case #RT-2205–06106).

Victims' limited knowledge of this form of investment was leveraged by perpetrators to engage in hybrid investment fraud. In one case, the perpetrator recommended a liquidity pool site, which "was a fraud site utilizing the brand of Allnodes, an established decentralized finance platform provider" (C33; Sophos, 2023a). When the victim purchased the 'mining certificate' that the offender suggested, the victim actually signed a smart contract that gave control of his wallet to the offender (i.e., when he bought the 'mining certificate,' he clicked on a prompt from his Coinbase wallet app that did not clearly explain he was signing over full access to his money). GASO (2021a) delineated how this was possible when they identified the Coinbase Wallet app flaw when communicating with perpetrators engaging in hybrid investment fraud and following their instructions:

While speaking with one of these 'crypto mining' scammers, I downloaded Coinbase Wallet and visited the scam site…With no money in my wallet, I pressed a button from within the Coinbase Wallet browser to join the mining pool, and just like that the scam website attempted to initialize the smart contract. Since I had no money in my wallet, I was informed that I didn't have enough money to join the pool. However, if I did have the required funds, a smart contract would have been authorized by Coinbase Wallet without my informed consent, leading me into one of these never-ending subscriptions that could drain my wallet within a year, a month, or even a day. This clearly is a just cause for alarm…Coinbase must hand over an authentication key to the scam … [app] in order to initiate the contract, yet makes no mention of this to the user, nor asks the user to affirm their consent to hand over this authentication key.

Thus, perpetrators of hybrid investment fraud not only take advantage of victims' limited knowledge of trading processes by promoting fraudulent investments based on real investment processes, but also exploit vulnerabilities in existing platforms and apps to surreptitiously perpetrate the fraud.

Moreover, disinformation, misinformation, and conflicting information online complicated victim's efforts to identify the fraud. Some fraudulent websites and/or fraudulent information provided by the offenders is easier to identify than others. For example, a fraudulent site identified in one of our cases (C39), Coinrule-web3, was covered by a website in a 'news story' identifying the platform as a preferred financial investment platform (Platte-Valley News Channel Nebraska, 2023). While there were instances of victims conducting research to determine if what was being presented was fraudulent, these

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

individuals were unable to accurately identify the fraud for various reasons. For instance, a victim conducted online research after being asked to pay taxes when attempting to withdraw invested cryptocurrencies (C25); when the victim came across information that stated that the Chinese government requires 20% on any transactions, the victim paid the 'taxes.'

Further, offenders lied to conceal their true whereabouts and to explain inconsistencies in their actions and stories. When perpetrators were outside of the United States, such as those in Namibia, they operated during specific times to account for the time difference with the U.S. to make it seem as if the offenders were in the same or close to the same time zone as the victim (C20). Additionally, to explain contacting the victim from a different phone number, the offender claimed that his phone was hacked (C53).

Finally, the offender, who pretended to be the victim's friend or in a romantic relationship, would feign having similar experiences with investment platforms, particularly when fees were required to withdraw funds. Specifically, in hybrid investment fraud, to obtain as much money as possible from victims, they are asked to pay fees, penalties, taxes and/or other charges when they attempt to withdraw invested funds. One victim in a case with multiple victims (C25), contacted an offender (the person who he fostered a relationship with) to discuss the fees the representative of the platform told him about. The offender substantiated the representative's claim by falsely claiming that when her account was supposedly more than $10,000,000 USD, she was informed that she had to pay $1.8 million USD to unfreeze the account. The offender also falsely stated that she was able to unfreeze her account and access her funds after making the payment. Another offender who targeted a different victim in this case went so far as to provide a screenshot from the Chief Financial Officer of the (fraudulent) platform that would guarantee that the victim would be able to withdraw their funds if a final verification fee was paid. However, after paying this fee, the victim was asked to pay another $50,000 USD for a blockchain congestion fee, and after paying that fee was asked for another $100,000 USD to become a VIP member of the platform. Once this payment was made, the victim was notified that the withdrawal was successful but never received any funds and the offender and the platform could not be reached.

*4.4.4.5. OPSEC measures.* The offenders engaged in operational security (OPSEC) measures to make it more difficult to identify, investigate, and prosecute them. To make it harder to trace stolen cryptocurrency, offenders would transfer it to multiple "private wallets and swapping services" (U.S. Attorney's Office, Eastern District of Virginia, 2022). In one case (C15), proceeds were commingled and deposited into numerous accounts. In another case with multiple victims, the stolen funds from one victim "were swapped from BTC to USDT using imToken and Tokenlon. The USDT was consolidated into wallet address and then rapidly transferred into and out of multiple intermediary wallet addresses, where they were commingled with other funds" (C25; In the Matter of Application by the United States for Seizure Warrant, 2022). This process is known as "chain hopping," where "the holder of cryptocurrency converts it from one from [*sic*] of cryptocurrency to another—for instance, converting Bitcoin to Ethereum. When cryptocurrency is converted, it can make it harder to trace because it will often result in the currency being moved onto a separate blockchain ledger" (C4; United States of America v. 5,012,294.90 in TetherUS et al., 2023, p. 28).

To protect their identities, our dataset revealed that offenders opened bank and cryptocurrency accounts using false names. For example, in United States of America v. Jin Hua Zhang, et al. (2022), forged Chinese passports and other individuals' identification documents were used to conceal offenders' identities (C17). To cover their tracks, offenders have also instructed victims to delete messages between them (C2); to conceal the reason for wire transfers by writing 'other' in the reasons for the transfer (C3) or sending the wires to

companies with names (e.g., HomeGoods LLC; C54) that would not be flagged as suspicious and would avoid drawing the attention of authorities; and to delete their social media account because it was not 'safe' (C25). Offenders have also added false reasons for the receipt of funds and/or have created fake invoices to justify the receipt of funds from victims, such as claiming that payment was received for the sale of toys, electronics, or other goods (e.g., C54), among other reasons.

*4.4.5. The fraud reveal*

If the target cannot pay and/or refuses to provide any more funds, communications between offender, target, and others involved in the fraud cease (with few exceptions). Overall, the target does not recover some or all of the funds (with few exceptions identified in the literature; see (Farivar, 2023). Our dataset revealed that the fraud was identified in a variety of ways. This stage is like GASO's (n.d.) "killed" stage and FinCEN's (2023) "point of no return" stage.

*4.4.5.1. Conducted research.* In certain cases, the fraud was identified after victims engaged in research. For example, one victim discovered the fraud after contacting Sophos (a cybersecurity company) and reviewing an article published by them on liquidity mining (C33). The victim was informed that he was a victim of fraud and was told to block and cease communications with the perpetrators. Other victims conducted research after either experiencing a negative consequence (e.g., being unable to withdraw money and/or being told money was needed to make withdrawal) or after an organization or agency informed them of potential fraudulent transactions. After being told by a customer service representative of the platform he was using to provide $1.5 million USD to withdraw his money, a victim searched online and found a U.S. Federal Bureau of Investigation (FBI) alert for this fraud (C51).

*4.4.5.2. Family members, friends, and coworkers.* Several of the victims in our dataset were alerted to the fraud by friends and families. For example, in one case (C25), a victim realized it was a fraud when he sought a home equity loan to pay taxes and his family questioned his investment. In another case (C26), a friend informed a victim of hybrid investment fraud after the victim shared information about her relationship with the offender (C26). Coworkers questioned another victim when she liquated her 401k (C28).

Further, in one case, the fraud was revealed by a husband who formed a remote romantic relationship with a woman who encouraged him to leave his wife during their 'relationship'(C39). The woman convinced him to liquidate his joint investments with his wife to invest more than $9 million USD in cryptocurrency investments (Krasilnikova, 2023) This fraud was revealed when the husband contacted his wife to liquidate the remaining assets to pay the requested 'fee' needed to withdraw his profits.

*4.4.5.3. Government agencies and banks.* A few victims realized they were the target of fraud when they contacted government authorities. For instance, in one case with multiple victims (C25), when one victim sought to withdraw money from their account, he was informed by the platform that taxes needed to be paid according to the IRS Blockchain Technology Cryptocurrency Authority. The victim contacted the US Internal Revenue Service and asked about the IRS Blockchain Technology Cryptocurrency Authority but was informed that no such agency exists. Nonetheless, our dataset did not reveal that taxes were questioned by all victims. In one case (C6), a purported customer service agent informed the victim that before a withdrawal was made a 25% tax must be paid to the International Tax Bureau (a bureau that does not exist). In another case, a bank manager informed a victim of the fraudulent scheme when the victim went to the bank to wire money to an account the offender provided (C54).

*4.4.5.4. Cryptocurrency exchanges.* Certain victims in our dataset identified the fraud after reporting issues with withdrawing their funds to cryptocurrency exchanges and/or regulatory agencies. For

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

instance, one victim learned of the fraud when the victim reported being unable to withdraw funds to Coinbase and Bitstamp. Crypto.com reached out to one victim to inform them of unusual transactions linked to frauds. Particularly, Crypto.com flagged some of the victim's transactions as being linked to wallet addresses associated with fraud and asked the victim to review the transactions (C8). Following this notification, the victim conducted online research and found a fraud alert by the California Department of Financial Protection and Innovation for the platform the victim was using.

*4.4.5.5. Customer service issues and multiple fees requested for withdrawals of funds.* Some victims identified the fraud because of the various excuses given as to why payment of funds could not be made as well as the new fees that were requested for withdrawals each time a fee was paid, and a request was made for payment. One victim was asked to pay a "risk deposit" fee after requesting to withdraw a portion of his funds. Once this was paid, he attempted to withdraw the money, only to be asked to pay another fee. Following this new request for money, he realized he was a victim of fraud (C54). Another victim realized that she was a victim of fraud when she was informed that she could not withdraw her money without paying taxes, which could not be deducted from the gains in her account (C14).

*4.4.5.6. Offenders stop communicating with the victims and/or the fraudulent app or website disappears.* In most of our cases, when offenders receive a substantial sum, the target sum, and/or the victim can no longer pay and/or no longer wants to pay fees and is requesting their funds, the offenders and associates (in the form of customer service and other representatives of the fraudulent platforms) eventually "ghost" the victims by becoming non-responsive and abruptly ceasing communications. After paying several fees when attempting to withdraw funds and being unsuccessful each time, the representative of the fraudulent platform becomes unreachable. In such cases, the listed fees and the payment amount that is reached before communications between representatives of the fraudulent platform and the victim cease varied by case. For instance, after wire transferring fee money to the offender, the offender immediately stopped communicating with the victim and the fraudulent site disappeared (C54). In most of the cases in our dataset, the offender(s) that initiated contact with the victim and fostered a relationship with the victim also became unreachable around the same time. In only one case did we identify a perpetrator who "revel[ed] in unveiling the financial — and emotional — deception" to the victim (C36; Podkul, 2022).

*4.4.6. Important outliers and deviations from known offender patterns*
*4.4.6.1. Video calling as a confidence building measure.* Our dataset included cases where the offenders agreed to engage in a video call with the victims.

The public is often warned to be wary of individuals who they meet online who refuse to either meet in person and/or engage in video calls (FINRA, 2022). While we only identified a few cases in our dataset where offenders' video called victims, this is an important finding as victims identified this action as a confidence building measure in the relationship and investments. Video chats were also used to share information to build victims' confidence in the investment. For example, in one case (C54), the offender showed the victim statements to substantiate her claims of millions in earnings in a video call. Nevertheless, we also identified cases in our dataset where perpetrators refused video calls and in person meetings for different reasons.

*4.4.6.2. More than one offender targeted the same victim.* A few cases in our dataset revealed that the same victim was targeted by more than one offender, who may or may not have been working together (from available information, this connection could not be established). For example, in one case (C2), the victim was contacted by the perpetrator (claiming to be Hao William Yang), who was interested in viewing the

victim's San Francisco home. When the victim similarly received multiple messages from other Asian men asking to see the San Francisco property, the victim told the perpetrator about this odd occurrence. The perpetrator responded angrily and accused the victim of cheating to divert attention away from this incident.

In the other case (C32), the offender (who used the persona of a Chinese woman named 'Hui Hui') reached out to the victim via social media. While the chat began friendly, it then turned romantic. While communicating with Hui Hui and investing $18,000 USD of his funds, the victim was also contacted by another Chinese woman named 'Lydia' on social media and formed a friendship. The victim expressed suspicions to Lydia about the money he invested with Hui Hui. Lydia informed him of another cryptocurrency investment opportunity after three months of communicating. He invested $20,000 USD into the second investment opportunity. After learning he could easily withdraw money from the second investment platform, he decided to invest more money. When he attempted to withdraw his money from the first platform, he was told he had to pay a $132,000 USD penalty. Following his failed attempt to withdraw funds from the first investment platform, he tried to withdraw funds from the second platform. The second platform also informed him that he must pay a $50,000 USD penalty. After these failed attempts, he realized he was a victim of fraud by both offenders.

In the third case (C25), in March 2022, the victim was contacted by someone named 'Eden Lin' on LinkedIn and developed a friendship. While the victim was sick with COVID-19, the offender introduced her to future trading and encouraged her to invest her cryptocurrency, money from her bank account, and money from liquidated retirement accounts to mcus.me. When attempting to withdraw funds from her investment, she was informed her account was frozen and a deposit of $293,000 USD was needed to reactivate her account. After notifying the offender that she was only able to raise $80,000 USD, she was instructed to wire transfer those funds to him. After sending the wire transfer, the mcus.us site was no longer accessible, and the offender stopped responding to her communications. In May 2022, the same victim was engaged by someone named 'Zelin Wang,' who purportedly needed advice with launching a company. After forming a friendship, the offender introduced the victim to Top Tank, where she invested $40,000 USD. When she attempted to withdraw funds, her account was "frozen" and she was informed she had to pay $60,000 USD to unfreeze her account and withdraw her money. The victim was unable to recover funds from either site. Likewise, another victim was targeted in two separate incidents by offenders identifying as women ("Unity/Sakurako" and "Emma/Annie Catherine") (C16).

Barring further details in these cases to show connections between perpetrators, the second hybrid investment fraud attempt could be alternatively interpreted as instances of what Button and Cross (Button and Cross, 2017) termed as recovery fraud, where victims experience revictimization.

*4.4.6.3. Private and financial information.* One victim provided personal information to open an account, and after he was denied, he was told he would need to submit a copy of his driver's license and passport (C55). Other victims were told to upload driver's licenses to platforms for verification reasons (C21), asked to provide driver's license and bank information (C25), and bank statements and "confidential, personally identifying information" (C9). The provision of this information exposes the victims to further forms of fraud, including identity theft and other forms of fraud. Government consumer protection alerts include warnings to victims to avoid sharing personal and financial information with strangers and online apps, platforms, and/or sites that cannot be authenticated (e.g., State of Michigan Attorney General, n.d.; FTC, n.d.; Federal Deposit Insurance Corporation FDIC, 2021; U.S. Department of Justice, 2023).

*4.4.6.4. Money requested for emergency.* In one case in our dataset (C45), which involved various frauds perpetrated by the offender, one of which was a specific form of hybrid investment fraud - romance

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

baiting, the offender sought money from one victim for an emergency. This finding conflicts with the understanding that the "request for money is not attributed to an emergency" in romance baiting (Cross, 2023, p. 5). The fraud in the case began as a traditional romance fraud, and then turned into a cryptocurrency investment fraud. The sequence of events of the fraud were as follows:

- the victim and offender developed a purely online relationship;
- the offender asks for assistance in purchasing medical equipment with the understanding that the victim would be reimbursed;
- the victim sends the money;
- the offender claims to be injured and in need of money for medical bills;
- the victim sends the money;
- documents are used to support the offender's claims and a 'third party'[7] reaches out to make stories of the offender more believable to obtain even more money from the victim (i.e., pretended to be a doctor, sent a purported photo of the victim on a hospital bed, and requested money for the victim);
- the offender states that she will reimburse the victim and provides an excuse as to why this reimbursement is not possible (i.e., the victim's bank would not accept the money);
- the offender offers to invest the victim's money in a cryptocurrency investment platform known as Alphacoin Lab so the victim could obtain the funds;
- the offender sets up an account for the victim on this platform;
- several representatives of this cryptocurrency exchange email the victim and message the victim via WhatsApp;
- the victim is informed that he could withdraw the funds after paying taxes and fees on the funds via wire transfer; and
- the victim wire transfers the taxes and fees.

Ultimately, after paying taxes and fees, the victim was unable to withdraw the funds.

*4.4.6.5. NFTs.* The limited literature on hybrid investment fraud predominantly focuses on cryptocurrency investments, and to a lesser extent gold. While our research likewise predominantly identified frauds involving the cryptocurrency trade, and to a lesser extent gold, we also identified a case that involved the trade of non-fungible tokens (NFTs). Specifically, our dataset included one case where a victim was conned into investing in NFTs via a fraudulent trade website (C54).

*4.4.6.6. Artificial intelligence and ChatGPT.* One case in our dataset involved a victim who contacted Sophos to report a hybrid investment fraud that involved the use of an artificial intelligence (AI) based tool, like ChatGPT (C38). The victim connected with the offender when using Tandem, a language app that has been used as a dating app. After the communications between victim and offender moved to WhatsApp, "[t]he victim became suspicious after he received a lengthy message that was clearly partly written by an AI chat tool using a large language model (LLM)" (C38; Pawaon, 2023). The use of pre-written scripts for hybrid investment fraud is consistent with the findings of Wang and Zhou (2023).

*4.4.7. Responses to hybrid investment fraud*

The cases in our dataset revealed that U.S. authorities have taken several measures to respond to hybrid investment fraud, including civil forfeiture and other civil actions against offenders and companies; seizing spoofed domains; administrative cease and desist orders; seizing financial accounts and cryptocurrency wallets; and arresting offenders. For the offenders criminally charged, the most common charges

included wire fraud, bank fraud, money laundering, unlicensed money transmitting business, conspiracy to commit wire fraud, bank fraud conspiracy, and conspiracy to commit money laundering.

## 5. Limitations

A main limitation of our study is the number of identified hybrid investment fraud cases. We encountered significant difficulties in identifying these cases. The colloquial term of 'pig butchering' was not always used. Also, various terms were used in cases and news articles to describe hybrid investment fraud, including romance baiting, cryptorom scams, cryptocurrency investment scheme, cryptocurrency scams, crypto catfishing, cryptocurrency confidence schemes, and cryptocurrency confidence scams. The inconsistent terms used to describe hybrid investment fraud made the identification of these cases extremely difficult. What is more, many of these terms are limiting, and exclude other cases of hybrid investment fraud. Specifically, the limitation of these terms to romance and cryptocurrencies omits cases where other forms of relationships were sought and other forms of investments. Furthermore, cases were difficult to identify as information about hybrid investment fraud was scattered over various news articles and administrative, civil and/or criminal court documents.

Our sample is not a representative sample of all hybrid investment fraud cases in the United States. Our sample also could not draw on existing crime measurement tools as they do not report hybrid investment fraud. For this reason, we reiterate the sentiment expressed in Lazarus et al.'s (2023) systematic review that more diverse data is needed and extend this perspective to news coverage, arguing that more diverse cases from a wider regional and global range must appear in the news along with more rich empirical data to fully understand the nature and extent of hybrid investment fraud. We followed a similar exploratory approach, the analysis of court documents and news articles, which has been used to study other forms of crime (e.g., Arsovska and Temple, 2016; Button and Cross, 2017; Maras and Arsovska, 2023). The content in private legal databases is constantly updated. The number of cases we identified were dependent on the dates in which we conducted the search, our search process, the terms we used, the process we used to exclude cases from our dataset, the information available in the documents, and the time period of the search.[8] By triangulating our sources, we were able to identify the elements of hybrid investment fraud, victims of this fraud, and the tactics, tools, targets, and methods of operation of offenders. Our exploratory research covered an understudied topic and filled an important gap in academic literature.

## 6. Conclusion

Our research revealed that existing fraud typologies, which were designed to clarify differences between various forms of fraud and serve as a comprehensive inventory of all types of fraud, do not adequately address the evolution of fraud, particularly hybrid fraud. Hybrid fraud, like hybrid investment fraud, combines tactics, tools, and methods of operation from different forms of fraud. Perpetrators of this fraud take operational security measures to evade detection, investigation, and prosecution, and engage in tactics to obscure the fraud. Hybrid fraud is a complex phenomenon with devastating psychological, social, and financial impacts.

Our research revealed offenders prey on people's desire for companionship and seek to gain victims' confidence and trust by creating an illusion of credibility and success, using images of attractive people,

---

[7] This may not actually be a third party. It can be the offender pretending to be another party.

[8] For example, even when two researchers conducted the search separately on the same day at the same time using the same criteria on NexisUni, the number of results returned varied (after clearing cache and running the same search in the same order, our search returned the same results).

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

promoting extravagant lifestyles, and claiming expertise in trading and investment knowledge to lure people first into fake connections and/or relationships and then fraudulent investment schemes. While many cases did involve the fostering of romantic relationships between victims and offenders and investments in cryptocurrencies, there were cases where relationships were not romantic in nature (i.e., friendship) and involved investments in gold and NFTs. The offenders used persuasive language, a sense of urgency, and confidence building and coercive measures to pressure victims to invest and provide additional funds to their original investments. The tactics used are designed to 'drain' victims of their funds to obtain as much money from them as possible, often recommending that the victims obtain loans, liquidate savings and retirement funds, and reach out to family and friends for financial assistance.

We use the term hybrid investment fraud to describe what is colloquially known as pig butchering, as the colloquial term dehumanizes victims and their experiences and does not adequately capture the multifaceted nature and the ultimate goal of this fraud. Our research advanced knowledge in the field by shedding light on the understudied topic of hybrid investment fraud. With our work, we hope to inspire the use of similar terms to describe the same phenomena in the literature, news, and cases, particularly the use of the word 'hybrid' to describe forms of cyber-enabled fraud that combine tactics, targets, tools, and elements of the methods of operation of perpetrators of different types of fraud. Moreover, we aim to stimulate future research on this topic and encourage the modification of existing fraud typologies to capture hybrid fraud.

**CRediT authorship contribution statement**

**Marie-Helen Maras:** Writing – review & editing, Writing – original draft, Supervision, Resources, Project administration, Methodology, Investigation, Formal analysis, Conceptualization. **Emily R. Ives:** Writing – review & editing, Resources, Methodology, Investigation, Formal analysis.

**Declaration of Competing Interest**

The authors declare that they have no known competing financial interests or personal relationships that could have appeared to influence the work reported in this paper.

**References**

Albert Abed, v Wei Lin, Melis, Case 1:23-cv-21059, Plaintiff's Memorandum of Law in Support of his Motion for a Preliminary Injunction (U.S. District Court for the District of New Jersey, October 11, 2023).

Access Wire, 2022. The Slaughtered Love: RealCall's Survey Finds 96.08% of Americans Were Targeted by Pig Butchering Scams. December 1, 2022. https://www.accesswire.com/729424/The-Slaughtered-Love-RealCalls-Survey-Finds-9608-of-Americans-Were-Targeted-by-Pig-Butchering-Scams#:~:text=555%2D555%2D5555-,The%20Slaughtered%20Love%3A%20RealCall%92s%20Survey%20Finds%2096.25%20of%20Americans%20Were,Targeted%20by%20Pig%20Butchering%20Scams&text=A%20new%20survey%20conducted%20by,expanded%20and%20caused%20huge%20losses. (Accessed 28 December 2023).

Adebayo, O., 2023. US authorities crackdown on pig butchering crypto scams. Newstex Blogs (NexisUni database). Cryptopolitan, September 28, 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:698M-CYK1-JCMN-Y108-00000-00&context=1516831 (Accessed 13 February 2024).

Alabama Securities Commission, 2022. Alabama Investor Loses Over $40,000 in Pig Butchering Scam. https://asc.alabama.gov/wp-content/uploads/2023/11/3-24-2022_Pig_Butchering_Scam.pdf (Accessed 13 February 2024).

Allen, F., 2021. Porky Pies - I lost £60k in new 'pig butchery' crypto scam when dating site fraudster brainwashed me into investing in fake scheme (NexisUni database). Sun (November 3, 2021. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:640S-82B1-DY4H-K3VP-00000-00&context=1516831).

Anuforo, C., 2023. Scammers add ChatGPT to their toolset – Sophos report (NexisUni database). Sun https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:68WH-J041-JDJN-6376-00000-00&context=1516831 (Accessed 13 February 2024).).

Armstrong, T., 2023. Dad reveals he lost half a million dollars, his home and WIFE after falling victim to cruel 'pig butchering' scam - as figures show Americans are losing

record amounts to crypto fraudster (NexisUni database). MailOnline, July 31, 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:68W2-Y971-DY4H-K081-00000-00&context=1516831 (Accessed 13 February 2024).

Arsovska, J., Temple, M., 2016. Organizational learning, adaptation, and rationality: The expansion of Albanian organized crime in New York City. Crime, Law and Social Change 66 (1), 1–20.

Australian Competition and Consumer Commission, 2023. Targeting scams: report of the ACCC on scams activity 2022. https://www.accc.gov.au/about-us/publications/serial-publications/targeting-scams-report-on-scams-activity/targeting-scams-report-of-the-accc-on-scams-activity-2022. (Accessed 5 May 2023).

Bartlett, S., 2023. Woman says she was victim of 'pig butchering' dating scam -and lost £360k. (NexisUni database). The Daily Star. https://www.dailystar.co.uk/love-sex/woman-says-victim-pig-butchering-30024018?utm_source=mynewsassistant.com&utm_medium=referral&utm_campaign=embedded_search_item_desktop [provided on NexisUni by Daily Star].

Beals, M., DeLiema, M., Deevy, M., 2015. Framework for a Taxonomy of Fraud. Stanf. Cent. Longev. 1–40.

Bilz, A., Shepherd, L.A., Johnson, G.I., 2023. Online fraud: a systematic literature review of online romance scam research. Interact. Comput. https://doi.org/10.1093/iwc/iwad048

Brian Hoop v. Emma Doe and John Does I-XX, and 177.7621 ETHER, and MEXC GLOBAL, LLC. Compliant Case 4:23-cv-00185-SMR-HCA (U.S. District Court for the Southern District of Iowa Central Division, June 5, 2023).

Buchanan, T., Whitty, M.T., 2013. The online dating romance scam: Causes and consequences of victimhood. Psychol., Crime. Law 20 (3), 261–283. https://doi.org/10.1080/1068316X.2013.772180

Button, M., Cross, C., 2017. Cyber frauds, scams and their victims. Routledge. https://doi.org/10.4324/9781315679877

Carter, E., 2020. Distort, extort, deceive and exploit: exploring the inner workings of a romance fraud. Br. J. Criminol. 61 (2), 283–302. https://doi.org/10.1093/bjc/azaa072

CE Noticias Financieras English, 2022a. Dating apps, the new target of crypto-scammers: how to protect yourself from crime (NexisUni database). 23 February 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:64VN-VNW1-DYY9-00T1-00000-00&context=1516831.

CE Noticias Financieras English, 2022b. How a woman lost US$ 2.5 million with a WhatsApp message (NexisUni database). 13 April 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:6574-77C1-DYY9-01DW-00000-00&context=1516831 (Accessed 13 February 2024).

Chandrinaik, J., Wu, X., 2021. CryptoRom fake iOS cryptocurrency apps hit US, European victims for at least $1.4 million. Sophos, October 13, 2021. https://news.sophos.com/en-us/2021/10/13/cryptorom-fake-ios-cryptocurrency-apps/ (accessed 5 May 2023).

China News, 2019. Top 10 new words in Chinese media in 2019, including night economy, extreme pressure and more. https://www.chinanews.com.cn/gn/2019/12-16/9034981.shtml. (Accessed 5 November 2023).

Citron, D.K., 2014. Hate Crimes in Cyberspace. Harvard University Press. https://doi.org/10.4159/harvard.9780674735613.c13

Coluccia, A., Pozza, A., Feretti, F., Carabellese, F., Masti, A., Gualtieri, G., 2020. Online romance scams: Relational dynamics and psychological characteristics of the victims and scammer. A scoping review. Clin. Pract. Epidemiol. Ment. Health 16 (1), 24–35. https://doi.org/10.2174/1745017902016010002

Commodity Futures Trading Commision, v. Cunwen Zhu and Justby International Auctions, Case 2:23-cv-04937, Complaint for Injunctive and Other Equitable Relief and for Civil Monetary Penalties Under the Commodity Exchange act and Commission Regulations (U. S. District Court for the Central District of California, June 22, 2023).

Cross, C., 2019. "You're not alone": the use of peer support groups for fraud victims. J. Hum. Behav. Soc. Environ. 29, 672–691. https://doi.org/10.1080/10911359.2019.1590279

Cross, C., 2023. Romance baiting, cryptorom and 'pig butchering': an evolutionary step in romance fraud. Curr. Issues Crim. Justice 1–13. https://doi.org/10.1080/10345329.2023.2248670

Cross, S., Hirrle, S., Lim, M-A., 2021. Cybercrime Strategy Guidebook. Interpol.

Cross, C., Holt, T., 2021. The use of military profiles in romance fraud schemes. Vict. Offenders 16 (3), 385–406. https://doi.org/10.1080/15564886.2020.1850582

Cross, C., Holt, K., O'Malley, R., 2022. If you don't pay they will share the pics": Exploring sextortion in the context of romance fraud. Victims & Offenders 18 (7), 1194–1215. https://doi.org/10.1080/15564886.2022.2075064.

Crypto Breaking News, 2023a. Report: Namibian Police Arrest 20 Ringleaders of Local Pig Butchering Crypto Scam (NexisUni database). 18 October 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:69DW-TM31-JCMN-Y21C-00000-00&context=1516831 (Accessed 13 February 2024).

Crypto Breaking News, 2023b. U.S. Justice Department Seizes Cryptocurrency Worth $112 Million in 'Pig Butchering' Crackdown (NexisUni database). April 5, 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:67 Y0-WK61-F03R-N24W-00000-00&context=1516831 (Accessed 13 February 2024).

Divya Gadasalli, an individual, v. Jerry Bulasa, an individual; Dong Lian, an individual; Danyun Lin, an individual; TD Bank, n.a., a National Banking Association; Abacus Federal Savings Bank, a Federal Savings Bank; Binance Holdings, LTD. d/b/a Binance, a Foreign Company; and Poloniex,LLC, a Delaware Limited Liability Company, Case 4:22-cv-00249-alm, Declaration of David C. Silver (U.S. District Court Eastern District of Texas, March 29, 2022).

Drew, J.M., Webster, J., 2024. The victimology of online fraud: A focus on romance fraud victimisation. J. Econ. Criminol., 100053. https://doi.org/10.1016/j.jeconc.2024.100053

M.-H. Maras and E.R. Ives

Journal of Economic Criminology 5 (2024) 100066

Ducklin, P. 2021. Romance scams with a cryptocurrency twist–new research from SophosLabs. https://nakedsecurity.sophos.com/2021/10/13/romance-scams-with-a-cryptocurrency-twist-new-research-from-sophoslabs/ (Accessed 5 May 2023).

Falcon, R., 2022. Dating apps, the new target of crypto-scammers: how to protect yourself from crime, Wate 6 (ABC), February 23, 2022. https://www.wate.com/news/tennessee/woman-loses-390k-in-crypto-from-hinge-romance-scammer/#:~:text=(NEXSTAR)%20%E2%80%94%20A%2024%2D,cryptocurrencies%20to%20hide%20their%20identities (Accessed 13 February 2023).

Farivar, C, 2022. 'Pig Butchering' Crypto Scam Victim to Get Money Back from Binance, Law Enforcement Says. Forbes, July 1, 2022. https://www.forbes.com/sites/cyrusfarivar/2022/07/01/pig-butchering-crypto-scam-victim-to-get-money-back-from-binance-law-enforcement-says/?sh=3819d6745ced (Accessed 5 November 2023).

Farivar, C,. 2023. They Lost Millions to Crypto Scammers. This Prosecutor Is Helping Them Get It Back. Forbes, January 17, 2023. https://county.da.sccgov.org/sites/g/files/exjcpb1121/files/documents/They%20Lost%20Millions%20To%20Crypto%20Scammers.%20This%20Prosecutor%20Is%20Helping%20Them%20Get%20It%20Back_.pdf (Accessed 5 November 2023).

Faux, Z., 2023. 'Don't you remember me?' The crypto hell on the other side of a spam text. The Business Standard, August 18, 2023. https://www.tbsnews.net/bloomberg-special/dont-you-remember-me-crypto-hell-other-side-spam-text-684258 (Accessed 5 November 2023).

Federal Bureau of Investigation (FBI) and Internet Crime and Complaint Center (IC3), 2023. The FBI Warns of False Job Advertisements Linked to Labor Trafficking at Scam Compounds. Alert Number I-052223-PSA. https://www.ic3.gov/Media/Y2023/PSA230522 (Accessed 5 November 2023).

Federal Deposit Insurance Corporation (FDIC), 2021. Avoiding Scams and Scammers. https://www.fdic.gov/resources/consumers/consumer-news/2021-10.html (Accessed 28 December 2023).

Federal Trade Commission (FTC), 2021. FTC Online Complaints (Filed: October 14, 2021). https://s3.documentcloud.org/documents/22418617/ftc-pig-butchering-scam-complaint.pdf (Accessed 13 February 2024).

Federal Trade Commission (FTC), n.d. Heads up: Stop. Think. Connect. https://consumer.ftc.gov/articles/heads-up(Accessed 28 December 2023).

FinCEN, 2023. FinCEN Alert on Prevalent Virtual Currency Investment Scam. Commonly Known as "Pig Butchering." FIN-2023-Alert005 https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf (Accessed 5 November 2023).

FinCEN, 2022. FinCEN Alert on Prevalent Virtual Currency Investment Scam Commonly Known as "Pig Butchering." FinCEN Alert, FIN-2023-Alert005. https://www.fincen.gov/sites/default/files/shared/FinCEN_Alert_Pig_Butchering_FINAL_508c.pdf (Accessed 5 November 2023).

FINRA, 2022. 'Pig Butchering' Scams: What They Are and How to Avoid Them. https://www.finra.org/investors/insights/pig-butchering-scams. (Accessed 5 November 2023).

FINRA. 2024. Be Alert to Signs of Imposter Investment Scams, https://www.finra.org/investors/insights/be-alert-signs-imposter-investment-scams (Accessed 16 March 2024).

Fletcher, E., Consumer Protection Data Spotlight, 2023. Social media: a golden goose for scammers. Federal Trade Commission (FTC), https://www.ftc.gov/news-events/data-visualizations/data-spotlight/2023/10/social-media-golden-goose-scammers (Accessed 5 November 2023).

GASO. 2021a. Coinbase Wallet Has a Major Security Vulnerability. https://www.globalantiscam.org/post/coinbase-s-lack-of-accountability-presents-a-security-vulnerability (Accessed 28 December 2023).

GASO, 2021b. Dating apps and social media tech: responsible and irresponsible? https://www.globalantiscam.org/post/dating-apps-and-social-media-tech-responsible-and-irresponsible. (Accessed 28 December 2023).

GASO, 2021c. Fake Investors Group Chat https://www.globalantiscam.org/post/fake-investors-group-chat (Accessed 16 March 2024).

GASO, n.d. The Pig Butchering Scam. https://www.globalantiscam.org/about.

GASO, 2022. Statistics of crypto-romance/pig-butchering scam. https://www.globalantiscam.org/post/statistics-of-crypto-romance-pig-butchering-scam (Accessed 28 December 2022).

Goode, L., 2023. Dating Apps Crack Down on Romance Scammers. Wired, February 14, 2023. https://www.wired.com/story/dating-apps-tools-to-thwart-scams/ (Accessed 5 November 2023).

Gordon, S., Ford, R., 2006. On the definition and classification of cybercrime. J. Comput. Virol. 2, 13–20. https://doi.org/10.1007/s11416-006-0015-z

Governance, Risk & Compliance Monitor Worldwide. NJ attorney general announces crackdown on 'pig butchering' schemes (NexisUni database). 7 February 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:67GW-NHD1-F11P-X3NX-00000-00&context=1516831.

Governance, Risk & Compliance Monitor Worldwide. 2022. Cryptocurrency broker RB Hood appears to be engaged in fraud against California consumers (NexisUni database). 29 December 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:676B-V5N1-JDJN-6231-00000-00&context=1516831 (Accessed 13 February 2024).

Gurung, Anjita v. Metaquotes LTD, a Cyprus Corporation; Metaquotes Software corp., a Bahamas Corporation; Metaquotes Software corp., a Delaware Corporation; Forexware Llc, a delaware limited liability company; sich capital LTD, a United Kingdom Corporation; OPSO, Case 1:23-cv-06362-oem-pk, Plaintiff's Omnibus Opposition to Defendants' Motions to Dismiss the Complaint (United States District Court Eastern District of New York, 2023).

Ibrahim, S., 2016. Social and contextual taxonomy of cybercrime: Socioeconomic theory of Nigerian cybercriminals. Int. J. Law Crime. Justice 47, 44–57. https://doi.org/10.1016/j.ijlcj.2016.07.002. ICE, 2021. 2021 Internet Crime Report. https://www.ic3.gov/Media/PDF/AnnualReport/2021_IC3Report.pdf. (Accessed 5 November 2023).

In Re Bien, Case 3:22mc80191, Amended Motion to Amend/Correct ex parte Application Filed by Rachel Bien, (U.S. District Court for the Northern District of California, October 27, 2022).

In the Matter of Application by the United States for Seizure Warrant for the Accounts for Investigation of 18 U.S.C. Section 1343 and other offenses, Case 3:22-mj-71553-AGT, Application for a Warrant to Seize Property Subject to Forfeiture (U.S. Northern District of California, November 30, 2022).

In the matter of Crestradedmining Limited, Summary Cease and Desist order (State of New Jersey, Bureau of Securities, 2023).

In the Matter of Forex Market Trade, Summary Cease and Desist order (State of New Jersey, Bureau of Securities, 2023).

In the Matter of MetaCapitals Limited, Summary Cease and Desist order (State of New Jersey, Bureau of Securities, 2023).

In the Matter of Seizure of any and all funds and/or othernegotiable instruments stored inthe account held by Binance associated with User Identificationnumber redacted heldin the name of redacted. Case 2:22 MJ-04906, Application andAffidavit for SeizureWarrant (U.S. District Court of California,December 15, 2022).

In the Matter of the Seizure of Funds not to Exceed $351,000.00 in Wallets at Binance Holdings Limited as Described in the June 6, 2022, Affidavit of TFO James Jackson, Case 2:22-cr-00608-mgb, Application for a Warrant to Seize Property Subject to Forfeiture (U.S. District Court for the District of South Carolina, June 07, 2022).

In the Matter of theseizure of the domain names simexcbr.com, simexlua.com, simexwim.com,simexarts.com, simexroe.com, simexvtn.com and simexbiz.com, Case2:22-sw-00596-WEF (U.S. Eastern District of Virginia, November 16, 2022).

In the matter of up to 489,269.52 Tether (usdt) Cryptocurrency on case number: deposit in the kraken user id aa27 n84g rdv7 whda held in the name of osl sg pte ltd, Case 23 mj 160, Application for a Warrant (Eastern District of Wisconsin, September 11, 2023).

In the matter of: www.batcipe.vip, James Yeh, www.batcnap.vip, Kenju Go, Administrator Order No. CD-2023-0011 (Alabama Securities Commission, July 6, 2023).

Internet Crime Complaint Center (IC3), 2021. Internet Crime Report 2021. U.S. Federal Bureau of Investigation. https://www.ic3.gov/Media/PDF/AnnualReport/2021_IC3Report.pdf (Accessed 5 November 2023).

Internet Crime Complaint Center (IC3), 2022. Internet Crime Report 2022. U.S. Federal Bureau of Investigation. https://www.ic3.gov/Media/PDF/AnnualReport/2022_IC3Report.pdf (Accessed 5 November 2023).

Jane, E.A., 2016. Online misogyny and feminist digilantism. Continuum 30 (3), 284–297. https://doi.org/10.1080/10304312.2016.1166560

Keaton, J., 2023. UN Warns that Hundreds of Thousands in Southeast Asia have been Roped Into Online Scams. Associate Press. https://apnews.com/article/cambodia-myanmar-migrants-online-scams-ebab962f236df69b1f9b7e136958e244 (Accessed 5 November 2023).

Kelly, H., 2023. Newly-divorced mum reveals how she lost $100,000 to man she met on Tinder in 'pig butchering' scam – here's the red flags she ignored (NexisUni database). MailOnline (G)18(C), June 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:68GW-W511-DY4H-K2HD-00000-00&context=1516831. https://www.dailymail.co.uk/news/article-12208425/Mum-reveals-lost-100k-man-met-Tinder-cruel-pig-butchering-scam.html (Accessed 13 February 2023)).

Krasilnikova, O., 2023. Minnesota Resident Got Ripped Off $9M In a Crypto Romance Scam. Cryptodaily, August 2, 2023. https://cryptodaily.co.uk/2023/08/minnesota-resident-got-ripped-off-9m-in-a-crypto-romance-scam#:~:text=Minnesota%20po-lice%20reported%20that%20the,losing%20%249million%20in%20total. (Accessed 5 November 2023).

Lazarus, S., 2019. Just Married: The Synergy between Feminist Criminology and The Tripartite Cybercrime Framework. Int. Soc. Sci. J. 69 (231), 15–33. https://doi.org/10.1111/issj.12201

Lazarus, S., Button, M., Kapend, R., 2022. Exploring the Value of Feminist Theory in Understanding Digital Crimes. Howard J. Crime. Justice 61 (3), 381–398. https://doi.org/10.1111/hojo.12485

Lazarus, S., Okolorie, G.U., 2019. The bifurcation of the Nigerian cybercriminals: Narratives of Economic and Financial Crimes Commission (EFCC) agents. Telemat. Inform. 40, 14–26. https://doi.org/10.1016/j.tele.2019.04.009

Lazarus, S., Whittaker, J.M., McGuire, M.R., Platt, L., 2023. What do we know about online romance fraud studies? A systematic review of the empirical literature (2000 to 2021). J. Econ. Criminol., 100013. https://doi.org/10.1016/j.jeconc.2023.100013

Lee, J., 2022. Pig butchering: A day in the life of a cyberfraud fighter (NexisUni database). VentureBeat, 28 October 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:66R9-J1X1-JCMN-Y116-00000-00&context=1516831 (Accessed 13 February 2023).

Leonard Terry Licht v. Tina Ling and Luxkey, Case 3:23-cv-01018-x, Plaintiff's Original Complaint (U.S District Court for the Northern District of Texas Dallas Division, May 8, 2023).

Levine, T.R., Kim, R.K., Hamel, L.M., 2010. People lie for a reason: An experimental test of the principle of veracity. Commun. Res. Rep. 27 (4), 271–285. https://doi.org/10.1080/08824096.2010.496334

Lim, J., 2023. Stop Scams podcast: How an American business owner lost $275k in a cryptocurrency scam. Straits (November 18, 2022. https://www.straitstimes.com/singapore/courts-crime/stop-scams-podcast-how-an-american-business-owner-lost-275k-in-a-crypto-currency-scam#:~:text=Home,-Stop%20Scams%20podcast%3A%20How%20an%20American%20business%20owner%20lost,k%20in%20a%20cryptocurrency%20scam&text=SINGAPORE%20%E2%80%93%20In%20September%202021%2C%20Mr,%2475%2C000%20in%20a%20cryptocurrency%20scam. (Accessed 5 November 2023).

Maras, M-H., 2017. Cybercriminology. Oxford University Press, New York, NY.

Maras, M.-H., 2024. Real Criminology. Oxford University Press, New York, NY forthcoming.

Maras, M-H., Arsovska, J., 2023. Maras and Arsovska, Understanding the Intersection Between Technology and Kidnapping: A Typology of Virtual Kidnapping. International Criminology 3, 162–176. https://doi.org/10.1007/s43576-023-00091-4.

McGuire, M., Dowling, S., 2013. Cyber crime: A review of the evidence. Summary of key findings and implications. Home Off. Res. Rep. 75, 1–35.

Michael Bullock v. Jessica Doe and John Does i-xx and - 119,873.29 U.S. dollar coin and 119,873 Tether Virtual Currency and - Bam management US holdings Inc.; Bam trading services, inc. d/b/a Binance.us; Payward ventures, inc. d/b/a Kraken; circle internet financial, LLC d/b/a Circle; and Tether operations limited d/b/a Tether, Case 3:23-cv-03042, Verified Complaint (United States District Court, Northern District of Iowa Central Division, October 19, 2023).

Michaelson, R., 2023. Turkish presidential candidate quits race after release of alleged sex tape. Guardian (11 May 2023). https://www.theguardian.com/world/2023/may/11/muhharrem-ince-turkish-presidential-candidate-withdraws-alleged-sex-tape (Accessed 13 February 2024).).

Middle East North Africa Financial Network, 2022. Crypto Scams on Tinder Rise: Cyber-Forensics.Net Explains How Cryptorom Scams Work on Tinder, And How to Avoid Them? (NexisUni database). MENAFN, May 2, 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:6698-G2J1-JBR8-B2PJ-00000-00&context=1516831 (Accessed 13 February 2024)

Middle East North Africa Financial Network, 2023. Minnesota Crypto Scam Costs Couple Over $9 Million (NexisUni database). MENAFN - Press Releases (English), 3 August 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:68VS-V9F1-DY6B-21XP-00000-00&context=1516831 (Accessed 13 February 2024).

Newman, L.H. , 2023. Hacker Lexicon: What Is a Pig Butchering Scam? Wired, January 2, 2023. https://www.wired.com/story/what-is-pig-butchering-scam/ (accessed 5 November 2023).

OKX.com, *Elaine Kim Chen: Yu, Does 1-15, and Does:16-20, case 23-01180*, Case 23-01180, Summary Order to Cease and Desist (Investor Protection Director for the State of Delaware, September 15, 2023).

Owczarzak, B., 2023. Man loses $35K in 'pig butchering' scam (NexisUni database). CNN Wire, 6 July 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:68MP-0BX1-JBSS-S0S7-00000-00&context=1516831 (Accessed 13 February 2024)

Pawson, R. 2023. CryptoRom Scammers Add AI Chat Tool, Like ChatGPT, and Fake Hacks on Crypto Accounts to Their Toolset. Sophos Finds (NexisUni database). Mid-East. Info, 7 August 2024. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:68WJ-66M1-JDJN-64W3-00000-00&context=1516831 (Accessed 13 February 2024).

Pepper, T., 2023. FinCEN Issues Alert for Financial Institutions on Red Flags for 'Pig Butchering' Schemes (NexisUni database). *Newstex Blogs JD Supra*, 13 September 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:695F-04J1-JCMN-Y1X3-00000-00&context=1516831 (Accessed 13 February 2024).

Platte-Valley News Channel Nebraska, 2023. Coinrule-Web3.com Emerges as Preferred Financial Investment Platform for American Customers with Exceptional Risk Control and Thoughtful Service. https://plattevalley.newschannelnebraska.com/story/49417698/coinrule-web3com-emerges-as-preferred-financial-investment-platform-for-american-customers-with-exceptional-risk-control-and-thoughtful-service (Accessed 5 November 2023).

Podkul, C., 2022. How to avoid China's 'pig butchering' cyberscams. 2023. (NexisUni database) MENAFN, September 26, 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:66R4-7WF1-DY6B-22PS-00000-00&context=1516831 (Accessed 13 February 2024).

Roose, K., 2022. Crypto Scammers' New Target: Dating Apps the Shift (NexisUni database) New York Times, 21 February 2022. Mid-East. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:64V1-XBC1-JBG3-61WK-00000-00&context=1516831 (Accessed 13 February 2024).

Sandhu-Longoria, A.K., 2023. Looking for love? Watch out for romance scams that break your heart (NexisUni database), USA Today. 17 February 2023. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:67K2-1SS1-DXGX-60P0-00000-00&context=1516831 (Accessed 13 February 2024).

Sarkar, G., Shukla, S.K., 2023. Behavioral analysis of cybercrime: Paving the way for effective policing strategies. J. Econ. Criminol., 100034. https://doi.org/10.1016/j.jeconc.2023.100034

Scamwatch, 2021. Romance baiting scams on the rise. National Anti-Scam Centre, Australia https://www.scamwatch.gov.au/about-us (Accessed 5 November 2023).

Schoeff, M., Jr., 2023. Investors continue to get roasted in pig-butchering schemes (NexisUni database). InvestmentNews (10 July 2023). https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:68NR-DWX1-JC7X-W317-00000-00&context=1516831 (Accessed 13 February 2024).

Skores, A., 2023. Here's how dating app Match Group is fighting romance scammers. Tampa Bay Times, 13 May 2023. https://www.tampabay.com/news/nation-world/2023/01/13/match-dating-scams-tinder-hinge-plenty-of-fish-meetic-ourtime/ (Accessed 5 November 2023).

Sophos, 2023a. Sophos Reports: Scammers Employ Bogus Cryptocurrency Trading Pools in Sha Zhu Pan Scheme, Siphoning Over $1 Million (NexisUni database). CXOToday, 24 October 2023. https://www.sophos.com/en-us/press/press-releases/2023/09/sha-zhu-pan-scammers-use-fake-cryptocurrency-trading-pools-steal-more (Accessed 13 February 2024).

Sophos. 2023b. Sophos Investigates Two Active Cyberfraud Operations, Indicating Scammers are Expanding Their Crypto-Romance Cons, https://www.sophos.com/en-us/press/press-releases/2023/02/cyberfraud-operations-indicate-scammers-are-expanding-their-crypto-romance-cons (Accessed 15 February 2023).

State News Service, 2022a. Cryptocurrency Broker Unisom FX Limited Appears to be Engaged on Fraud Against California Consumers (NexisUni database). December 27, 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:6766-B6S1-JCBF-S37K-00000-00&context=1516831 (Accessed February 13, 2024).

State of Indiana vs XU XIONGJU, LI KUN, HU JIAJIAN, HAN ZHAOQING, and DIN TAY TRAN, Case No. 29D07-2303-MI-002357, Complaint for Damages, Forfeiture of Property, Seizure of Assets and for Injunctive Relief. Jurisdiction (Hamilton County Superior Court 7, June 27, 2023).

State of Michigan Attorney General, Consumer Protection Team, n.d. Cryptocurrency Scam - Pig Butchering. https://www.michigan.gov/consumerprotection/protect-yourself/consumer-alerts/scams/cryptocurrency-scam-pig-butchering (Accessed 28 December 2023).

States News Service, 2022b. Cryptocurrency broker ZC exchange appears to be engaged in fraud against California consumers (NexisUni database). 27 December 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:6766-B6S1-JCBF-S37R-00000-00&context=1516831 (Accessed February 13, 2024).

U.S. Attorney's Office, Central District of California, 2023. Justice Dept. Seizes Over $112M in Funds Linked to Cryptocurrency Investment Schemes, With Over Half Seized in Los Angeles Case. https://www.justice.gov/usao-cdca/pr/justice-dept-seizes-over-112m-funds-linked-cryptocurrency-investment-schemes-over-half (Accessed 3 April 2023).

U.S. Attorney's Office, Eastern District of Virginia, 2022. Court Authorizes the Seizure of Domains Used in Furtherance of a Cryptocurrency "Pig Butchering" Scheme. https://www.justice.gov/usao-edva/pr/court-authorizes-seizure-domains-used-furtherance-cryptocurrency-pig-butchering-scheme. (Accessed 5 November 2023).

U.S. Attorney's Office, District of New Jersey, 2022. Middlesex County Man Charged with Laundering $2.1 Million Obtained from Internet-Related Frauds (NexisUni database). October 11, 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:66MC-H111-DYVR-P3GG-00000-00&context=1516831 (Accessed 13 February 2024)

U.S. Department of Financial Protection and Innovation, 2022a. Cryptocurrency broker RB Hood appears to be engaged in fraud against California consumers. https://dfpi.ca.gov/2022/12/28/cryptocurrency-broker-rb-hood-appears-to-be-engaged-in-fraud-against-california-consumers/#:~:text=Cryptocurrency%20broker%20RB%20Hood%20appears%20to%20be%20engaged%20in%20fraud%20against%20California%20consumers,-Dec%2028%2C%202022&text=The%20California%20Department%20of%20Financial,resident%20regarding%20a%20crypto%20investment (Accessed 13 February 2024).

U.S. Department of Financial Protection and Innovation, 2022b. Cryptocurrency Broker ZC Exchange Appears to be Engaged in Fraud Against California Consumers. https://dfpi.ca.gov/2022/12/27/cryptocurrency-broker-zc-exchange-appears-to-be-engaged-in-fraud-against-california-consumers/#:~:text=Cryptocurrency%20broker%20ZC%20Exchange%20appears%20to%20be%20engaged%20in%20fraud%20against%20California%20consumers,-Dec%2027%2C%202022&text=The%20California%20Department%20of%20Financial,resident%20regarding%20a%20crypto%20investment (Accessed 13 February 2024).

U.S. Department of Financial Protection and Innovation, 2022c. Cryptocurrency Broker Unisom FX Limited Appears to be Engaged on Fraud Against California Consumer. https://dfpi.ca.gov/2022/12/27/cryptocurrency-broker-unison-fx-limited-appears-to-be-engaged-in-fraud-against-california-consumers/ (Accessed 13 February 2024).

U.S. Department of Justice, 2023. On Valentine's Day, Attorney General Bonta Warns Californians Against Romance Scams. https://oag.ca.gov/news/press-releases/valentine%E2%80%99s-day-attorney-general-bonta-warns-californians-against-romance-scams (Accessed 28 December 2023).

U.S. Fed News, 2023. Investor Protection Unit Grills "Pig Butchering" Scammers. (NexisUni database). 28 September 2022. https://advance-lexis-com.ez.lib.jjay.cuny.edu/api/document?collection=news&id=urn:contentItem:66GY-B2P1-F12F-F18D-00000-00&context=1516831 (Accessed 13 February 2024).

United Nations Human Rights Office of the High Commissioner, 2023. Online Scam Operations and Trafficking into Forced Criminality in Southeast Asia: Recommendations for a Human Rights Response. https://bangkok.ohchr.org/wp-content/uploads/2023/08/ONLINE-SCAM-OPERATIONS-2582023.pdf (Accessed 5 November 2023).

United States of America v. $811,549.41 in Bank Funds in Citibank Account '1187, $729,981.00 in Bank Funds in Cathay Bank Account '7026, $228,331.19 in Bank Funds in Citizens Bank Account '0334, $159,091.41 in Bank Funds in East West Bank Account '8584, and $100,000.00 in Bank Funds in East West Bank Account '5043, Case: 2:23-cv-08774-MCS-AJR, Verified Complaint for Forfeiture (U.S. District Court for the Central District of California, October 18, 2023).

United States of America v. 5,012,294.90 in TetherUS ("USDT"), 75,589,553.41 in Gala ("GALA"), 226.81 in BNB ("BNB"), 1,264.16 in Bitcoin ("BTC"), 1,495.72 in Litentry ("LIT"), 48,969 in Fantom ("FTM"), 47.17 in Ethereum ("ETH"), 501.41 in BUSD ("BUSD"). Case 2:23-cv-01988-JJT, Verified Complaint for Forfeiture in Rem (U.S. District of Arizona, September 20, 2023).

United States of America v. 56,382.9700 Tether Seized from Binance Account Ending 1678; and 0.03001485 Ether Seized from Binance Account Ending 1678, Case 1:23-cv-04861-at, Verified Complaint for Forfeiture (United States District Court or the Northern District of Georgia Atlanta Division, October 23, 2023).

United States of America v. Approximately 1, 360,000.748 Tether and $3,859,703.65 in U.S. Currency, Case 3:23-cv-04400, Verified Complaint for Civil Forfeiture in REM (U.S. District Court Northern District of California San Francisco Division, August 25, 2023).

United States of America v. Approximately 503, 349.86 Tether, 1,379,999 Cardano, and 163,118 Binance USD, Case 3:22-cv-05199-tlt, Verified Complaint for Civil Forfeiture in REM (United States District Court Northern District of California San Francisco division, September 7, 2022).

United States of America v. Jin Hua Zhang, Gregory Armand, Chen Chen, Yanbin Chen, Yanbing Chen, Changgui Huang, Xin Jin, Jiahui Miao, LingMing Zeng, Jin Fu Zhang, and Hua Zhou, Criminal Indictment, Case No. 1:22-cr-00458-LDH (U.S. Eastern District of New York, October 14, 2022).

*M.-H. Maras and E.R. Ives*

*Journal of Economic Criminology 5 (2024) 100066*

United States of America v. Hailong Zhu, Case 1:23-mj-00063-IDD, Affidavit in Support of a Criminal Complaint and Arrest Warrant: Case Images (U.S. District Court for the Eastern District of Virginia, March 10, 2023a).

United States of America v. Hailong Zhu, Case 1:23-mj-00063-IDD, Affidavit in Support of a Criminal Complaint and Arrest Warrant (U.S. District Court for the Eastern District of Virginia, March 10, 2023b).

United States of America v. Hailong Zhu, Case 1:23-sw-372, Indictment (U.S. District Court for the Eastern District of Virginia, March 10, 2023c).

United States of America v. Hailong Zhu, Case 1:23-sw-00372-JFA, Affidavit in Support of Seizure Warrant (U.S. District Court for the Eastern District of Virginia, March 10, 2023d).

United States of America, v. 1. 12,324.84 USDT Seized from Binance.com User ID # 2974 in the name of Duean Phikunkaew; 2. Cryptocurrency Seized from Binance.com User ID # 0476 in the name of Varat Vitthayanuwat; 3. Cryptocurrency Seized from Binance.com User ID # 5033 in the name of Wang Xuewen; 4. 6,972.2 USDT Seized from Binance.com User ID # 3307 in the name of Jiang Changsen, Case 1:23-cv-02549, Verified Complaint for Forfeiture in REM (U.S. District Court for the District of Colorado, September 29, 2023).

United States of America, v. Ze'shawn Stanley, Case 2:21-cr-00099-mcs document 67, (U. S. District Court for the Central District of California, March 17, 2023).

United States of America, v. 86,766.00 USDT Seized from OKY Account UUID ending 5504 and id number '097799 with affiliated deposit address ending 94d8, Case 1:23-cv-0116, Verified Complaint for Forfeiture in REM (United States District Court Western District of Michigan Southern Division, November 23, 2023).

UNODC, 2013. Draft Compr. Study Cyber (https://www.unodc.org/documents/organized-crime/UNODC_CCPCJ_EG.4_2013/CYBERCRIME_STUDY_210213.pdf (Accessed 13 February 2024).).

UNODC, 2019. Cybercrime module 2 introduction and learning outcomes. Teach. Modul. Ser. Cyber (https://sherloc.unodc.org/cld/en/education/tertiary/cybercrime/module-2/introduction-and-learning-outcomes.html (Accessed 16 March 2023)).

UNODC, 2022. Digest of Cyber Organized Crime, second ed. United Nations, Vienna.

Wall, D., 2007. Cybercrime: The Transformation of Crime in the Information Age. Polity.

Wall, David S., 2015. Dis-organised crime: towards a distributed model of the organization of cybercrime. 2015. Eur. Rev. Organ. Crime. 2 (2), 71–90. https://doi.org/10.2139/ssrn.2677113

Wang, F., Zhou, X., 2023. Persuasive schemes for financial exploitation in online romance scam: an anatomy on Sha Zhu Pan in China. Vict. Offenders 18 (5), 915–942. https://doi.org/10.1080/15564886.2022.2051109

Wang B. Denver man loses $1.6 million in new "Pig Butchering" cryptocurrency scam. Denver7 ABC, December 20 2021 2021. https://www.denver7.com/news/contact-denver7/denver-man-loses-1-6-million-in-new-pig-butchering-cryptocurrency-scam.

Whittaker, J.M., Lazarus, S., Corcoran, T., 2024. Are fraud victims nothing more than animals? Critiquing the propagation of "pig butchering" (Sha Zhu Pan, 杀猪盘). J. Econ. Criminol. 3, 100052. https://doi.org/10.1016/j.jeconc.2024.100052

Whitty, M., 2013. The scammers persuasive techniques model: Development of a stage model to explain the online dating romance scam. Br. J. Criminol. 53 (4), 665–884. https://doi.org/10.1093/bjc/azt009

Whitty, M.T., Buchanan, T., 2016. The online dating romance scam: the psychological impact on victims - both financial and non-financial. Criminol. Crim. Justice 16 (2), 176–194. https://doi.org/10.1177/1748895815603773

Wiederhold, B.K., 2020. Internet dating: should you try it? Cyber, Behav., Soc. Netw. 23 (4), 195–196. https://doi.org/10.1089/cyber.2020.29178.bkw

Zimwara, T., 2023. Namibian Police Arrest 20 Ringleaders of Local Pig Butchering Crypto Scam. Crypto Break. N. (October 18, 2023. https://news.bitcoin.com/report-namibian-police-arrest-20-ringleaders-of-local-pig-butchering-crypto-scam/ (Accessed 13 February 2024)).

Zuo, M., 2021. Online 'pig butchering' love scams have gone global after getting their start in China. South China Morning Post. https://www.scmp.com/news/people-culture/social-welfare/article/3150688/online-pig-butchering-love-scams-have-gone (Accessed 5 November 2023).



Attachment 1-B

# Federal Bureau of Investigation
# Internet Crime Report



## 2024

INTERNET CRIME COMPLAINT CENTER

2 FEDERAL BUREAU OF INVESTIGATION

**CONTENTS**

**INTRODUCTION** ............................................................................................................................3

**2024 BY THE NUMBERS** ..............................................................................................................4

**IC3's ROLE IN COMBATTING CYBER CRIME** ...........................................................................5

**IC3 CORE FUNCTIONS** ...............................................................................................................6

**IC3 COMPLAINT STATISTICS** ....................................................................................................7

PAST FIVE YEARS .......................................................................................................................7

2024 COMPLAINTS BY AGE GROUP ........................................................................................8

2024 CRIME TYPES ....................................................................................................................9

CYBER-ENABLED FRAUD ........................................................................................................11

CYBER THREATS ......................................................................................................................12

IC3 RECOVERY ASSET TEAM .................................................................................................13

POSITIVE IMPACT ....................................................................................................................14

INTERNATIONAL COMPLAINT COUNTRIES...........................................................................16

TOP 10 STATES ........................................................................................................................17

THREE YEAR COMPLAINT COUNT COMPARISON ................................................................18

OVERALL STATE STATISTICS..................................................................................................20

CRIME TYPES BY AGE GROUPS .............................................................................................24

**2024 IC3 ELDER FRAUD** ..........................................................................................................26

COMPLAINTS FILED BY INDIVIDUALS 60+ ............................................................................27

CRIME TYPES REPORTED BY 60+ ..........................................................................................28

THREE YEAR COMPARISON ...................................................................................................30

OVERALL STATE STATISTICS..................................................................................................32

**2024 IC3 CRYPTOCURRENCY FRAUD** ...................................................................................34

2024 IC3 CRYPTOCURRENCY FRAUD ...................................................................................35

CRIME TYPES WITH CRYPTOCURRENCY NEXUS ................................................................37

OVERALL STATE STATISTICS..................................................................................................39

**APPENDIX A: ABOUT IC3** .........................................................................................................41

**APPENDIX B: DEFINITIONS** ....................................................................................................42

**APPENDIX C: ADDITIONAL INFORMATION ABOUT IC3 DATA**............................................44

**APPENDIX D: PUBLIC SERVICE ANNOUCEMENTS PUBLISHED** ........................................45

**APPENDIX E: EDUCATIONAL MATERIALS PUBLISHED** .......................................................47

**Dear Reader:**

This year marks the 25th anniversary of the FBI's Internet Crime Complaint Center, or IC3. Originally intended to serve the law enforcement community, IC3 has evolved to become the primary destination for the public to report cyber-enabled crime and fraud as well as a key source for information on scams and cyber threats. Since its founding, IC3 has received over 9 million complaints of malicious activity. During its infancy, IC3 received roughly 2,000 complaints every month. For the past five years, IC3 has averaged more than 2,000 complaints every day.

As nearly all aspects of our lives have become digitally connected, the attack surface for cyber actors has grown exponentially. Scammers are increasingly using the Internet to steal Americans' hard-earned savings. And with today's technology, it can take mere taps on a keyboard to hijack networks, cripple water systems, or even rob virtual exchanges. Cryptocurrency has become an enticing means to cheat investors, launder proceeds, and engage in other illicit schemes.

Last year saw a new record for losses reported to IC3, totaling a staggering $16.6 billion. Fraud represented the bulk of reported losses in 2024, and ransomware was again the most pervasive threat to critical infrastructure, with complaints rising 9% from 2023. As a group, those over the age of 60 suffered the most losses and submitted the most complaints.

These rising losses are even more concerning because last year, the FBI took significant actions to make it harder, and more costly, for malicious actors to succeed. We dealt a serious blow to LockBit, one of the world's most active ransomware groups. Since 2022, we have offered up thousands of decryption keys to victims of ransomware, avoiding over $800 million in payments.

Also in 2024, we worked proactively to prevent losses and minimize victim harm through private sector collaboration and initiatives like Operation Level Up. We disbanded fraud and laundering syndicates, shut down scam call centers, shuttered illicit marketplaces, dissolved nefarious "botnets," and put hundreds of other actors behind bars. Our partnerships across the intelligence, law enforcement, and private sector communities have never been stronger.

The criminals Americans face today may look different than in years past, but they still want the same thing: to harm Americans for their own benefit. This brings me back to IC3's quarter-century milestone. While the top threats facing our country have certainly shifted over the decades, protecting American citizens—whether that means your safety, your money, or your data—remains a cornerstone of the FBI's mission.

And in the fight against increasingly savvy criminals, the FBI also relies on *you*. Without the information you report to us through IC3 or your local FBI Field Office, we simply cannot piece together the puzzle of this ever-shifting threat landscape. If ever you suspect you're a victim of cyber-enabled crime, do not hesitate to let us know. We want to be there for you, and what you report will help us help others.

*B. Chad Yarbrough*

**B. Chad Yarbrough**
**Operations Director for Criminal and Cyber**
**Federal Bureau of Investigation**

## 2024 BY THE NUMBERS[1]

**859,532**  Total Complaints in 2024

**$16.6 Billion**  Losses in 2024

**33%**  Increase in Losses from 2023

**256,256**  Complaints with Actual Loss

**$19,372**  Average Loss

---

[1] Accessibility description: Image depicts key statistics regarding complaints and losses. In 2024, complaints totaled 859,532, with losses of $16.6 billion, representing a 33 percent increase from 2023. 256,256 complaints reported an actual loss. For complaints, the average reported loss was $19,372.

# IC3's ROLE IN COMBATTING CYBER CRIME[2]



---

[2] Accessibility description: Image lists IC3's primary functions including partnering with private sector and with local, state, federal, and international agencies: hosting a reporting portal at www.ic3.gov; providing a central hub to alert the public to threats; Perform Analysis, Complaint Referrals, and Asset Recovery; and hosting a remote access database for all law enforcement via FBI's LEEP website.

6                                                    FEDERAL BUREAU OF INVESTIGATION

# IC3 CORE FUNCTIONS[3]



## COLLECTION

IC3 is the central point for Internet crime victims to report and alert the appropriate agencies to suspected cybercriminal activity.
Victims are encouraged and often directed by law enforcement to file a complaint online at **www.ic3.gov.**
Complainants are asked to document accurate and complete information related to suspected cyber-enabled crime, as well as any other relevant information.



## ANALYSIS

IC3 reviews and analyzes data submitted through its website to identify emerging threats and new trends. In addition, IC3 can quickly alert financial institutions to fraudulent transactions which enables the freezing of victim funds if certain reporting criteria are met.



## PUBLIC AWARENESS

Public service announcements, industry alerts, and other publications outlining specific scams are posted to the **www.ic3.gov** website. As more people become aware of cyber-enabled crimes and the methods used to carry them out, potential victims are equipped with a broader understanding of the dangers associated with Internet activity and are in a better position to avoid falling prey to schemes online.



## REFERRALS

IC3 aggregates related complaints to build referrals, which are forwarded to local, state, federal, and international law enforcement agencies for potential investigation. If law enforcement investigates and determines a crime has been committed, legal action may be brought against the perpetrator.

---

[3] Accessibility description: Image contains icons with the core functions. Core functions - Collection, Analysis, Public Awareness, and Referrals - are listed in individual blocks as components of an ongoing process.

# IC3 COMPLAINT STATISTICS

## PAST FIVE YEARS

IC3 has received an average of 836,000 complaints per year. These complaints address a wide array of Internet scams affecting individuals around the globe.[4]





---

[4] Accessibility description: Chart describes complaint counts and losses over a 5-year period.
[5] Accessibility description: Chart includes yearly and aggregate data for complaints and losses over the years 2020 to 2024. Over this time, IC3 received a total of 4.2 million complaints, a reported loss of $50.5 billion, and an average of 836,000 complaints received per year. Since 2000, IC3 has received more than 9 million complaints. * Please see Appendix C for more information regarding IC3 data.

# 2024 COMPLAINTS BY AGE GROUP [6]



**Under 20**
17,993
$22.5 Million

■ Complaints    ■ Losses

**20 - 29**
71,399
$540.1 Million

**30 - 39**
108,899
$1.4 Billion

**40 - 49**
112,755
$2.2 Billion

**50 - 59**
84,540
$2.5 Billion

**60+**
147,127
$4.8 Billion

---

[6] Not all complaints include an associated age range—those without this information are excluded from this table. Please see Appendix C for more information regarding IC3 data. Accessibility description: Chart shows number of complaints and losses by age group. Under 20: 17,993 complaints, $22.5 million in losses; 20-29: 71,399 complaints, $540.1 million in losses; 30-39: 108,899 complaints, $1.4 billion in losses; 40-49: 112,755 complaints, $2.2 billion in losses; 50-59: 84,540 complaints, $2.5 billion in losses; 60+: 147,127 complaints, $4.8 billion in losses.

2024 IC3 ANNUAL REPORT

# 2024 CRIME TYPES

| BY COMPLAINT COUNT | | | |
|---|---|---|---|
| **Crime Type** | **Complaints** | **Crime Type** | **Complaints** |
| **Phishing/Spoofing** | 193,407 | **Harassment/Stalking** | 11,672 |
| **Extortion** | 86,415 | **Real Estate** | 9,359 |
| **Personal Data Breach** | 64,882 | **Advanced Fee** | 7,097 |
| **Non-Payment/ Non-Delivery** | 49,572 | **Crimes Against Children** | 4,472 |
| **Investment** | 47,919 | **Lottery/Sweepstakes/ Inheritance** | 3,690 |
| **Tech Support** | 36,002 | **Data Breach** | 3,204 |
| **Business Email Compromise** | 21,442 | **Ransomware** | 3,156 |
| **Identity Theft** | 21,403 | **Overpayment** | 2,705 |
| **Employment** | 20,044 | **IPR*/Copyright and Counterfeit** | 1,583 |
| **Confidence/Romance** | 17,910 | **Threats of Violence** | 1,360 |
| **Government Impersonation** | 17,367 | **SIM Swap** | 982 |
| **Credit Card/Check Fraud** | 12,876 | **Botnet** | 587 |
| **Other** | 12,318 | **Malware** | 441 |
| *Descriptor** | | | |
| **Cryptocurrency** | 149,686 | | |

*IPR: Intellectual Property Rights

** This descriptor relates to the medium or tool used to facilitate the crime and used by IC3 for tracking purposes only. It is available as a descriptor only after a crime type has been selected.

Please see Appendix C for more information regarding IC3 data.

FEDERAL BUREAU OF INVESTIGATION

# 2024 CRIME TYPES *continued*

| BY COMPLAINT LOSS | | | |
|---|---|---|---|
| **Crime Type** | **Loss** | **Crime Type** | **Loss** |
| **Investment** | $6,570,639,864 | **Extortion** | $143,185,736 |
| **Business Email Compromise** | $2,770,151,146 | **Lottery/Sweepstakes/Inheritance** | $102,212,250 |
| **Tech Support** | $1,464,755,976 | **Advanced Fee** | $102,074,512 |
| **Personal Data Breach** | $1,453,296,303 | **Phishing/Spoofing** | $70,013,036 |
| **Non-Payment/Non-Delivery** | $785,436,888 | **SIM Swap** | $25,983,946 |
| **Confidence/Romance** | $672,009,052 | **Overpayment** | $21,452,521 |
| **Government Impersonation** | $405,624,084 | **Ransomware *** | $12,473,156 |
| **Data Breach** | $364,855,818 | **Harassment/Stalking** | $10,611,223 |
| **Other** | $280,278,325 | **Botnet** | $8,860,202 |
| **Employment** | $264,223,271 | **IPR/Copyright and Counterfeit** | $8,715,512 |
| **Credit Card/Check Fraud** | $199,889,841 | **Threats of Violence** | $1,842,186 |
| **Identity Theft** | $174,354,745 | **Malware** | $1,365,945 |
| **Real Estate** | $173,586,820 | **Crimes Against Children** | $519,424 |
| *Descriptor*** | | | |
| Cryptocurrency | $9,322,335,911 | | |

\* Regarding ransomware adjusted losses, this number does not include estimates of lost business, time, wages, files, or equipment, or any third-party remediation services acquired by an entity. In some cases, entities do not report any loss amount to FBI, thereby creating an artificially low overall ransomware loss rate. Lastly, the number only represents what entities report to FBI via IC3 and does not account for the entity directly reporting to FBI field offices/agents.

\*\* This descriptor relates to the medium or tool used to facilitate the crime and is used by IC3 for tracking purposes only. It is available as a descriptor only after a crime type has been selected.

Please see Appendix C for more information regarding IC3 data.

# CYBER-ENABLED FRAUD

Cyber-enabled fraud includes complaints where criminals use the Internet or other technology to commit fraudulent activities, often involving the theft of money, data, or identity, or the creation of counterfeit goods or services. Cyber-enabled fraud is responsible for almost 83% of all losses reported to IC3 in 2024. [7]



**CYBER-ENABLED FRAUD in 2024**

| 333,981 Complaints | $13.7 Billion Losses | 38% of 2024 Complaints | 83% of 2024 Losses |

## TRENDS

| Call Center Scams | Emergency Scams |
|---|---|
| 53,369 complaints; $1.9 billion in losses | 357 complaints; $2.7 million in losses |
| FBI Warns of Scammers Impersonating Cryptocurrency Exchanges | FBI Warns of Scammers Targeting Senior Citizens in Grandparent Scams... |
| Increase in Tech Support Scams Targeting Older Adults and Directing Victims to Send Cash... | Telephone Scam Alleging a Relative is in a Financial or Legal Crisis |
| **Toll Scams** | **Gold Courier Scams** |
| 59,271 complaints; $129,624 in losses | 525 complaints; $219 million in losses |
| Smishing Scam Regarding Debt for Road Toll Services | Scammers Use Couriers to Retrieve Cash and Precious Metals... |

---

[7] Accessibility description: Chart describes totals for crime types generally considered to be cyber-enabled fraud: 333,981 complaints; $13.7 billion in losses; 38% of 2024 complaints received; 83% of 2024 losses. * Please see Appendix C for more information regarding IC3 data.

[8] Accessibility description: Chart describes counts and losses for crime types generally considered to be cyber-enabled fraud.

FEDERAL BUREAU OF INVESTIGATION

# CYBER THREATS

A cyber or cybersecurity threat is a malicious act that seeks to damage data, steal data, or disrupt digital life in general. Cyber threats include ransomware, viruses and malware, data breaches, Denial of Service (DoS) attacks, and other attack vectors. IC3 received more than 4,800 complaints from organizations belonging to a critical infrastructure sector that were affected by a cyber threat. The most reported cyber threats among critical infrastructure organizations were ransomware and data breaches.

[9]



[10]



---

[9] Accessibility description: This chart outlines cyber threat complaints in 2024: 263,455 complaints; $1.571 billion in losses; 4,878 complaints from critical infrastructure. The five most reported ransomware variants: Akira, LockBit, RansomHub, FOG, and PLAY.

[10] Accessibility description: This chart outlines the number of ransomware and data breach complaints filed by the critical infrastructure sectors.

## IC3 RECOVERY ASSET TEAM



Established in 2018, the IC3 Recovery Asset Team streamlines communications with financial institutions and FBI field offices to assist in the freezing of funds for victims of fraudulent domestic and international transactions via the Financial Fraud Kill Chain. Most Financial Fraud Kill Chain incidents initiated by the IC3 RAT are Business Email Compromise (BEC). The Financial Fraud Kill Chain can also be initiated for Tech Support Fraud, Romance Scams, and Data Breaches.

The Recovery Asset Team assumed responsibility for domestic-to-international transactions in April 2024. The International Financial Fraud Kill Chain is a partnership between federal law enforcement and financial entities whose purpose is to freeze fraudulent funds wired by victims. International requests are coordinated through the Financial Crimes Enforcement Network Rapid Response Team and law enforcement entities, including FBI LEGAT offices and international law enforcement partners. [12]



[11] Accessibility description: Chart describes FFKC activity in 2024: 3,020 complaints attempted for $848.4 million. Domestic: 2,651 complaints, $469.1 million frozen; International: 369 complaints, $92.5 million frozen; 66% success rate.

[12] Accessibility description: Chart describes FFKC domestic and international frozen and loss amounts from 2020 to 2024.

FEDERAL BUREAU OF INVESTIGATION

# POSITIVE IMPACT

## Operation Level Up

Launched in January 2024, Operation Level identified victims of cryptocurrency investment fraud and notified them of the scam. The operation was initiated with the support of agents from FBI and the U.S. Secret Service. Cryptocurrency investment fraud, also known as "pig butchering," is a confidence-based scam. Subjects target victims online and develop a relationship before introducing a fraudulent investment opportunity in cryptocurrency. Victims are coached to invest more and more money into what appears to be an extremely profitable platform, only to be unable to withdraw their funds.

**Success Stories**

Utilizing IC3 complaint data, Operation Level Up reported:

- 4,323 victims of cryptocurrency investment fraud were notified.
- 76% of those victims were unaware they were being scammed.
- Estimated savings to victims of $285,639,989.
- 42 victims referred to an FBI victim specialist for suicide intervention.

**Read More About It**

Operation Level-Up: How the FBI Is Saving Victims from Cryptocurrency Investment Fraud

Operation Level Up — FBI

## Call Center Fraud

Illegal call centers defraud thousands of victims each year. Two categories of call center fraud reported to the IC3 are Tech/Customer Support and Government Impersonation.

**DOJ, FBI, and Central Bureau of Investigation:**

Since 2022, the DOJ, FBI, and IC3 have collaborated with law enforcement in India, such as the Central Bureau of Investigation (CBI) in New Delhi and local Indian states, to combat cyber-enabled financial crimes and transnational call center fraud.

In 2024, law enforcement in India conducted multiple call center raids, disruptions, seizures, and arrests of the individuals alleged to be involved in perpetrating these crimes.

FBI Washington Field Office participated in two media series aimed at bringing awareness to call center fraud.

**Success Stories**

FBI responded to over 38 requests from law enforcement in India and provided approximately 60 actionable leads.

FBI enabled over 215 arrests through 11 joint operations with the CBI and other local law enforcement in 2024. This represented a 700% increase in arrests from 2023, the first full year of the collaboration.

FBI conducted hundreds of interviews and continues to support Indian law enforcement efforts and prosecution of call centers perpetrating these frauds.

**Read More About It**

Tech/Customer Support and Government Impersonation

# POSITIVE IMPACT

## Ransomware

IC3 recognized 67 new ransomware variants in 2024. The most reported of these new variants were:

- FOG
- Lynx
- Cicada 3301
- Dragonforce
- Frag

IC3 provides this information to FBI Field Offices to help identify new ransomware variants, discover the enterprises the threat actors are targeting, and determine whether critical infrastructure is being targeted.

### Success Story

**FBI Boston, February 2024**: Authorities seized www.warzone.ws and three related domains, which together offered for sale the Warzone RAT malware — a sophisticated remote access trojan capable of enabling cybercriminals to surreptitiously connect to victims' computers for malicious purposes. The Warzone RAT provided cybercriminals the ability to browse victim file systems, take screenshots, record keystrokes, steal victim usernames and passwords, and watch victims through web cameras, all without the victims' knowledge or permission.

**Read More About It**

International Cybercrime Malware Service Dismantled by Federal Authorities: Key Malware Sales and Support Actors in Malta and Nigeria Charged in Federal Indictments | United States Department of JusticeCharged in Federal Indictments

## Financial Fraud Kill Chain

The IC3 Recovery Asset Team streamlines communications with financial institutions and FBI field offices to assist in the freezing of funds for victims of fraudulent domestic and international transactions.

**FBI Denver, March 2024**: The Recovery Asset Team received a complaint reporting a BEC involving a real estate transaction. The individuals were in the process of purchasing property and received a spoofed email from their supposed real estate agents requesting that they wire $956,342 to a U.S. domestic bank to finalize the closing. Two days after the wire was initiated, the victims realized the instructions came from a spoofed email. Upon notification, the Recovery Asset Team immediately initiated the process to freeze the fraudulent recipient bank account. The transfer of $955,060 was stopped and the money was returned to the individuals.

### Success Story

**LEGAT Singapore, September 2024**: The Recovery Asset Team received a request from LEGAT Singapore regarding a transaction sent to a U.S. domestic recipient bank in the amount of $6,661,650 due to a BEC incident. The Recovery Asset Team initiated the Financial Fraud Kill Chain request to the domestic recipient bank, who blocked the account and froze a total of $5,100,000 for recovery.  Funds not available were wired out immediately upon deposit to accounts located in Spain and China.  Efforts by the domestic recipient bank were made to potentially recover those wires as well.

**Read More About It**

SPF | International Cooperation Leading To The Interception Of Over USD 5 Million Linked To Business Email Compromise Scam

16                                                    FEDERAL BUREAU OF INVESTIGATION

# INTERNATIONAL COMPLAINT COUNTRIES [13]

IC3 received complaints from more than 200 countries in 2024.

| TOP 20 FOREIGN COUNTRIES WITH CITIZENS SUBMITTING COMPLAINTS TO IC3 | | | |
|---|---|---|---|
| **Country** | **Complaints** | **Country** | **Complaints** |
| **United Kingdom** | 102,692 | **Mexico** | 1,116 |
| **Canada** | 6,951 | **South Africa** | 1,075 |
| **India** | 4,189 | **Pakistan** | 979 |
| **France** | 2,223 | **Indonesia** | 895 |
| **Philippines** | 1,790 | **Italy** | 761 |
| **Australia** | 1,533 | **Sweden** | 732 |
| **Germany** | 1,524 | **China** | 651 |
| **Japan** | 1,492 | **Turkey** | 649 |
| **Brazil** | 1,472 | **Spain** | 639 |
| **Honduras** | 1,352 | **Netherlands** | 598 |

Transactional information provided in IC3 complaints also helps identify where funds are going when victims are directed to send funds overseas. [14]



**Top International Destinations for Fraudulent Wire Transactions in 2024**

| Hong Kong | Vietnam | Mexico | Philippines | India | China |
|---|---|---|---|---|---|
| 3,043 | 2,629 | 1,498 | 1,421 | 1,322 | 1,270 |

---

[13] Accessibility description: Charts list the top 20 countries by number of total complaints submitted to IC3, aside from the U.S. Please see Appendix C for more information regarding IC3 data.

[14] Accessibility description: Chart shows the countries with the highest number of reported fraudulent wire transactions in 2024.

2024 IC3 ANNUAL REPORT

# TOP REPORTED TRANSACTION TYPES [15]

Transaction information provided in IC3 complaints helps FBI understand how victims are losing funds to fraud and assists the Recovery Asset Team Financial Fraud Kill Chain process when complaints are filed as quickly as possible. This chart identifies the top ways complainants reported financial loss in fraud.



## Top Ways Funds Are Lost in Fraud

- ■ Cryptocurrency
- ■ Wire transfer/ACH
- ■ Debit/Credit Card
- ■ Peer-to-Peer Transfer
- ■ Gift/Prepaid Card
- ■ Check/Cashier's Check
- ■ Cash

**TOP 10 STATES BY NUMBER OF COMPLAINTS** [16]

| State | Number |
|---|---|
| California | 96,265 |
| Texas | 62,347 |
| Florida | 52,191 |
| New York | 36,468 |
| Pennsylvania | 27,838 |
| Illinois | 25,446 |
| Ohio | 24,915 |
| Indiana | 23,659 |
| North Carolina | 22,021 |
| Arizona | 20,101 |

**TOP 10 STATES BY LOSS (IN MILLIONS)** [17]

| State | Loss |
|---|---|
| California | $2,539 |
| Texas | $1,352 |
| Florida | $1,072 |
| New York | $904 |
| Illinois | $479 |
| New Jersey | $435 |
| Georgia | $420 |
| Pennsylvania | $400 |
| Arizona | $392 |
| Washington | $368 |

---

[15] Accessibility description: Chart depicts the top reported transaction types: Cryptocurrency, Wire transfer/ACH, Debit/Credit Card, Peer-to-Peer, Check/Cashier's Check, Gift/Prepaid Card, and Cash.

[16] Accessibility description: Chart depicts the top 10 states based on number of complaints. These include California, Texas, Florida, New York, Pennsylvania, Illinois, Ohio, Indiana, North Carolina, and Arizona. Please see Appendix C for more information regarding IC3 data.

[17] Accessibility description: Chart depicts the top 10 states based on reported losses are labeled. These include California, Texas, Florida, New York, Illinois, New Jersey, Georgia, Pennsylvania, Arizona, and Washington. Please see Appendix C for more information regarding IC3 data.

# THREE YEAR COMPLAINT COUNT COMPARISON

| BY COMPLAINT COUNT | | | |
| --- | --- | --- | --- |
| Crime Type | 2024 | 2023 | 2022 |
| Advanced Fee | 7,097 | 8,045 | 11,264 |
| Business Email Compromise | 21,442 | 21,489 | 21,832 |
| Botnet | 587 | 540 | 568 |
| Confidence Fraud/Romance | 17,910 | 17,823 | 19,021 |
| Credit Card/Check Fraud | 12,876 | 13,718 | 22,985 |
| Crimes Against Children | 4,472 | 2,361 | 2,587 |
| Data Breach | 3,204 | 3,727 | 2,795 |
| Employment | 20,044 | 15,443 | 14,946 |
| Extortion | 86,415 | 48,223 | 39,416 |
| Government Impersonation | 17,367 | 14,190 | 11,554 |
| Harassment/Stalking | 11,672 | 9,587 | 11,779 |
| Identity Theft | 21,403 | 19,778 | 27,922 |
| Investment | 47,919 | 39,570 | 30,529 |
| IPR/Copyright and Counterfeit | 1,583 | 1,498 | 2,183 |
| Lottery/Sweepstakes/Inheritance | 3,690 | 4,168 | 5,650 |
| Malware | 441 | 659 | 762 |
| Non-Payment/Non-Delivery | 49,572 | 50,523 | 51,679 |
| Other | 12,318 | 8,808 | 9,966 |
| Overpayment | 2,705 | 4,144 | 6,183 |
| Personal Data Breach | 64,882 | 55,851 | 58,859 |
| Phishing/Spoofing | 193,407 | 298,878 | 321,136 |
| Ransomware | 3,156 | 2,825 | 2,385 |
| Real Estate | 9,359 | 9,521 | 11,727 |
| SIM Swap | 982 | 1,075 | 2,026 |
| Tech Support | 36,002 | 37,560 | 32,538 |
| Threats of Violence | 1,360 | 1,697 | 2,224 |

# THREE YEAR COMPLAINT LOSS COMPARISON

| BY COMPLAINT LOSS | | | |
|---|---|---|---|
| **Crime Type** | **2024** | **2023** | **2022** |
| **Advanced Fee** | $102,074,512 | $134,516,577 | $104,325,444 |
| **Business Email Compromise** | $2,770,151,146 | $2,946,830,270 | $2,742,354,049 |
| **Botnet** | $8,860,202 | $22,422,708 | $17,099,378 |
| **Confidence Fraud/Romance** | $672,009,052 | $652,544,805 | $735,882,192 |
| **Credit Card/Check Fraud** | $199,889,841 | $173,627,614 | 264,148,905 |
| **Crimes Against Children** | $519,424 | $2,031,485 | $577,464 |
| **Data Breach** | $364,855,818 | $534,397,222 | $459,321,859 |
| **Employment** | $264,223,271 | $70,234,079 | $52,204,269 |
| **Extortion** | $143,185,736 | $74,821,835 | $54,335,128 |
| **Government Impersonation** | $405,624,084 | $394,050,518 | $240,553,091 |
| **Harassment/Stalking** | $10,611,223 | $9,677,332 | $5,621,402 |
| **Identity Theft** | $174,354,745 | $126,203,809 | 189,205,793 |
| **Investment** | $6,570,639,864 | $4,570,275,683 | $3,311,742,206 |
| **IPR/Copyright and Counterfeit** | $8,715,512 | $7,555,329 | $4,591,177 |
| **Lottery/Sweepstakes/Inheritance** | $102,212,250 | $94,502,836 | $83,602,376 |
| **Malware** | $1,365,945 | $1,213,317 | $9,326,482 |
| **Non-Payment/Non-Delivery** | $785,436,888 | $309,648,416 | $281,770,073 |
| **Other** | $280,278,325 | $240,053,059 | $117,686,789 |
| **Overpayment** | $21,452,521 | $27,955,195 | $38,335,772 |
| **Personal Data Breach** | $1,453,296,303 | $744,219,879 | $742,438,136 |
| **Phishing/Spoofing** | $70,013,036 | $18,728,550 | $160,015,411 |
| **Ransomware** | $12,473,156 | $59,641,384 | $34,353,237 |
| **Real Estate** | $173,586,820 | $145,243,348 | $396,932,821 |
| **SIM Swap** | $25,983,946 | $48,798,103 | $72,652,571 |
| **Tech Support** | $1,464,755,976 | $924,512,658 | $806,551,993 |
| **Threats of Violence** | $1,842,186 | $13,531,178 | $4,972,099 |

# OVERALL STATE STATISTICS

| COMPLAINTS BY STATE* | | | | | |
|---|---|---|---|---|---|
| Rank | State | Complaints | Rank | State | Complaints |
| 1 | California | 96,265 | 30 | Alaska | 6,770 |
| 2 | Texas | 62,347 | 31 | Louisiana | 6,455 |
| 3 | Florida | 52,191 | 32 | Kentucky | 6,165 |
| 4 | New York | 36,468 | 33 | Connecticut | 5,695 |
| 5 | Pennsylvania | 27,838 | 34 | Kansas | 4,797 |
| 6 | Illinois | 25,446 | 35 | Arkansas | 4,240 |
| 7 | Ohio | 24,915 | 36 | New Mexico | 3,884 |
| 8 | Indiana | 23,659 | 37 | District of Columbia | 3,856 |
| 9 | North Carolina | 22,021 | 38 | Idaho | 3,081 |
| 10 | Arizona | 20,101 | 39 | Mississippi | 3,068 |
| 11 | Georgia | 19,797 | 40 | Delaware | 2,806 |
| 12 | Washington | 18,009 | 41 | Hawaii | 2,603 |
| 13 | Virginia | 17,466 | 42 | Nebraska | 2,603 |
| 14 | Michigan | 16,302 | 43 | West Virginia | 2,594 |
| 15 | New Jersey | 15,701 | 44 | New Hampshire | 2,340 |
| 16 | Maryland | 14,996 | 45 | Puerto Rico | 2,241 |
| 17 | Colorado | 14,848 | 46 | Maine | 2,137 |
| 18 | Massachusetts | 14,254 | 47 | Montana | 1,854 |
| 19 | Tennessee | 11,411 | 48 | Rhode Island | 1,642 |
| 20 | Nevada | 10,716 | 49 | Wyoming | 1,377 |
| 21 | Missouri | 10,028 | 50 | South Dakota | 1,298 |
| 22 | South Carolina | 9,661 | 51 | Vermont | 937 |
| 23 | Wisconsin | 9,619 | 52 | North Dakota | 885 |
| 24 | Minnesota | 9,264 | 53 | U.S. Minor Outlying Islands | 170 |
| 25 | Oregon | 9,011 | 54 | Guam | 96 |
| 26 | Alabama | 7,840 | 55 | American Samoa | 91 |
| 27 | Oklahoma | 7,479 | 56 | Virgin Islands, U.S. | 87 |
| 28 | Iowa | 7,193 | 57 | Northern Mariana Islands | 21 |
| 29 | Utah | 6,877 | | | |

* Note: This information is based on the total number of complaints from each state, American Territory, and the District of Columbia for which the complainant provided state information. Please see Appendix C for more information regarding IC3 data.

# OVERALL STATE STATISTICS *CONTINUED*

| LOSSES BY STATE* | | | | | |
|---|---|---|---|---|---|
| Rank | State | Loss | Rank | State | Loss |
| 1 | California | $2,539,041,635 | 30 | Alabama | $103,771,880 |
| 2 | Texas | $1,351,598,183 | 31 | Puerto Rico | $91,363,707 |
| 3 | Florida | $1,071,909,632 | 32 | Louisiana | $87,411,457 |
| 4 | New York | $903,975,003 | 33 | Kansas | $80,300,908 |
| 5 | Illinois | $479,054,271 | 34 | New Mexico | $76,621,670 |
| 6 | New Jersey | $434,856,424 | 35 | Kentucky | $73,919,940 |
| 7 | Georgia | $420,454,472 | 36 | Iowa | $72,860,333 |
| 8 | Pennsylvania | $400,082,312 | 37 | Mississippi | $65,613,936 |
| 9 | Arizona | $392,441,717 | 38 | Idaho | $63,035,342 |
| 10 | Washington | $368,203,209 | 39 | Hawaii | $55,180,901 |
| 11 | Massachusetts | $338,872,378 | 40 | New Hampshire | $52,811,455 |
| 12 | North Carolina | $324,287,947 | 41 | Arkansas | $51,714,039 |
| 13 | Virginia | $317,406,595 | 42 | Nebraska | $46,730,894 |
| 14 | District of Columbia | $291,531,458 | 43 | Wyoming | $43,502,744 |
| 15 | Ohio | $278,038,028 | 44 | Delaware | $37,611,598 |
| 16 | Nevada | $268,769,310 | 45 | Montana | $31,603,407 |
| 17 | Colorado | $243,517,403 | 46 | Maine | $31,455,797 |
| 18 | Michigan | $241,737,979 | 47 | Alaska | $26,296,803 |
| 19 | Maryland | $238,976,904 | 48 | South Dakota | $24,957,446 |
| 20 | Minnesota | $203,352,530 | 49 | West Virginia | $24,196,661 |
| 21 | Tennessee | $190,271,310 | 50 | Rhode Island | $23,597,036 |
| 22 | Missouri | $183,751,987 | 51 | North Dakota | $21,831,953 |
| 23 | Wisconsin | $169,942,495 | 52 | Vermont | $11,285,112 |
| 24 | South Carolina | $146,468,765 | 53 | Guam | $2,532,544 |
| 25 | Oregon | $144,160,344 | 54 | Virgin Islands, U.S. | $1,441,830 |
| 26 | Connecticut | $143,884,002 | 55 | U.S. Minor Outlying Islands | $1,107,380 |
| 27 | Utah | $129,414,310 | 56 | American Samoa | $195,182 |
| 28 | Indiana | $125,093,323 | 57 | Northern Mariana Islands | $121,874 |
| 29 | Oklahoma | $113,724,886 | | | |

\* Note: This information is based on the total losses from complaints in each state, American Territory, and the District of Columbia for which the complainant provided state information. Please see Appendix C for more information regarding IC3 data.

22

FEDERAL BUREAU OF INVESTIGATION

## OVERALL STATE STATISTICS *CONTINUED*

| Rank | State | Count | Rank | State | Count |
|---|---|---|---|---|---|
| COMPLAINTS PER 100K CITIZENS* | | | | | |
| 1 | Alaska | 914.7 | 27 | Georgia | 177.1 |
| 2 | District of Columbia | 549.1 | 28 | South Carolina | 176.3 |
| 3 | Indiana | 341.7 | 29 | New Hampshire | 166.1 |
| 4 | Nevada | 328.0 | 30 | New Jersey | 165.3 |
| 5 | Delaware | 266.8 | 31 | Montana | 163.0 |
| 6 | Arizona | 265.1 | 32 | Kansas | 161.5 |
| 7 | Colorado | 249.2 | 33 | Wisconsin | 161.4 |
| 8 | California | 244.1 | 34 | Michigan | 160.8 |
| 9 | Maryland | 239.4 | 35 | Missouri | 160.6 |
| 10 | Wyoming | 234.3 | 36 | Minnesota | 159.9 |
| 11 | Washington | 226.3 | 37 | Tennessee | 157.9 |
| 12 | Florida | 223.3 | 38 | Connecticut | 155.0 |
| 13 | Iowa | 221.9 | 39 | Idaho | 153.9 |
| 14 | Pennsylvania | 212.8 | 40 | Maine | 152.1 |
| 15 | Oregon | 210.9 | 41 | Alabama | 152.0 |
| 16 | Ohio | 209.7 | 42 | Rhode Island | 147.6 |
| 17 | Illinois | 200.2 | 43 | West Virginia | 146.6 |
| 18 | Massachusetts | 199.7 | 44 | Vermont | 144.5 |
| 19 | North Carolina | 199.4 | 45 | Louisiana | 140.4 |
| 20 | Texas | 199.3 | 46 | South Dakota | 140.4 |
| 21 | Virginia | 198.2 | 47 | Arkansas | 137.3 |
| 22 | Utah | 196.3 | 48 | Kentucky | 134.4 |
| 23 | New York | 183.6 | 49 | Nebraska | 129.8 |
| 24 | Oklahoma | 182.6 | 50 | North Dakota | 111.1 |
| 25 | New Mexico | 182.3 | 51 | Mississippi | 104.2 |
| 26 | Hawaii | 180.0 | 52 | Puerto Rico | 70.0 |

* Note: This information is based on the estimated 2024 Census estimated data and the total number of complaints from each state, the District of Columbia, and Puerto Rico for which the complainant provided state information. Please see Appendix C for more information regarding IC3 data. https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html#v2024

# OVERALL STATE STATISTICS *CONTINUED*

| Rank | State | Loss | Rank | State | Loss |
|------|-------|------|------|-------|------|
| | **LOSSES PER 100K CITIZENS\*** | | | | |
| 1 | **District of Columbia** | $41,513,914 | 27 | **Pennsylvania** | $3,059,025 |
| 2 | **Nevada** | $8,225,617 | 28 | **Missouri** | $2,942,166 |
| 3 | **Wyoming** | $7,403,235 | 29 | **North Carolina** | $2,935,789 |
| 4 | **California** | $6,439,159 | 30 | **Puerto Rico** | $2,852,179 |
| 5 | **Arizona** | $5,175,704 | 31 | **Wisconsin** | $2,850,918 |
| 6 | **Massachusetts** | $4,748,658 | 32 | **Montana** | $2,778,974 |
| 7 | **Washington** | $4,626,726 | 33 | **Oklahoma** | $2,776,898 |
| 8 | **Florida** | $4,586,256 | 34 | **North Dakota** | $2,740,752 |
| 9 | **New Jersey** | $4,577,026 | 35 | **Kansas** | $2,703,183 |
| 10 | **New York** | $4,550,077 | 36 | **South Dakota** | $2,699,068 |
| 11 | **Texas** | $4,319,470 | 37 | **South Carolina** | $2,673,358 |
| 12 | **Colorado** | $4,087,582 | 38 | **Tennessee** | $2,632,511 |
| 13 | **Connecticut** | $3,915,137 | 39 | **Michigan** | $2,383,896 |
| 14 | **Hawaii** | $3,815,721 | 40 | **Ohio** | $2,339,737 |
| 15 | **Maryland** | $3,815,560 | 41 | **Nebraska** | $2,330,178 |
| 16 | **Illinois** | $3,769,066 | 42 | **Iowa** | $2,247,743 |
| 17 | **Georgia** | $3,760,478 | 43 | **Maine** | $2,238,828 |
| 18 | **New Hampshire** | $3,748,066 | 44 | **Mississippi** | $2,229,457 |
| 19 | **Utah** | $3,693,739 | 45 | **Rhode Island** | $2,121,448 |
| 20 | **Virginia** | $3,602,310 | 46 | **Alabama** | $2,011,980 |
| 21 | **New Mexico** | $3,596,829 | 47 | **Louisiana** | $1,901,183 |
| 22 | **Delaware** | $3,575,529 | 48 | **Indiana** | $1,806,591 |
| 23 | **Alaska** | $3,552,983 | 49 | **Vermont** | $1,740,206 |
| 24 | **Minnesota** | $3,510,223 | 50 | **Arkansas** | $1,674,485 |
| 25 | **Oregon** | $3,374,247 | 51 | **Kentucky** | $1,611,028 |
| 26 | **Idaho** | $3,149,218 | 52 | **West Virginia** | $1,367,059 |

\* Note: This information is based on the estimated 2024 Census estimated data and the total number of complaints from each state, the District of Columbia, and Puerto Rico for which the complainant provided state information. Please see Appendix C for more information regarding IC3 data. https://www.census.gov/data/tables/time-series/demo/popest/2020s-state-total.html#v2024

FEDERAL BUREAU OF INVESTIGATION

# CRIME TYPES BY AGE GROUPS

| COUNTS | UNDER 20 | 20 - 29 | 30 – 39 | 40 – 49 | 50 - 59 |
|---|---|---|---|---|---|
| Advanced Fee | 220 | 971 | 1,102 | 968 | 1,009 |
| Business Email Compromise | 90 | 800 | 2,058 | 2,934 | 3,047 |
| Botnet | 74 | 99 | 79 | 55 | 42 |
| Confidence/Romance | 272 | 1,219 | 1,814 | 2,056 | 2,365 |
| Credit Card/Check Fraud | 295 | 1,206 | 1,690 | 1,641 | 1,642 |
| Crimes Against Children | 1,367 | 140 | 73 | 58 | 28 |
| Data Breach | 33 | 147 | 358 | 523 | 402 |
| Employment | 604 | 3,674 | 2,916 | 2,003 | 1,516 |
| Extortion | 6,540 | 13,811 | 6,180 | 4,305 | 3,620 |
| Government Impersonation | 161 | 1,462 | 1,894 | 1,818 | 1,711 |
| Harassment/Stalking | 548 | 1,667 | 1,998 | 1,619 | 990 |
| Identity Theft | 288 | 1,922 | 3,550 | 3,163 | 2,688 |
| Investment | 399 | 3,453 | 6,822 | 6,873 | 5,797 |
| IPR/Copyright and Counterfeit | 24 | 146 | 216 | 198 | 168 |
| Lottery/Sweepstakes/ Inheritance | 31 | 168 | 298 | 343 | 708 |
| Malware | 47 | 86 | 113 | 89 | 66 |
| Non-Payment/ Non-Delivery | 1,691 | 7,644 | 8,436 | 7,466 | 5,848 |
| Other | 318 | 883 | 1,375 | 1,187 | 909 |
| Overpayment | 314 | 776 | 507 | 456 | 449 |
| Personal Data Breach | 1,335 | 6,312 | 10,756 | 9,870 | 7,008 |
| Phishing/Spoofing | 203 | 1,088 | 1,532 | 1,701 | 2,060 |
| Ransomware | 12 | 62 | 120 | 211 | 253 |
| Real Estate | 150 | 1,749 | 1,407 | 1,088 | 1,011 |
| SIM Swap | 7 | 58 | 185 | 213 | 172 |
| Spoofing | 127 | 615 | 955 | 902 | 1,045 |
| Tech Support | 279 | 1,928 | 2,537 | 2,794 | 3,584 |
| Threats of Violence | 118 | 254 | 326 | 249 | 168 |
| Cryptocurrency | 858 | 6,277 | 10,885 | 10,338 | 8,953 |

* 60+ crime type information is available in the 2024 IC3 Elder Fraud Report.

# CRIME TYPES BY AGE GROUPS

| LOSSES | UNDER 20 | 20 - 29 | 30 – 39 | 40 – 49 | 50 - 59 |
|---|---|---|---|---|---|
| Advanced Fee | $289,546 | $4,479,321 | $9,638,362 | $16,770,456 | $12,970,490 |
| Business Email Compromise | $11,067,986 | $30,611,039 | $207,186,022 | $302,370,195 | $361,651,832 |
| Botnet | $60 | $30,718 | $2,691 | $17,303,168 | $2,001 |
| Confidence/Romance | $759,616 | $11,016,901 | $31,008,972 | $46,027,157 | $82,466,829 |
| Credit Card/Check Fraud | $687,043 | $4,581,387 | $9,861,167 | $25,602,871 | $21,660,432 |
| Crimes Against Children | $95,862 | $4,292 | $45,366 | $29,655 | $499,469 |
| Data Breach | $970,279 | $3,251,108 | $64,898,844 | $43,983,317 | $15,586,514 |
| Employment | $1,971,457 | $13,138,194 | $15,419,807 | $9,874,429 | $10,102,359 |
| Extortion | $2,080,479 | $11,799,104 | $8,777,342 | $8,984,024 | $7,784,643 |
| Government Impersonation | $2,008,033 | $34,354,239 | $30,281,258 | $20,880,418 | $18,727,179 |
| Harassment/Stalking | $51,719 | $676,809 | $2,185,563 | $2,699,273 | $649,797 |
| Identity Theft | $269,690 | $4,522,239 | $13,036,661 | $17,427,975 | $12,879,363 |
| Investment | $13,571,240 | $154,183,205 | $540,646,646 | $616,072,673 | $871,842,750 |
| IPR/Copyright and Counterfeit | $4,302 | $61,107 | $780,863 | $1,662,760 | $2,851,670 |
| Lottery/Sweep-stakes/Inheritance | $28,558 | $732,222 | $2,118,356 | $3,512,077 | $3,856,993 |
| Malware | $18,056 | $43,693 | $59,168 | $202,908 | $135,302 |
| Non-Payment/Non-Delivery | $1,578,742 | $19,895,195 | $40,383,092 | $54,348,415 | $49,535,571 |
| Other | $1,366,980 | $11,369,781 | $22,380,525 | $15,665,583 | $16,411,270 |
| Overpayment | $1,006,792 | $2,055,986 | $2,799,535 | $2,737,512 | $2,570,057 |
| Personal Data Breach | $635,038 | $20,180,645 | $115,301,927 | $224,444,555 | $108,826,649 |
| Phishing/Spoofing | $35,368 | $1,229,413 | $2,726,832 | $2,612,598 | $2,751,552 |
| Ransomware | $0 | $12,548 | $37,660 | $187,680 | $517,222 |
| Real Estate | $413,752 | $4,784,750 | $6,623,054 | $9,331,733 | $22,466,504 |
| SIM Swap | $0 | $800,617 | $6,752,902 | $6,250,788 | $5,080,192 |
| Spoofing | $780,878 | $876,082 | $2,624,922 | $3,054,743 | $3,665,661 |
| Tech Support | $1,007,672 | $14,019,656 | $25,573,715 | $48,163,755 | $48,548,923 |
| Threats of Violence | $4,181 | $7,908 | $6,063,974 | $65,817 | $331,395 |
| Cryptocurrency | $14,745,598 | $169,240,044 | $695,761,773 | $851,201,069 | $904,569,789 |

 * 60+ crime type information is available in the 2024 IC3 Elder Fraud Report.



2024 Elder Fraud

INTERNET CRIME COMPLAINT CENTER

# COMPLAINTS FILED BY INDIVIDUALS 60+





---

# CRIME TYPES REPORTED BY 60+

| COMPLAINANTS 60+ | | | |
|---|---|---|---|
| **Crime Type** | **Count** | **Crime Type** | **Count** |
| **Phishing/Spoofing** | 23,252 | **Advanced Fee** | 1,897 |
| **Tech Support** | 16,777 | **Real Estate** | 1,765 |
| **Extortion** | 12,618 | **Lottery/Sweepstakes/Inheritance** | 1,711 |
| **Personal Data Breach** | 9,827 | **Harassment/Stalking** | 696 |
| **Investment** | 9,448 | **Overpayment** | 527 |
| **Non-Payment/Non-Delivery** | 7,646 | **Data Breach** | 300 |
| **Confidence/Romance** | 7,626 | **Ransomware** | 208 |
| **Government Impersonation** | 4,521 | **SIM Swap** | 205 |
| **Identity Theft** | 4,064 | **IPR/Copyright and Counterfeit** | 163 |
| **Business Email Compromise*** | 3,300 | **Threats of Violence** | 111 |
| **Credit Card/Check Fraud** | 3,226 | **Malware** | 45 |
| **Other** | 2,017 | **Crimes Against Children** | 25 |
| **Employment** | 1,928 | **Botnet** | 23 |
| **Descriptor**\*\* | | | |
| **Cryptocurrency** | 33,369 | | |

\*Regarding Business Email Compromise counts: A whole number is given to depict the overall complaint count and includes when a 60+ complainant may be reporting on behalf of a business or personally.

\*\* This descriptor relates to the medium or tool used to facilitate the crime and are used by IC3 for tracking purposes only. It is available only after a crime type has been selected. Please see Appendix C for more information regarding IC3 data.

# CRIME TYPES REPORTED BY 60+ *Continued*

| COMPLAINANTS 60+ LOSSES | | | |
|---|---|---|---|
| **Crime Type** | **Loss** | **Crime Type** | **Loss** |
| Investment | $1,834,242,515 | Data Breach | $28,546,213 |
| Tech Support | $982,440,006 | Identity Theft | $28,463,106 |
| Confidence/Romance | $389,312,356 | Extortion | $24,901,693 |
| Business Email Compromise* | $385,001,099 | Phishing/Spoofing | $20,202,521 |
| Personal Data Breach | $254,187,196 | SIM Swap | $6,342,329 |
| Government Impersonation | $208,096,366 | Overpayment | $5,900,921 |
| Other | $111,300,637 | IPR/Copyright and Counterfeit | $1,076,710 |
| Non-Payment/Non-Delivery | $76,794,753 | Harassment/Stalking | $713,693 |
| Real Estate | $76,324,236 | Threats of Violence | $300,488 |
| Lottery/Sweepstakes/Inheritance | $75,897,926 | Crimes Against Children | $231,600 |
| Advanced Fee | $41,622,868 | Malware | $187,911 |
| Employment | $37,882,347 | Ransomware** | $43,199 |
| Credit Card/Check Fraud | $33,813,267 | Botnet | $14,852 |
| **Descriptor*** | | | |
| Cryptocurrency | $2,839,333,197 | | |

\* Regarding Business Email Compromise losses: A whole number is given to depict the overall complaint count and includes when a 60+ complainant may be reporting on behalf of a business or personally.

\*\* Regarding ransomware adjusted losses, this number does not include estimates of lost business, time, wages, files, or equipment, or any third-party remediation services acquired by an entity. In some cases, entities do not report any loss amount to FBI, thereby creating an artificially low overall ransomware loss rate. Lastly, the number only represents what entities report to FBI via IC3 and does not account for the entity directly reporting to FBI field offices/agents.

\*\*\* This descriptor relates to the medium or tool used to facilitate the crime and used by IC3 for tracking purposes only. It is available only after a crime type has been selected. Please see Appendix C for more information regarding IC3 data.

FEDERAL BUREAU OF INVESTIGATION

# THREE YEAR COMPARISON

| 60+ COMPLAINT COUNT | | | |
|---|---|---|---|
| Crime Type | 2024 | 2023 | 2022 |
| Advanced Fee | 1,897 | 1,951 | 3,153 |
| Business Email Compromise | 3,300 | 3,080 | 3,938 |
| Botnet | 23 | 17 | 33 |
| Confidence Fraud/Romance | 7,626 | 6,740 | 7,166 |
| Credit Card/Check Fraud | 3,226 | 3,182 | 4,956 |
| Crimes Against Children | 25 | 26 | 84 |
| Data Breach | 300 | 336 | 333 |
| Employment | 1,928 | 1,079 | 1,286 |
| Extortion | 12,618 | 5,396 | 4,285 |
| Government Impersonation | 4,521 | 3,517 | 3,425 |
| Harassment/Stalking | 696 | 568 | 754 |
| IPR/Copyright and Counterfeit | 163 | 152 | 235 |
| Identity Theft | 4,064 | 3,010 | 4,825 |
| Investment | 9,448 | 6,443 | 4,661 |
| Lottery/Sweepstakes/Inheritance | 1,711 | 1,771 | 2,388 |
| Malware | 45 | 67 | 125 |
| Non-Payment/Non-Delivery | 7,646 | 6,693 | 7,985 |
| Other | 2,017 | 1,447 | 2,016 |
| Overpayment | 527 | 698 | 1,183 |
| Personal Data Breach | 9,827 | 7,333 | 7,849 |
| Phishing/Spoofing | 23,252 | 2,856 | 8,369 |
| Ransomware | 208 | 175 | 215 |
| Real Estate | 1,765 | 1,498 | 1,862 |
| SIM Swap | 205 | 174 | 301 |
| Tech Support | 16,777 | 17,696 | 17,810 |
| Threats of Violence | 111 | 115 | 166 |
| Cryptocurrency | 33,369 | 16,968 | 9,991 |

**2024 IC3 ANNUAL REPORT**

## THREE YEAR COMPARISON, *Continued*

| 60+ COMPLAINT LOSSES | | | |
|---|---|---|---|
| **Crime Type** | **2024** | **2023** | **2022** |
| **Advanced Fee** | $41,622,868 | $67,923,263 | $49,322,099 |
| **Business Email Compromise** | $385,001,099 | $382,372,731 | $477,342,728 |
| **Botnet** | $14,852 | $23,142 | $120,621 |
| **Confidence Fraud/Romance** | $389,312,356 | $356,888,968 | $419,768,142 |
| **Credit Card/Check Fraud** | $33,813,267 | $37,862,023 | $61,649,198 |
| **Crimes Against Children** | $231,600 | $1,159,939 | $48,373 |
| **Data Breach** | $28,546,213 | $23,913,130 | $17,681,749 |
| **Employment** | $37,882,347 | $6,835,684 | $6,403,021 |
| **Extortion** | $24,901,693 | $23,093,451 | $15,555,047 |
| **Government Impersonation** | $208,096,366 | $179,646,103 | $136,500,338 |
| **Harassment/Stalking** | $713,693 | $1,930,347 | $254,659 |
| **IPR/Copyright and Counterfeit** | $1,076,710 | $183,169 | $203,140 |
| **Identity Theft** | $28,463,106 | $34,551,900 | $42,653,578 |
| **Investment** | $1,834,242,515 | $1,243,010,600 | $990,235,119 |
| **Lottery/Sweepstakes/Inheritance** | $75,897,926 | $67,396,206 | $69,845,106 |
| **Malware** | $187,911 | $261,144 | $1,851,421 |
| **Non-Payment/Non-Delivery** | $76,794,753 | $59,018,965 | $51,531,615 |
| **Other** | $111,300,637 | $72,707,042 | $31,410,237 |
| **Overpayment** | $5,900,921 | $7,496,049 | $10,977,231 |
| **Personal Data Breach** | $254,187,196 | $109,724,027 | $127,736,607 |
| **Phishing/Spoofing** | $20,202,521 | $3,355,436 | $36,715,205 |
| **Ransomware** | $43,199 | $635,548 | $210,052 |
| **Real Estate** | $76,324,236 | $65,634,851 | $135,239,020 |
| **SIM Swap** | $6,342,329 | $15,148,072 | $19,515,629 |
| **Tech Support** | $982,440,006 | $589,759,770 | $587,831,698 |
| **Threats of Violence** | $300,488 | $5,128,768 | $376,458 |
| **Cryptocurrency** | $2,839,333,197 | $1,653,484,444 | $1,088,330,051 |

32                                         FEDERAL BUREAU OF INVESTIGATION

# OVERALL STATE STATISTICS

| COUNTS BY STATE FROM COMPLAINTS FILED BY INDIVIDUALS 60+* | | | | | |
|---|---|---|---|---|---|
| Rank | State | Count | Rank | State | Count |
| 1 | California | 18,091 | 30 | Kentucky | 1,336 |
| 2 | Florida | 11,902 | 31 | Connecticut | 1,209 |
| 3 | Texas | 9,473 | 32 | New Mexico | 1,150 |
| 4 | Arizona | 6,683 | 33 | Kansas | 1,129 |
| 5 | Pennsylvania | 6,353 | 34 | Arkansas | 1,063 |
| 6 | New York | 6,225 | 35 | Iowa | 803 |
| 7 | Illinois | 6,064 | 36 | Idaho | 775 |
| 8 | Ohio | 5,388 | 37 | Hawaii | 647 |
| 9 | Indiana | 5,324 | 38 | New Hampshire | 633 |
| 10 | North Carolina | 5,031 | 39 | Maine | 608 |
| 11 | Virginia | 3,841 | 40 | Mississippi | 604 |
| 12 | Washington | 3,692 | 41 | West Virginia | 594 |
| 13 | Georgia | 3,622 | 42 | Nebraska | 551 |
| 14 | Maryland | 3,231 | 43 | Delaware | 514 |
| 15 | Massachusetts | 3,224 | 44 | Alaska | 466 |
| 16 | Michigan | 3,148 | 45 | Montana | 438 |
| 17 | Colorado | 3,128 | 46 | Rhode Island | 324 |
| 18 | New Jersey | 2,918 | 47 | Puerto Rico | 285 |
| 19 | Tennessee | 2,543 | 48 | District of Columbia | 267 |
| 20 | Nevada | 2,299 | 49 | Wyoming | 267 |
| 21 | South Carolina | 2,293 | 50 | South Dakota | 259 |
| 22 | Oregon | 2,288 | 51 | Vermont | 243 |
| 23 | Missouri | 2,199 | 52 | North Dakota | 174 |
| 24 | Oklahoma | 1,858 | 53 | U.S. Minor Outlying Islands | 39 |
| 25 | Minnesota | 1,836 | 54 | Guam | 20 |
| 26 | Wisconsin | 1,785 | 55 | Virgin Islands, U.S. | 17 |
| 27 | Utah | 1,762 | 56 | Northern Mariana Islands | 2 |
| 28 | Alabama | 1,567 | 57 | American Samoa | 1 |
| 29 | Louisiana | 1,372 | | | |

* Note: This information is based on the total number of complaints from each state, American Territory, and the District of Columbia for which the complainant provided state information. Please see Appendix C for more information regarding IC3 data.

# OVERALL STATE STATISTICS, *Continued*

| LOSSES BY STATE FROM COMPLAINTS FILED BY INDIVIDUALS 60+* | | | | | |
|---|---|---|---|---|---|
| Rank | State | Loss | Rank | State | Loss |
| 1 | California | $832,710,048 | 30 | Iowa | $34,991,114 |
| 2 | Texas | $489,790,386 | 31 | Alabama | $33,200,314 |
| 3 | Florida | $388,436,198 | 32 | Connecticut | $30,918,559 |
| 4 | New York | $257,658,301 | 33 | New Mexico | $30,034,919 |
| 5 | District of | $251,454,544 | 34 | Mississippi | $28,870,444 |
| 6 | Arizona | $190,686,835 | 35 | Arkansas | $27,253,501 |
| 7 | Georgia | $174,744,201 | 36 | Kentucky | $26,139,251 |
| 8 | Pennsylvania | $151,096,514 | 37 | Kansas | $23,511,153 |
| 9 | Illinois | $133,794,241 | 38 | Nebraska | $21,414,248 |
| 10 | New Jersey | $133,397,512 | 39 | Puerto Rico | $20,183,422 |
| 11 | Washington | $107,052,160 | 40 | Hawaii | $18,851,052 |
| 12 | Virginia | $106,575,141 | 41 | Idaho | $18,663,392 |
| 13 | Massachusetts | $99,804,762 | 42 | New Hampshire | $15,840,854 |
| 14 | Ohio | $95,441,773 | 43 | Maine | $12,980,616 |
| 15 | Michigan | $92,378,793 | 44 | Delaware | $12,293,619 |
| 16 | North Carolina | $87,449,567 | 45 | Montana | $12,056,193 |
| 17 | Nevada | $81,400,930 | 46 | South Dakota | $8,975,829 |
| 18 | Maryland | $80,128,654 | 47 | Wyoming | $8,648,675 |
| 19 | Colorado | $74,760,501 | 48 | Alaska | $8,173,395 |
| 20 | Missouri | $63,530,750 | 49 | Rhode Island | $6,309,411 |
| 21 | Tennessee | $61,882,884 | 50 | West Virginia | $5,790,489 |
| 22 | South Carolina | $58,581,997 | 51 | North Dakota | $5,781,845 |
| 23 | Minnesota | $52,262,721 | 52 | Vermont | $4,177,269 |
| 24 | Wisconsin | $50,525,457 | 53 | U.S. Minor Outlying | $670,314 |
| 25 | Oklahoma | $50,203,394 | 54 | Guam | $592,965 |
| 26 | Oregon | $48,116,839 | 55 | Virgin Islands, U.S. | $163,884 |
| 27 | Utah | $44,155,961 | 56 | American Samoa | $3,000 |
| 28 | Louisiana | $37,512,993 | 57 | Northern Mariana Islands | $120 |
| 29 | Indiana | $37,209,947 | | | |

\* Note: This information is based on the total losses in each state, American Territory, and the District of Columbia for which the complainant provided state information. Please see Appendix C for more information regarding IC3 data.



2024

Cryptocurrency Fraud

INTERNET CRIME COMPLAINT CENTER

35                                    2024 IC3 ANNUAL REPORT

# 2024 IC3 CRYPTOCURRENCY FRAUD



[20]

| COMPLAINTS REFERENCING CRYPTOCURRENCY | | |
|---|---|---|
| AGE RANGE[21] | COUNT | LOSS |
| Under 20 | 1,819 | $7,778,157 |
| 20 – 29 | 13,591 | $370,443,345 |
| 30 – 39 | 22,218 | $1,006,382,458 |
| 40 – 49 | 22,555 | $1,462,040,974 |
| 50 – 59 | 19,317 | $1,184,912,854 |
| Over 60 | 33,369 | $2,839,333,197 |

[22]



---

[20] Accessibility description: Chart outlines cryptocurrency complaints in 2024: 149,686 complaints; $9.3 billion in losses; 66% increase in loss; largest age group to report is 60+.

[21] Not all complaints include an associated age range—those without this information are excluded from this table. Please see Appendix C for more information regarding IC3 data.

[22] Chart outlines the number of cryptocurrency related complaints from 2017 to 2024.

36    FEDERAL BUREAU OF INVESTIGATION

## CRYPTOCURRENCY in FRAUD TRENDS

### Cryptocurrency Investment

41,557 Complaints; $5.8 Billion in Losses
-----
29% Increase in Complaints from 2023
47% Increase in Losses from 2023
-----
The FBI Warns of a Spike in Cryptocurrency Investment Schemes

| CRYPTO INVESTMENT FRAUD by AGE GROUP | | |
|---|---|---|
| Age Group | Count | Losses |
| Under 20 | 303 | $3,307,216 |
| 20 - 29 | 2,906 | $273,447,400 |
| 30 - 39 | 6,217 | $373,696,736 |
| 40 - 49 | 7,145 | $1,053,964,645 |
| 50 - 59 | 6,364 | $811,298,119 |
| Over 60 | 8,043 | $1,600,353,509 |

### Cryptocurrency ATMs/Kiosks

10,956 Complaints; $246.7 Million in Losses
------
99% Increase in Complaints from 2023
31% Increase in Losses from 2023
------
The FBI Warns of Fraudulent Schemes Leveraging Cryptocurrency ATMs and QR Codes to Facilitate Payment

| REPORTS of CRYPTO ATM/KIOSK USE by AGE GROUP | | |
|---|---|---|
| Age Group | Count | Losses |
| Under 20 | 7 | $51,913 |
| 20 - 29 | 280 | $3,739,620 |
| 30 - 39 | 361 | $4,241,387 |
| 40 - 49 | 319 | $3,621,774 |
| 50 – 59 | 349 | $5,523,230 |
| Over 60 | 2,674 | $107,206,251 |

| CRIME TYPES MOST ASSOCIATED WITH CRYPTO ATM USE | | | | | |
|---|---|---|---|---|---|
| | Count | Losses | | Count | Losses |
| Extortion | 4,189 | $5,601,953 | Government Impersonation | 1,786 | $44,587,335 |
| Tech Support | 3,037 | $107,429,709 | Investment | 606 | $38,090,269 |

### Extortion/Sextortion

54,936 Complaints; $33.5 Million in Losses
-----
59% Increase in Complaints from 2023
9% Increase in Losses from 2023
-----
Malicious Actors Manipulating Photos and Videos to Create Explicit Content and Sextortion Schemes

| EXTORTION / SEXTORTION by AGE GROUP | | |
|---|---|---|
| Age Group | Count | Losses |
| Under 20 | 7,463 | $3,720,078 |
| 20 - 29 | 20,279 | $39,863,422 |
| 30 - 39 | 18,617 | $102,445,015 |
| 40 - 49 | 17,577 | $160,993,499 |
| 50 - 59 | 12,946 | $255,512,960 |
| Over 60 | 20,445 | $724,288,735 |

# CRIME TYPES WITH CRYPTOCURRENCY NEXUS

| COMPLAINTS | | | |
|---|---|---|---|
| **Crime Type** | **Count** | **Crime Type** | **Count** |
| **Extortion** | 47,054 | **Identity Theft** | 527 |
| **Investment** | 41,557 | **Credit Card/Check Fraud** | 389 |
| **Personal Data Breach** | 11,644 | **Ransomware** | 389 |
| **Tech Support** | 11,129 | **Lottery/Sweepstakes/Inheritance** | 329 |
| **Employment** | 6,533 | **Business Email Compromise** | 256 |
| **Phishing/Spoofing** | 3,938 | **Real Estate** | 256 |
| **Confidence/Romance** | 3,811 | **SIM Swap** | 215 |
| **Government Impersonation** | 3,585 | **Harassment/Stalking** | 211 |
| **Non-Payment/Non-Delivery** | 2,492 | **Overpayment** | 186 |
| **Advanced Fee** | 1,537 | **Malware** | 53 |
| **Other** | 1,315 | **Botnet** | 44 |
| **Data Breach** | 846 | **Crimes Against Children** | 42 |

| Descriptor* | | | |
|---|---|---|---|
| **Cryptocurrency** | 149,686 | | |

\* This descriptor relates to the medium or tool used to facilitate the crime and are used by IC3 for tracking purposes only. It is available only after a crime type has been selected. Please see Appendix C for more information regarding IC3 data.

FEDERAL BUREAU OF INVESTIGATION

## CRIME TYPES WITH CRYPTOCURRENCY NEXUS *Continued*

| LOSSES | | | |
|---|---|---|---|
| **Crime Type** | **Loss** | **Crime Type** | **Loss** |
| **Investment** | $5,819,531,069 | **SIM Swap** | $28,463,106 |
| **Personal Data Breach** | $1,120,793,009 | **Credit Card/Check Fraud** | $24,901,693 |
| **Tech Support** | $961,998,313 | **Identity Theft** | $20,202,521 |
| **Confidence/Romance** | $237,151,771 | **Lottery/Sweepstakes/ Inheritance** | $6,342,329 |
| **Employment** | $197,224,612 | **Real Estate** | $5,900,921 |
| **Data Breach** | $167,874,424 | **Ransomware*** | $1,076,710 |
| **Government Impersonation** | $146,057,054 | **Botnet** | $713,693 |
| **Extortion** | $96,072,767 | **Overpayment** | $300,488 |
| **Business Email Compromise** | $63,882,699 | **Harassment/Stalking** | $231,600 |
| **Other** | $63,516,319 | **Malware** | $187,911 |
| **Non-Payment/Non-Delivery** | $55,139,529 | **IPR/Copyright and Counterfeit** | $43,199 |
| **Advanced Fee** | $36,436,824 | **Threats of Violence** | $289,288 |
| **Phishing/Spoofing** | $28,546,213 | **Crimes Against Children** | $19,174 |
| **Descriptor**** | | | |
| **Cryptocurrency** | $9,322,335,911 | | |

\* Regarding Ransomware adjusted losses, this number does not include estimates of lost business, time, wages, files, equipment, or any third-party remediation services acquired by a complainant. In some cases, complainants do not report any loss amount to FBI, thereby creating an artificially low overall ransomware loss rate. Lastly, the number only represents what complainants report to FBI via IC3 and does not account for complainants directly reporting to FBI field offices/agents.

\*\* This descriptor relates to the medium or tool used to facilitate the crime and are used by IC3 for tracking purposes only. It is available only after a crime type has been selected. Please see Appendix C for more information regarding IC3 data.

# OVERALL STATE STATISTICS

| CRYPTOCURRENCY COMPLAINTS BY STATE* | | | | | |
|---|---|---|---|---|---|
| Rank | State | Count | Rank | State | Count |
| 1 | California | 19,508 | 30 | Kentucky | 1,196 |
| 2 | Texas | 11,270 | 31 | Louisiana | 1,165 |
| 3 | Florida | 10,698 | 32 | New Mexico | 885 |
| 4 | New York | 8,053 | 33 | Kansas | 862 |
| 5 | Pennsylvania | 4,355 | 34 | Idaho | 835 |
| 6 | Illinois | 4,319 | 35 | Arkansas | 775 |
| 7 | New Jersey | 4,259 | 36 | Hawaii | 709 |
| 8 | Washington | 4,169 | 37 | Iowa | 668 |
| 9 | Arizona | 4,145 | 38 | Mississippi | 582 |
| 10 | Virginia | 4,016 | 39 | New Hampshire | 547 |
| 11 | North Carolina | 3,684 | 40 | Nebraska | 541 |
| 12 | Georgia | 3,533 | 41 | District of Columbia | 534 |
| 13 | Ohio | 3,371 | 42 | Alaska | 453 |
| 14 | Colorado | 3,218 | 43 | Maine | 429 |
| 15 | Maryland | 3,158 | 44 | Montana | 421 |
| 16 | Massachusetts | 3,015 | 45 | Delaware | 406 |
| 17 | Michigan | 3,009 | 46 | West Virginia | 406 |
| 18 | Tennessee | 2,354 | 47 | Rhode Island | 329 |
| 19 | Nevada | 2,153 | 48 | Puerto Rico | 278 |
| 20 | Oregon | 2,070 | 49 | South Dakota | 254 |
| 21 | Wisconsin | 1,973 | 50 | Wyoming | 250 |
| 22 | Missouri | 1,951 | 51 | Vermont | 207 |
| 23 | South Carolina | 1,944 | 52 | North Dakota | 184 |
| 24 | Indiana | 1,880 | 53 | U.S. Minor Outlying Islands | 28 |
| 25 | Minnesota | 1,852 | 54 | Guam | 15 |
| 26 | Utah | 1,658 | 55 | Virgin Islands, U.S. | 13 |
| 27 | Connecticut | 1,361 | 56 | American Samoa | 5 |
| 28 | Alabama | 1,313 | 57 | Northern Mariana Islands | 3 |
| 29 | Oklahoma | 1,208 | | | |

\* Note: This information is based on the total number of complaints from each state, American Territory, and the District of Columbia when the complainant provided state information. Please see Appendix C for more information regarding IC3 data.

40                                          FEDERAL BUREAU OF INVESTIGATION

## OVERALL STATE STATISTICS, *Continued*

| | CRYPTOCURRENCY LOSSES BY STATE* | | | | |
|---|---|---|---|---|---|
| Rank | State | Loss | Rank | State | Loss |
| 1 | California | $1,393,628,996 | 30 | Louisiana | $49,306,020 |
| 2 | Texas | $738,583,341 | 31 | Kansas | $49,045,398 |
| 3 | Florida | $584,746,970 | 32 | Indiana | $48,009,883 |
| 4 | New York | $375,087,857 | 33 | New Mexico | $43,269,446 |
| 5 | Illinois | $272,633,678 | 34 | Oklahoma | $37,752,198 |
| 6 | District of Columbia | $262,640,821 | 35 | Wyoming | $36,386,737 |
| 7 | New Jersey | $236,721,074 | 36 | Idaho | $35,149,916 |
| 8 | Pennsylvania | $218,642,276 | 37 | Kentucky | $32,907,797 |
| 9 | Washington | $204,694,032 | 38 | Hawaii | $24,893,821 |
| 10 | Massachusetts | $201,530,349 | 39 | Nebraska | $23,094,744 |
| 11 | Georgia | $197,647,537 | 40 | New Hampshire | $22,699,416 |
| 12 | Nevada | $185,521,892 | 41 | Arkansas | $20,654,583 |
| 13 | Arizona | $177,578,809 | 42 | Iowa | $20,350,712 |
| 14 | North Carolina | $174,411,615 | 43 | Delaware | $19,973,180 |
| 15 | Virginia | $158,769,093 | 44 | Maine | $17,137,660 |
| 16 | Maryland | $132,730,401 | 45 | Mississippi | $14,505,794 |
| 17 | Colorado | $130,631,488 | 46 | South Dakota | $13,811,508 |
| 18 | Michigan | $126,330,606 | 47 | Montana | $12,900,561 |
| 19 | Ohio | $123,379,667 | 48 | Rhode Island | $12,556,877 |
| 20 | Missouri | $93,029,140 | 49 | Alaska | $11,780,664 |
| 21 | Minnesota | $91,614,693 | 50 | North Dakota | $7,700,246 |
| 22 | Tennessee | $82,748,140 | 51 | West Virginia | $7,686,156 |
| 23 | Puerto Rico | $71,185,851 | 52 | Vermont | $4,265,121 |
| 24 | Oregon | $68,159,115 | 53 | U.S. Minor Outlying Islands | $874,714 |
| 25 | Utah | $68,133,250 | 54 | Guam | $751,009 |
| 26 | Wisconsin | $67,513,795 | 55 | Virgin Islands, U.S. | $324,580 |
| 27 | South Carolina | $60,529,485 | 56 | American Samoa | $145,182 |
| 28 | Connecticut | $59,749,544 | 57 | Northern Mariana Islands | $16,946 |
| 29 | Alabama | $51,273,598 | | | |

\* Note: This information is based on the total number of complaints from each state, American Territory, and the District of Columbia when the complainant provided state information. Please see Appendix C for more information regarding IC3 data.

# APPENDIX A: ABOUT IC3

Today's FBI is an intelligence-driven and threat focused national security organization with both intelligence and law enforcement responsibilities. FBI is focused on protecting the American people from terrorism, espionage, cyber-attacks, and major criminal threats, which are increasingly emanating from our digitally connected world. To do that, FBI leverages IC3 as a mechanism to gather intelligence on cybercrime so that we can provide the public and our many partners with information, services, support, training, and leadership to stay ahead of the threat.

Every day, IC3 receives thousands of complaints reporting a wide array of scams, many of them targeting our most vulnerable populations. The information submitted to IC3 can be impactful in the individual complaints, but it is most impactful in the aggregate. That is, when the individual complaints are combined with other data, it allows FBI to connect complaints, investigate reported crimes, track trends and threats, and, in some cases, even freeze stolen funds. Just as importantly, IC3 shares reports of crime throughout its vast network of FBI field offices and law enforcement partners, strengthening our nation's collective response both locally and nationally.

IC3 was established in May 2000 to receive complaints crossing the spectrum of cyber matters, to include cyber threats and cyber-enabled fraud in their many forms including ransomware, intrusions (hacking), extortion, international money laundering, investment fraud, and a growing list of crimes. As of publication, IC3 has received over 9 million complaints. IC3's mission is to provide the public and our partners with a reliable and convenient reporting mechanism to submit information concerning suspected cyber-enabled criminal activity and to develop effective alliances with law enforcement and industry partners to help those who report. Information is analyzed and disseminated for investigative and intelligence purposes for law enforcement and public awareness.

To promote public awareness and as part of its prevention mission, IC3 aggregates the submitted data and produces an annual report on the trends impacting the public as well as routinely providing intelligence reports about trends. The success of these efforts is directly related to the quality of the data submitted by the public through the IC3.gov interface. Their efforts help IC3 and FBI better protect their fellow citizens.

Frauds and scams will continue to evolve, but many characteristics of these schemes remain the same even as new trends develop. Review previous IC3 Annual Reports and Public Service Announcements (PSAs) to further educate and protect yourself, as well as your family, friends, and community.

FEDERAL BUREAU OF INVESTIGATION

# APPENDIX B: DEFINITIONS

**Advanced Fee Fraud:** An individual pays money to someone in anticipation of receiving something of greater value in return, but instead, receives significantly less than expected or nothing.

**Business Email Compromise (BEC):** BEC is a scam targeting businesses or individuals working with suppliers and/or businesses regularly performing wire transfer payments. These sophisticated scams are carried out by fraudsters by compromising email accounts and other forms of communication such as phone numbers and virtual meeting applications, through social engineering or computer intrusion techniques to conduct unauthorized transfer of funds.

**Botnet:** A botnet is a group of two or more computers controlled and updated remotely for an illegal purchase such as a Distributed Denial of Service or Telephony Denial of Service attack or other nefarious activity.

**Confidence/Romance Fraud:** An individual believes they are in a relationship (family, friendly, or romantic) and are tricked into sending money, personal and financial information, or items of value to the perpetrator or to launder money or items to assist the perpetrator. This includes the Grandparent's Scheme and any scheme in which the perpetrator preys on the targeted individual's "heartstrings."

**Credit Card Fraud/Check Fraud:** Credit card fraud is a wide-ranging term for theft and fraud committed using a credit card or any similar payment mechanism (ACH, EFT, recurring charge, etc.) as a fraudulent source of funds in a transaction.

**Crimes Against Children:** Anything related to the exploitation of children, including child abuse.

**Data Breach:** A data breach in the cyber context is the use of a computer intrusion to acquire confidential or secured information. This does not include computer intrusions targeting personally owned computers, systems, devices, or personal accounts such as social media or financial accounts.

**Employment Fraud:** An individual believes they are legitimately employed and loses money, or launders money/items during their employment.

**Extortion:** Unlawful extraction of money or property through intimidation or undue exercise of authority. It may include threats of physical harm, criminal prosecution, or public exposure.

**Government Impersonation:** A government official is impersonated to collect or extort money.

**Harassment/Stalking:** Repeated words, conduct, and/or action that serve no legitimate purpose and are directed at a specific person to annoy, alarm, or distress that person. Engaging in a course of conduct directed at a specific person that would cause a reasonable person to fear for his/her safety or the safety of others or suffer substantial emotional distress.

**Identity Theft:** Someone wrongfully obtains and uses personally identifiable information in some way that involves fraud or deception, typically for economic gain.

**Investment Fraud:** Deceptive practice that induces investors to make purchases based on false information. These scams usually offer those targeted large returns with minimal risk. (Retirement, 401K, Ponzi, Pyramid, etc.).

**Intellectual Property Rights (IPR)/Copyright and Counterfeit:** The illegal theft and use of others' ideas, inventions, and creative expressions – what's called intellectual property – everything from trade secrets and proprietary products and parts to movies, music, and software.

**Lottery/Sweepstakes/Inheritance Fraud:** An individual is contacted about winning a lottery or sweepstakes they never entered, or to collect on an inheritance from an unknown relative.

**Malware:** Software or code intended to damage, disable, or capable of copying itself onto a computer and/or computer systems to have a detrimental effect or destroy data.

**Non-Payment/Non-Delivery Fraud:** Goods or services are shipped, and payment is never rendered (non-payment). Payment is sent, and goods or services are never received, or are of lesser quality (non-delivery).

**Other:** Criminal or civil matters not currently designated as an IC3 crime type.

**Overpayment:** An individual is sent a payment/commission and is instructed to keep a portion of the payment and send the remainder to another individual or business.

**Personal Data Breach:** A leak/spill of personal data which is released from a secure location to an untrusted environment. Also, a security incident in which an individual's sensitive, protected, or confidential data is copied, transmitted, viewed, stolen, or used by an unauthorized individual.

**Phishing/Spoofing:** The use of unsolicited email, text messages, and telephone calls purportedly from a legitimate company requesting personal, financial, and/or login credentials.

**Ransomware:** A type of malicious software designed to block access to a computer system until money is paid.

**Real Estate Fraud:** Loss of funds from a real estate investment or fraud involving rental or timeshare property.

**SIM Swap:** The use of unsophisticated social engineering techniques against mobile service providers to transfer a victim's phone service to a mobile device in the criminal's possession.

**Tech Support Fraud:** Subject posing as technical or customer support/service.

**Threats of Violence:** An expression of an intention to inflict pain, injury, self-harm, or death not in the context of extortion.

44                                                    FEDERAL BUREAU OF INVESTIGATION

# APPENDIX C: ADDITIONAL INFORMATION ABOUT IC3 DATA

- As appropriate, complaints are reviewed by IC3 analysts, who apply descriptive data, such as crime type and adjusted loss.

- Descriptive data for complaints, such as crime type or loss, is variable and can evolve based upon investigative or analytical proceedings. Statistics are an assessment taken at a point in time, which may change.

- Complainants are not required to provide an age range.

- Each complaint will only have one crime type.

- Complainant is identified as the individual filing a complaint.

- Some complainants may have filed more than once, creating a possible duplicate complaint.

- All location-based reports are generated from information entered when known/provided by the complainant.

- Losses reported in foreign currencies are converted to U.S. dollars when possible.

- Complaint counts represent the number of individual complaints received from each state and do not represent the number of individuals filing a complaint.

# APPENDIX D: PUBLIC SERVICE ANNOUCEMENTS PUBLISHED

| Title | Date |
|---|---|
| Chinese Police Imposters Incorporate Aggressive Tactics to Target U.S.-Based Chinese Community | 1/3/2024 |
| Malicious Actors Threaten U.S. Synagogues, Schools, Hospitals, and Other Institutions with Bomb Threats | 1/12/2024 |
| Scammers Use Couriers to Retrieve Cash and Precious Metals from Victims of Tech Support and Government Impersonation Scams | 1/29/2024 |
| IC3 Annual Report and Fraud Flyer | 3/18/2024 |
| Child Sexual Abuse Material Created by Generative AI and Similar Online Tools is Illegal | 3/29/2024 |
| Cyber Criminals Target Victims Using Social Engineering Techniques | 4/11/2024 |
| Smishing Scam Regarding Debt for Road Toll Services | 4/12/2024 |
| Alert on Cryptocurrency Money Services Businesses | 4/25/2024 |
| New Verification Schemes Target Users of Online Dating Platforms | 4/26/2024 |
| Foreign Terrorist Organizations and their Supporters Likely Heighten Threat Environment during 2024 Pride Month | 5/10/2024 |
| Democratic People's Republic of Korea Leverages U.S.-Based Individuals to Defraud U.S. Businesses and Generate Revenue | 5/16/2024 |
| Guidance on the 911 S5 Residential Proxy Service | 5/29/2024 |
| Scammers Defraud Individuals via Work-From-Home Scams | 6/4/2024 |
| Fictitious Law Firms Targeting Cryptocurrency Scam Victims Offering to Recover Funds | 6/24/2024 |
| Scammers Falsely Promise Significant Profit to Victims in Collectible Coin Scams | 6/25/2024 |
| DDoS Attacks: Could Hinder Access to Election Information, Would Not Prevent Voting | 7/31/2024 |
| FBI Warns of Scammers Impersonating Cryptocurrency Exchanges | 8/1/2024 |
| Safety Concern Related to Recent Trend in Financial Institution Customer Fraud Scheme | 8/2/2024 |
| Just So You Know: Ransomware Disruptions during Voting Periods Will Not Impact the Security and Resiliency of Vote Casting or Counting | 8/15/2024 |
| North Korea Aggressively Targeting Crypto Industry with Well-Disguised Social Engineering Attacks | 9/3/2024 |
| Business Email Compromise: The $55 Billion Scam | 9/11/2024 |

46                                                          FEDERAL BUREAU OF INVESTIGATION

| | |
|---|---|
| Just So You Know: False Claims of Hacked Voter Information Likely Intended to Sow Distrust of U.S. Elections | 9/12/2024 |
| Anniversary of October 7, 2023, HAMAS Attacks May Motivate Individuals to Violence in the United States | 10/4/2024 |
| Counterfeit Check Scam Targets Law Firms Via Debt Collection Scheme | 10/8/2024 |
| Just So You Know: Foreign Threat Actors Likely to Use a Variety of Tactics to Develop and Spread Disinformation During 2024 U.S. General Election Cycle | 10/18/2024 |
| Scammers Exploit 2024 US General Election to Perpetrate Multiple Fraud Schemes | 10/29/2024 |
| Criminals Use Generative Artificial Intelligence to Facilitate Financial Fraud | 12/3/2024 |

# APPENDIX E: EDUCATIONAL MATERIALS PUBLISHED



Check – Call – Wait
Avoid falling to a BEC scam.

IC3 Fraud Flyer



Attachment 1-C

8:35

🔒 **trusthftwallet.com**    10    ⋮



## Market

**All markets**    Top



| | | |
|---|---|---|
| **BTC Coin** USDT | | US$ 66,886.9 **-0.74%** 24 Hrs |
| **ETH Coin** USDT | | US$ 3,456.67 -1.553% |
| **BCH Coin** USDT | | US$ 388.53 -1.531% 24 Hrs |

**Attachment 1-D**
**Reactor Tracing Graph**



# Attachment 1-E
## Customer Info

User Basic Information(id: 879647170 time:2024-04-11 02:17:48 -2025-03-20 23:59:59)

**Basic Information**

| User ID | Email | Mobile | Name | User ID Number | Account Type | User authentication type | User nationality | Registration time | User authentication time |
|---------|-------|--------|------|----------------|--------------|--------------------------|------------------|-------------------|--------------------------|
| 879647170 | | 62117469 | | 14307932 | Master account | personal | NONE | 2024-04-11 02:17:48 | 2024-04-11 02:22:20 |

**KYC Approved Info**

| Birthday | ID issue Country | ID Address | ID Type | ID Sub-type | Issuing Authority | Issuing Date | ID expiry Date |
|----------|------------------|------------|---------|-------------|-------------------|--------------|----------------|
| 1988-12-22 | MO | | ID_CARD | NATIONAL_ID | | | 2029-04-24 |

**Address Validation**

| Residence | Region/State | City | Address | Postal/Zip Code |
|-----------|--------------|------|---------|-----------------|
| | | | | |

**Sub-accounts**

| Has Sub-account | Sub-account Number |
|-----------------|--------------------|
| false | 0 |



**KYC Refused**



# Binance Account Outgoing Transactions

| User ID | Currency | Amount | Destination Address | txid | Apply Time | Network |
|---|---|---|---|---|---|---|
| 879647170 | USDT | 128.00000000 | TfCyQXtan5Yt6uTLeVrAyyd5zkBn1y8Gu | 9e4a38d493111116c05d9d1c0d5d61315491d27f4a5ded782eac4a74ccc63b82 | 2024-07-11 14:02:36 | TRX |
| 879647170 | USDT | 92,559.00000000 | 0xDf691d0730453889031a80093D61cF53de68330c | 0xfd897394538869031a80093D61cf53d9acf25fcd7df291a2d6333b01310fd8d989 | 2024-07-11 04:34:26 | ETH |
| 879647170 | USDT | 93,015.00000000 | 0x11F8430B3fd659770f0fb62e4e866Ad2759cF03c36E | 0x028aFa4ff851106618dffed0373f65a15a4bf450ba40a00cf7ea73c611427417ba2 | 2024-07-11 04:12:05 | ETH |
| 879647170 | USDT | 37,012.00000000 | 0x61e0739fc9890C92A6f3633370928330e0C88E0A | 0x0e60b5c3a9d462aba0d84eefecd796f9297be2c62eb9d22440517b80deb054931e | 2024-07-11 03:56:59 | ETH |
| 879647170 | USDT | 70,850.00000000 | 0x11F8430B3fd659770f0fb62e4e866Ad2759cF03c36E | 0x4828ddd8e0d0862d707d75cf10b3bedf7ee667a2e03071c0f12d07d48bc102 | 2024-07-11 03:56:07 | ETH |
| 879647170 | USDT | 100,000.00000000 | 0x61e0739fc9890C92A6f3633370928330e0C88E0A | 0x3fc45549eea44eb149897f4e630c48d035 c6570e91df99d45ccaf4289c4365 | 2024-07-11 03:48:17 | ETH |
| 879647170 | USDT | 94,010.00000000 | 0x08D3f975ad6bec493fa20c01bd68598E3194288b | 0x7e091e41ed21da51f60bd19e6e89cecf1290413d23d63c00f2e069fec00d318F | 2024-07-11 03:39:36 | ETH |
| 879647170 | USDT | 5.00000000 | TfCyQXtan5Yt6uTLeVrAyyd5zkBn1y8Gu | 9c6a11335ed0a2d1c0f90d5f73f924e3dcaf05bd30c1397b56bea5c0c599c | 2024-07-11 03:32:45 | TRX |
| 879647170 | USDC | 92,039.00000000 | 0xc236da5c4E8eF2a81c8d650BF8c86FFC047da28F | 0xef0a802d697c5a759fb1ee020d0c0be844aaa0fd2d30bf74fd4f032a83b0d5d03d | 2024-07-10 04:00:28 | ETH |
| 879647170 | USDC | 126,000.00000000 | 0x61A0Af6c7fc46bf75a6d3dD610414F179369416 | 0x67f61c0d2e71f4d690272e9bf5e6e4e6f0718ee4c80364e58d1107102175bce | 2024-07-10 03:54:06 | ETH |
| 879647170 | USDC | 58,993.00000000 | 0x61A0Af6c7fc46bf75a6d3dD610414F179369416 | 0xd8eb042aB4d0e2cdf4dd66d5c483f9f0e804c6e8a0350f444ad2f84a12a41998accef | 2024-07-10 03:47:47 | ETH |
| 879647170 | USDC | 50,000.00000000 | 0xF3281a884c0f5b63a2317d8b1586C6b6df1E1E | 0x4607229ed3533ba0df1a645c700c039eded4d9a54f450f3d2a44cd8e421f5c110 | 2024-07-10 03:46:53 | ETH |
| 879647170 | USDC | 95,015.00000000 | 0xF3281a884c0f5b63a2317d8b1586C6b6df1E1E | 0be732a0d134f89a0ba47df81f636bcd795eb0e6d0f68b721f05f238d2d82be0 | 2024-07-10 03:39:07 | ETH |
| 879647170 | USDC | 100,000.00000000 | 0x5F0000f9Ab88fff3298866d86C317l00d5f33de68 | 0x31408334c4c781a30f0bd5f04e4b9f0c12a3c08edb02cf44d85713219c6f6c5c | 2024-07-10 03:32:10 | ETH |
| 879647170 | USDT | 9.00000000 | TfCyQXtan5Yt6uTLeVrAyyd5zkBn1y8Gu | 31c61cecb0eaf233576b9733d4c120dfd0fe21fe15f769593d423b4c2320475 | 2024-07-10 03:25:15 | TRX |
| 879647170 | USDC | 99,980.00000000 | 0x19D0b50d5157528e0435531d732ba35a697f5864 | 0xc6f9744147d7F6d2de50e22a01059e45574d0df0c5c0bbafa4cb0ddcd430a00f | 2024-07-09 04:50:22 | ETH |
| 879647170 | USDC | 118,000.00000000 | 0x66608ac8597a50e3970f1540f30140c1c010d0 | 0x0b0ca4895a0cf76a389377418e02fd09f19aa159985c67 | 2024-07-09 04:11:33 | ETH |
| 879647170 | USDC | 99,980.00000000 | 0x66608ac8597a50e3970f1540f30140c1c010d0 | 0x66c0ab885a0f76a938f97f18e02a0e91ed9a15980167 | 2024-07-09 04:10:45 | ETH |
| 879647170 | USDC | 99,980.00000000 | 0x93c906298311131cd4ea0e81B301e8a03147 | 0xe3dd99d43d6370a3c84Ad2844CD432056 | 2024-07-09 03:51:09 | ETH |
| 879647170 | USDC | 116,000.00000000 | 0xFF6E237b0fd44d09a3a1f60f1d03913a1dd40d08 | 0x8872884476080a9a9b91cf47947a69d0fE8d23A | 2024-07-09 03:32:12 | ETH |
| 879647170 | USDT | 9.00000000 | TfCyQXtan5Yt6uTLeVrAyyd5zkBn1y8Gu | 78e79dfac0C22031de95dbf2d11c0b88300927456d01e6d4e3d0af4028622 | 2024-07-09 03:01:59 | TRX |
| 879647170 | USDC | 81,000.00000000 | 0x418d34a15850f376f3970e291f3e1346f61018f6c02b00 | 0x3e0b0d5c6564ca120fe1340f0d0d012d079e00c78cd6e54a0e3f0bc05de96d5d020 | 2024-07-08 04:03:15 | ETH |
| 879647170 | USDC | 118,895.00000000 | 0x418d34a15850f376f3970e291f3e1346f61018f6c02b00 | 0x5cabcd7fe0a40964a01ca2a2412912dbf3fd6b1032ec600464c230ff02ba0 | 2024-07-08 03:55:56 | ETH |
| 879647170 | USDC | 100,000.00000000 | 0xF627b71a486627f888bdf00b0ffF13f966e62a3f9a4e84cf6e881139c6811 | 0x7d782721a486627f888bdf00b0ffF13f966e62a3f9a2467e881139c6811 | 2024-07-08 03:48:27 | ETH |
| 879647170 | USDC | 100,000.00000000 | 0xFF6E237b0fd44d09a31f2ff9d079f7f1c0c4000e8 | 0x1f810576715e1a01f6c0657b0e3eef5531708822e12a0f9f850f2d0fec5a13 | 2024-07-08 03:37:38 | ETH |
| 879647170 | USDC | 100,010.00000000 | 0xFF6E237b0fd44d09a31f2ff9d079f7f1c0c4000e8 | 0xe84e17ea6f00200b0f722348b0d01307ce0a62a0d318bf0fe12ea401e04553f67 | 2024-07-08 03:28:43 | ETH |
| 879647170 | USDT | 9.00000000 | TfCyQXtan5Yt6uTLeVrAyyd5zkBn1y8Gu | 5cd6d375e0b313f84354c21e02bd15dd30f78c0be0e3c1fc8957a01b05f15 | 2024-07-08 03:23:33 | TRX |
| 879647170 | USDC | 98,998.00000000 | 0xd5efcd587b73085356a09d4C4F2497fa6d05716Dc6 | 0x60ca0540b072e10c2133771c70aa4d83f70be7a11F702287f670d0a816266a097d | 2024-07-07 04:34:51 | ETH |
| 879647170 | USDC | 99,198.00000000 | 0x0df6cd0769117f197ed2598e73acccd0251e0f | 0x6e08f0420040572a70896150730f095c6a600160b3ce9152f27fc7e79c154 | 2024-07-07 04:29:23 | ETH |
| 879647170 | USDC | 97,405.00000000 | 0x0693c5C2999f4a72434159c5f3f89500015783f0 | 0x7d9c0cd8f0913c9a387050a80f702d09155b008800bde0796480041b345a4ef | 2024-07-07 04:24:40 | ETH |
| 879647170 | USDC | 97,605.00000000 | 0xDbc6a63Ee7fe40fFaf497a00F059735FC6CN2F0e0B1 | 0xFdf0180b25a5A16cf706F074fFc059735fC6CN2F0e0B1 | 2024-07-07 04:19:37 | ETH |
| 879647170 | USDC | 99,198.00000000 | 0x33B1ff539fc90e69474a7f844a123a5f0b5f76E2c | 0xf0a66810f57caf0f5a5f2a20c0f0b5fe414d41d0b8fd3040fca04c0e7f663794c | 2024-07-07 04:14:19 | ETH |
| 879647170 | USDC | 97,306.00000000 | 0xd74b8bb4767714af5a2750ba3c8385FF9a777bccd0 | 0x0b201B8ff04a0dd099faeb67b3f68443867f50ce43baf782a3b416f61a951 | 2024-07-07 04:07:42 | ETH |
| 879647170 | USDC | 99,197.00000000 | 0x642b0c31aef730d339386e01656a62570 | 0xcbf67e449fe56d0b38b0ea4a3e54b61193ab938eb706f0cf818 | 2024-07-07 04:02:23 | ETH |
| 879647170 | USDC | 97,626.00000000 | 0x851df017a1f2784f6d9e0391840e5c70b0ba8f31b1a | 0xe80b5d7c5b0d1c06ae6d0a33b77670442d0ce41b9580a5de9b58b0e87cb629 | 2024-07-07 03:55:34 | ETH |
| 879647170 | USDC | 97,604.00000000 | 0x0b80B69DCe0c04769868e0e8ea8ea9947f178f032 | 0x4d05f66c70c1f5a6545d3ef0f53f0e54a5a3b5047124f546a1fa075425e | 2024-07-07 03:46:43 | ETH |
| 879647170 | USDC | 99,198.00000000 | 0x5d5f0c6f6d8fff6fe5f5e7b1899a3a7014d61 | 0x4d05f66c0f0c1f5a6545d3ef00f53f0e54a5a3b5047124f546a1fa075425e | 2024-07-07 03:41:08 | ETH |
| 879647170 | USDC | 98,503.00000000 | 0x5d5f0c6f6d8fff6fe5f5e7b1899a3a7014d61 | 0x870df01eb557a0bf5a0d2a4ee8d0f957c7cd0aef9f84f5c4706e4a8f00 | 2024-07-07 03:34:08 | ETH |
| 879647170 | USDC | 82,513.00000000 | | 5f0ea37bd626c571064f40b04079cb6ba36a7fe42d0159c6e457253950c66f25cb37c | 2024-07-07 03:28:38 | ETH |
| 879647170 | USDT | 9.00000000 | TfCyQXtan5Yt6uTLeVrAyyd5zkBn1y8Gu | | 2024-07-07 03:22:54 | TRX |

# Incoming Transactions During Period of Cohn's Transfers to TrustHFTWallet

| User ID | Currency | Amount | Deposit Address | Source Address | TXID | Create Time | Network |
|---|---|---|---|---|---|---|---|

| User ID | Currency | Amount | Account Type | USDT |
|---------|----------|--------|--------------|------|
| 879647170 | USDT | 355.00000000 | Spot Wallet | 355.00000000 |
| 879647170 | USDT | 185.00000000 | Spot Wallet | 185.00000000 |
| 879647170 | USDT | 92,035.00000000 | Spot Wallet | 92,035.00000000 |
| 879647170 | USDT | 93,030.00000000 | Spot Wallet | 93,030.00000000 |
| 879647170 | USDT | 107,890.00000000 | Spot Wallet | 107,890.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | USDT | 92,035.00000000 | Spot Wallet | 92,035.00000000 |
| 879647170 | USDT | 126,000.00000000 | Spot Wallet | 126,000.00000000 |
| 879647170 | USDT | 109,000.00000000 | Spot Wallet | 109,000.00000000 |
| 879647170 | USDT | 95,020.00000000 | Spot Wallet | 95,020.00000000 |
| 879647170 | USDT | 100,100.00000000 | Spot Wallet | 100,100.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 118,024.00000000 | Spot Wallet | 118,024.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 116,023.00000000 | Spot Wallet | 116,023.00000000 |
| 879647170 | USDT | 81,000.00000000 | Spot Wallet | 81,000.00000000 |
| 879647170 | USDT | 118,900.00000000 | Spot Wallet | 118,900.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 99,990.00000000 | Spot Wallet | 99,990.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 98,996.00000000 | Spot Wallet | 98,996.00000000 |
| 879647170 | USDT | 99,196.00000000 | Spot Wallet | 99,196.00000000 |
| 879647170 | USDT | 97,403.00000000 | Spot Wallet | 97,403.00000000 |
| 879647170 | USDT | 97,603.00000000 | Spot Wallet | 97,603.00000000 |
| 879647170 | USDT | 99,296.00000000 | Spot Wallet | 99,296.00000000 |
| 879647170 | USDT | 97,304.00000000 | Spot Wallet | 97,304.00000000 |
| 879647170 | USDT | 99,195.00000000 | Spot Wallet | 99,195.00000000 |
| 879647170 | USDT | 97,604.00000000 | Spot Wallet | 97,604.00000000 |
| 879647170 | USDT | 97,602.00000000 | Spot Wallet | 97,602.00000000 |
| 879647170 | USDT | 98,797.00000000 | Spot Wallet | 98,797.00000000 |
| 879647170 | USDT | 98,500.00000000 | Spot Wallet | 98,500.00000000 |
| 879647170 | USDT | 82,512.00000000 | Spot Wallet | 82,512.00000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 100,300.0000000 | Spot Wallet | 100,300.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,200.0000000 | Spot Wallet | 100,200.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,200.0000000 | Spot Wallet | 100,200.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 98,498.0000000 | Spot Wallet | 98,498.0000000 |
| 879647170 | USDT | 97,702.0000000 | Spot Wallet | 97,702.0000000 |
| 879647170 | USDT | 97,305.0000000 | Spot Wallet | 97,305.0000000 |
| 879647170 | USDT | 99,495.0000000 | Spot Wallet | 99,495.0000000 |
| 879647170 | USDT | 97,305.0000000 | Spot Wallet | 97,305.0000000 |
| 879647170 | USDT | 98,198.0000000 | Spot Wallet | 98,198.0000000 |
| 879647170 | USDT | 98,097.0000000 | Spot Wallet | 98,097.0000000 |
| 879647170 | USDT | 98,599.0000000 | Spot Wallet | 98,599.0000000 |
| 879647170 | USDT | 99,395.0000000 | Spot Wallet | 99,395.0000000 |
| 879647170 | USDT | 97,702.0000000 | Spot Wallet | 97,702.0000000 |
| 879647170 | USDT | 97,802.0000000 | Spot Wallet | 97,802.0000000 |
| 879647170 | USDT | 98,500.0000000 | Spot Wallet | 98,500.0000000 |
| 879647170 | USDT | 98,191.0000000 | Spot Wallet | 98,191.0000000 |
| 879647170 | USDT | 97,999.0000000 | Spot Wallet | 97,999.0000000 |
| 879647170 | USDT | 97,305.0000000 | Spot Wallet | 97,305.0000000 |
| 879647170 | USDT | 98,699.0000000 | Spot Wallet | 98,699.0000000 |
| 879647170 | USDT | 97,105.0000000 | Spot Wallet | 97,105.0000000 |
| 879647170 | USDT | 98,798.0000000 | Spot Wallet | 98,798.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,300.0000000 | Spot Wallet | 100,300.0000000 |
| 879647170 | USDT | 100,200.0000000 | Spot Wallet | 100,200.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,200.0000000 | Spot Wallet | 100,200.0000000 |
| 879647170 | USDT | 100,300.0000000 | Spot Wallet | 100,300.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,200.0000000 | Spot Wallet | 100,200.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,200.0000000 | Spot Wallet | 100,200.0000000 |
| 879647170 | USDT | 100,300.0000000 | Spot Wallet | 100,300.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,400.0000000 | Spot Wallet | 100,400.0000000 |
| 879647170 | USDT | 100,300.0000000 | Spot Wallet | 100,300.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,500.0000000 | Spot Wallet | 100,500.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 100,200.0000000 | Spot Wallet | 100,200.0000000 |
| 879647170 | USDT | 100,300.0000000 | Spot Wallet | 100,300.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 96,303.0000000 | Spot Wallet | 96,303.0000000 |
| 879647170 | USDT | 97,903.0000000 | Spot Wallet | 97,903.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 98,102.0000000 | Spot Wallet | 98,102.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 98,500.0000000 | Spot Wallet | 98,500.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 98,500.0000000 | Spot Wallet | 98,500.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |

| | | | |
|---|---|---|---|
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 98,400.0000000000 | Spot Wallet | 98,400.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 98,599.0000000000 | Spot Wallet | 98,599.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 98,002.0000000000 | Spot Wallet | 98,002.0000000000 |
| 879647170 | USDT | 98,320.0000000000 | Spot Wallet | 98,320.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 98,500.0000000000 | Spot Wallet | 98,500.0000000000 |
| 879647170 | USDT | 97,505.0000000000 | Spot Wallet | 97,505.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 98,500.0000000000 | Spot Wallet | 98,500.0000000000 |
| 879647170 | USDT | 103,203.0000000000 | Spot Wallet | 103,203.0000000000 |
| 879647170 | USDT | 94,025.0000000000 | Spot Wallet | 94,025.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 99,700.0000000000 | Spot Wallet | 99,700.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 99,000.0000000000 | Spot Wallet | 99,000.0000000000 |
| 879647170 | USDT | 116,316.0000000000 | Spot Wallet | 116,316.0000000000 |
| 879647170 | USDT | 108,950.0000000000 | Spot Wallet | 108,950.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 85,957.0000000000 | Spot Wallet | 85,957.0000000000 |
| 879647170 | USDT | 89,100.0000000000 | Spot Wallet | 89,100.0000000000 |
| 879647170 | USDT | 94,025.0000000000 | Spot Wallet | 94,025.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 103,925.0000000000 | Spot Wallet | 103,925.0000000000 |
| 879647170 | USDT | 110,000.0000000000 | Spot Wallet | 110,000.0000000000 |
| 879647170 | USDT | 89,050.0000000000 | Spot Wallet | 89,050.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 99,000.0000000000 | Spot Wallet | 99,000.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 108,950.0000000000 | Spot Wallet | 108,950.0000000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | USDT | 64,025.00000000 | Spot Wallet | 64,025.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 76,924.00000000 | Spot Wallet | 76,924.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 130,013.00000000 | Spot Wallet | 130,013.00000000 |
| 879647170 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | USDT | 100,100.00000000 | Spot Wallet | 100,100.00000000 |
| 879647170 | USDT | 108,900.00000000 | Spot Wallet | 108,900.00000000 |
| 879647170 | USDT | 68,990.00000000 | Spot Wallet | 68,990.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 109,055.00000000 | Spot Wallet | 109,055.00000000 |
| 879647170 | USDT | 92,035.00000000 | Spot Wallet | 92,035.00000000 |
| 879647170 | USDT | 107,940.00000000 | Spot Wallet | 107,940.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | USDT | 96,955.00000000 | Spot Wallet | 96,955.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 113,925.00000000 | Spot Wallet | 113,925.00000000 |
| 879647170 | USDT | 95,548.00000000 | Spot Wallet | 95,548.00000000 |
| 879647170 | USDT | 79,200.00000000 | Spot Wallet | 79,200.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 108,950.00000000 | Spot Wallet | 108,950.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 126,188.00000000 | Spot Wallet | 126,188.00000000 |
| 879647170 | USDT | 110,000.00000000 | Spot Wallet | 110,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 70,195.00000000 | Spot Wallet | 70,195.00000000 |

| | | | | | |
|---|---|---|---|---|---|
| 879647170 | 89,100.00000000 | USDT | 89,100.00000000 | Spot Wallet | 89,100.00000000 |
| 879647170 | 94,025.00000000 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | 112,911.10000000 | USDT | 112,911.10000000 | Spot Wallet | 112,911.10000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 108,950.00000000 | USDT | 108,950.00000000 | Spot Wallet | 108,950.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 108,950.00000000 | USDT | 108,950.00000000 | Spot Wallet | 108,950.00000000 |
| 879647170 | 89,063.00000000 | USDT | 89,063.00000000 | Spot Wallet | 89,063.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 89,050.00000000 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 94,025.00000000 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 108,950.00000000 | USDT | 108,950.00000000 | Spot Wallet | 108,950.00000000 |
| 879647170 | 100,100.00000000 | USDT | 100,100.00000000 | Spot Wallet | 100,100.00000000 |
| 879647170 | 89,050.00000000 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 84,034.00000000 | USDT | 84,034.00000000 | Spot Wallet | 84,034.00000000 |
| 879647170 | 108,900.00000000 | USDT | 108,900.00000000 | Spot Wallet | 108,900.00000000 |
| 879647170 | 99,000.00000000 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | 94,958.00000000 | USDT | 94,958.00000000 | Spot Wallet | 94,958.00000000 |
| 879647170 | 108,950.00000000 | USDT | 108,950.00000000 | Spot Wallet | 108,950.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 111,045.00000000 | USDT | 111,045.00000000 | Spot Wallet | 111,045.00000000 |
| 879647170 | 89,050.00000000 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | 99,000.00000000 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 103,975.00000000 | USDT | 103,975.00000000 | Spot Wallet | 103,975.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 94,025.00000000 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | 100,000.00000000 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | 90,000.00000000 | USDT | 90,000.00000000 | Spot Wallet | 90,000.00000000 |
| 879647170 | 89,100.00000000 | USDT | 89,100.00000000 | Spot Wallet | 89,100.00000000 |
| 879647170 | 110,000.00000000 | USDT | 110,000.00000000 | Spot Wallet | 110,000.00000000 |
| 879647170 | 108,900.00000000 | USDT | 108,900.00000000 | Spot Wallet | 108,900.00000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 50,000.00000000 | Spot Wallet | 50,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 77,986.00000000 | Spot Wallet | 77,986.00000000 |
| 879647170 | USDT | 99,995.00000000 | Spot Wallet | 99,995.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 50,000.00000000 | Spot Wallet | 50,000.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 106,033.00000000 | Spot Wallet | 106,033.00000000 |
| 879647170 | USDT | 119,000.00000000 | Spot Wallet | 119,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 108,930.00000000 | Spot Wallet | 108,930.00000000 |
| 879647170 | USDT | 50,000.00000000 | Spot Wallet | 50,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 96,015.00000000 | Spot Wallet | 96,015.00000000 |
| 879647170 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 108,900.00000000 | Spot Wallet | 108,900.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | USDT | 73,941.00000000 | Spot Wallet | 73,941.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 122,086.00000000 | Spot Wallet | 122,086.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 100,100.00000000 | Spot Wallet | 100,100.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 119,000.00000000 | Spot Wallet | 119,000.00000000 |
| 879647170 | USDT | 1,953.00000000 | Spot Wallet | 1,953.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 108,950.00000000 | Spot Wallet | 108,950.00000000 |
| 879647170 | USDT | 50,000.00000000 | Spot Wallet | 50,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 97,010.00000000 | Spot Wallet | 97,010.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |

| 879647170 | USDT | 119,000.0000000 | Spot Wallet | 119,000.0000000 |
|---|---|---|---|---|
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 108,950.00000000 | Spot Wallet | 108,950.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 103,975.00000000 | Spot Wallet | 103,975.00000000 |
| 879647170 | USDT | 109,000.00000000 | Spot Wallet | 109,000.00000000 |
| 879647170 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | USDT | 100,100.00000000 | Spot Wallet | 100,100.00000000 |
| 879647170 | USDT | 102,041.00000000 | Spot Wallet | 102,041.00000000 |
| 879647170 | USDT | 98,005.00000000 | Spot Wallet | 98,005.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 102,141.00000000 | Spot Wallet | 102,141.00000000 |
| 879647170 | USDT | 96,015.00000000 | Spot Wallet | 96,015.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 98,005.00000000 | Spot Wallet | 98,005.00000000 |
| 879647170 | USDT | 104,955.00000000 | Spot Wallet | 104,955.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 96,015.00000000 | Spot Wallet | 96,015.00000000 |
| 879647170 | USDT | 40,000.00000000 | Spot Wallet | 40,000.00000000 |
| 879647170 | USDT | 97,620.00000000 | Spot Wallet | 97,620.00000000 |
| 879647170 | USDT | 93,030.00000000 | Spot Wallet | 93,030.00000000 |
| 879647170 | USDT | 50,000.00000000 | Spot Wallet | 50,000.00000000 |
| 879647170 | USDT | 93,030.00000000 | Spot Wallet | 93,030.00000000 |
| 879647170 | USDT | 100,100.00000000 | Spot Wallet | 100,100.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 113,925.00000000 | Spot Wallet | 113,925.00000000 |
| 879647170 | USDT | 93,028.00000000 | Spot Wallet | 93,028.00000000 |
| 879647170 | USDT | 90,000.00000000 | Spot Wallet | 90,000.00000000 |
| 879647170 | USDT | 94,075.00000000 | Spot Wallet | 94,075.00000000 |
| 879647170 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 105,000.00000000 | Spot Wallet | 105,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 94,025.00000000 | Spot Wallet | 94,025.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 83,590.0000000 | Spot Wallet | 83,590.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 89,050.0000000 | Spot Wallet | 89,050.0000000 |
| 879647170 | USDT | 81,460.0000000 | Spot Wallet | 81,460.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 80,000.0000000 | Spot Wallet | 80,000.0000000 |
| 879647170 | USDT | 104,700.0000000 | Spot Wallet | 104,700.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 121,364.0000000 | Spot Wallet | 121,364.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 89,050.0000000 | Spot Wallet | 89,050.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,990.0000000 | Spot Wallet | 100,990.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 99,000.0000000 | Spot Wallet | 99,000.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 115,077.0000000 | Spot Wallet | 115,077.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 99,975.0000000 | Spot Wallet | 99,975.0000000 |
| 879647170 | USDT | 84,642.0000000 | Spot Wallet | 84,642.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 89,050.0000000 | Spot Wallet | 89,050.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 99,000.0000000 | Spot Wallet | 99,000.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,990.0000000 | Spot Wallet | 100,990.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 99,000.0000000 | Spot Wallet | 99,000.0000000 |
| 879647170 | USDT | 100,100.0000000 | Spot Wallet | 100,100.0000000 |
| 879647170 | USDT | 67,071.0000000 | Spot Wallet | 67,071.0000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 101,985.0000000000 | Spot Wallet | 101,985.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 96,015.0000000000 | Spot Wallet | 96,015.0000000000 |
| 879647170 | USDT | 98,000.0000000000 | Spot Wallet | 98,000.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 102,980.0000000000 | Spot Wallet | 102,980.0000000000 |
| 879647170 | USDT | 105,011.0000000000 | Spot Wallet | 105,011.0000000000 |
| 879647170 | USDT | 95,020.0000000000 | Spot Wallet | 95,020.0000000000 |
| 879647170 | USDT | 80,000.0000000000 | Spot Wallet | 80,000.0000000000 |
| 879647170 | USDT | 90,000.0000000000 | Spot Wallet | 90,000.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 118,850.0000000000 | Spot Wallet | 118,850.0000000000 |
| 879647170 | USDT | 125,853.0000000000 | Spot Wallet | 125,853.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 97,019.0000000000 | Spot Wallet | 97,019.0000000000 |
| 879647170 | USDT | 102,980.0000000000 | Spot Wallet | 102,980.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 103,021.0000000000 | Spot Wallet | 103,021.0000000000 |
| 879647170 | USDT | 73,188.0000000000 | Spot Wallet | 73,188.0000000000 |
| 879647170 | USDT | 94,025.0000000000 | Spot Wallet | 94,025.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 85,515.0000000000 | Spot Wallet | 85,515.0000000000 |
| 879647170 | USDT | 99,100.0000000000 | Spot Wallet | 99,100.0000000000 |
| 879647170 | USDT | 104,475.0000000000 | Spot Wallet | 104,475.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 108,950.0000000000 | Spot Wallet | 108,950.0000000000 |
| 879647170 | USDT | 97,000.0000000000 | Spot Wallet | 97,000.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 94,025.0000000000 | Spot Wallet | 94,025.0000000000 |
| 879647170 | USDT | 80,000.0000000000 | Spot Wallet | 80,000.0000000000 |
| 879647170 | USDT | 108,950.0000000000 | Spot Wallet | 108,950.0000000000 |
| 879647170 | USDT | 100,000.0000000000 | Spot Wallet | 100,000.0000000000 |
| 879647170 | USDT | 97,010.0000000000 | Spot Wallet | 97,010.0000000000 |
| 879647170 | USDT | 100,990.0000000000 | Spot Wallet | 100,990.0000000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 31,166.0000000 | Spot Wallet | 31,166.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 99,000.0000000 | Spot Wallet | 99,000.0000000 |
| 879647170 | USDT | 94,125.0000000 | Spot Wallet | 94,125.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 99,000.0000000 | Spot Wallet | 99,000.0000000 |
| 879647170 | USDT | 99,100.0000000 | Spot Wallet | 99,100.0000000 |
| 879647170 | USDT | 87,025.0000000 | Spot Wallet | 87,025.0000000 |
| 879647170 | USDT | 108,950.0000000 | Spot Wallet | 108,950.0000000 |
| 879647170 | USDT | 99,000.0000000 | Spot Wallet | 99,000.0000000 |
| 879647170 | USDT | 70,338.0000000 | Spot Wallet | 70,338.0000000 |
| 879647170 | USDT | 104,025.0000000 | Spot Wallet | 104,025.0000000 |
| 879647170 | USDT | 103,975.0000000 | Spot Wallet | 103,975.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 90,000.0000000 | Spot Wallet | 90,000.0000000 |
| 879647170 | USDT | 108,950.0000000 | Spot Wallet | 108,950.0000000 |
| 879647170 | USDT | 101,000.0000000 | Spot Wallet | 101,000.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 99,050.0000000 | Spot Wallet | 99,050.0000000 |
| 879647170 | USDT | 103,258.0000000 | Spot Wallet | 103,258.0000000 |
| 879647170 | USDT | 94,025.0000000 | Spot Wallet | 94,025.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 100,920.0000000 | Spot Wallet | 100,920.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 118,988.0000000 | Spot Wallet | 118,988.0000000 |
| 879647170 | USDT | 99,050.0000000 | Spot Wallet | 99,050.0000000 |
| 879647170 | USDT | 90,000.0000000 | Spot Wallet | 90,000.0000000 |
| 879647170 | USDT | 82,000.0000000 | Spot Wallet | 82,000.0000000 |
| 879647170 | USDT | 108,950.0000000 | Spot Wallet | 108,950.0000000 |
| 879647170 | USDT | 127,474.0000000 | Spot Wallet | 127,474.0000000 |
| 879647170 | USDT | 100,000.0000000 | Spot Wallet | 100,000.0000000 |
| 879647170 | USDT | 128,950.0000000 | Spot Wallet | 128,950.0000000 |
| 879647170 | USDT | 94,075.0000000 | Spot Wallet | 94,075.0000000 |
| 879647170 | USDT | 90,000.0000000 | Spot Wallet | 90,000.0000000 |
| 879647170 | USDT | 105,012.0000000 | Spot Wallet | 105,012.0000000 |

| | | | | |
|---|---|---|---|---|
| 879647170 | USDT | 103,975.00000000 | Spot Wallet | 103,975.00000000 |
| 879647170 | USDT | 85,000.00000000 | Spot Wallet | 85,000.00000000 |
| 879647170 | USDT | 87,111.00000000 | Spot Wallet | 87,111.00000000 |
| 879647170 | USDT | 99,050.00000000 | Spot Wallet | 99,050.00000000 |
| 879647170 | USDT | 94,525.00000000 | Spot Wallet | 94,525.00000000 |
| 879647170 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 103,975.00000000 | Spot Wallet | 103,975.00000000 |
| 879647170 | USDT | 100,100.00000000 | Spot Wallet | 100,100.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 108,900.00000000 | Spot Wallet | 108,900.00000000 |
| 879647170 | USDT | 99,500.00000000 | Spot Wallet | 99,500.00000000 |
| 879647170 | USDT | 99,000.00000000 | Spot Wallet | 99,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 111,440.00000000 | Spot Wallet | 111,440.00000000 |
| 879647170 | USDT | 89,050.00000000 | Spot Wallet | 89,050.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 100,000.00000000 | Spot Wallet | 100,000.00000000 |
| 879647170 | USDT | 97,010.00000000 | Spot Wallet | 97,010.00000000 |
| 879647170 | USDC | 33,100.00000000 | Spot Wallet | 33,103.31000000 |

| TXID | Create Time |
|------|-------------|
| d51c3de764a014b776d1eae9a5453ccca17db38025236771370ee6e4d9f0801 | 2024-07-11 04:32:26 |
| 96876463d6ea24f64a5c781696089939e90bd36538d9fbadda1b8d671c5d4011ae | 2024-07-11 04:26:10 |
| 40d5c3b7dab209ab604ce39006e2227e08c89351f5dabcd435126af1fc1e4789b | 2024-07-11 04:22:14 |
| 8e7ebb158a09eff59403136d05bdba054ca142a4a7a1f8e59f29f1df9b76c13 | 2024-07-11 04:09:14 |
| 7c2d716414f3821727cfeb56cddeca75537b9df4289ff14625efd681e3d1cf16 | 2024-07-11 03:53:32 |
| 691cde3311c69cc604478e5878a96f405137f6ce81893e3505e9646b9bc68ae | 2024-07-11 03:45:10 |
| 08ffd44ff241d4dd5a289936b707cf9b556fc3cfb0e72673a8ca6c2ed4e3dd486d | 2024-07-11 03:37:40 |
| 997220ab00fda15b9b32cd4828b0a9a9c8e5e079e48cf07f8bf758c261b842bec | 2024-07-10 03:59:02 |
| accaf3c9186761c848c0612dd6e4fdcddef546f37676cfda4b3c337b4621729 | 2024-07-10 03:53:08 |
| 56f05205c037459a66fcbadd957d8942f23720 4ecce837a173a11c976f3cae | 2024-07-10 03:43:38 |
| 1738affb4e60b9ad7d7ab8c092efa8383665981b34cbd3c0e43cdd558d38970b | 2024-07-10 03:37:28 |
| ac02bfa8f0d104f9b1c617e078b5fdb69eed1e45b8f57fe5045fbe14eee88dd1 | 2024-07-10 03:30:08 |
| 0xdc3436316b3e535366f481a5121e0c45f5f0627c39bbc82e06d8ba8ea395032e4 | 2024-07-09 04:36:31 |
| 0xcc4c184802b8d8f511faea51a02d073f5218cc309a1063a6977de9a96b15c90 | 2024-07-09 04:17:00 |
| 0x422fb6a57386627 8b54b9a6f74f1a71991f16f3e704a3240ea54139d7ece47ad | 2024-07-09 03:56:01 |
| 0xf2ac5c238bbc625c24b32abfae441fe884770c6aedd21be6bbb137baf90f9eca | 2024-07-09 03:37:02 |
| 0x1592856 6aa32e5239794f7652063698 8bd1b1f94725cfd0bb53c9d55921414884e | 2024-07-09 03:18:31 |
| e4cf82648ea11e847a05146148135 6d0214d47ab0530 4fc93d71d9938ae4f | 2024-07-08 04:02:02 |
| 918da24cfa08f7da36328bc089c06d4229ae99e768486e87ee202e54be17ea0bb | 2024-07-08 03:54:26 |
| 6ba6fd6fc82dc230bd2422199b916193044839 9a4db24690b2391ffdbbaf91293d | 2024-07-08 03:46:12 |
| 417789ddeefdd88dc9c8712c14a27c519cd1bb814cc11656dc53922cb c86e1a9c | 2024-07-08 03:36:14 |
| 9c6431cd517ad31d1b43aacd89fcbd8713a8261ce75d072fb259c31a5b110044 | 2024-07-08 03:26:46 |
| 77f02ac8f378b9224ef9a240fba52bcc0b65d8568b1135 39b9d6b53d4ee71a44 | 2024-07-07 04:32:38 |
| b486e2aadf104eeaa9dd64c79806a4c28e44cf2104a79cbab06c3ca3e4ebb1a3 | 2024-07-07 04:27:34 |
| 94bcff15f96285326823e5b7806eb94cedb25e219fcc1e5fd0a4fc755f4178559 | 2024-07-07 04:22:52 |
| 4b8e632660c863d21ea78aa8b5198af48ea6d17e07d521300 8a0f90b7e2d99 | 2024-07-07 04:17:20 |
| da1d83e2ae3304a268990f7eba70e50b6b65abd8644ae4badf122 2f38ee8d33d | 2024-07-07 04:11:14 |
| be4818f53ca64408a6795fc52be88874350ba c6f0ec1359e3fadebb48c720859 | 2024-07-07 04:05:56 |
| b0b5260842b3bf717de88554cf16591b57d7e1f4de401e79217dd442ac06acd0 | 2024-07-07 03:58:56 |
| b2ba01e4d09c190dbacbb4d655e82e2d2d80de3e0b2b180ed9801 9a44b23f | 2024-07-07 03:53:20 |
| 188d112bf301321efb1489e74ad2e1430cbe674b5adb8d8a8fb3c13e3b48e26a | 2024-07-07 03:44:38 |
| 8c363947612740887348fca8ffbe39c34f5b877ab6f8f33d0199a0a4c904fc287 | 2024-07-07 03:38:28 |
| ed88ae3cfe78169ff7f5506ab1549e1e74a1be1d134f0ac667debb27abd836bb | 2024-07-07 03:32:03 |
| 080cb4f677b00dacce723ab723548ee4808a06def9e96c83b3b8768aa4857b98 | 2024-07-07 03:26:12 |

| | |
|---|---|
| 0xb44117fa9bd5f21dd3af4ab568de942a363ae56be5029684f87c0b2fb428c5f | 2024-07-06 05:48:01 |
| 0xb64355987586b7e1d7c650634d96d33ee6cf471e903eb8707c58ba94249e175211 | 2024-07-06 05:29:01 |
| 0xf0675258f7a4503def39fceafa35f3a4077d6a75c2fe218f24e7a7bd476edd2a1 | 2024-07-06 05:06:01 |
| 0xf62418701dd607e6bea0a722cc915a591d0effc5ba8e54ed52d45b2e1764fad1d | 2024-07-06 04:44:01 |
| 0x084dcc90d3dfd3b14111e952210a324dead2758f15fc0594893e018ca60577820 | 2024-07-06 04:24:31 |
| 0x39e7fc3877cd3e72a3d7509d01d29061963e9e26ae9084ee0bcf266f755233d79 | 2024-07-06 04:06:01 |
| 0x99232bf71d282b456141d159de06bd492d1b715351e08fe6770b7c97243352a0a0 | 2024-07-06 03:48:01 |
| 0x5bd130e1e00a81ce247c2ddac478a8027596ae366d4058e8ecf702f6385eb988 | 2024-07-06 03:27:30 |
| 0bcb9a5d112a5f6f94beee10130289e0aabcb000f9655879e9144dcf9c76e3 | 2024-07-05 03:52:58 |
| 8009saf98ad442e98fb6302314556086e68cc4dd3133fedf3be088a1304e74d09 | 2024-07-05 03:47:09 |
| b5c003f2378f882075b8419ebf3a483cafa98d0ecd0af33a10d4af20789274 | 2024-07-05 03:40:38 |
| 345bbe6e23822f3f4487c5fe7eb2b4f6c6ec4124c9b09adfe517237ab913052 | 2024-07-05 03:32:32 |
| 0x75f79e98c34c5ce86e03a2de229e7f97df280283afeeeb9b95bf0cbdcd66d15 | 2024-07-04 09:07:32 |
| 0x2ce9badeaf46c9b27586e8de3144d992126d4e633e4fcf1e917f84e1db508f23 | 2024-07-04 08:47:01 |
| 0x8af953d04cda454588e2a16636c2f808b37a1f36f099ec545d85458673af4134 | 2024-07-04 08:25:31 |
| 0xb25f80aab01ee197722fef08bf46fa7095ac51110068f515c28c82be28abc2dbd5 | 2024-07-04 08:06:00 |
| 0xd27032674d34681e633a6fc1370885241f142e8fe0387bbcae07733aff6bb17539 | 2024-07-04 07:48:00 |
| 0x23c8e14552e1505d56a6b99aaeedc032489902b10100679f18e4fe9cc8435049 | 2024-07-04 07:27:32 |
| 0xaa877ceef802c8c1f9ee0663484df59f16b20d73bd7ea59d129cdd118faeea | 2024-07-04 07:09:32 |
| 0x90561527bfdfadfe8d6f55956361c52cd317ca6735129d964b9cf296bf8432 | 2024-07-04 06:51:01 |
| 0xd4f1ec373b9bda5de4cb52cde4c73a7b38f170f0321075e8f9d74f1d8386a8ee | 2024-07-04 06:25:00 |
| 0xa188c402cd46a7a8fde90ee279993c5b6e3f29e6c870241f8febcdac2571b2a0 | 2024-07-04 06:05:31 |
| 0x6075fb7fd557fe5a18d2f5ee40b65952e4e7b71ebaf21e5d59af62bcc1de63e | 2024-07-04 05:38:31 |
| 0x081286e0db88c30ec9dcf922fdf9487b882318799d5243d65df298b68e70429 | 2024-07-04 05:17:32 |
| 0x755bca338e7beb5d311928319029b74584da25f4ea2ef786632b33a08fd9bc | 2024-07-03 08:50:31 |
| 0xd888c9fcff490648f3fc7cdd1095e4ed6532c436ecf485695d1eeabe39ec893e5 | 2024-07-03 08:30:31 |
| 0x520641df90d7f11d7f949aebf7e0f250860ec76eda0fbf4f61d897ac1fdacd | 2024-07-03 08:18:01 |
| 0x574f0a3e88f762e19de2cd22d27584e6fafc386c824af9cdc00b4263a262f1a | 2024-07-03 07:52:01 |
| 0xa28c16d3a9e4794ef63cd7a6c88535199d7d8f9c03a1449d4d51061e7b75ca2c1f | 2024-07-03 07:32:00 |
| 0x5925e319cc00a242ec4d70e087316f50cd5b4a410c7efd9a48fbab75f3be46e7 | 2024-07-03 07:03:00 |
| 0x3ebb92e9743b24dca512f573e094b31a6ee71403666d752d3ba2ec6b8622fa6 | 2024-07-03 06:43:30 |
| 0x1bb58685c6f30f3e8492e8896f85a72314effbdf27a0e6470994d901bcb5b5 | 2024-07-03 06:25:00 |
| 0xa7541b884b50628634cbaffa5e822f00cc96c5f77cd5dd7b7aad409e688e3c67 | 2024-07-03 06:03:30 |
| 0x3efea7f7aa6019fd64d6897a49c9bed77f661398ba9dcd46a728a44b561a9d3d | 2024-07-03 05:44:00 |
| 0x29caedde6611260bce4bff0a84c9ca2c5ec9fcfa3ffaf53461a7547378b0a9b | 2024-07-03 05:21:01 |

| | |
|---|---|
| 0xfca2c59c99db856fa18c867f03d5fe9fa3223b603b23911b635953a48febe969c | 2024-07-03 05:03:01 |
| 1ab706d2eb985b15588b5dcb7dbf3449976ea588599fa5bc8cd1242dab8ebbd274 | 2024-07-02 07:36:50 |
| 5f0196899f487a7a7da89ea778580cba6395a43ed39ed411430013a9df2c79db | 2024-07-02 07:28:56 |
| a1ad774b848e7844b725c20c3a25dc1d0d4a4ae2c61cdb4da3516cb17cadac | 2024-07-02 07:21:56 |
| b8b7e823d4cf9e3ec970eb32ddffe4e60f5f4193f2053b54b9f3ce873cbb0aad | 2024-07-02 07:13:26 |
| 0xfbb79264ce2aa3e57dbf4dba9ead2b415a6226c38d98e970d0a9ac666221ff48 | 2024-07-02 06:53:00 |
| 0x386d68a33121991f695c22f97b4323c471fe23593a2f07735be46238b0b145619 | 2024-07-02 06:30:30 |
| 0xf9d83714c1b1c8074c266cfd4b73bdec511e760a513b41f2e543f08016a48b2 | 2024-07-02 06:12:30 |
| 0x13eecf628cf33843ae77931c42ad8107b7984ed53e08f12538ae0a251dc88f5e | 2024-07-02 05:53:31 |
| 0xbf6b395e186697b2222beeabf738a6b4ca015bae079f9fb945af c0a1cde17a4 | 2024-07-02 05:32:32 |
| 0x0a9c2e187f6d76925d d443335d815c41342476347af8d4f6f7d19b62b801e08a51 | 2024-07-02 05:12:32 |
| 0x4bde685c71a9807b9c2b6d3ec16bc43 25c633dc1228d0ec3c8f202f2cf38fcf | 2024-07-02 04:53:00 |
| 0x349013c2d35f9e12ca1f6e13b0da9b6d70a4fb8c22ebb7e433caa513f3012646 | 2024-07-02 04:34:00 |
| 0x03aa1fb1af141df d3b619ed978a31a22d71a6be52c676437334ad6bbb550aadb | 2024-07-01 08:08:01 |
| 0x555a a92b2164842525611f533ddb896f75a02cca8f596e346f202286e3185be5 | 2024-07-01 07:48:32 |
| 0x541239ebd4235ee1704a4e0d24d77f3f36c9991637cfae7a3b3568214b50f67 | 2024-07-01 07:29:32 |
| 0xf2dc016b511d3c21e507883bd95c303d4ba917247bef32e987c38af67ada9494 | 2024-07-01 07:10:30 |
| 0xdcc6127721316f7d0bf84866da6fe30a1c7a006f06e63bc987709335e27504c1b | 2024-07-01 06:50:31 |
| 0xffbc2242f4b181966afdc96e2c2875f1288a30d7afc928cfcf81513cbdcbeaa | 2024-07-01 06:32:01 |
| 0xee09f446126 0f39b4394dbf1da65555e7237acdf4a7ba545be7ce7e7be6d7ade | 2024-07-01 06:12:31 |
| 0xb3cb4cebc8b4feeac9adb04daa00e8f7133 62f48955459b2cd10ffc311ab024 | 2024-07-01 05:54:01 |
| 0xed22b3a97a5ae28888a2c1b38b0801c971ba3088df54a93c81acbbbe24690d3a | 2024-07-01 05:32:31 |
| 0x9d22c171816354173a3bbcc2ad81309ba4fe0d46799631466fca765b4080a2fa0 | 2024-07-01 05:12:00 |
| 0xc180c1f0124b0cdbbaf9664c12539b3c909ef58d6b39e5c09075a04635 6e7f76 | 2024-07-01 04:53:30 |
| 0x36529088511b4182ec9ee205138cd79f79d2540b68beafff25b61b942cc5e41a | 2024-07-01 04:33:32 |
| 0x34280d5e44f05bb0e151d4b8e1fdf918ed64cfc5940bd3915f6b6047e17d8a79 | 2024-06-30 07:16:32 |
| 0x3a9b7f872b14a5f2b5f9599ceb2548875ac54a08ad78fca8789538a7a9350ca | 2024-06-30 06:54:30 |
| 0x98a8eb2d2e5e077c6dd4871109ea519f40bddeadc6e8e01e04502c41e9f9404c | 2024-06-30 06:34:31 |
| 0x1c7b6c3213 61fac7e0a31d41d167921 39ca2da266f121f4fa23420fed07b2e01 | 2024-06-30 06:17:30 |
| 0xfc2c3949570aa3aa7356363363634be226d6fdb342cb7feef73e78dd6d55813dfc | 2024-06-30 05:57:31 |
| 0x30c0deb40e475404d241ce1c5889ea4ebd c0ca4ba336a1fabbfbd5c07f692a2 | 2024-06-30 05:40:00 |
| 0x54a49f4f6 4b654e1ca18692f49331c37748147c9999c6764c119bb831a02b7e8 | 2024-06-30 05:21:01 |
| 0xf7b3ebda8fe76718302a2101f65587 9db34ebe912760ee3fb1cfa8842dc252bd | 2024-06-30 05:02:00 |
| 0x89313d99e9cbcc45a6a1ef39d9f0321cd3c6397f2a59d476daba6686815d13bb | 2024-06-30 04:43:30 |
| 0x1ca5fc37905bc9bb10161a606799b257e11337b545ee0f026d75d37047236796 | 2024-06-30 04:25:00 |

| | |
|---|---|
| 0xd2497f85032f394f4ef49c2637192bee4c362a0447f87f43fcb9a2ecd23c3b9f | 2024-06-30 04:06:32 |
| 0xa527813f1719ba2667b78b7efa8acf5e38359f7f62653ac770cf3ea1c467091 | 2024-06-30 03:42:32 |
| 0x4b12a006020f2cba97da22879a1684d8ae649e1d92cccb1d2d1b6e4ae32f68f4 | 2024-06-30 03:25:00 |
| d7591c13281794402f05e7b63e85b6213894ec14ebaffa8695913cf41f141816 | 2024-06-29 07:28:14 |
| 5c57c00bd08d498f19a847b6ada7d20064699ebbb915dd293b9d23e2ee364693 | 2024-06-29 07:21:38 |
| 473d281afd32468097fc2086475c1dcd0acb474d059a57f93b5adbf643da4a8 | 2024-06-29 07:14:58 |
| 932f002efb36a22b4dd32909f44aa28bfacedaded5b6586c4d61151993c11d64 | 2024-06-29 07:09:16 |
| e2ef4ebf5882ec0eadd0adc514d6fbe1ee91867d247272965566076607847c2 | 2024-06-29 06:59:20 |
| 9392f4930c2a99c7a2389c46e73ccf29d90eb60593bf51034b0a7cb050418d | 2024-06-29 06:52:20 |
| 517119f04d4b719db74190242902f3558cb197c05c476f784802eb54f83e58 | 2024-06-29 06:44:50 |
| b321df146e7118c2899590046a927f542281dfb2815b4fd6a46a28f731da71af07 | 2024-06-29 06:35:32 |
| 14d6bbb442af370ce426342e644e0e2caaba9c38836d3b1e887b0e7ffe40a18a | 2024-06-29 06:24:46 |
| a7690e4171b5340bcb7bc65c73e7ab23837a18a6335a215794c2a250c6e90456 | 2024-06-29 06:10:58 |
| 50f219a3b88bc39123314403cadb035fa9c316fb176cb7563b5772f5ef78654855 | 2024-06-29 06:02:56 |
| a8833f6f31402e46cd4e4b7cc3055b8eacd8949f52b6286feb0bfc0992061a | 2024-06-29 05:55:58 |
| 479674a651c31c48d0ba639b8a8163f080c08db7a08e84c2617f288f50f1d3fd | 2024-06-28 05:10:40 |
| fad6813a85ca3fec79cf2e31665700194bbb27a86392e35cc596e4c114e2 | 2024-06-28 05:05:34 |
| 2c07fb7b42c600297ade91ze632727740c53721ececdc333ec355e3f293598563 | 2024-06-28 04:57:10 |
| 56e0d2c8f3b1bbee2f2e49734bf57b21c1a68c01026z9cbf72f8cc425b4a205 | 2024-06-28 04:52:20 |
| 7324c936f750a2a19e6faa5dc5ef41d55435bc5fccd8df56aedabdaba97c70abfa | 2024-06-28 04:45:38 |
| d1a71b7a3ddca0748232f35c2e9a8a25cf36ea8dcfb767e6b5b929ac54c0323d | 2024-06-28 04:40:10 |
| 151195f1d94632db333bffa40b0a86cb5cad5541796317c7f03d74cd2c0789d20 | 2024-06-28 04:32:52 |
| 2c1ae9b96839d29be9a28c409d02aab0cadd23e04e5bd990a0c9c061e309c462 | 2024-06-28 04:25:34 |
| 43017097bb5a6a2b3adeb7eddc9b89cfd704d466be81b6fe5bb32f3158ba54 | 2024-06-28 04:19:14 |
| 4422f65b3ac5f61f34aa3edfccfdbd7627bbf3e88216625a4158b8a177471ca4 | 2024-06-28 04:12:52 |
| 0x3cebac718c3bb9de329557e25af26c23dace2827b3dba78c15fccfbc6f70452e | 2024-06-27 08:03:31 |
| 0xbcae4f8b44c7d8797cc554dd267016a431b7c33c357b5412f8027d112bbc8dc | 2024-06-27 07:44:32 |
| 0x9db0112a3934bed1f584b2d11658e4e55b62f2a19328eec284dd470aa9f571738 | 2024-06-27 07:27:30 |
| 0x8b0a22c9550f9f1cf2a286f78d0121bee7fd0a396b4179a0724e431aa4f8ffab6 | 2024-06-27 07:06:31 |
| 0x7ea364061c9472eec3a2b5b2f340da0858a664b93b1a8be7a0965c55842d2dbcf | 2024-06-27 06:47:31 |
| 0x9bf6a6de1e47de1332f3c40133254ea3bf5aa5dd3ed076c9335d03e1fd08a12 | 2024-06-27 06:29:00 |
| 0xd1f226404ffccd7b33ded737ca362811fd19fda7221553ae0dea64b8b5275b11bd7 | 2024-06-27 06:07:30 |
| 0x1518cc355eddbbf8514a2619e5caaca8b2c919cb84e18fd5b0b26b284e0d60fe | 2024-06-27 05:47:32 |
| 0xe91ac1e67bee9640dfcfcc855d6f4a441c515ad401776e3d01a58002515562 0a6f7 | 2024-06-27 05:24:32 |
| 0x1cf7fb4a42968429523a0ffe7a3ad152391f6a4d0e3367caa50b1037b77bfbd | 2024-06-27 05:05:02 |

| | |
|---|---|
| 86b0cb7456454ff0d9d03e4f4ac78ffe0431e99705a5355866z2baa29c35e3a83a | 2024-06-26 11:54:20 |
| 3b23159c5ada6514cded1a9b1b4f4a0bff53b684bbea2c13bc9dc00da6fd8845 | 2024-06-26 11:49:10 |
| 5976148ade50d557d697238b0a140b62bb97890d4f89637495bb4f40f7c75bb | 2024-06-26 11:42:38 |
| d829e18a029931911c97cc243b4202d9bb5a536217a28150d015e32e59da9f72e4 | 2024-06-26 11:36:38 |
| f7487b36ee6759d434d2b3e09aff1a42709ec9d95ff3cc0efde3ac431519476b | 2024-06-26 11:30:34 |
| 0f5a10c93ed1c080ce04e10daf31c8a773c3aa6bff0bc16f3346162f0f3ec29 | 2024-06-26 11:22:22 |
| 7710e044c9e3be90f068728090534bd4e5194aeeb06c327b730c44f49ae4848 | 2024-06-26 11:17:15 |
| f54849dd6d212b1fcbcd2c84833b634888fe959d9bc29ad86ef6814d443e90a9e97 | 2024-06-26 11:10:51 |
| a88c1331724f8f2cad71445z4fcc41512e2c582378ff554fde4ee1ebe0f8bea0b0 | 2024-06-26 11:03:50 |
| 1706229eb8de3751681b4bf3e5c959907f885363185d8f06d90231eba3bf5d538 | 2024-06-26 10:54:32 |
| 0x1c3f95d54e35af0542ce08b90b95cc938d7710226d2e7bf198fd09d9f6b0040 | 2024-06-25 10:40:32 |
| 0xa8ec7af0a3c84915fdbdfa6c7210d3faed32ce4fe6632652487c6c1513557928 6 | 2024-06-25 10:21:02 |
| 0x7321ec23e427c942d222cd93e047c760aee5762b90020ba70dc07c66cd5d60561 | 2024-06-25 09:58:30 |
| 0x919f004bc390026b27a251d11553169e285f6dcc3a1ee2fa91bc08ca835547da11a | 2024-06-25 09:37:30 |
| 0xbf88d3bae60cecdb9c15835614d2947855c96eec7223905eeab0285e5db3b2 | 2024-06-25 09:18:37 |
| 0x6a623bf1e38bb1d4f4a5cb3ab4d763918cc0231c2fe1e8a7ea4a9418069fc16d5 | 2024-06-24 13:40:01 |
| 0x4bcc933a16844dc10f9e288f0cb33d8e8622b13fe017e403fb4e3bb33a878650 | 2024-06-24 13:20:01 |
| 0x9dcd9a9dd868c341a8ab35b7d70665ca5cf4f5bdda3b0b0628f4e045b5be410a | 2024-06-24 12:57:31 |
| 0x1d11d1f46533ccd4abe55b630535f5dcf309c0460b27a65c7e7ceea4eeda c65f | 2024-06-24 12:38:31 |
| 0xead43e8058eb9f305dda118359f0d0e18eba4d2984effed49795cd89bf27dc1c | 2024-06-24 12:20:01 |
| 5bb80e7f833d47f72c159230 71ca653 70a28b9dcaf1736b9e4a99f74f4eed24ae | 2024-06-23 06:36:22 |
| 6517 1a79cc75e5e377c975a62a5288b12ae3368b133a5bdf b0c0ae4fe6be08ea0 | 2024-06-23 06:29:02 |
| 90a93c8827e22890ee500449eedd5d65cb9a94fd2a47448ff6436e5a00e1d0 | 2024-06-23 06:22:46 |
| 80f260b7dff73d0d4b6652b1a05b047fbfeaf4d85f0335beea5925d3fa8d7a2 | 2024-06-23 06:16:08 |
| 5304f14d6cdc7c4c04d9235738a62bf3641750bbf87104558b3d7eca2e b6e0b48 | 2024-06-23 06:09:14 |
| 900d6254def48865bf8842a87ea336 78d8b868d92282 9a18c46178068622 1fd | 2024-06-23 06:01:05 |
| d113ca63f096b30997b3d4d5d0682693bf11452aba438a355bcaa83acf885b57 | 2024-06-23 05:54:52 |
| e95d9f552c61155725 21c437cb148e240266bc265c1dda094ac7b2109 07d7549 | 2024-06-23 05:48:04 |
| c99f6ecca7b73dfb15fded23 10dc71d70df7263d1840e33a56ad38080ef1f1347 | 2024-06-23 05:40:34 |
| 5435 6e3681 23b8f0a61830e8c83530deaf703ce1ded8fe8c73a810f4ca48d676e | 2024-06-23 05:34:32 |
| 738f1456e220 44fabd3b59b20b5bb0e0b60603227d82e7c5bbe2bbd4924ea21d99 | 2024-06-22 06:28:58 |
| 7760cb146f28f9b297436c7f25fe8887c26188350e32f1800c35a5757a49c8b1 | 2024-06-22 06:23:08 |
| 71dd7f40881 6f49f032a144f0b5e193ade0ede40353ba b60c068c13cabfdad | 2024-06-22 06:15:28 |
| 5e32f3d8a335d1854cb6039cc30fcfebf7ffee5528647605d6fe98bc00466917a | 2024-06-22 06:09:52 |
| c57db1befb964dfce68c802461b16d81bbf adb5e2a9523ced c960c1630e7e71d | 2024-06-22 06:02:58 |

| | |
|---|---|
| 894dd961110bd8fc8433b47ba6c88c7a695bfcf95d7beaf1474d6d3974330cd8c | 2024-06-22 05:52:32 |
| aa962100d13caea20aad6a1673a5b6f19dbe7e3197533300d65e38466771bb2c28ec | 2024-06-22 05:43:22 |
| b87e076e346182f39e7d46183998ad1eb254cfa7fb11c3e93377b1cb9e40a546 | 2024-06-22 05:37:46 |
| 3a13b526f156616ed73067a1cac42fc1b85ec1795200bc9a8ebb3a015a2b27a2c | 2024-06-22 05:30:22 |
| 21c9410437b0da0440eeabb423804e7158eeb84f8b9c578c1c070dd431cad1a6 | 2024-06-22 05:25:10 |
| 39aba2a3a24bb644c3b000bf31cc619672a12c2e8701e27a0731010b6dd9bc | 2024-06-21 05:24:58 |
| 5b54719f8ae8ddaf8f6d66137a0bb88804a305fd7d7aab2c89580e06aa145dc | 2024-06-21 05:17:26 |
| d5d994d635e8816f649475bbd28bf64ddc02e77709da567d962053b0ee83a08a7 | 2024-06-21 05:10:20 |
| f62c9362039ff5492368422cc5c64f9ca0899931d45b82eeced3062df2aa2138 | 2024-06-21 05:02:16 |
| 301a54ce2384cf27db962919f6d10c1d3033b043a2faba3551c961e62d68077 | 2024-06-21 04:54:28 |
| 1345d6dafefbf1fae9839de09434a30a6a893f821e0bca4aa58d0c1da4b8408a | 2024-06-21 04:47:20 |
| 6c3c0d66bb8a4ab1ef5bf397897fe81d725e14aa947d9d3c467f661c024370zaf | 2024-06-21 04:40:14 |
| 8418f12a73482e2b26f9a47f591f8c652f4d38daf63b19bf0791d03298f66114 | 2024-06-21 04:32:46 |
| 729f31adfe49cdd33942e5c0efc0bb3e33319fa0038f8a1ce3592ca69dd22 | 2024-06-21 04:25:10 |
| 14e855db6663c6ede44320f2e3404564b782a0ddd19801a36c395344eef6af5 | 2024-06-21 04:18:26 |
| 6099d901119ad2b924a1bc5fc37cf6df583431a18fb0d5783f24f0271c0bd75b | 2024-06-20 05:17:14 |
| 4ea8305a44a31abe9349ce58ec7d42215e6a6a85e47b5bb90032b45b7aa6fa87a | 2024-06-20 05:08:50 |
| b135c39af48f9f4e26c20eed2031c78009470060b155be555f648bf07aad30059 | 2024-06-20 05:03:10 |
| b4e9368001624a2478a7369212f4cde1fab0591691a43798c1b2321ee70e54f | 2024-06-20 04:55:02 |
| ba1dc2ca18633dc4e947f2801e2432a4d33cc3f8073ba3eb43ee9b52f401a99 | 2024-06-20 04:49:04 |
| 30b8f60ec3dff6e3e1100ed46442e45fabbcf9cb290ff6b522975bb1fe4a9d17 | 2024-06-20 04:42:34 |
| 20184836cb9d40df595302eca54277de3a7a845e156f450aa5aea593e24c1839 | 2024-06-20 04:33:56 |
| cef0a5c941fa9405fde0041df7a99b972ced50e92bda8409ed5eb77c73362d0e | 2024-06-20 04:28:28 |
| 1e04fa3e8433743abc85aef58a833a564ce6b57bf63c2612ebe38ec63ad01150 | 2024-06-20 04:20:22 |
| b0c94f889bf1a2c67f7815b0417492cf8ed83febafa7035fcdcbc4ff596ae6d8 | 2024-06-20 04:14:20 |
| 1c01ddb10e5c16465602d43780d0566d503ab0a6c3d53753a2effe347ec2016 | 2024-06-19 06:36:28 |
| b233270ed03d189a93c6676c2166d6de07fc1e5a627037e6e4f372f35af52b2 | 2024-06-19 06:30:50 |
| 40169e76a62b8f0b9a8504a719b69b553868c1b1315c47274zb10107cd2571343 | 2024-06-19 06:22:04 |
| 0bec8484c4d716e34ee9bccd5ceb6adf3b5209c28c0cb2445c457e51a2e7685e | 2024-06-19 06:15:52 |
| 19c102c5737c0392b164907c1349bb66723801008787dbdcf52d0bae64c874191 | 2024-06-19 06:10:16 |
| b11f801dd959ff1dba4996d8c85c345848da0d4d153d3327abf556e5971281ba41 | 2024-06-19 06:00:34 |
| 0781e502f02e06f36d465fe82b4a0c77d848e01cb45be862294bd55a095da9714c | 2024-06-19 05:53:20 |
| b3a64b970ef34142d46c0dbafdab6bcccd393c85d725e4169ae41a972293fd6bc4e | 2024-06-19 05:48:08 |
| 4dab3accd2e38b20e66f521c24292b9c2d7d4c80a163e1d03f535d7a60f6a1b67f | 2024-06-19 05:36:38 |
| c250ea9224a3d15e940cf311fbc493dd17d323eddca430eb3f2db2b06ff359e86 | 2024-06-19 05:27:40 |

| | |
|---|---|
| aaf650234d0c2e2fdfbbc5a49f4b525eb33ba4932005d01754c349b98ff7ef8744 | 2024-06-18 12:45:14 |
| d3ba3ded6ca16280993a2c47fa5774ecfcb38e7e6f86943cbcb0769b68ca35d7 | 2024-06-18 12:39:32 |
| b6f21be30dfa424ef5cd29a80319d0f9f9a3cea24d0ae467cb87762aaf2c2607 | 2024-06-18 12:34:28 |
| 98c2f3d48b74affe559eead2e9cf90b24a6e9f1d3d4fa1f17cc93c0046fab7c4 | 2024-06-18 12:25:08 |
| 0b42776dd4e421a1000d8b7bd2dd584380f0080e013e4a314c6b49bff782d4d6c | 2024-06-18 12:19:34 |
| fc6cb3fa1d7ed6dbaac7c6616239bb16a26866862454169c08aa05a4e182506 | 2024-06-18 12:09:02 |
| c1dcaea7344570d05e325b074d9543cac4ace25fa191cf65ec1a8e8c772a0cd9 | 2024-06-18 05:47:26 |
| b7e76664e36ce4937e58ac3a42219ee7eb057e0121c8ba757b30a52f9eabad8b | 2024-06-18 05:38:56 |
| 544687de843c4c38b443883210 9a16391023c6869deae1a9ae592f3dbde27030 | 2024-06-18 05:30:32 |
| c8c22ce7bb32317353thf2155e4dca12c35a73ed97de42147ff76998a14168ad | 2024-06-18 05:22:02 |
| 57af6f0a6d3d2528c60fda7abcc30b8a7658cf6575fe5afcfd70e285fc27b44e | 2024-06-18 05:12:38 |
| 7495f52d3739a35c83de80754d949f154ceae7f72fee43d3bbb72381e61 0382e | 2024-06-17 13:03:56 |
| 6407617b7ecb8da61664aa5bdcb43bf66e20b9a1b11006f3339e4acf87a8eb65 | 2024-06-17 12:54:35 |
| 5003f73a8aa03c3534a1d2f7c17cb0081446 3c9bac38cb63f020147b84266756 | 2024-06-17 12:45:17 |
| 152688d0a3e1c91b12de4e0b95cb285154a382968247193b3747c2f57f79988 | 2024-06-17 06:08:14 |
| a2bc6f4d603cb1452dea4b7edc2f2cd0da4612da7e69935675f7950a11a303eb2 | 2024-06-17 05:59:26 |
| 89f9f76d9aa29821c2f9588815fe7e5dc89e796c5ee72ff4a4be3dec7106914ef59 | 2024-06-17 05:46:52 |
| fa64bb4337f08a5f11373663b760c272ad078b92100d4d137cc3dfb9fc771e4 | 2024-06-17 05:37:44 |
| b996a26e8a7d28b634bd0026ac51718 77d57a1135642b68135 39c67394adb0dc | 2024-06-17 05:28:32 |
| 3220df52638552b441642a19211e25962690 dd2e9b9b80e702e463d52d86afd | 2024-06-16 04:45:56 |
| 57f47acdbd507fe8f380461c29f8e05388f1212260fbaeaa4ab7256f429ebe3e4 | 2024-06-16 04:37:04 |
| 8d790d2dcc2c4fca4e58aec913fa7b4e7802f75e3c8fd72d0d8edef1c8b98474 | 2024-06-16 04:29:32 |
| 4c9246f867f7e337feac53feba4ece863dda7c2530f741c46baaf563f1f50b042 | 2024-06-16 04:19:10 |
| da674cc759c44b0b9e686ef93e119ad02a56889dc1607ab67f0881ae2dc55f86 | 2024-06-16 04:10:50 |
| c3abe89afba4c69b2c73c13b0aa2041 94bffea0ad95baac51d0f9c672d15a80d | 2024-06-15 04:44:22 |
| d2bc7730edbbcc926635be4eb3ad03623ce62e41c02ab69b78d990a94d40bfe | 2024-06-15 04:37:38 |
| 8b9e7d4e3d44cf4c80bddfb1aea997bf62b7455d3b039a4a3a71d3590abaa82 | 2024-06-15 04:31:52 |
| 00bd4ddd8d15c596deb74c365fe94bd4335b0e3e998957973a4eeb765d21033f | 2024-06-15 04:31:14 |
| 8eabbe79d9caed25a943575c6d778a7eee0a94a3ba33f38e5cb81ec04ca9d79 | 2024-06-15 04:22:04 |
| 43f1191bf617b10da50b058903317dca3920b8515a74149680d9e7407bb29145 | 2024-06-15 04:12:40 |
| 538d451f08d183f5ecbb90630773aae043c156 71fb6c310d885792f42073a4b | 2024-06-14 15:35:44 |
| 13afad6aa2d00fcc326dd833de5e76d467e19839890e70fee2a13bdb00e779d5 | 2024-06-14 15:22:01 |
| ce6f0dabbc7d062623a6d0d5d4457ac2f2d7cf944708dce987add004b2311ca0 | 2024-06-14 15:15:26 |
| f0e274bf085b0ea70e4e442c92b391 05be79e6958938e30a44b992032410332d | 2024-06-14 05:41:44 |
| cabf3003cfb576bd30126 56c65a396b3da c9de6cfb73554bc69f0cb4d8962e | 2024-06-14 05:32:46 |

| Hash | Timestamp |
|---|---|
| d2ead4d08e58e13f27b4e4d30e2bd9016707275c6b08a62e1dd338e7a07addca | 2024-06-14 05:25:22 |
| 7824ae34490fea959d5d23b7ce74636975ad4a198703b84ea387edbe8867c713 | 2024-06-14 05:16:04 |
| 411d562b9be7382178567e64539f719f17fbaae09412da40a2fcd2249842134 | 2024-06-14 05:06:56 |
| 0x7c8eeb39d083fdc5a30374468331e77ce388127b85a44b7bd0481f39c7922669 | 2024-06-12 10:34:30 |
| 0x9e5ddbddb98fa54b5bbbb22ca46903b7a1a49c6b4bad6badf1dfc1403e3c8538 | 2024-06-12 10:14:33 |
| 0xec4d6607e360cbe9d74612107da8ef6fd698786269f0defdab2ffaf740fcb2f | 2024-06-12 09:54:30 |
| 0x3ada08dfe24783bda46011f90b75699552689ef46104e2d21b0796a072c0f726 | 2024-06-12 09:28:31 |
| 0xc0f1e788c98b3f39c2a7192d5a47e346e9c7a1edc956589fa0fb524556b07ded | 2024-06-12 09:08:30 |
| 0ab72f89ebba9bad82df99f3f3f144b5b37f2d26dd1a76b6af0fdaa30e6049 | 2024-06-11 05:12:40 |
| a3d0ca4010b4377018f0e1a8c3d7da75bc7f66ee38acafbdf35faee15eeee143 | 2024-06-11 05:05:28 |
| 73e7996da1c2b1d319d7cfaabc52139dd35d0657c5ba67fc1e7edda50fdef7c | 2024-06-11 04:55:20 |
| c94e284de7c215b31770f5e89c9a6669516d9ef57623701d2f6ba0acc76128 | 2024-06-11 04:46:40 |
| c89952324191366669fe844757ad2294d671a3bf9a7f1584ade7f52eeac04e1 | 2024-06-11 04:38:40 |
| b5f954c6ba4be83603e08f2f1606df98e1d89307d02aa8184dec0c85ae5def35 | 2024-06-10 05:08:32 |
| f88ded31cbd66351b2e10d2541b2e315ce57d3504dd37e8ddcaa7d9a5bc6a | 2024-06-10 04:57:46 |
| 398f4f35931540d780cdb51593f352b56e6022b1cc1fcd08740de717656257ee | 2024-06-10 04:50:22 |
| e0d57dd5a02b84a3c9a4cc0f481c5c98b05d9d297d34625f89fe8373c2a0b540 | 2024-06-10 04:40:58 |
| dd902c2712c70b7ae9240f6796d2530f8a3e905ee7cd753dea234d4667abebe6 | 2024-06-10 04:33:20 |
| 368692726b716444d2b21c8b1a79e14c6245b2f971dd62392cc82fa9b3a68e4a2 | 2024-06-09 09:39:03 |
| 466e8d062f2f124d711ac8dde6fa107ff4e5ba43ca3e1e309f353755b99c0d67d2 | 2024-06-09 09:28:22 |
| 6d9d28eab14e31bfed9fb5d87cf1f4c75471d0ebea06a767141747a41168428f7228 | 2024-06-09 09:21:16 |
| 580b0535075f1a5bdaaa4eb698d6ea61abd40f5a59cb8c96f9d5ce8aa5b532398f | 2024-06-09 08:55:08 |
| e8976687ae721bafb567476b56f9ac498ace42e64e21a2300e034139df72156 | 2024-06-09 08:47:26 |
| 8034bceee41c3c2d0464b18fef964b3dffb67ea6ac8db0930325baab9ebcc62 | 2024-06-09 08:39:16 |
| ad326f929d5762819edb8f0080a690c4114215c9cce8a9f963e7f89f73a1e0e | 2024-06-07 05:08:22 |
| b8e4a221f81c430e61130617c1b1761a8d4097a5fd7324fac6af6ef6d90e86a672e344b | 2024-06-07 05:00:26 |
| 11e617ef836d4403193909b652723a46ab56555169f1ace26ec7b3f534c6a88dd014 | 2024-06-07 04:49:38 |
| e2939694960e480ff354cc16f46d2f0960f383ef39f57c9ba059d314cd8748e7 | 2024-06-07 04:39:22 |
| de73afcecb5583e02160f51a76d028ab745ec4c62d6b67b4fed4a5ba66c479213 | 2024-06-07 04:28:58 |
| 2b6ded062494b796608c5fe2a43248cad0d290f66c87df3b77a81207a537b7a | 2024-06-04 06:00:44 |
| d7b72ac5138605d3929292e2372c78bcdea156b6a63b41cdef832a3c81a8e838e | 2024-06-04 05:53:02 |
| 29c4b8cbc349e8cfa82e75806fc2cc8471be767a28b6e45fad4ff2a2baa4710 | 2024-06-04 05:42:20 |
| 6630b73564186e59377c0e61699c052ac7dd60c7baf5513fceca4c7bc2e5830a | 2024-06-04 05:29:12 |
| fa585bde1698894226d4888ca65f54bd02a4ebb01dbbc28aa13b77ec7e7dbfb | 2024-06-04 04:35:58 |
| c4f044724f09b8d2ee85265cbcef88cc391dd4e2dcd84bbb11d1f0397c1f0d | 2024-05-30 05:26:44 |

| | |
|---|---|
| cbefa65b5050e7170e0b5e6a966aabf3e8e4c517881f5e6aa0c8159ba447dff | 2024-05-30 05:17:28 |
| 6ac9c4923af5c8659a6157ca9d24e44391528474903d8892023b9ec29ce00e0f | 2024-05-30 05:06:18 |
| be9ae00302fa0c237f0ddb92fdea052b562b719f53d3f77b37cbc8c306b02c2 | 2024-05-30 04:53:28 |
| edea2b956683e48cfd52e53c0eee87e9905875d3518e96b3c9a02e128ffe54f11 | 2024-05-30 04:45:22 |
| 62df7c6539d72e7a75f6229fa0a5d3c9c181b069883ec326b3467c183f9d01fe | 2024-05-21 04:56:44 |
| f137336c3aea66f40166bfa8fcc4363f1f665940c98244d9c64f8a26f33fde9ea7d | 2024-05-21 04:45:28 |
| b072dd6a8e6ea0dbdd14c7325e9f1bcbd11017accbb9fc9f73cb95537r2c4ad0c0 | 2024-05-21 04:35:46 |
| 2588661dda895aa5075bfc5f65783ac93d2c0ddd425f1152d6a4cd305628fc4049 | 2024-05-21 04:25:14 |
| 5a15373b1cec06b2bdcf4f081e9cfa0a5d94199af4f49cf62e7e7b8c86064a472f | 2024-05-21 04:16:16 |
| 5d093d85cd81e432489c1cc2eb016b245b09adfb93566156ea89aeaa1b083e81 | 2024-05-18 04:51:50 |
| 2411b41f92eae0280c11d06a3236e3ca14922bcdbac8845974f64974d234666 | 2024-05-18 04:45:20 |
| 4cac23b1496193a419f0e900592b6f3a780ff07f58319b7f8e5857fc6263b7 | 2024-05-18 04:37:04 |
| 298ddfc9131cd046418e0f4f0c3a49c7d437r7fbb1bec19c867c7abec601766f | 2024-05-18 04:27:08 |
| 5480763dd1b13ce61acd0f33e76dacb7f937c078d0242c4d4b16ef0f7963e9637 | 2024-05-18 04:19:34 |
| 640e814a0b400ceed6c8d9d3fbef82310d3d9eeb657cbdb320c1f76c8c1272ea2 | 2024-05-17 05:04:46 |
| 68cd35be7bd78d1398cc7aa14a602a9f622281b44b5ec27a82e63dd36a563cba0 | 2024-05-17 04:56:34 |
| a8f133e7637b79e1ca51b150a766af5d065a2dcf6b8e129a176cf962ad52e402 | 2024-05-17 04:46:40 |
| 9df88ec286ff88dcbca05e956c2d74dc9ea042599b6aeed2ef67e5c4180e84ac | 2024-05-17 04:37:58 |
| da874939g8d0dd80f77a9608c870bdcbf5aa3887ecb1cb8ca41cf5df22132c9bf | 2024-05-17 04:26:58 |
| 0x60cd8a56e530c52dea36d9f647245eb84ef1edcc5567d8d5591e3211697840d | 2024-05-15 06:37:01 |
| 0x79a45b44ca8c603a97b5a948ce610978851fb2876b1e3f9ea8858c561f1396f | 2024-05-15 06:16:00 |
| 0x2a7a9f5a9d4205a2382b1617ea6796c02a7e1972367bdbdefd0037f77f47219bc | 2024-05-15 05:51:31 |
| 0x012822e8a1a0d3262a927e086e62116ac3531f5b10da1651ad629becbc3716 | 2024-05-15 05:27:30 |
| 0x7861adaaa581d31a96c110d2b27a638e019556ce93271c88e8d7ef79b1e30412 | 2024-05-15 05:05:31 |
| c681b8bbe241d9f77ed32309a4d6f324672f17a3eac46660b3da8b9d79c6670365 | 2024-05-14 09:24:28 |
| 9323476218f255abdfcc6b28b2bc1c8255e6a60ca2952afde0e930b9f85194d | 2024-05-14 09:17:20 |
| 2fa87d2d137ba8d1caf927b7bf14cdc637098567f28665a9aa97a1481f417722 | 2024-05-14 09:07:04 |
| 98226915ec27f9e6aefedb9c378a7a0d120f83424573636cd8e79e9438b0b5426 | 2024-05-14 08:57:38 |
| 76429acf56a063bfcebcfaeeda5fc303f90509f941227a596e7ffc3c41facfb040 | 2024-05-14 08:49:44 |
| 213593add376f15c436c760a280dfb9158e41335e2cadc79c48fe6c926509c31 | 2024-05-13 04:51:22 |
| ce5866f0f23d0e727accc25683dabb3236fc2afda94033d9b91197c4f879b4027a | 2024-05-13 04:38:22 |
| b1491ceace90ac96366bf7de7e9b7d3f871b7fdde717fae44b51dabebab290aa | 2024-05-13 04:29:34 |
| ddb5df23a281912f49ee1f575200c6cdf394f0fe9767f286f7146c0ee8e7daba564 | 2024-05-13 04:16:28 |
| 4baf0f489884661876cf4cdb6775123ecbccafb75a234812e7b6c9340a62a92e | 2024-05-13 04:07:02 |
| 280a9c2282ca41f1690001639495911fffc510f86a42b692e2414428bd9112f84 | 2024-05-11 05:07:16 |

| | |
|---|---|
| d9fd62764 2ac8896c2f393447ae9a34f5248bd903c0c87d6eea994d58df82d5d4 | 2024-05-11 04:56:52 |
| ef7795b15a1ab8187cbac1e3324a0c8fd23b0fb369c7db83d3b039cd8e068bd6 | 2024-05-11 04:50:38 |
| b90a1b157d8a544f73118a4d16132 87f6354793bbcd42 64d9e3ccb4c58c55f593 | 2024-05-11 04:38:46 |
| 845b1dc28fa2cdf0c6ac268ffa6c80fbf61a9fac56be30fbea919797cbe23b03 | 2024-05-11 04:26:14 |
| 0f6fcd76d3b62d7b72cfecd7428106b3bd1cdda6583cb596e04fe402d8dc8c0d | 2024-05-10 04:52:56 |
| 7cc9eee1fc4ec9e40fd3892111fcd5e7c85f190fd51e8ecab4cc09e0c9881b4e0 | 2024-05-10 04:41:58 |
| b1a3b9253c9619dc656823 7a2 64d0c7375b8cbaaee057358cc24a8aaaaf072a26d | 2024-05-10 04:33:08 |
| 17bf2171a9d7d060e438e50171abf2d44a52f3854c89895860a66a19da70be5 | 2024-05-10 04:22:44 |
| 2badb6bfca756db65c4e5ace7c1b7726842 9487 5d3166b9380ac322d74c826b4 | 2024-05-10 04:12:40 |
| fbb108b1c038b947b14a3db25d9100945354 02a9 78c9a8c01c8e6e5afbaf578 | 2024-05-09 05:21:20 |
| cf88e5cd189558a61 9e6e5898e9bf808e011615ee7498ccdb38d06169c0cb6b | 2024-05-09 05:11:10 |
| 8f3666b894e70b61c774859381363ad7cd86171686e5a6666d630f6ecf9a905b | 2024-05-09 05:03:28 |
| c047d465606fffe95544077171 71b2 07d6ea42457e29f7b108ed8ff88e0a5861 | 2024-05-09 04:53:26 |
| c48510d4b2bc2ec70817cb09e99dde3eb76 4ed0ca3a4e02be7618804 4d0b7d42 | 2024-05-09 04:46:28 |
| 2c807 6d3233f809f1b37 8009394ddd cd420a1cc71c0aad84b2a3edc5a9f4e5d1 | 2024-05-08 05:44:41 |
| 5fa503e49308a2afb7c548ce736a34a7d863f6d0aeac1613e138fe45be3cb28d | 2024-05-08 05:34:57 |
| b6aab60b10f9b7bed3ba6ec7c6f9e13a88e5049 5f23004e05aa2de92065be55 | 2024-05-08 05:21:40 |
| 95e79e09bba8c5c97ae3bfb737e93b62b0bb43001e1de21ee14b120d3365b069 | 2024-05-08 05:08:14 |
| 91e5e9d0e80535acd24fd16548789fb74ad473f079651 5d8b22f f923b772df b4 | 2024-05-08 04:55:02 |
| 0b51f4ff4c95ada41b579cb1e25e68368bf83612bab024d264b0eb78aad492bc | 2024-05-07 05:34:20 |
| 172366caf670b45776f07d30785574b2af13654bf89320c41fd93e3abe2748d | 2024-05-07 05:22:32 |
| 56db01b7ea5fd9a92cf889cae093d828d7759a7c579bbcf1966aad544d38a47f | 2024-05-07 05:13:04 |
| 2577e4df065e59d100f21cdc45627 16a30f24f63d81 8d0c5bb7d9a89d174fec6 | 2024-05-07 05:05:08 |
| aa4483bc6c29eca43555a88d600440 0ae880837283d4b3831667c36ee860ef1 | 2024-05-07 04:57:22 |
| bab722bf753d1e8efb1b3843a7ea34e8c1f680ce8e6469b5e660920 68f6a35 | 2024-05-06 05:01:22 |
| 6100d5485b07fbd8a82680df0568073 9b5b9df68d657 6ce72 415af1f98fabb9a | 2024-05-06 04:50:52 |
| 3c7e7562deb5bb93d92 402 949cee8719fc8059f120ba b6ba50b5178a33e5b649 | 2024-05-06 04:42:44 |
| 6dbd81c9fc84bc9a7faf84e2a848433 91f2cfab3b5b89d23ffe7b6f6a24379c | 2024-05-06 04:31:44 |
| 8367d31f4edbaccbe27874cf58316311fe7df5d9796 47362d7d407afce893d53 | 2024-05-02 06:56:50 |
| a4d880edb3012bea453e182ddbb895f2b0c485 63c22c623fb575654bb26e4d8b | 2024-05-02 06:42:52 |
| 792a734a b9e51db1c51a8fef6bae531c692b394d7df b803ad19fa445d896f1f1 | 2024-05-02 06:30:50 |
| 63b4e46c35f22156eed2793ae5f236c9ab5da8cd7450557fc0c0f86fbbf9bf | 2024-05-02 06:19:02 |
| 8f571b1b61b4f125d3b40e597edaad13213ebd7379af0cfbb66ab6687260fb676 | 2024-05-02 06:07:04 |
| 23373663a0d1646df4efbacb65aecc0dd0f5362029d5592af79155d2afeeb69e4 | 2024-05-01 10:06:10 |
| ae750fa7bea110b087286 37b9a04e4d82e39df8edde879b18dd12ec328 47d76b | 2024-05-01 09:56:34 |

| | |
|---|---|
| ad05e894760ff90fdc09e68ffde0e227f1ca1239527bcd061221cdedf2033zf0 | 2024-05-01 09:46:08 |
| e610656af8dbbbb2459f74299c363ec26bf1eb834ec16520599ad9d78ec421d5 | 2024-05-01 09:41:16 |
| f7372D567154e5f58a88a74011feef78dcf93848a4cfa0d516637fc7ebad799932 | 2024-05-01 09:25:32 |
| d8d1ae18a75d9b702b8fe8eb886f9670f066ab1e0860a725030bea44a3248e8b | 2024-05-01 09:10:47 |
| c7f26e6ad8a17c08a72a81e8612d69c4bbc209fd94e1d05a33133e09af478eeb | 2024-04-29 05:04:20 |
| 9b3aa8ee87d7719f1ecaf3da4e2a179e9b10f5c8b781f1ca20f72a2f601ac95 | 2024-04-29 04:55:40 |
| 2d14dcf72a7c4cdd331d47c2bc005f97a5b97e70e6d850ce903618375d7a4f | 2024-04-29 04:48:58 |
| 0c047b9f02302a82ec9cafc152ab6bfde07e42bd1e335e9eae80dfce3c03d0 | 2024-04-29 04:40:52 |
| 6ceae8d52ccf6dc4885ee29edf6a8ad1d6d7aa3fddeb2d5bdff773a874d0d6c3 | 2024-04-29 04:30:16 |
| 1b85f81b155d9380079a2032ba68bd666e9c7de366bfacfdf36acc29e638e48 | 2024-04-28 05:38:34 |
| 92b3f56e6afb4726251557a5c91592e22fa446b0c38817ce86ef6f9fa2300ed | 2024-04-28 05:32:02 |
| 383dfa5ec15e39e47502e4a43142bcfd54627c4fb2f6f7f967783ab1adc8be43dd | 2024-04-28 05:22:50 |
| ec7fb19d44939e9812ab96c904850124ddd79c15412516dc02b7c75db16a3824 | 2024-04-28 05:12:52 |
| 62155bc8a1b0c4f7221c53581b562d1a5357d2797f271c9cc2411a83ab9a031 | 2024-04-28 05:03:38 |
| 515464838fa63bfe8a8330f77b8d0f02c983005ffb5f1a35225fbad804194dc9 | 2024-04-25 04:31:20 |
| ccb3c101e9040a63465f13b0117fd5b960e6d66965 0e908c051cda158021d9d | 2024-04-24 05:19:26 |
| ffe71c44aa5e5a0edb58bd02b2e994fd11e3d1079b1b818b7c8379c7206e300f | 2024-04-24 05:10:58 |
| 46d1597274a0c3474294f5e57a5a6eaec5a35d4a50e5e150da9cc4b0c96dc1bc7 | 2024-04-24 05:01:22 |
| 81ffbd81dbcf6e6242a1066f7e71baa7f133368bc40554426189590022f17c789 | 2024-04-24 04:53:02 |
| 689bfc3b4966de52598668a0d73dc9a8c8963440d9e12a15a9d5460443af55af3 | 2024-04-19 09:24:03 |
| e83c815cc694694315 8c1b540e5270bd6e9e4b850b8f9e3ba16a1f1a9412506 | 2024-04-19 09:17:11 |
| aea500b1799486bc93e3288c54609204 12b2f052dda5b50b56882990cd8d47cb9 | 2024-04-19 09:02:16 |
| 7871 5e4d7144032cebc17d3a2beac669d2131c635f2a9e973a6025ad0316a6c | 2024-04-19 08:49:34 |
| dd8f22cd5a795333d5a0d858306c29d5bb00d037291a635f4734544a62c16650e4 | 2024-04-19 08:42:11 |
| 9a1ed3100e9299720f7535cec324fba0dc5d381a5411021c17ccf6fce2bf6109 | 2024-04-18 06:42:02 |
| 93bbaf2f462777faf5b46444c7ebc674155d7f8683515b3ad03993108d9e6e49 | 2024-04-18 06:33:04 |
| f8e736802f1091a3412c5974b47324df0dbc0a0f00e2e363778d9a3c02 3d605 | 2024-04-18 06:25:16 |
| 0cf10d6fb35cd25e6214d f9b20c2e4691fafee9a99961a9f18b64bce53165ab1 | 2024-04-18 06:12:02 |
| 571bb19f6a68a94b77906445c8875015 67f97310865e7e4839 1cdf8af003a0144 | 2024-04-18 06:02:08 |
| 533e2698e1f01d7773b052f1538c196e6a9231511436b2b8ab2de94756680 0ed5 | 2024-04-17 05:28:14 |
| 9d9587a4befbd38c782b351a60c568bf3f4989f9dc6d3e453eab1d170ae5cd2 | 2024-04-17 05:18:58 |
| 3e2ad961b21883b2a18292d1777fe52ae552153ad50fb6d7a8fc30869c0c0ee4c | 2024-04-17 05:09:02 |
| e0e45074391e79508947803150 8e49e2ae99c030eca8eddfcfa7ce019774424 | 2024-04-17 04:57:44 |
| 1995fc03ade66fd61 92b839e8a4b362 14e6949974c383f09516a49855de26097 | 2024-04-17 04:47:32 |
| a4e007127ce40b9a8a861fc79d2a97b372f74f1a0dcb5ffc4fb723bed038911 | 2024-04-16 04:36:22 |

| | |
|---|---|
| 34500f6243bf6745fabac47b610f29ff67e17f81dbbec7bebd558b0a2a8dbfb | 2024-04-16 04:25:38 |
| 9f40770ba2f8218993e9a952da4e8fcae32b624c5f89ed61f755aa728f0f39fc | 2024-04-16 04:16:20 |
| 5d4d6c6f2a18f7a6cef074c112ecdbbf9ba4b91600d6a89baa3a6aa1f06ebc75 | 2024-04-16 04:06:40 |
| 9c5bd0aff85b4f2af093b204de5e51575f67db8e31e395552e3e8b72476f c28d | 2024-04-16 03:55:50 |
| 0xcce2b54e852b7f4ec02f53e13f83e6e9d85f22c83aded39342613f7f17c739a | 2024-04-14 08:18:30 |
| 0xb01cf1c8da3b33d064abea60a94d540f617ef618a6f26a86c8ee8cab87f89ae3 | 2024-04-14 07:54:00 |
| 0xf46367a6959e4087e36ffb3526c1b609f4f5f39b987ea7535242a4d5c30b3d30f | 2024-04-14 07:38:30 |
| 0x2157cdfca01346d17b59576de2d9cd72053172cb925aecfb8d7cac152b91f546d | 2024-04-14 07:16:31 |
| 0xf2c9bd35a7129fa8fae98b75df1d53de99ef522e8e3df78eaeef67b749aeeda | 2024-04-14 07:01:01 |
| 0x9c67e10608664bba1ba16c56fa58f48827d0efb2437c0c9c4a9ce9df3c954a782 | 2024-04-13 05:46:31 |
| 0x9ff0b565bb73921abd97e61fc61b1558b8d9d1dbf08704934d1c1cb04ce2398e3e | 2024-04-13 05:25:01 |
| 3e68cd695fd3fd38e38738895218a0c39e92aeb05895ccc1cafa0b2c6e9a04ec | 2024-04-13 05:18:04 |
| 3325adfc3c829cdc58a18f090d5cef225a231b0aa679d7966952bc191286b6b0 | 2024-04-13 05:08:32 |
| 1696896161d5ff3408717f6589a8e6b5360c900f87a8cb9cba33a4ff7e3ec366b | 2024-04-13 05:00:38 |
| 82df46a4541461 9acafd7e5595a31b60947185341f6a1f050 5e79a91e32c2 0cd | 2024-04-11 05:55:02 |
| 3b66b647b853511cc3848be51d437fa3ccd3f03b2eb25ff1291 6d806a f827b8 | 2024-04-11 05:43:22 |
| a14ffbf869174dae95920a62c7bad706cbeb288c8d5aa30a3ab9059e78c2a83f | 2024-04-11 05:38:38 |
| 79975c146ee6528 81ca2bfcfee2e4dd019d865437 85b7f5800c7cc0e6a99113e | 2024-04-11 05:29:20 |
| 67d1d9e9879 4fc291641 2e68f7cb1f477746 1089288a9aa7dab7 3f3aad15f8 | 2024-04-11 05:37:44 |
| 0x94a246cc88c25ca3d3b b4bfcda164383c2327fb806fde0a54baa27326eb99a0a | 2024-04-11 02:39:31 |

# Attachment 1-F
## Outgoing Transactions Traced

| Case Name: Cohn | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| Tracking Name: Cohn - Tracing | | | | | | |
| Tracking ID: 3a1b24a33-449b-4fb3-a50d0ddcdff7fd | | | | | | |

| Transaction Hash | Source Address | Destination Address | Asset Name | Amount in scope (per Asset Name) | Amount in scope (in USD @ day of transaction) | Amount in scope (in USD @ day of report) |
| --- | --- | --- | --- | --- | --- | --- |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 56423bb7687f6d833d85e837c93414d31 | USDCoin | 99,197.00000 | $99,188.77 | $99,199.25 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 074538b47f4538af88d7f65dfc4b38af7d26e16d1a6fa1 | USDCoin | 97,606.00000 | $97,606.00 | $97,599.36 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | fb16292f044303a313ff03d7f8433e14 | USDCoin | 100,010.00000 | $99,388.55 | $100,003.30 |
| | 21a31eet1af c5149f4c2ef cca a2f02ad102d285549 | d6ee c6d87b78d855a0f4c4f2497bd6d9 | USDCoin | 98,598.00000 | $98,995.72 | $98,991.27 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | ffc323792044330ab312f1fbb72f94313a1e | USDCoin | 100,000.00000 | $103,100.00 | $99,993.20 |
| | 21a31eet1af c5149f4c2ef cca a2f02ad102d285549 | 66c8d885a e76c49387e18e02c a0fd9a19 | USDCoin | 99,980.00000 | $99,980.00 | $99,973.20 |
| | 21a31eet1af c5149f4c2ef cca a2f02ad102d285549 | 51a0ae8c7f ceb37f6646f3e6d2e04f37c17 | TetherUSD | 58,993.00000 | $58,960.08 | $54,988.99 |
| | 969bf59e4d72e237bed8f f6d426a240514f696976 | 61e2f39f c6899d5d4673635370923d39ed | USDCoin | 37,012.00000 | $37,012.00 | $37,011.48 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | 11f9d30b355977f7f0602ba e86bda8d2795ef | USDCoin | 93,015.00000 | $93,005.33 | $93,008.67 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | 15e00e6de1573f50543f2b29274298df42 | USDCoin | 99,980.00000 | $99,913.44 | $99,913.44 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 61e2f39f c6899d5d4673635370923d39ed | USDCoin | 97,605.00000 | $97,564.30 | $97,598.36 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 61e2f39f c6899d5d467363 7323489e5c361 | USDCoin | 100,000.00000 | $100,000.00 | $99,993.20 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 5c8be c7f4ef8eb4d553e e5d40f7f413156d | USDCoin | 97,306.00000 | $97,297.92 | $99,299.38 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | b965c c99f e4e ba724341591d73c95008 | USDCoin | 97,405.00000 | $97,364.38 | $97,398.38 |
| | 21a31eet1af c5149f4c2ef cca a2f02ad102d285549 | 33b4f528c98ee947f5a7e44e232a0588b | USDCoin | 99,298.00000 | $99,289.76 | $99,231.25 |
| | 21a31eet1af c5149f4c2ef cca a2f02ad102d285549 | 5f40d95ab8a7f f28f28e05d518c c40f6c | USDCoin | 100,000.00000 | $99,997.70 | $99,993.20 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 36d5f95ada8b797288b a6d8b37c0d4d5c | USDCoin | 94,010.00000 | $93,981.69 | $99,003.61 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 5df4cd6f d11f e7f ee208ct73ac cd825 | USDCoin | 99,198.00000 | $99,195.72 | $99,135.25 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | f32b1a8be4df5b53a231f4d1d8ec6b4 | USDCoin | 50,000.00000 | $49,972.10 | $49,996.60 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | c23666d ca46ef2ab1a50608068d6f6ed41 | USDCoin | 92,039.00000 | $99,223.08 | $99,032.74 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | dff01d073043a09d11a80091d61cct538 | USDCoin | 92,559.00000 | $92,517.16 | $99,552.71 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | bd38cfc25ccc f6b58acb4d9a3f7fb31 | USDCoin | 98,502.00000 | $98,495.99 | $98,495.30 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | 1e61f4a580f87b78f2919e1346f601181 | USDCoin | 81,000.00000 | $80,594.90 | $80,594.49 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | 88720a447bd8e a0aa49bb1f e e9a7f ce86 | USDCoin | 116,000.00000 | $515,326.30 | $515,599.11 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 1e61f4a580f87b78f2919e1346f601181 | USDCoin | 118,895.00000 | $118,895.00 | $518,886.92 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | 66c8d885a e76c49387e18e02c a0fd9a19 | USDCoin | 118,000.00000 | $118,000.00 | $117,991.98 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 51a0ae8c7f ceb37f6646f3e6d2e04f37c17 | USDCoin | 116,000.00000 | $515,326.30 | $425,995.43 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | f413c0e c6baf f61f6c fb7c4839a370 | USDCoin | 82,513.00000 | $82,392.20 | $82,507.39 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | f c65e f623d2044314e713803380bec116e | USDCoin | 97,604.00000 | $97,604.00 | $97,597.36 |
| | df65293d8e3df4f4e59e90ef65a2956a1343963d | 1b05fc4f47c738a488978ee4471ac4ee | USDCoin | 98,799.00000 | $98,792.97 | $99,792.28 |
| | 21a31eet1af c5149f4c2ef cca a2f02ad102d285549 | 49bfc9fdb23a031d11f7f946a a1ah9a9e6f | USDCoin | 100,000.00000 | $100,000.00 | $99,973.20 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | f32b1a8be4df5b53a231f4d1d8ec6b4 | USDCoin | 95,015.00000 | $95,012.81 | $95,008.54 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | 11f9d30b355977f7f0602ba e86bda8d2795ef | TetherUSD | 70,860.00000 | $570,860.00 | $570,859.01 |
| | 28c6c0829bd514d0d899340713 5ce574 3bf21d60 | db38f5d7f e200738f f6d79da94d284a cc | USDCoin | 99,980.00000 | $99,980.00 | $99,973.20 |

# Assets Traced to USDC Addresses

By Address

**Case Name:** Coin
**Tracking Name:** Coin [_____] Tracking
**Tracking ID:** 5a6c4e334489-419b-a9af-b06a0a9ff2fd

| Destination Address | Owner Name (Destination Address) | Stop Reason | Confirmed by all tracking methods | Asset Type | Asset Name | Assets Traced (amount per Asset Name) | Assets Traced (in USD @ day of transaction) |
|---|---|---|---|---|---|---|---|
| | | Traced Assets Remain | Yes | a0b669916521bb16cd19d4a2e9eb0ce3b06e0e8 | USDCoin | 300,010.0000000 | $300,010.00 |
| | | Traced Assets Remain | Yes | a0b669916521bb16cd19d4a2e9eb0ce3b06e0e8 | USDCoin | 295,801.0000000 | $295,096.80 |
| | | Traced Assets Remain | Yes | a0b669916521bb16cd19d4a2e9eb0ce3b06e0e8 | USDCoin | 294,208.0000000 | $294,502.21 |
| | | Traced Assets Remain | Yes | a0b669916521bb16cd19d4a2e9eb0ce3b06e0e8 | USDCoin | 294,000.0000000 | $294,303.01 |
| | | Traced Assets Remain | Yes | a0b669916521bb16cd19d4a2e9eb0ce3b06e0e8 | USDCoin | 199,895.0000000 | $199,895.00 |
| | | Traced Assets Remain | Yes | a0b669916521bb16cd19d4a2e9eb0ce3b06e0e8 | USDCoin | 98,998.0000000 | $98,991.27 |

Attachment 1-G

# SERVICE AGREEMENT

## END USER SERVICE AGREEMENT FOR MILLIONAIREMATCH

**Last Updated:** March 18, 2025

- **INTRODUCTION**

  SuccessfulMatch.com, Inc., a Delaware corporation ("we", "us", or "our" or the "Company") is pleased to make the Company's MillionaireMatch dating services (collectively, its "Service(s)") available through the Company's MillionaireMatch website, mobile application, and/or other related platforms or technologies provided now or in the future (including but not limited to through AR/VR devices, wearables, and other emerging technologies) (hereinafter collectively, the **"MillionaireMatch Site"**).

  By registering for the Service, or by otherwise using any of the Services or the **MillionaireMatch Site**, or by clicking any "I AGREE" box, you hereby agree to be bound by the terms set forth in this End User Service Agreement, our Privacy Policy, and all other provisions and policies associated with your access and use (collectively, the "Agreement").

  **PLEASE READ THE TERMS OF THE AGREEMENT CAREFULLY.**

  **IF YOU CHOOSE TO ACCEPT THIS AGREEMENT BY CHECKING THE "AGREE" BOX, OR IF YOU OTHERWISE CHOOSE TO COMPLETE THE REGISTRATION PROCESS FOR ANY OF OUR SERVICES, OR IF YOU OTHERWISE CONTINUE TO USE ANY OF OUR SERVICES OR THE MILLIONAIREMATCH SITE, YOU HEREBY UNDERSTAND AND AGREE THAT:**

  (I) YOU ARE AT LEAST 19 YEARS OLD AND HAVE REACHED THE AGE OF MAJORITY AND LEGAL CONSENT IN YOUR JURISDICTION;

  (II) YOU HEREBY AUTOMATICALLY CONSENT TO BE BOUND BY, AND HEREBY AUTOMATICALLY AGREE TO, ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT (AS DEFINED ABOVE), INCLUDING WITHOUT LIMITATION ALL TERMS AND CONDITIONS OF BECOMING A MEMBER (DEFINED BELOW), THE ALTERNATIVE DISPUTE RESOLUTION PROVISIONS, THE CLASS ACTION WAIVER, AND THE PRIVACY POLICY;

  (III) YOU CONSENT TO THE COLLECTION AND PROCESSING OF CERTAIN PERSONAL AND OTHER INFORMATION ABOUT YOU.

  **THE TERMS AND CONDITIONS OF THIS AGREEMENT MAY BE MODIFIED BY US AT ANY TIME, IN OUR SOLE DISCRETION, WITH OR WITHOUT NOTICE.**

  **THE FOLLOWING IS A LINK TO THE COMPANY'S PRIVACY POLICY: https://www.millionairematch.com/privacyPolicy (THE "PRIVACY POLICY")**

  **NO CHANGES (ADDITIONS OR DELETIONS) BY YOU TO THE AGREEMENT WILL BE ACCEPTED BY THE COMPANY.**

**IF YOU DO NOT WISH TO ACCEPT ALL TERMS AND CONDITIONS CONTAINED IN THIS AGREEMENT (AS DEFINED HEREIN), THEN YOU SHOULD NOT CHECK THE "AGREE" BOX OR COMPLETE THE REGISTRATION PROCESS FOR THIS SERVICE OR CONTINUE TO USE ANY OF OUR SERVICES.**

**THIS IS A BINDING CONTRACT BETWEEN YOU AND THE COMPANY, AND YOU SHOULD DOWNLOAD AND PRINT THIS AGREEMENT, INCLUDING WITHOUT LIMITATION THE PRIVACY POLICY, FOR YOUR RECORDS.**

As more fully set forth in Section 2, you may register as a Member (as defined in Section 2) of the Services at no cost to access some, but not all, of the features of the Services. Additional features are available to Members of the Services through a paid subscription, as described below.

The Company owns and operates the MillionaireMatch Site. In addition to the MillionaireMatch Site, the Company may own and/or operate a number of other dating sites (hereinafter referred to as "Related Sites")

When a Member registers and creates a profile with the MillionaireMatch Site, the Company may share that Member's member profile or other information from the MillionaireMatch Site with one of the Related Sites, all pursuant to this Agreement, the Company's Privacy Policy, or as otherwise agreed to or consented to by the Member. By way of example, and without limiting the foregoing, and as described in further detail in Section 2 of this Agreement, we may share data about members of the MillionaireMatch Site with a Related Site for security and fraud prevention purposes.

The Company also works with a number of other dating websites that help us provide potential matches for our Members ("**Affiliate Sites**"). **THE COMPANY DOES NOT OWN OR OPERATE ANY OF THESE AFFILIATE SITES OR ANY THIRD PARTY SITES (AS DEFINED BELOW THE PREAMBLE TO THIS AGREEMENT)**.

The MillionaireMatch Site has its own Affiliate Sites that are specifically associated with the MillionaireMatch Site. Users who seek to register through the Affiliate Site associated with the MillionaireMatch Site will be redirected to the MillionaireMatch Site to become a Member of the MillionaireMatch Site.

Anyone who seeks to register via an Affiliate Site for the MillionaireMatch Site will be directed to become a Member of the MillionaireMatch Site to use the Services through the MillionaireMatch Site.

In addition to the registration function, our Affiliate Sites may provide additional information about our Services, including but not limited to frequently asked questions and contact information. Regardless of whether you register by accessing the MillionaireMatch Site or through one of its Affiliate Sites, you will become a Member of the MillionaireMatch Site to

use the Services through the MillionaireMatch Site , your profile will be accessible to all other Members of the MillionaireMatch Site, including but not limited to those members who registered through a different Affiliate Site. For a full list of the Affiliate Sites, please click here.

Separate from the Related Sites and Affiliate Sites, certain third party websites may provide links to our MillionaireMatch Site and Affiliate Sites ("Third Party Sites"). **AS DISCUSSED BELOW IN SECTION 13, THESE THIRD PARTY SITES ARE NOT OWNED OR OPERATED BY SUCCESSFULMATCH.COM, INC.**

We are not responsible for the privacy policies or information practices of any of these Third Party Sites or Affiliate Sites; we also are not liable for any information that you share with any Affiliate Sites or Third Party Sites prior to being directed to us.

As set forth in Section 14 of this Agreement, the Company will use your Personal Information (as such term is defined in Section 14 herein) only pursuant to our Company's Privacy Policy (a copy of which you can access in Section 14 herein).

- **OVERVIEW AND SUBSCRIPTION/MEMBERSHIP PROCESS**
  - Setting up your Account. After you have consented to this Agreement and registered to use the Service, you can view other Member profiles, communicate with other Members, access and view our blog, and communicate with us through the Service. You need to create a Member account for the Service ("Account") and set up a member profile to use the Service. To set up an Account you need to: (i) be at least nineteen (19) years old and have reached the age of majority and legal consent in your place of residence or jurisdiction.(ii) have a valid email address; and (iii) select a user name and create a unique password; and (iv) provide any other information that we may require, now or in the future, as part of the setting up or maintaining your Account. You also must have a valid credit card/payment method if you choose to register for a paid subscription (hereinafter a "subscription") , which will provide you access to all the features and functions of our Service. We hereby reserve the right to authenticate your identity to ensure compliance with the terms of this Agreement and applicable law. By creating an Account you represent and warrant that all information you have provided is accurate and true. You will receive an email confirmation that includes a copy of the Agreement after you have successfully set up a profile and an Account.
  - Registering and creating your Account serves as an application. All applications to become a Member are placed on a waiting list by default. After an internal review process, we determine, using our discretion, whether an applicant is eligible to join as a Member of MillionaireMatch. We reserve the right to decline applications. Approval may not be immediate and can take time. Applicants on the waiting list are periodically reviewed for approval. If you wish to be removed from the waiting list, please email us at support<AT>MillionaireMatch.com or <u>contact us</u> directly. We do not disclose reasons for keeping an application on the waiting list or approving or declining an applicant as a Member. Our decision is final and will not be reconsidered. For clarity and the avoidance of doubt, you will only be deemed a "Member" of the Service and will only be deemed to hold a "Membership" with the Service under this Agreement if all of the following conditions have been satisfied: (i) you have fully and completely complied with all of the registration and Account requirements set forth in this Agreement; (ii) your application to become a Member has been accepted by the Company; and (iii) you remain in full and complete compliance with this Agreement (hereinafter a "Member" or "Membership").

- Account Types. You may register to use our Service as set forth above at no cost and use some, but not all, of the features of our Service. To access and use all features of our Service, you must enter into a paid subscription and complete the required verification process. You may elect for different subscription periods, as described in further detail when you register. Subscription fees are subject to change and are paid in advance of the subscription term that you choose.
  To the extent permissible by law, we reserve the right to modify, limit, or discontinue any product, feature, or service, including for paid subscribers, due to operational, security, legal, or business reasons. These changes may occur without prior notice unless required by applicable law. We also reserve the right to establish terms for exclusive offerings, adjust service access, and decline service requests when necessary to maintain the integrity, security, or quality of our platform.

- Subscription Renewal and Cancellation. To ensure uninterrupted service, we reserve the right to renew your Membership for the subscription term you initially selected at the time of subscription (ie: monthly, every 3 months, or every 6 months, or any other renewal period explicitly offered at the time of subscription). For clarity, until terminated, we may automatically renew all paid subscriptions upon their expiration date. After the initial subscription term and any subsequent renewal periods, your subscription will automatically renew for the same duration as your initial subscription. By agreeing to these terms, you acknowledge and consent to the automatic renewal of your Account and subscription as described herein. If you wish to disable automatic renewal, modify, or cancel your subscription, please log in to the, MillionaireMatch Site navigate to "Settings" and follow the provided instructions, or contact us.

- Subscription Cancellation and Termination. Notwithstanding the foregoing, you may cancel a subscription within three (3) business days of subscribing to our Service to receive a refund by notifying us through the contact information provided below. This three business day period is your "Trial Period". You may cancel your subscription at any time during the subscription term by contacting us at support<AT>millionairematch.com or contact us. Subscription fees are non-refundable, except for cancellations during the Trial Period. Failure to pay subscription fees will result in termination of the paid Service and/or your Account.

- No Payment Disputes. You acknowledge and agree that all payments made by you to the Company are final and non-refundable. If you encounter any payment-related issues (such as auto-renew), you can contact us at support<AT>MillionaireMatch.com first.

- Account Security. You are solely responsible for: (i) maintaining the confidentiality of your email address or phone number used to create your Account; (ii) ensuring all information used in connection with our Service is accurate and current; and (iii) any activity you conduct through your Account, whether by you or someone else. You must immediately notify us of any unauthorized use of your Account. We reserve the right, in our sole discretion, to terminate this Agreement (including without limitation the right to terminate or suspend your Account or permanently terminate your status as a Member), including if we have reason to believe that you have provided fraudulent information in connection with your Account or activities on our Service. For security and fraud prevention purpose, we may share data with our Affiliate Sites as well as any Related Sites. You are entirely accountable for any actions conducted using your email address/phone number, password or Account, including sharing your Personal Information with other users. You agree that the Company is not responsible or liable for any third-party access to your Account or Personal Information when such access arises due to your actions or omissions, such as voluntarily sharing your email address, phone number, password, Account, or other personal details. Furthermore, you agree that the Company is not liable for any third-party access to your Account or Personal Information resulting from the theft or unauthorized use of your email address, phone number, password, Account, or other personal details under your possession, care, or control.
- In addition, you authorize us to obtain updated or replacement expiration dates and card numbers for your credit or debit card as provided by your credit or debit card issuer.

- **PROFILE DISCLAIMER, PROFILE VISIBILITY AND YOUR CONTENT**
  - Profile Visibility and Disclaimer. Your profile is used to connect you with other Members of the Service and will be visible to those Members. FOR THE AVOIDANCE OF DOUBT, WHEN YOU CREATE AN ACCOUNT AND USE OUR SERVICE, YOUR PROFILE WILL BE VISIBLE TO REGISTERED MEMBERS OF OUR SERVICE. AS EXPLAINED IN THE INTRODUCTION, TO ENHANCE YOUR OPPORTUNITY OF MEETING SOMEONE SPECIAL, WE WILL SHARE YOUR PROFILE WITH MEMBERS WHO REGISTER VIA OUR AFFILIATED SITES IN ADDITION TO MEMBERS WHO REGISTER DIRECTLY VIA THE MILLIONAIREMATCH SITE. YOU CAN SEE A LIST OF THE CURRENT AFFILIATE SITES FOR THE MILLIONAIREMATCH SITE VIA THIS LINK.

    There are various features that enable you to block or restrict designated users from being able to view and/or access your profile, to provide more anonymity by hiding certain photos, and to create private photo albums. Your profile will not be visible on any Third Party Site that provides links to our MillionaireMatch Site or Affiliate Sites.

  - Content You Post.

    3.2.1 During your use of the Services (including without limitation your access and use of the MILLIONAIREMATCH Site), You may be able to post, upload, store, share or other otherwise use pictures, text, images, content and/or other material in connection with your Member profile, Account, and use of the Services, including without limitation your personal-identifiable information (collectively, "Content"). You understand that all of the Content you post, upload, store, share or otherwise use, including your user name and picture, may be viewed by other Members of the Service.

    3.2.2 You are solely responsible for your submitted Content and shall indemnify, defend and hold us and our employees, officers, directors, shareholders and agents harmless for any and all losses, costs, disputes, demands, claims and liabilities (including reasonable attorneys' fees) arising from your Content.

    3.2.3 You acknowledge and agree that we may monitor, review, or inspect your profile and content, and we reserve the absolute right, at our sole discretion, to remove, delete, modify, restrict, promote, suspend, or otherwise deny access to your profile and Content at any time. Furthermore, you agree and understand that we are under no legal obligation to display, review, or maintain your profile or Content.

- **USE RIGHTS**
  - Content. You hereby grant the Company a worldwide, perpetual, non-exclusive, royalty-free, sub-licensable and transferable license to use, reproduce, distribute, prepare derivative works of, and/or display any of your submitted Content at any time during the term of, and after the termination of, this Agreement. You have no reasonable expectation of privacy when using the Service because you understand that anything you post or communicate through the Service may be seen by other Members, including Members who you choose to communicate with you directly. You have the option to make some conversations or photo albums private so that only those Members whom you choose have access to them. You are solely responsible for all Content submitted to the Service. If your Membership with the Service is terminated (for any reason) or if you delete Content from your profile, you acknowledge and agree that some Content may: (i) continue to be used by us as set forth in this Agreement (including without limitation this Section) and/or as set forth in the Privacy Policy; and/or (ii) remain available, including because of cached internet pages or other uses by third parties that are beyond our control. By checking the "I Agree" box, you acknowledge that you understand and agree that we cannot and do not assume any liability for or relating to third party use or cached content which is beyond our control.
  - Service. Subject to your compliance with this Agreement, and only during the term of this Agreement, the Company grants you a limited, non-exclusive, non-transferable, revocable limited right to access and use our Service as expressly permitted herein, but for no other purposes whatsoever . We reserve all rights not expressly granted herein.

○ Content Enforcement Authorization.

4.3.1 In order to assist the Company in the enforcement of this Agreement, each Member (hereinafter, the **"Innocent Member"**) hereby grants the Company a right and the legal authority to act on behalf of the Innocent Member in order to enforce this Agreement against any other Member or any other party (the **"Unauthorized User(s)"**) that has used or is still using the Innocent Member's Content or any other Personal Information of that Innocent Member in a way that:(i) is not explicitly permitted/authorized by this Agreement; (ii) violates any provisions of this Agreement; and/or (ii) violates any laws or regulations in any jurisdiction anywhere, including, without limitation, any privacy laws, laws prohibited the unauthorized use of any personal health/medical information or any other types of personal-identifiable information, any copyright law or any other intellectual property laws, laws prohibiting the use of a person's name or likeness, or any other civil or criminal laws (the **"Content Enforcement Authorization"**).

4.3.2 The Innocent Member hereby agrees that: (a) the Company is not obligated to exercise the Content Enforcement Authorization; (b) the Company will exercise such Content Enforcement Authorization only in the Company's sole and exclusive discretion; (c) the Company shall have no liability to the Innocent Party arising out of or related to the Company's exercise or use of the Content Enforcement Authorization against any Unauthorized Users, regardless of the outcome of any actions taken by the Company in its exercise or use of said Content Enforcement Authorization; and (d) the Company shall have no liability to the Innocent Party arising out of or related to the Company's decision to not pursue any Content Enforcement Authorization against any one or more Unauthorized User(s).

- **RESTRICTIONS/CODE OF CONDUCT**
  The Service may be used only for lawful, non-transactional dating. Depending on our Brands and the audiences they serve, available relationship preferences may differ by Brand, as described on the applicable Brand's site or in its user interface. As a condition of your use of the Service, you represent, warrant, and agree that you will not use (or plan, encourage, or help others to use) the Service for any purpose or in any manner prohibited by this Agreement or by applicable law. It is your responsibility to ensure that your use of the Service complies with this Agreement, and to pursue the Company's prior written consent for any use not expressly permitted herein.

  You must not request, offer, advertise, arrange, negotiate, facilitate, or accept: Pay-Per-Meet (PPM); escorting; prostitution; human trafficking; any transactional or compensated relationship (including sex for money or exchanging money or anything of value, or friends-with-benefits (FWB), or hookups. By proceeding, you acknowledge and agree to be bound by this Agreement.

- You are solely responsible for your interaction with other Members of the Service, whether online or offline. We are not responsible or liable for the conduct of any Members. Please exercise common sense and prudent judgment in your interactions with others in all of your online and offline activities.

  You agree not to do any of the following:

  Submit any direct or indirect endorsement or opinion of the product or services without disclosing any association or material connection you may have with such Content, as required by the Federal Trade Commission.

  Upload any Content for the purpose of intentionally misleading us or any other Service Member. Use the Service to engage in or solicit prostitution, to procure or facilitate another to commit prostitution, or to promote the prostitution of another person in any manner whatsoever.

  Publish, post, upload, distribute or disseminate any inappropriate, profane, defamatory, obscene, indecent or unlawful Content.

  Upload, or otherwise make available Content protected by intellectual property laws, including, by way of example, and not as limitation, copyright or trademark laws (or by rights of privacy or publicity) unless you own or control the rights thereto or have received all necessary consent to do the same.

  Upload Content or any files that contain viruses, Trojan horses, worms, time bombs, cancel bots, corrupted files, or any other similar software or programs that may damage the operation of our Service or another's computer or property of another.

  Download Content posted by another user of our Service that you know, or reasonably should know, cannot be legally reproduced, displayed, performed, and/or distributed in such manner.

  Falsify or delete any copyright management information, such as author attributions, legal or other proper notices or proprietary designations or labels of the origin or source of Content or other material contained in a file that is uploaded.

  Resell or otherwise commercialize Content or any other function or feature of the Service.

  Use our Service or any Content therein, including without limitation any Personal Information or other Content related to any other Member, for any business, marketing, advertising, or other commercial purposes or for any other purposes that are not explicitly authorized by this Agreement.

  Include in your public profile any telephone numbers, street addresses, last names, URLs, email addresses, anatomical or sexual references or sexually suggestive language. You also agree not to post or send any photos containing nudity or otherwise vulgar or offensive materials through our Service.

  Use hateful or discriminatory language based on race, color, sex, sexual orientation, religion, nationality, ethnicity, marital status, disability, age or otherwise

objectionable language.

Spam or otherwise generally harass users of our Service.

Violate any applicable laws including but not limited to the Communications Decency Act, 47 U.S.C. § 230(c), or regulations with respect to your access and use of Content and the Service.

Participate in any activity that violates any laws or regulations (including without limitation any criminal laws) of any jurisdictions, including without limitation any jurisdictions in in which any Member resides, visits, or interacts with any other Members.

Seek compensation for dating.

Use our Service for political campaigning, electioneering or extremist speech. Reasonable personal political views remain permitted.

You further agree that:

You are intent on establishing a meaningful connection;

You are not subject to any registration requirements under state, federal, or local sex offender laws or regulations;

You maintain a single Account within our Services and do not operate duplicate or multiple Accounts;

You have not previously been banned or removed from our Services, any Related Sites or those of our Affiliate Sites, unless expressly authorized by us in writing to create a new Account;

You comply with this Agreement and periodically review this page to stay informed of any updates;

You represent yourself accurately and with integrity by uploading at least one photograph that clearly and verifiably displays your facial identity.

○ Without limiting any other provisions in this Agreement, each Member further covenants, represents and warrants to the Company as follows (hereinafter collectively referred to as the **"Covenant Not to Misuse Other Member's Personal Information"**)

(a) Each such Member shall not use (and is hereby explicitly prohibited from using) the Content (as defined in Section 3.2 herein) or any other Personal Information (as defined in Section 14 herein) of any of other Member (including without limitation any personal-identifiable information or any financial information of such other Member) :

(i) to promote your matchmaking business.

(ii) for any purpose that is not explicitly permitted/authorized by this Agreement;

(iii) in any way that violates any provisions of this Agreement;

(iv) in any way that violates any laws or regulations in any jurisdiction anywhere, including, without limitation, any privacy laws, laws prohibited the unauthorized use of any personal health/medical information or any other types of personal-identifiable information, any copyright law or any other intellectual property laws, laws prohibiting the use of a person's name or likeness, or any other civil or criminal laws. (the foregoing are hereinafter collectively referred to as the **"Unauthorized Use"**).

(b) No Content Capture. Members may not screenshot, record, photograph, copy, or otherwise capture or reproduce any portion of the Service (including but not limited to the App, the Website, or any Member Content) without the Company's prior written consent, except when submitting materials to Customer Support through authorized channels. Any other capture may result in warning, suspension, termination, or legal action.

(c) Without limiting the foregoing in any way, each Member further agrees that for the lifetime of disclosing party, such Member will not disclose, share, or use another Member's Content or other Personal Information (including without limitation another Member's financial information, sex life, sexual orientation, health, and/or other private or confidential information) obtained through or as a result of using the Service for any commercial purposes, retaliatory or revenge-driven purposes or publicity purposes or for any other Unauthorized Use (as defined in Section 5.2(a) herein).

(d) Each Member further acknowledges and agrees that any violation of any provisions of the Restrictions/Code of Conduct set forth in this Section 5 (including without limitation the foregoing Covenant Not to Misuse Other Member's Personal Information) shall constitute a material breach of this Agreement and shall also cause material damage to the reputation and business of the Company, and the Company shall have the right to exercise any and all remedies at law, equity or contract as more fully set

forth in Section 10 below, including without limitation the right to immediately terminate this Agreement, including without limitation permanently terminating the Member's status as a Member.

- ○ **FOR CLARITY AND THE AVOIDANCE OF DOUBT, WE RESERVE THE RIGHT TO IMMEDIATELY AND PERMANENTLY TERMINATE YOUR USE OF THE SERVICE AND YOUR STATUS AS A MEMBER (IN OUR SOLE DISCRETION) IF WE DETERMINE THAT YOU HAVE VIOLATED ANY PROVISION OF THE AGREEMENT, INCLUDING WITHOUT LIMITATION ANY PROVISIONS OF THE RESTRICTIONS/CODE OF CONDUCT IN THIS SECTION 5 OR OF THE PRIVACY POLICY.**
  **WE RESERVE THE RIGHT TO INVESTIGATE ANY ILLEGAL, SUSPICIOUS AND / OR UNAUTHORIZED USE OF OUR SERVICES, INCLUDING THOSE INVOLVING THE MILLIONAIREMATCH SITE, ANY RELATED SITES, OR ANY OF OUR AFFILIATE SITES, AND WE WILL TAKE ANY LEGAL RECOURSE THAT WE DEEM APPROPRIATE. WE MAY ALSO REFER ACTIVITIES THAT WE DEEM SUSPICIOUS OR ILLEGAL TO THE PROPER GOVERNMENTAL AUTHORITIES FOR THEIR INVESTIGATION.**

  **FOR CLARITY AND THE AVOIDANCE OF DOUBT, THE PROVISIONS OF THIS SECTION 5 SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT FOR ANY REASON, INCLUDING WITHOUT LIMITATION THE TERMINATION OF YOUR STATUS AS A MEMBER.**

- **OUR PROPRIETARY RIGHTS**

Our Service and all logos, trademarks, buttons icons, images, pictures, graphics, and content used in connection with our Services(collectively referred to as "Our Content") are protected under U.S. intellectual property laws, and are exclusively owned and/or controlled by us.

**UNAUTHORIZED USE, MODIFICATION, REPUBLISHING, TRANSMITTING, DISTRIBUTING OR DUPLICATING OR ANY OTHER MISUSE OF OUR CONTENT IS PROHIBITED.**

- **DISCLAIMER OF WARRANTIES**
  **YOU UNDERSTAND AND AGREE THAT THE SERVICE IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS. NEITHER WE NOR OUR RESPECTIVE SUPPLIERS MAKE REPRESENTATIONS ABOUT THE AVAILABILITY OF THE SERVICE OR THE CONTENT YOU OR OTHER USERS SUBMIT. YOU ARE SOLELY RESPONSIBLE FOR YOUR INTERACTIONS WITH OTHER USERS. WE DISCLAIM TO THE FULLEST EXTENT PERMISSIBLE BY LAW, AND YOU WAIVE, ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS, IMPLIED, OR STATUTORY, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. FURTHER, TO THE EXTENT PERMITTED UNDER APPLICABLE LAWS, YOU HEREBY RELEASE US FROM ANY AND ALL CLAIMS OR LIABILITY RELATED TO ANY SERVICE OFFER BY OTHER USERS, ANY ACTION OR INACTION BY OTHER USERS, INCLUDING OTHER USER'S FAILURE TO COMPLY WITH THE TERMS OF THE AGREEMENT. THE FUNCTIONS AND FEATURES OF THE SERVICE ARE NOT WARRANTED TO BE UNINTERRUPTED, TIMELY, SECURE OR ERROR-FREE. WE DISCLAIM ANY RESPONSIBILITY FOR THE DELETION, FAILURE TO STORE, MIS-DELIVERY, OR UNTIMELY DELIVERY OF ANY CONTENT. YOU ASSUME THE ENTIRE RISK OF LOSS OF CONTENT AND/OR DAMAGE DUE TO YOUR USE OF THE SERVICE.**

IF ANY PROVISION OF THIS AGREEMENT IS DEEMED UNENFORCEABLE UNDER APPLICABLE LAW, SUCH PROVISION SHALL BE SEVERED FROM THIS AGREEMENT, AND THE REMAINING TERMS SHALL BE CONSTRUED AS IF SUCH PROVISION WERE NEVER INCLUDED, AND SHALL REMAIN ENFORCEABLE TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW.

Other online platforms may allow users to link their MillionaireMatch Accounts and share their Content from their Account to the other online platform. When you share any of your Content in this way, you will still be bound by this Agreement as a Member, but you may also be subject to any terms of service or other agreements that govern that other online platform. Any of the Company's advice, opinions or other information posted on, or offered or provided within or through the MillionaireMatch Site or otherwise provided through the Service under this Agreement are for informational and entertainment purposes only and are not intended to replace or be a substitution for professional, financial, medical, legal, or other expert advice. The Company makes no representations or warranties and expressly disclaims any liability for any outcomes, treatment, action, or effect on any person resulting from reliance on any such advice, opinions or other information posted on, or offered or provided within or through the MillionaireMatch Site or any other part of our Service If you

have specific concerns or encounter a situation that requires professional or medical advice, you should consult with a qualified and appropriately trained specialist and seek immediate attention from the relevant professional.

WE RECOMMEND THAT YOU CONSULT WITH AN ATTORNEY PRIOR TO ENTERING INTO THIS AGREEMENT.

- **MILLIONAIRE BADGE AND CREDIT LEVEL PROGRAMS; NO CRIMINAL BACKGROUND SCREENING**

- Millionaire Badge Program and Credit Level Program.
  - The Company, in its discretion, may make its Millionaire Badge Program (as defined below) available to its Members at any time and from time to time. For purposes of this Agreement, the term "**Millionaire Badge Program**" means a voluntary program offered by the Company pursuant to which: (i) a Member provides the Company with copies of the Member's financial information in a form as required by the Company (the "**Member Financial Records**"); and (ii) based solely on the Company's review of the data provided by the Member in the Member Financial Records, the Company may place a "**Certified Millionaire**" badge on that Member's profile to signal to others that the Member is a millionaire. A Member can voluntarily participate in the then-current Millionaire Badge Program that is offered by the Company on the MillionaireMatch Site.
  - The Company, in its discretion, may make its Credit Level Program (as defined below) available to its Members at any time and from time to time. For purposes of this Agreement, the term "**Credit Level Program**" means a voluntary program offered by the Company pursuant to which: (i) a Member provides the Company with copies of the Member's credit report in a form as required by the Company (the "**Credit Reports**"); and (ii) based solely on the Company's review of the data provided in said Credit Reports, the Company may give the Member a "Credit Level" rating on the Member's profile to signal to others that the Member is financially credit worthy. A Member can voluntarily participate in the then-current Credit Level Program that is offered by the Company on the MillionaireMatch Site.
  - The Member hereby grants the Company a right to use the Member Financial Records and the Credits Reports for all purposes needed or useful for the Company to carry out the Millionaire Badge Program and the Credit Level Program.

- THE MILLIONAIRE BADGE PROGRAM AND ITS "CERTIFIED MILLIONAIRE" BADGE, AND THE CREDIT LEVEL PROGRAM AND ITS "CREDIT LEVEL", AND ALL RESULTS ARISING THEREFROM: (A) ARE PROVIDED "AS IS" AND "WITH ALL FAULTS" WITHOUT WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED OR OTHERWISE; AND (B) ARE BASED SOLELY ON, AND RELY EXCLUSIVELY ON, THE MEMBER FINANCIAL RECORDS AND CREDIT REPORTS PROVIDED BY THE MEMBER TO THE COMPANY. THE COMPANY HAS NOT INDEPENDENTLY VERIFIED THE ACCURACY OR COMPLETENESS OF ANY OF THE INFORMATION IN THE MEMBER FINANCIAL RECORDS AND/OR IN THE CREDIT REPORTS PROVIDED BY THE MEMBER

  THE COMPANY DOES **NOT** REPRESENT, WARRANT OR COVENANT THAT: (1) THE MILLIONAIRE BADGE PROGRAM (AND ITS "CERTIFIED MILLIONAIRE" BADGE) AND THE CREDIT LEVEL PROGRAM (AND ITS "CREDIT LEVEL"), AND ALL RESULTS THEREFROM, ARE IN FACT ACCURATE OR COMPLETE, IN WHOLE OR IN PART; (2) THE "CERTIFIED MILLIONAIRE" BADGE MEANS THAT THE GRADED MEMBER IS, IN FACT, A MILLIONAIRE; AND (3) THE GRADED MEMBER'S FINANCIAL STATUS DOES, IN FACT, MEET THE CREDIT LEVEL

○ In addition to the limitations and disclaimers in Section 8.1. above, you further acknowledge and accept that the Company does not conduct any type of criminal background checks, background checks, or any other screening of its Members or any other users of its Services. While we aim to foster a respectful and secure user experience, we do not represent, guarantee, or warrant the behavior, accuracy of information, or suitability of any Member or other user, whether on or off our Service. You assume all risks associated with using the Services, including, but not limited to, risks arising from online or offline interactions with other Members and other users. It is crucial to exercise caution and good judgment when communicating with or meeting strangers. Always prioritize your safety and take appropriate precautions during interactions.

The Company reserves the right, at its sole discretion, to conduct criminal background checks or other screenings, but has no obligation to do so and, if it does so, using a scope of search at its sole discretion. By using our Services, you hereby authorize the Company to perform such screenings if the Company elects to do so (in its sole discretion) You further agree that any information you provide may be used for these purposes. If the Company elects to conduct any screenings through a consumer reporting agency, you further authorize us to obtain and use a consumer report in accordance with applicable laws to evaluate your compliance with this Agreement.

You are solely responsible for your interactions with other Members and all other users. The Company does not, and cannot, guarantee your safety and is not a substitute for your own responsibility in following safety guidelines and taking necessary precautions. Communications you receive through the Services, including notifications sent by the Company through the Services, may stem from users misusing the Services for fraudulent, harassing, or other improper purposes and you hereby release the Company from any liability from such user.

Your conduct outside of the MillionaireMatch Site or any of your other uses of the Service may also affect your Account status. If we receive reports with supporting evidence suggesting that you have caused harm to another Member through in-person meetings, social gatherings, text messages, or external messaging platforms, or if you have engaged in—or have been reported to have engaged in—serious criminal or any other types of conduct that we (in our sole determination) deem to be harmful conduct, we reserve the right to review the situation and take appropriate action, including but not limited to suspending or termination your Account suspension and/or ther termination of this Agreement. We may also request additional information from involved parties as part of our investigation.

If you wish to report behavior of other Members that violates the contractual terms and conditions of this Agreement, you can use the "Report" button or similar buttons or links on the Service, or contact us at support<AT>millionairematch.com; provided,

however, you agree that the Company is under no contractual or legal obligation to take any action whatsoever in response to the information you have provided the Company in any such Report.

- **LIMITATION OF LIABILITY**
**YOUR USE OF THE SERVICE IS ENTIRELY AT YOUR SOLE RISK. WE AND OUR OWNERS, DIRECTORS, OFFICERS, EMPLOYEES, LICENSORS, AND AGENTS SHALL NOT BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY OR PUNITIVE DAMAGES OR LOSSES (INCLUDING WITHOUT LIMITATION LOSS OF PROFITS, GOODWILL, USE, DATA OR OTHER INTANGIBLE LOSSES), WHETHER BASED IN CONTRACT, TORT, STRICT LIABILITY, OR OTHERWISE, WHICH YOU MAY INCUR IN CONNECTION WITH THE USE OF, OR INABILITY TO USE, THE SERVICE, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSS.**

WITHOUT LIMITING THE FOREGOING, YOU HEREBY FURTHER AGREE THAT:

(A) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY SHALL NOT BE LIABLE FOR ANY INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR INDIRECT DAMAGES ARISING FROM OR RELATING TO YOUR USE, OR INABILITY TO USE, THE SERVICES, INCLUDING WITHOUT LIMITATION ANY DAMAGES ARISING FROM THE LOSS OR CORRUPTION OF DATA OR PROGRAMS, INTERRUPTIONS IN SERVICE, OR THE NEED TO OBTAIN SUBSTITUTE SERVICES, EVEN IF THE COMPANY HAS BEEN ADVISED OF THE POTENTIAL FOR SUCH DAMAGES; AND

(B) TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY'S TOTAL LIABILITY, REGARDLESS OF THE FORM OF ACTION, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE USE OF THE SERVICE (INCLUDING WITHOUT LIMITATION ANY USE OF THE MILLIONAIREMATCH SITE) , SHALL NOT EXCEED THE GREATER OF US$30.00 OR THE AMOUNTS YOU PAID THE COMPANY FOR THE SERVICES IN THE TWELVE (12) MONTHS BEFORE THE CLAIM AROSE.THE FOREGOING EXCLUSIONS, DISCLAIMERS, AND LIMITATIONS APPLY TO THE COMPANY, ITS PARENT, SUBSIDIARIES, AFFILIATES, AND EACH OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, AND SUPPLIERS.

(C) IF YOU ARE A UNITED STATES RESIDENT, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, YOU WAIVE ANY RIGHTS YOU MAY HAVE UNDER CALIFORNIA CIVIL CODE §1542, OR ANY OTHER SIMILAR APPLICABLE STATUTE OR LAW OF ANY OTHER JURISDICTION, WHICH SAYS THAT: A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

You agree that we are not responsible for damages or losses arising from fraudulent, misleading, or inapprop (including without limitation by other members), including but not limited to identity theft, financial scams, or misrepresentation on the platform. You further

acknowledge: (A) that online interactions involve inherent risks and that you accept these risk, and (B) that you should exercise caution when engaging with other users (including without limitation other members).

Additionally, we do not guarantee that our services will be uninterrupted, error-free, or completely secure. We are not responsible for any service failures, cyberattacks, system outages, or technical malfunctions that may affect the availability or performance of our MILLIONAIREMATCH site or our services.

- **INDEMNIFICATION**
  You hereby agree to indemnify, defend and hold the Company harmless and our parent entites, subsidiaries, affiliates, officers, directors shareholders, and agents for any and all loss, cost, disputes, demands, claims and liabilities (including reasonable attorneys' fees) arising out of or incurred due to: (i) your breach of the Agreement, including without limitation any violation of the "Restrictions/Code of Conduct" provisions set forth in Section 5 herein; (ii) your use or misuse of the Service; (iii) your violation of any law or the rights of any third party; and/or (iv) your interaction with other Members or other Service users.

- **TERMINATION**
  - You may terminate your Membership at any time by discontinuing use of the Service. At that time we may delete Content you have submitted via the Service in accordance with our Privacy Policy, but subject to our retention and use rights set forth herein. If you have a dispute with us or with the Service, immediately cease all use of the Service. Ceasing all use of the Service is your only remedy with respect to any such dispute that you may have with us. If we terminate your Membership and all of your underlying Subscriptions after the Trial Period has ended, you will not be entitled to any refund of unused subscription fees.

- In the event the you breach any of the terms or conditions of this Agreement or the Privacy Policy, the Company has the right to exercise, at its election, any one or more of remedies available to the Company at law, equity or contract, including without limitation exercising any one or more of the following:
  (i) the Company shall have the right to immediately terminate this Agreement, including without limitation permanently terminating the Member's status as a Member and all underlying Subscriptions; and/or

  (ii) the Company shall have the right (at its sole election, but without any obligation to do so) to enforce the Restrictions/Code of Conduct set forth in Section 5 (including without limitation the Covenant Not to Misuse Other Member's Personal Information) against the breaching Member at any time.

  Following the expiration or termination of this Agreement, we reserve the right to maintain certain of your Content information (including without limitation certain Account-related information) for analytics, maintaining accurate records, fraud prevention, fee collection, enforcement of contract terms, safeguarding the MillionaireMatch Site, any other parts of our Services, and its users, and other legally permissible actions. Furthermore, any information previously shared with third parties in accordance with our Privacy Policy will be governed by their respective privacy policies, including without limitation their respective data retention policies and procedures.

  Notwithstanding the Company's right to use your Content after termination of this Agreement pursuant to Section 4.1 herein, the Company does not have an obligation to retain or store any of your Content after any such termination of this Agreement.

  In addition to any other provisions of this Agreement which by their nature are intended to survive the termination of this Agreement, the following Sections of this Agreement shall survive the termination of this Agreement for any reason (including without limitation any termination of your status as a Member or the termination of the Service): Section 3 (Profile Disclaimer, etc.); Section 4 (Use Rights); Section 5 (Restrictions/Code of Conduct); Section 6 (Proprietary Rights); Section 7 (Disclaimer of Warranties); Section 9 (Limitation of Liability); Section 10 (Indemnification), this Section 11 (Termination); Section 12 (Changes); Section 13 (Affiliates, etc); Section 14 (Privacy); and Section 18 (General).

- You agree that any notice to us shall be made via email to support<AT>MillionaireMatch.com or contact us. If the notice concerns your withdrawal from the Service or cancelation or termination of your membership, it will be effective within a reasonable time after we receive it.

- **CHANGES TO SERVICES AND TERMS OF THE AGREEMENT**
The Company reserves the right to change the terms of this Agreement from time to time or at any time, including without limitation: (i) modifying, suspending, or discontinuing (in whole or in part) any feature, or add new features associated with your access and use of the Service; or (ii) adjusting the availability of features within our subscription plans (collectively, a "Change(s)"). The Company reserves the right to make these Changes by giving any notice that the Company deems reasonable (both in form and where such notice will be posted), provided, however the Company reserves the right not to give a separate or individualized notice to you of such Changes. We shall not be liable to you for any Changes, including without limitation any addition, modification, suspension, or discontinuance (in part or wholly) to or of the Service and/or features associated with the availability or use of Content. Without limiting the foregoing, in any way, pursuant to any such Changes, we reserve the right to: (i) establish additional policies and practices concerning use of the Service; and/or (ii) change any term of this Agreement (in part or in whole) at any time, with or without prior notice. If, as a part of any such Changes, we add any new features that do not materially affect the Services and terms of the Agreement, we may not update this Agreement. Such new features are provided pursuant to the terms of this Agreement, and any specific terms provided with each feature.


YOU ARE RESPONSIBLE FOR REGULARLY REVIEWING THE MILLIONAIREMATCH SITE FOR ANY CHANGES. BY CONTINUING TO ACCESS OR USE THE MILLIONAIREMATCH SITE OR OUR SERVICES, YOU ARE HEREBY DEEMED TO HAVE ACCEPTED SUCH CHANGES AND TO BE LEGALLY BOUND BY SUCH CHANGES AND BY THIS AGREEMENT AS IT IS UPDATED BY SUCH CHANGES.

- **AFFILIATE AND THIRD PARTY SITES**
  - As explained in Section 1 ( Introduction), in addition to the MillionaireMatch Site, the Company works with a number of Affiliate Sites as defined above.
    These Affiliate Sites potentially increase the number of individuals with whom you may have a match by facilitating the registration of additional Members. Your profile and any Content you upload or provide will be made available to Members of the, including those who join the MillionaireMatch Site , by way, or by referral from, any Affiliate Sites. All Members who register for the MillionaireMatch Site consent to and are bound by the terms of this Agreement.

    Separately, some Third Party Sites may provide links to the MillionaireMatch Site and Affiliate Sites.

  - We may share Member profiles or other information with these Third Party Sites only pursuant to this Agreement, including without limitation in the Privacy Policy. However, before directing you to the MillionaireMatch Site or an Affiliate Site, these Third Party Sites may collect data or solicit personal information from you. We neither own, operate, nor control such Third Party Sites and are not responsible for their content or actions. Please read the terms and conditions and privacy policies of any Third Party Site that links to our Service before providing that Third Party Site with your data.
  - From time to time, the Company may make available third-party opinions, advice, statements, offers, or other content on the MillionaireMatch Site and/or through the Service. All third-party content is the responsibility of its respective authors and should not be considered as endorsed, verified, or guaranteed by the Company. The authors of such third-party content are solely accountable for its accuracy and validity.
    The Company does not: (I) guarantee the accuracy, completeness, or usefulness of any third-party content on the the MillionaireMatch Site or provided through the Service; or (II) adopt, endorse, or assume responsibility for the accuracy or reliability of any opinion, advice, statement or other information made or provided by any third party on the MillionaireMatch Site or Service.

    Under no circumstances shall the Company, its affiliates, or subsidiaries be liable for any loss or damage resulting from reliance on any information, opinions, advice or any other content posted on the MillionaireMatch Site, provided through the Service, or transmitted to or by any Members.

  - Links to other websites made available by or through the MillionaireMatch Site or any other part of the Service are provided only for your convenience. We are not responsible for, and do not control, approve or endorse these linked websites and the information or any other content contained therein.

- ○ Paid members of MillionaireMatch may access an exclusive shopping portal at reserved.millionairematch.com, which is operated by MillionaireMatch for the purpose of product display only. When users click on a product, they will be redirected to third-party merchant platforms to complete their purchases.
  MillionaireMatch and reserved.millionairematch.com do not participate in any sales activities, do not collect commissions or share in any revenue, and are not responsible for the following:

  The quality, authenticity, or accuracy of product descriptions

  Price changes or product availability

  Order fulfillment, shipping, or after-sales services

  Any disputes arising from transactions or refund issues

  All transactions are conducted solely between the user and the third-party merchant. Users assume full responsibility for their interactions and agreements with third-party sellers.

- **PRIVACY**
  - ○ For purpose of this Agreement, the following terms have the following meanings:
    (i) **"Personal Information"** mean any and all personal information of, about, or related to a Member that is gathered, collected, recorded, held, distributed, shared, disclosed, or otherwise used (collectively **"Process"** or **"Processed"**) as part of, or during the Member's access and use of the MILLIONAIREMATCH Site or any other part of the Service, including without limitation the Member's Content (as such term is defined in Section 3.2 herein).

    (ii) **"Process"** or **"Processed Personal Information" has the meaning set forth in Section 14.1(i) herein.**.

  - ○ We collect and use and otherwise Process your Personal Information for the purpose of making the MillionaireMatch Site and other services available to you and for developing and improving the Service. Please review our Privacy Policy at the following link for more information about how we collect, use and Process your Personal Information: https://www.millionairematch.com/privacyPolicy.
  - ○ We take your privacy very seriously and this Agreement and the Company's Privacy Policy contain a number of provisions designed to protect your privacy and confidential information communicated between you and another Member you meet on the MillionaireMatch Site. Each Member is bound by the confidentiality provisions of set forth in the "Restrictions/Code of Conduct" provisions in Section 5 herein.

- **MINORS**
Under age use of our Service is prohibited. Our privacy practices are consistent with the Federal Children's Online Privacy Protection Act ("COPPA") and we will not knowingly request or collect personal information from any child under the age of majority. If a child under 19 submits personal information to us and we learn that such information is of a child under 19 we will make commercially reasonable efforts to delete the information as soon as possible. If you believe that we might have collected any personal information from a child under the age of 19, please contact us at support<AT>millionairematch.com or contact us. BY REGISTERING FOR AN ACCOUNT, YOU REPRESENT THAT YOU ARE AN ADULT OVER THE AGE OF 19, HAVE THE CAPACITY TO CONSENT, AND AGREE TO BE PERSONALLY BOUND BY ALL OF THE TERMS OF THIS AGREEMENT.

Posting or transmitting material that exploits individuals under 19 years old, requesting personal information from anyone under 19, failing to report knowledge of an individual under 19 to support<AT>millionairematch.com, or continuing to use the MillionaireMatch Site or the Service to interact with anyone you know or suspect is under 19, is strictly prohibited and a breach of this Agreement. Any violation of these rules will lead to the termination of this Agreement and your Membership and may result in a referral to law enforcement or other agencies, including the National Center for Missing and Exploited Children.

- **ACCESSIBILITY STATEMENT**
We care about our community and strive to incorporate Web Content Accessibility Guidelines 2.0 (WCAG) and other measures to assist with making our Service user friendly and accessible to visitors with disabilities. WCAG principles provide for website content to be perceivable, operable, understandable, and robust. We have a team of dedicated professionals who regularly evaluate the content of our Service in relation to WCAG's recommendations and who accordingly assist with operationalizing the same. Not all WCAG principals are operational and you understand that the application and use of WCAG recommendations will vary based upon the dynamic nature of the content on our Service.

Please contact us by e-mail at support<AT>millionairematch.com or contact us for assistance with accessing and using the Service.

- **COMMUNICATIONS**
By agreeing to the terms of this Agreement, you consent to receive communications sent from or on behalf of us regarding the Service, Content, and/or your rights and obligations under this Agreement.

- **GENERAL**
  - Governing Law. Regardless of where you live or from which physical location you access our Service, the substantive and choice of law provisions of the State of Delaware shall apply to this Agreement and your access and use of the Service, and any action related thereto, without regard to Delaware's conflict of law provisions, but Delaware law shall not apply to the arbitration provisions in Section 18.3 of this Agreement, which are governed solely by the Federal Arbitration Act.
  - Non-Waiver. Our failure to exercise or enforce any right or provision of this Agreement or the Privacy Policy shall not constitute a waiver of such right or provision.

- Alternative Dispute Resolution.
  BY CONSENTING TO AND/OR BY ENTERING INTO THIS AGREEMENT AND THE PRIVACY POLICY YOU AGREE THAT, IF ANY DISPUTE ARISES OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, THE PRIVACY POLICY AND/OR YOUR USE OF THE "SERVICE" AS DESCRIBED IN SUCH END USER SERVICE AGREEMENT (HEREINAFTER COLLECTIVELY REFERRED TO AS THE "DISPUTES"), ANY AND ALL SUCH DISPUTES SHALL BE RESOLVED BY SUBMISSION TO BINDING ARBITRATION IN SAN FRANCISCO, CALIFORNIA BEFORE A RETIRED JUDGE OR JUSTICE WITH JAMS PURSUANT TO JAMS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES ("JAMS RULES")IN EFFECT AT THE TIME OF ANY SUCH DISPUTE.

  PURSUANT TO JAMS RULES IN EFFECT AT THE TIME, THE COMPANY MAY REQUEST THAT THE ARBITRATOR CONDUCT ANY PROCEEDING, OR ANY PORTION THEREOF, IN PERSON OR VIRTUALLY BY CONFERENCE CALL, VIDEOCONFERENCE OR USING OTHER COMMUNICATIONS TECHNOLOGY WITH PARTICIPANTS IN ONE OR MORE GEOGRAPHICAL PLACES.

  YOU AND THE COMPANY MUTUALLY AGREE THAT THE ARBITRATOR, AND NOT ANY FEDERAL, STATE, OR LOCAL COURT OR AGENCY, SHALL HAVE THE EXCLUSIVE AUTHORITY TO RESOLVE ANY DISPUTE RELATING TO THE INTERPRETATION, APPLICABILITY, ENFORCEABILITY, OR FORMATION OF THIS AGREEMENT AND THE PRIVACY POLICY, INCLUDING, BUT NOT LIMITED TO, ANY CLAIM THAT ALL OR ANY PART OF THIS PRIVACY POLICY AND THE END USER SERVICE AGREEMENT IS VOID OR VOIDABLE.

  IF THE PARTIES ARE UNABLE TO AGREE ON A JAMS RETIRED JUDGE OR JUSTICE WITHIN FIFTEEN (15) CALENDAR DAYS OF A DEMAND FOR ARBITRATION FILED WITH JAMS BY EITHER OF US, JAMS WILL FOLLOW THE PROCEDURE IN ITS COMPREHENSIVE ARBITRATION RULES AND PROCEDURES TO NAME A RETIRED JUDGE OR JUSTICE WHO WILL ACT AS THE SOLE ARBITRATOR. ANY DECISION OF THE ARBITRATOR MAY BE CONFIRMED BY A COURT OF COMPETENT JURISDICTION AND THE ENSUING JUDGMENT MAY THEREAFTER BE ENFORCED IN THE SAME MANNER AS A JUDGMENT IN A CIVIL ACTION. THE ENSUING JUDGMENT MAY ALSO BE APPEALED PURSUANT TO APPLICABLE FEDERAL LAW. YOU ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT AND THE PRIVACY POLICY INVOLVES INTERSTATE COMMERCE AND THAT THIS ARBITRATION PROVISION IS GOVERNED BY THE FEDERAL ARBITRATION ACT.

  TIME LIMIT TO BRING A CLAIM OR DISPUTE. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, FOR ANY DISPUTE, WE AND YOU MUST BRING CLAIMS (INCLUDING COMMENCING AN ARBITRATION PROCEEDING)

WITHIN ONE (1) YEAR AFTER THE DISPUTE FIRST AROSE; OTHERWISE, SUCH DISPUTE IS PERMANENTLY BARRED.

- Class Action Waiver.
  EXCEPT AS OTHERWISE REQUIRED UNDER APPLICABLE LAW, (I) YOU AND THE COMPANY HEREBY MUTUALLY INTEND AND AGREE THAT NEITHER WILL ASSERT ANY CLASS ACTIONS OR REPRESENTATIVE ACTIONS, NOR WILL SUCH ACTIONS OR PROCEDURES APPLY IN ANY ARBITRATION PURSUANT TO THIS AGREEMENT AND THE PRIVACY POLICY; (II) WE MUTUALLY AGREE THAT NEITHER WILL ASSERT CLASS ACTION OR REPRESENTATIVE ACTION CLAIMS AGAINST THE OTHER IN ARBITRATION OR IN ANY OTHER PROCEEDING OR ACTION; AND (III) YOU SHALL ONLY SUBMIT YOUR OWN, INDIVIDUAL CLAIMS IN ARBITRATION AND WILL NOT SEEK TO REPRESENT THE INTERESTS OF ANY OTHER PERSON.

- ARBITRATION CONFIDENTIALITY.
  THE DISPUTES (AS DEFINED ABOVE), AS WELL AS THE ARBITRATION PROCEEDINGS AND AWARD REGARDING SUCH DISPUTES, SHALL BE KEPT STRICTLY CONFIDENTIAL AND GOVERNED BY THE CONFIDENTIALITY PROVISIONS ADDRESSED IN THIS AGREEMENT BETWEEN YOU AND THE COMPANY.

- ARBITRAL JURISDICTION.
  YOU AND THE COMPANY AGREE THAT THIS AGREEMENT AND THE PRIVACY POLICY INVOLVES INTERSTATE COMMERCE AND THE ARBITRATION WILL BE GOVERNED BY THE PROVISIONS OF THE FEDERAL ARBITRATION ACT (9 U.S.C. 1 ET SEQ.). DELAWARE SUBSTANTIVE LAW SHALL GOVERN THE UNDERLYING DISPUTES TO BE ARBITRATED.

  YOU AND THE COMPANY AGREE THAT THE ARBITRATOR, NOT ANY FEDERAL OR STATE COURT JUDGE, SHALL HAVE THE EXCLUSIVE JURISDICTION TO RESOLVE ANY AND ALL DISPUTES REGARDING THE ARBITRATOR'S JURISDICTION AND THE INTERPRETATION, APPLICABILITY, ENFORCEABILITY OR FORMATION OF THIS BINDING PRIVACY POLICY AND THE BINDING END USER SERVICE AGREEMENT TO ARBITRATE, INCLUDING BUT NOT LIMITED TO DETERMINING WHICH DISPUTES ARE SUBJECT TO ARBITRATION, OR ANY CONTENTION THAT ALL OR ANY PART OF THIS ARBITRATION AGREEMENT IS UNENFORCEABLE, VOIDABLE OR VOID.

- **DIGITAL MILLENNIUM COPYRIGHT ACT ("DMCA")**
  - Infringement Notification If you believe that your Content has been copied and posted on our Service in a way that constitutes copyright infringement, please provide our designated agent with the following information:
    - your contact information (i.e. name, email address, telephone number, and address);
    - a description of the copyrighted work of concern;
    - a link to the location(s) on the Service of the copyrighted work of concern;
    - a statement by you that you have a good faith belief that the disputed use is not authorized by the copyright owner, its agent, or the law;
    - a signed statement by you, made under penalty of perjury, that the information contained in your report is accurate and that you are the copyright owner (or authorized to act on behalf of the copyright owner).

The foregoing information ("DMCA Notice") should be sent to our "Designated Agent" as follows:

SuccessfulMatch.com

Attn: Legal Counsel – DMCA Agent

RE: DMCA NOTICE

10 - 8707 Dufferin St, Suite 160

Vaughan, Ontario L4J 0A6

Canada

- Counter-Notice. If your work has been removed due to a DMCA Notice pursuant to the foregoing procedure, and you believe that your content is not infringing, then you may send a counter-notice ("DMCA Counter-Notice") to our Designated Agent (contact information above) containing the following information:

     Identification of the Content that has been removed or to which access has been disabled and the location at which the Content appeared before it was removed or disabled;

     A statement that you have a good faith belief that the content was removed or disabled as a result of mistake or a misidentification of the Content;

     Your contact information (i.e. name, email address, telephone number, and address), a statement that you consent to the jurisdiction of the United States District Court of San Francisco California, and a statement that you will accept service of process from the person who provided notification of the alleged infringement;

     Your physical or electronic signature.

If a DMCA Counter-Notice is received by our Designated Agent, then we may send a copy of the DMCA Counter-Notice to the original complaining party informing that person that we may replace the removed Content or cease disabling it after a reasonable time period. Unless the alleged copyright owner files an action petitioning for a court order against the content provider, member, or user, the removed content may be replaced, or access to it restored, in a reasonable time period after receipt of the DMCA Counter-Notice, at our sole discretion.

- **Personal Use Only - No Commercial Activity Permitted**
  The MillionaireMatch Site and all of the Services are intended strictly for personal, non-commercial usage. Any usage by media organizations, business competitors, or entities/individuals intending to obtain financial or commercial gain is deemed to be "Commercial Use" by "Commercial Users" and is not permitted. Prohibited "commercial use" includes, but is not limited to:

  1. Marketing or promoting products/services not provided by the Company to other users;

  2. Organizing commercial gatherings, business networking events, or social functions for profit;

  3. Engaging in unauthorized media or press activities (media inquiries must be sent to press<AT>millionairematch.com);

  4. Gathering business leads or customer data for any commercial purposes (regardless of whether such activities occur on or off the platform); and

  5. Data mining, scraping, or unauthorized collection of platform information.

  Institutional entities, such as but not limited to organizations, corporations, agencies, businesses, and any non-individual entities, are prohibited from becoming Members or utilizing the the MillionaireMatch Site or any other Services for any purpose.

  The Company reserves the right to investigate and take appropriate legal measures against unauthorized or illegal usage of the MillionaireMatch Site or any other part of the Services, including without limitation:

  Unauthorized collection of Member contact information for spam purposes;
  Unauthorized framing or linking to the MillionaireMatch Site or any other part of the Services;
  Display or use of any MillionaireMatch Site content (including without limitation any information from any Member profiles) on any other platforms or on our using any other media, in any formt, without permission

  The Company reserves the right to, at its sole discretion, to (i) investigate suspicious activities that violate this Agreement or the Privacy Policy and pursue available legal remedies, including civil action, criminal charges, and injunctive relief; and (ii) report any and all suspicious activities to law enforcement agencies or any other relevant government authorities, including cooperating with such law enforcement agencies and/or other government authorities.

- **Harassment of SuccessfulMatch or MillionaireMatch Staff Is Prohibited**
  You agree not to engage in any form of harassment, annoyance, intimidation, or threats towards any employees, officers, directors, shareholders, staff or agents or contractors of the Company, or of any parent entities, subsidiaries, or affiliates. Should we find, in our sole determination, that any of your behavior towards any of the foregoingis threatening, inappropriate or otherwise violates this Section 21, we reserve the right to immediately terminate the Agreement.

- **QUESTIONS**
  If you have any questions about this Agreement please contact us at:

  SuccessfulMatch.com, Inc.

  10 - 8707 Dufferin St, Suite 160

  Vaughan, Ontario L4J 0A6

  Canada

  [support<AT>MillionaireMatch.com](support<AT>MillionaireMatch.com)


MEMBER'S AGREEMENT


**BY CHECKING THE "I AGREE" BOX WHEN I REGISTER, I CONFIRM THAT I HAVE READ AND UNDERSTOOD THIS AGREEMENT AND THAT I CONSENT TO ITS TERMS AND CONDITIONS.**


**BY CHECKING THE "I AGREE" BOX WHEN I REGISTER, I REPRESENT AND WARRANT THAT I HAVE THE AUTHORITY AND CAPACITY TO ENTER INTO THIS AGREEMENT, THAT I DO SO OF MY OWN FREE CHOICE, AND THAT I WILL ABIDE BY ALL THE TERMS AND CONDITIONS IN THIS AGREEMENT, INCLUDING THE PRIVACY POLICY, WHICH MAY BE MODIFIED FROM TIME TO TIME.**

Attachment 1-G



Attachment 1-H



Attachment 1-H



# Attachment 1-I

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

**CURRENT REPORT**
**Pursuant to Section 13 or 15(d)**
**of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported) December 3, 2025**

---

# BANDWIDTH INC.
**(Exact name of registrant as specified in its charter)**

---

| **Delaware** | **001-38285** | **56-2242657** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**2230 Bandmate Way**
**Raleigh, NC 27607**
**(Address of principal executive offices) (Zip Code)**

**(800) 808-5150**
**Registrant's telephone number, including area code**

**Not Applicable**
**(Former name or former address, if changed since last report)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐    Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)
☐    Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)
☐    Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))
☐    Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Class A Common Stock, par value $0.001 per share | BAND | NASDAQ Global Select Market |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

☐

**Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On December 3, 2025, Mr. John C. Murdock, member of the board of directors (the "Board") of Bandwidth, Inc. (the "Company") and the Chairman of the Compensation Committee of the Board, notified the Company of his intention to resign from the Board, effective as of December 31, 2025.

Mr. Murdock confirmed his decision was not based on any disagreement with the Company and expressed his support of the Board, the management team and the Company. The Board expressed gratitude for Mr. Murdock's nine years of service to the Company.

The Board has approved a reduction in the size of the Board from six members to five members, to be effective immediately following the effective date of Mr. Murdock's resignation.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

BANDWIDTH INC.

Date: December 5, 2025

By:    /s/ R. Brandon Asbill

Name:    R. Brandon Asbill

Title:    General Counsel and Secretary

Attachment 1-J



For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# Attachment 1-K

**AMENDED AND RESTATED**
**CERTIFICATE OF INCORPORATION OF ALPHABET INC.**

A Delaware Corporation

Alphabet Inc., a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), hereby certifies as follows:

A. The name of the Corporation is Alphabet Inc. The Corporation's original Certificate of Incorporation was filed with the Secretary of State of the State of Delaware on July 23, 2015.

B. This Amended and Restated Certificate of Incorporation was duly adopted in accordance with Sections 242, 245 and 228 (by written consent of the sole stockholder of the Corporation) of the General Corporation Law of the State of Delaware, and restates, integrates and further amends the provisions of the Corporation's Certificate of Incorporation.

C. The text of the Certificate of Incorporation of this Corporation is hereby amended and restated in its entirety, effective June 3, 2022, at 4:01p.m., EDT, as set forth in Exhibit A attached hereto.

IN WITNESS WHEREOF, the Corporation has caused this Amended and Restated Certificate of Incorporation to be executed by the undersigned officer, thereunto duly authorized, this third day of June 2022.

ALPHABET INC.
a Delaware corporation

By: /s/ Sundar Pichai

Name: Sundar Pichai
Title: Chief Executive Officer

**EXHIBIT A**

**Article I**

The name of this corporation is Alphabet Inc. (hereinafter, the "<u>Corporation</u>").

**Article II**

The address of the Corporation's registered office in the State of Delaware is 251 Little Falls Drive, City of Wilmington, County of New Castle, Delaware 19808. The name of its registered agent at such address is Corporation Service Company.

**Article III**

The nature of the business or purposes to be conducted or promoted by the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

**Article IV**

Section 1. <u>Authorized Shares</u>. This Corporation is authorized to issue one hundred eighty billion (180,000,000,000) shares of Class A Common Stock, par value $0.001 per share (the "<u>Class A Common Stock</u>"), sixty billion (60,000,000,000) shares of Class B Common Stock, par value $0.001 per share (the "<u>Class B Common Stock</u>", and together with the Class A Common Stock, the "<u>Common Stock</u>"), sixty billion (60,000,000,000) shares of Class C Capital Stock, par value $0.001 per share (the "<u>Class C Capital Stock</u>"), and one hundred million (100,000,000) shares of Preferred Stock, par value $0.001 per share. The number of authorized shares of any class or classes of stock may be increased or decreased (but not below the number of shares thereof then outstanding) by the affirmative vote of the holders of at least a majority of the voting power of the issued and outstanding shares of Common Stock of the Corporation, voting together as a single class.

Section 2. <u>Common Stock</u>. A statement of the designations of each class of Common Stock and the powers, preferences and rights and qualifications, limitations or restrictions thereof is as follows:

    (a)  <u>Voting Rights</u>.

        (i)    Except as otherwise provided herein or by applicable law, the holders of shares of Class A Common Stock and Class B Common Stock shall at all times vote together as one class on all matters (including the election of directors) submitted to a vote or for the consent of the stockholders of the Corporation.

        (ii)   Each holder of shares of Class A Common Stock shall be entitled to one (1) vote for each share of Class A Common Stock held as of the applicable date on any matter that is submitted to a vote or for the consent of the stockholders of the Corporation.

        (iii)  Each holder of shares of Class B Common Stock shall be entitled to ten (10) votes for each share of Class B Common Stock held as of the applicable date on any matter that is submitted to a vote or for the consent of the stockholders of the Corporation.

    (b)  <u>Dividends</u>. Subject to the preferences applicable to any series of Preferred Stock, if any, outstanding at any time, the holders of Class A Common Stock and the holders of Class B Common Stock shall be entitled to share equally, on a per share basis, in such dividends and other distributions of cash, property or shares of stock of the Corporation as may be declared by the Board of Directors from time to time with respect to the Common Stock out of assets or funds of the Corporation legally available therefor; provided, however, that in the event that such dividend is paid in the form of shares of Common Stock or rights to acquire Common Stock, the holders of Class A Common Stock shall receive Class A Common Stock or rights to acquire Class A Common Stock, as the case may be, and the holders of Class B Common Stock shall receive Class B Common Stock or rights to acquire Class B Common Stock, as the case may be.

    (c)  <u>Liquidation</u>. Subject to the preferences applicable to any series of Preferred Stock, if any outstanding at any time, in the event of the voluntary or involuntary liquidation, dissolution, distribution of assets or winding up of the Corporation, the holders of Class A Common Stock and the holders of Class B Common Stock shall be entitled to share equally, on a per share basis, all assets of the Corporation of whatever kind available for distribution to the holders of Common Stock.

(d) <u>Subdivision or Combinations</u>. If the Corporation in any manner subdivides or combines the outstanding shares of one class of Common Stock, the outstanding shares of the other class of Common Stock will be subdivided or combined in the same manner.

(e) <u>Equal Status</u>. Except as expressly provided in this Article IV, Class A Common Stock and Class B Common Stock shall have the same rights and privileges and rank equally, share ratably and be identical in all respects as to all matters. Without limiting the generality of the foregoing, (i) in the event of a merger, consolidation or other business combination requiring the approval of the holders of the Corporation's capital stock entitled to vote thereon (whether or not the Corporation is the surviving entity), the holders of the Class A Common Stock shall have the right to receive, or the right to elect to receive, the same form of consideration, if any, as the holders of the Class B Common Stock and the holders of the Class A Common Stock shall have the right to receive, or the right to elect to receive, at least the same amount of consideration, if any, on a per share basis as the holders of the Class B Common Stock, and (ii) in the event of (x) any tender or exchange offer to acquire any shares of Common Stock by any third party pursuant to an agreement to which the Corporation is a party or (y) any tender or exchange offer by the Corporation to acquire any shares of Common Stock, pursuant to the terms of the applicable tender or exchange offer, the holders of the Class A Common Stock shall have the right to receive, or the right to elect to receive, the same form of consideration as the holders of the Class B Common Stock and the holders of the Class A Common Stock shall have the right to receive, or the right to elect to receive, at least the same amount of consideration on a per share basis as the holders of the Class B Common Stock.

(f) <u>Conversion</u>.

(i) As used in this Section 2(f), the following terms shall have the following meanings:

(1) "<u>Founder</u>" shall mean either Larry Page or Sergey Brin, each as a natural living person, and "<u>Founders</u>" shall mean both of them.

(2) "<u>Class B Stockholder</u>" shall mean (a) the Founders, (b) the registered holder of a share of Class B Common Stock of Google Inc. on July 6, 2004 (the "<u>Effective Time</u>"), (c) each natural person who Transferred shares of Class B Common Stock of Google Inc. (or securities convertible into or exchangeable for shares of Class B Common Stock of Google Inc.) prior to the Effective Time to a Permitted Entity that, as of the Effective Time, complies with the applicable exception for such Permitted Entity specified in Section 2(f)(iii)(2), and (d) the initial registered holder of any shares of Class B Common Stock of Google Inc. that were originally issued by the Corporation after the Effective Time.

(3) "<u>Permitted Entity</u>" shall mean, with respect to any individual Class B Stockholder, any trust, account, plan, corporation, partnership, or limited liability company specified in Section 2(f)(iii)(2) established by or for such individual Class B Stockholder, so long as such entity meets the requirements of the exception set forth in Section 2(f)(iii)(2) applicable to such entity.

(4) "<u>Transfer</u>" of a share of Class B Common Stock shall mean any sale, assignment, transfer, conveyance, hypothecation or other transfer or disposition of such share or any legal or beneficial interest in such share, whether or not for value and whether voluntary or involuntary or by operation of law. A "<u>Transfer</u>" shall also include, without limitation, a transfer of a share of Class B Common Stock to a broker or other nominee (regardless of whether or not there is a corresponding change in beneficial ownership), or the transfer of, or entering into a binding agreement with respect to, Voting Control over a share of Class B Common Stock by proxy or otherwise; <u>provided</u>, <u>however</u>, that the following shall not be considered a "<u>Transfer</u>" within the meaning of this Section 2(f)(i)(4):

a) the granting of a proxy to officers or directors of the Corporation at the request of the Board of Directors of the Corporation in connection with actions to be taken at an annual or special meeting of stockholders;

b) entering into a voting trust, agreement or arrangement (with or without granting a proxy) solely with stockholders who are Class B Stockholders, that (A) is disclosed either in a Schedule 13D filed with the Securities and Exchange Commission or in writing to the Secretary of the Corporation, (B) either has a term not exceeding one (1) year or is terminable by the Class B Stockholder at any time and (C) does not involve any payment of cash, securities, property or other consideration to the Class B Stockholder other than the mutual promise to vote shares in a designated manner; or

      c)   the pledge of shares of Class B Common Stock by a Class B Stockholder that creates a mere security interest in such shares pursuant to a bona fide loan or indebtedness transaction so long as the Class B Stockholder continues to exercise Voting Control over such pledged shares; <u>provided</u>, <u>however</u>, that a foreclosure on such shares of Class B Common Stock or other similar action by the pledgee shall constitute a "<u>Transfer</u>."

   (5)  "<u>Voting Control</u>" with respect to a share of Class B Common Stock shall mean the power (whether exclusive or shared) to vote or direct the voting of such share of Class B Common Stock by proxy, voting agreement or otherwise.

(ii)  Each share of Class B Common Stock shall be convertible into one (1) fully paid and nonassessable share of Class A Common Stock at the option of the holder thereof at any time upon written notice to the transfer agent of the Corporation.

(iii)  Each share of Class B Common Stock shall automatically, without any further action, convert into one (1) fully paid and nonassessable share of Class A Common Stock upon a Transfer of such share, other than a Transfer:

   (1)  from a Founder, or such Founder's Permitted Entities, to the other Founder, or such Founder's Permitted Entities.

   (2)  by a Class B Stockholder who is a natural person to any of the following Permitted Entities, and from any of the following Permitted Entities back to such Class B Stockholder and/or any other Permitted Entity established by or for such Class B Stockholder:

      a)   a trust for the benefit of such Class B Stockholder and for the benefit of no other person, <u>provided</u> such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder and, <u>provided</u>, <u>further</u>, that in the event such Class B Stockholder is no longer the exclusive beneficiary of such trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

      b)   a trust for the benefit of persons other than the Class B Stockholder so long as the Class B Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such trust, <u>provided</u> such Transfer does not involve any payment of cash, securities, property or other consideration (other than an interest in such trust) to the Class B Stockholder, and, <u>provided</u>, <u>further</u>, that in the event the Class B Stockholder no longer has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

      c)   a trust under the terms of which such Class B Stockholder has retained a "qualified interest" within the meaning of §2702(b)(1) of the Code and/or a reversionary interest so long as the Class B Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such trust; <u>provided</u>, <u>however</u>, that in the event the Class B Stockholder no longer has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

      d)   an Individual Retirement Account, as defined in Section 408(a) of the Internal Revenue Code, or a pension, profit sharing, stock bonus or other type of plan or trust of which such Class B Stockholder is a participant or beneficiary and which satisfies the requirements for qualification under Section 401 of the Internal Revenue Code; <u>provided</u> that in each case such Class B Stockholder has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held in such account, plan or trust, and <u>provided</u>, <u>further</u>, that in the event the Class B Stockholder no longer has sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such account, plan or trust, each share of Class B Common Stock then held by such trust shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

e)  a corporation in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns shares with sufficient Voting Control in the corporation, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such corporation; provided that in the event the Class B Stockholder no longer owns sufficient shares or has sufficient legally enforceable rights to enable the Class B Stockholder to retain sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such corporation, each share of Class B Common Stock then held by such corporation shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock;

f)  a partnership in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns partnership interests with sufficient Voting Control in the partnership, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such partnership; provided that in the event the Class B Stockholder no longer owns sufficient partnership interests or has sufficient legally enforceable rights to enable the Class B Stockholder to retain sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such partnership, each share of Class B Common Stock then held by such partnership shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock; or

g)  a limited liability company in which such Class B Stockholder directly, or indirectly through one or more Permitted Entities, owns membership interests with sufficient Voting Control in the limited liability company, or otherwise has legally enforceable rights, such that the Class B Stockholder retains sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such limited liability company; provided that in the event the Class B Stockholder no longer owns sufficient membership interests or has sufficient legally enforceable rights to enable the Class B Stockholder to retain sole dispositive power and exclusive Voting Control with respect to the shares of Class B Common Stock held by such limited liability company, each share of Class B Common Stock then held by such limited liability company shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock.

Notwithstanding the foregoing, if the shares of Class B Common Stock held by the Permitted Entity of a Class B Stockholder would constitute stock of a "controlled corporation" (as defined in Section 2036(b)(2) of the Code) upon the death of such Class B Stockholder, and the Transfer of shares of Class B Common Stock by such Class B Stockholder to the Permitted Entity did not involve a bona fide sale for an adequate and full consideration in money or money's worth (as contemplated by Section 2036(a) of the Code), then such shares will not automatically convert to Class A Common Stock if the Class B Stockholder does not directly or indirectly retain Voting Control over such shares until such time as the shares of Class B Common Stock would no longer constitute stock of a "controlled corporation" pursuant to the Code upon the death of such Class B Stockholder (such time is referred to as the "Voting Shift"). If the Class B Stockholder does not, within five (5) business days following the mailing of the Corporation's proxy statement for the first annual or special meeting of stockholders following the Voting Shift, directly or indirectly through one or more Permitted Entities assume sole dispositive power and exclusive Voting Control with respect to such shares of Class B Common Stock, each such share of Class B Common Stock shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock.

(3)  by a Class B Stockholder that is a partnership, or a nominee for a partnership, which partnership beneficially held more than five percent (5%) of the total outstanding shares of Class B Common Stock as of the Effective Time, to any person or entity that, at the Effective Time, was a partner of such partnership pro rata in accordance with their ownership interests in the partnership and the terms of any applicable partnership or similar agreement binding the partnership at the Effective Time, and any further Transfer(s) by any such partner that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company and the terms of any applicable partnership or similar agreement binding the partnership or limited liability company at the Effective Time. All shares of Class B Common Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(4)  by a Class B Stockholder that is a limited liability company, or a nominee for a limited liability company, which limited liability company beneficially held more than five percent (5%) of the total outstanding shares of Class B Common Stock as of the Effective Time, to any person or entity that, at the Effective

Time, was a member of such limited liability company pro rata in accordance with their ownership interests in the company and the terms of any applicable agreement binding the company and its members at the Effective Time, and any further Transfer(s) by any such member that is a partnership or limited liability company to any person or entity that was at such time a partner or member of such partnership or limited liability company pro rata in accordance with their ownership interests in the partnership or limited liability company and the terms of any applicable partnership or similar agreement binding the partnership or limited liability company. All shares of Class B Common Stock held by affiliated entities shall be aggregated together for the purposes of determining the satisfaction of such five percent (5%) threshold.

(iv) Each share of Class B Common Stock held of record by a Class B Stockholder who is a natural person, or by such Class B Stockholder's Permitted Entities, shall automatically, without any further action, convert into one (1) fully paid and nonassessable share of Class A Common Stock upon the death of such Class B Stockholder; provided, however, that:

    (1) If a Founder, or such Founder's Permitted Entity (in either case, the "Transferring Founder") Transfers exclusive Voting Control (but not ownership) of shares of Class B Common Stock to the other Founder (the "Transferee Founder") which Transfer of Voting Control is contingent or effective upon the death of the Transferring Founder, then each share of Class B Common Stock that is the subject of such Transfer shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock upon that date which is the earlier of: (a) nine (9) months after the date upon which the Transferring Founder died, or (b) the date upon which the Transferee Founder ceases to hold exclusive Voting Control over such shares of Class B Common Stock; provided, further, that if the Transferee Founder shall die within nine (9) months following the death of the Transferring Founder, then a trustee designated by the Transferee Founder and approved by the Board of Directors may exercise Voting Control over: (x) the Transferring Founders' shares of Class B Common Stock and, in such instance, each such share of Class B Common Stock shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock upon that date which is the earlier of: (A) nine (9) months after the date upon which the Transferring Founder died, or (B) the date upon which such trustee ceases to hold exclusive Voting Control over such shares of Class B Common Stock; and (y) the Transferee Founders' shares of Class B Common Stock (or shares held by an entity of the type referred to in paragraph (2) below established by or for the Transferee Founder) and, in such instance, each such share of Class B Common Stock shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock upon that date which is the earlier of: (A) nine (9) months after the date upon which the Transferee Founder died, or (B) the date upon which such trustee ceases to hold exclusive Voting Control over such shares of Class B Common Stock; and

    (2) If both Founders die simultaneously, a trustee designated by the Founders and approved by the Board of Directors may exercise Voting Control over the Founders' shares of Class B Common Stock and, in such instance, each such share of Class B Common Stock shall automatically convert into one (1) fully paid and nonassessable share of Class A Common Stock upon that date which is the earlier of: (a) nine (9) months after the date upon which both Founders died, or (b) the date upon which such trustee ceases to hold exclusive Voting Control over such shares of Class B Common Stock.

(v) The Corporation may, from time to time, establish such policies and procedures relating to the conversion of the Class B Common Stock to Class A Common Stock and the general administration of this dual class common stock structure, including the issuance of stock certificates with respect thereto, as it may deem necessary or advisable, and may request that holders of shares of Class B Common Stock furnish affidavits or other proof to the Corporation as it deems necessary to verify the ownership of Class B Common Stock and to confirm that a conversion to Class A Common Stock has not occurred. A determination by the Secretary of the Corporation that a Transfer results in a conversion to Class A Common Stock shall be conclusive.

(vi) In the event of a conversion of shares of Class B Common Stock to shares of Class A Common Stock pursuant to this Section 2, such conversion shall be deemed to have been made at the time that the Transfer of such shares occurred. Upon any conversion of Class B Common Stock to Class A Common Stock, all rights of the holder of shares of Class B Common Stock shall cease and the person or persons in whose names or names the certificate or certificates representing the shares of Class A Common Stock are to be issued shall be treated for all purposes as having become the record holder or holders of such shares of Class A Common Stock. Shares of Class B Common Stock that are converted into shares of Class A Common Stock as provided in this Section 2 shall be retired and may not be reissued.

(g) <u>Reservation of Stock</u>. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock, solely for the purpose of effecting the conversion of the shares of Class B Common Stock, such number of its shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of Class B Common Stock into shares of Class A Common Stock.

Section 3. <u>Change in Control Transaction</u>. The Corporation shall not consummate a Change in Control Transaction without first obtaining the affirmative vote, at a duly called annual or special meeting of the stockholders of the Corporation, of the holders of the greater of: (A) a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation then entitled to vote thereon, voting together as a single class, and (B) sixty percent (60%) of the voting power of the shares of capital stock present in person or represented by proxy at the stockholder meeting called to consider the Change in Control Transaction and entitled to vote thereon, voting together as a single class. For the purposes of this section, a "<u>Change in Control Transaction</u>" means the occurrence of any of the following events:

(a) the sale, encumbrance or disposition (other than non-exclusive licenses in the ordinary course of business and the grant of security interests in the ordinary course of business) by the Corporation of all or substantially all of the Corporation's assets;

(b) the merger or consolidation of the Corporation with or into any other corporation or entity, other than a merger or consolidation which would result in the voting securities of the Corporation outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) more than fifty percent (50%) of the total voting power represented by the voting securities of the Corporation or such surviving entity or its parent outstanding immediately after such merger or consolidation; or

(c) the issuance by the Corporation, in a transaction or series of related transactions, of voting securities representing more than two percent (2%) of the total voting power of the Corporation before such issuance, to any person or persons acting as a group as contemplated in Rule 13d-5(b) under the Securities Exchange Act of 1934 (or any successor provision) such that, following such transaction or related transactions, such person or group of persons would hold more than fifty percent (50%) of the total voting power of the Corporation, after giving effect to such issuance.

Section 4. <u>Preferred Stock</u>. The Board of Directors is authorized, subject to any limitations prescribed by law, to provide for the issuance of shares of Preferred Stock in series, and to establish from time to time the number of shares to be included in each such series, and to fix the designation, power, preferences, and rights of the shares of each such series and any qualifications, limitations or restrictions thereof. Except as otherwise required by law, holders of Common Stock shall not be entitled to vote on any amendment to this Certificate of Incorporation (including any certificate of designation filed with respect to any series of Preferred Stock) that relates solely to the terms of one or more outstanding series of Preferred Stock if the holders of such affected series are entitled, either separately or together as a class with the holders of one or more other such series, to vote thereon by law or pursuant to this Certificate of Incorporation (including any certificate of designation filed with respect to any series of Preferred Stock).

Section 5. <u>Class C Capital Stock</u>. A statement of the designation of the Class C Capital Stock and the powers, preferences and rights and qualifications, limitations or restrictions thereof is as follows:

(a) <u>Voting</u>. Except as otherwise required by applicable law, shares of Class C Capital Stock shall have no voting power and the holders thereof, as such, shall not be entitled to vote on any matter that is submitted to a vote or for the consent of the stockholders of the Corporation.

(b) <u>Dividends</u>. Subject to the preferences applicable to any series of Preferred Stock, if any, outstanding at any time, the holders of Class C Capital Stock shall be entitled to receive, on a per share basis, the same form and amount of dividends and other distributions of cash, property or shares of stock of the Corporation as may be declared by the Board of Directors from time to time with respect to shares of the Common Stock out of assets or funds of the Corporation legally available therefor; <u>provided</u>, <u>however</u>, that in the event that such dividend is paid in the form of shares of Common Stock or rights to acquire Common Stock, the holders of Class C Capital Stock shall receive Class C Capital Stock or rights to acquire Class C Capital Stock, as the case may be.

(c) <u>Conversion upon Liquidation</u>. Immediately prior to the earlier of (i) any distribution of assets of the Corporation to the holders of the Common Stock in connection with a voluntary or involuntary liquidation, dissolution, distribution of assets or winding up of the Corporation pursuant to Section 2(c) or (ii) any record date established to determine the holders of capital stock of the Corporation entitled to receive such distribution of assets, each outstanding

share of the Class C Capital Stock shall automatically, without any further action, convert into and become one (1) fully paid and nonassessable share of Class A Common Stock. The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Class A Common Stock, solely for the purpose of effecting the conversion of the shares of Class C Capital Stock pursuant to this Section 5(c), such number of its shares of Class A Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of Class C Capital Stock into shares of Class A Common Stock.

(d) <u>Subdivision or Combinations</u>. If the Corporation in any manner subdivides or combines the outstanding shares of any class of Common Stock, the outstanding shares of the Class C Capital Stock will be subdivided or combined in the same manner. The Corporation shall not subdivide or combine the outstanding shares of the Class C Capital Stock unless a subdivision or combination is made in the same manner with respect to each class of Common Stock.

(e) <u>Equal Status</u>. Except as expressly provided in this Article IV, Class C Capital Stock shall have the same rights and privileges and rank equally, share ratably and be identical in all respects to the Common Stock as to all matters. Without limiting the generality of the foregoing, (i) in the event of a merger, consolidation or other business combination of the Corporation requiring the approval of the holders of the Corporation's capital stock entitled to vote thereon (whether or not the Corporation is the surviving entity), the holders of the Class C Capital Stock shall receive the same amount and form of consideration, if any, on a per share basis as the consideration, if any, received by holders of the Class A Common Stock in connection with such merger, consolidation or combination (<u>provided</u> that if holders of Class A Common Stock are entitled to make an election as to the amount or form of consideration such holders shall receive in any such merger, consolidation or combination with respect to their shares of Class A Common Stock, the holders of Class C Capital Stock shall be entitled to make the same election as to their shares of Class C Capital Stock), and (ii) in the event of (x) any tender or exchange offer to acquire any shares of Common Stock by any third party pursuant to an agreement to which the Corporation is a party or (y) any tender or exchange offer by the Corporation to acquire any shares of Common Stock, pursuant to the terms of the applicable tender or exchange offer, the holders of the Class C Capital Stock shall receive the same amount and form of consideration on a per share basis as the holders of the Class A Common Stock (<u>provided</u> that if holders of Class A Common Stock are entitled to make an election as to the amount or form of consideration such holders shall receive in any such tender or exchange offer with respect to their shares of Class A Common Stock, the holders of Class C Capital Stock shall be entitled to make the same election as to their shares of Class C Capital Stock).

**Article V**

The Corporation is to have perpetual existence.

**Article VI**

Section 1. The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors. In addition to the powers and authority expressly conferred upon them by statute or by this Certificate of Incorporation or the Bylaws of the Corporation, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation.

Section 2. In furtherance and not in limitation of the powers conferred by statute, the Board of Directors is expressly authorized to adopt, alter, amend or repeal the Bylaws of the Corporation. The affirmative vote of at least a majority of the Board of Directors then in office shall be required in order for the Board of Directors to adopt, amend, alter or repeal the Corporation's Bylaws. The Corporation's Bylaws may also be adopted, amended, altered or repealed by the stockholders of the Corporation. Notwithstanding the above or any other provision of this Certificate of Incorporation, the Bylaws of the Corporation may not be amended, altered or repealed except in accordance with Article X of the Bylaws. No Bylaw hereafter legally adopted, amended, altered or repealed shall invalidate any prior act of the directors or officers of the Corporation that would have been valid if such Bylaw had not been adopted, amended, altered or repealed.

Section 3.

(a) If, at any time during which shares of capital stock of the Corporation are listed for trading on either The Nasdaq National Market ("<u>Nasdaq</u>") or the New York Stock Exchange ("<u>NYSE</u>"), holders of the requisite voting power under the then-applicable Nasdaq or NYSE listing standards notify the Corporation in writing of their election to cause the Corporation to rely upon the applicable "controlled company" exemptions (the "<u>Controlled Company Exemption</u>") to the corporate governance rules and requirements of the Nasdaq or the NYSE (the "<u>Exchange Governance Rules</u>"), the Corporation shall call a special meeting of the stockholders to consider whether to approve the election to be held within ninety (90) days of written notice of such election (or, if the next succeeding annual meeting of stockholders will be held within ninety (90) days of written notice of such election, the

Corporation shall include a proposal to the same effect to be considered at such annual meeting). The Corporation shall not elect to rely upon the Controlled Company Exemption until such time as the Corporation shall have received the approval from holders of at least sixty-six and two thirds percent (66 2/3%) of the voting power of the issued and outstanding shares of capital stock of the Corporation at such annual or special meeting.

(b)  In the event such approval is obtained, for so long as shares of the capital stock of the Corporation are listed on either the Nasdaq or the NYSE and the Corporation remains eligible for the Controlled Company Exemption under the requirements of the applicable Exchange Governance Rules, then the Board of Directors shall be constituted such that (i) a majority of the directors on the Board of Directors shall be Outside Directors (as defined below), and (ii) the Corporation's compensation committee and the governance and nominating committee (or such committees serving similar functions as the Board of Directors of the Corporation shall constitute from time to time) shall consist of at least two (2) members of the Board of Directors and shall be composed entirely of Outside Directors. In the event the number of Outside Directors serving on the Board of Directors constitutes less than a majority of the directors on the Board of Directors as a result of the death, resignation or removal of an Outside Director, then the Board of Directors may continue to properly exercise its powers and no action of the Board of Directors shall be so invalidated, provided, that the Board of Directors shall promptly take such action as is necessary to appoint new Outside Director(s) to the Board of Directors.

(c)  An "Outside Director" shall mean a director who, currently and for any of the past three years, is and was not an officer of the Corporation (other than service as the chairman of the Board of Directors) or a parent or subsidiary of the Corporation and is not and was not otherwise employed by the corporation or a parent or subsidiary of the Corporation.

Section 4. The chairman of the Board of Directors shall be an Outside Director (as defined above) and shall not hold any other office of the Corporation unless the appointment of the chairman is approved by two-thirds of the members of the Board of Directors then in office, provided, however, that if there is no chief executive officer or president of the Corporation as a result of the death, resignation or removal of such officer, then the chairman of the Board of Directors may also serve in an interim capacity as the chief executive officer of the Corporation until the Board shall appoint a new chief executive officer.

Section 5. The Board of Directors of the Corporation shall establish an audit committee whose principal purpose will be to oversee the Corporation's and its subsidiaries' accounting and financial reporting processes, internal systems of control, independent auditor relationships and audits of consolidated financial statements of the Corporation and its subsidiaries. The audit committee will also determine the appointment of the independent auditors of the Corporation and any change in such appointment and ensure the independence of the Corporation's auditors. In addition, the audit committee will assume such other duties and responsibilities delegated to it by the Board of Directors and specified for it under applicable law and Exchange Governance Rules.

Section 6. The Board of Directors of the Corporation shall establish a corporate governance and nominating committee whose principal duties will be to assist the Board of Directors by identifying individuals qualified to become members of the Board of Directors consistent with criteria approved by the Board of Directors, to recommend to the Board of Directors for its approval the slate of nominees to be proposed by the Board of Directors to the stockholders for election to the Board of Directors, to develop and recommend to the Board of Directors the governance principles applicable to the Corporation, as well as such other duties and responsibilities delegated to it by the Board of Directors and specified for it under applicable law and Exchange Governance Rules. In the event the corporate governance and nominating committee will not be recommending a then incumbent director for inclusion in the slate of nominees to be proposed by the Board of Directors to the stockholders for election to the Board of Directors, and provided such incumbent director has not notified the committee that he or she will be resigning or that he or she does not intend to stand for re-election to the Board of Directors, then, in the case of an election to be held at an annual meeting of stockholders, the corporate governance and nominating committee will recommend the slate of nominees to the Board of Directors at least thirty (30) days prior to the latest date required by the provisions of Sections 2.14 (advance notice of stockholder business) and 2.15 (advance notice of director nominations) of the Bylaws of the Corporation (as such provisions may be amended from time to time) for stockholders to submit nominations for directors at such annual meeting, or in the case of an election to be held at a special meeting of stockholders, at least ten (10) days prior to the latest date required by the provisions of Sections 2.14 and 2.15 of the Bylaws for stockholders to submit nominations for directors at such special meeting.

Section 7. The Board of Directors of the Corporation shall establish a compensation committee whose principal duties will be to review employee compensation policies and programs as well as the compensation of the chief executive officer and other executive officers of the Corporation, to recommend to the Board of Directors a compensation program for outside members of the Board of Directors, as well as such other duties and responsibilities delegated to it by the Board of Directors and specified for it under applicable law and Exchange Governance Rules.

Section 8. Elections of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

Section 9. No stockholder will be permitted to cumulate votes at any election of directors.

Section 10. The number of directors that constitute the whole Board of Directors shall be fixed exclusively in the manner designated in the Bylaws of the Corporation.

**Article VII**

Section 1. To the fullest extent permitted by the General Corporation Law of Delaware as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. If the General Corporation Law of Delaware is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated to the fullest extent permitted by the General Corporation Law of Delaware, as so amended.

Section 2. The Corporation may indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, she, his or her testator or intestate is or was a director, officer, employee or agent at the request of the Corporation or any predecessor to the Corporation or serves or served at any other enterprise as a director, officer, employee or agent at the request of the Corporation or any predecessor to the Corporation.

Section 3. Neither any amendment or repeal of any Section of this Article VII, nor the adoption of any provision of this Certificate of Incorporation inconsistent with this Article VII, shall eliminate or reduce the effect of this Article VII, in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Article VII, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

**Article VIII**

Meetings of stockholders may be held within or without the State of Delaware, as the Bylaws may provide. The books of the Corporation may be kept (subject to any provision contained in the statutes) outside of the State of Delaware at such place or places as may be designated from time to time by the Board of Directors or in the Bylaws of the Corporation.

**Article IX**

Section 1. Except as otherwise provided for or fixed by or pursuant to the provisions of Article IV hereof in relation to the rights of the holders of Preferred Stock to elect directors under specified circumstances, newly created directorships resulting from any increase in the number of directors, created in accordance with the Bylaws of the Corporation, and any vacancies on the Board of Directors resulting from death, resignation, disqualification, removal or other cause shall be filled only by the affirmative vote of a majority of the remaining directors then in office, even though less than a quorum of the Board of Directors, or by a sole remaining director. Any director elected in accordance with the preceding sentence shall hold office until the next annual meeting of stockholders and until such director's successor shall have been elected and qualified, or until such director's earlier death, resignation or removal. No decrease in the number of directors constituting the Board of Directors shall shorten the term of any incumbent director.

Section 2. Any director or the entire Board of Directors may be removed from office at any time, with or without cause, by the affirmative vote of the holders of at least a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation then entitled to vote in the election of directors.

**Article X**

Advance notice of new business and stockholder nominations for the election of directors shall be given in the manner and to the extent provided in the Bylaws of the Corporation.

**Article XI**

Section 1. Unless otherwise required by law, special meetings of the stockholders of the Corporation, for any purpose or purposes, may be called only by (i) the Board of Directors of the Corporation, (ii) the Chairman of the Board of Directors of the Corporation, (iii) the Chief Executive Officer (or, in the absence of a Chief Executive Officer, the President) of the Corporation, or (iv) a holder, or group of holders, of Common Stock holding more than twenty percent (20%) of the total voting power of the outstanding shares of capital stock of the Corporation then entitled to vote.

Section 2. Any action required or permitted to be taken by the stockholders of the Corporation must be effected at a duly called annual or special meeting of stockholders of the Corporation and may not be effected by any consent in writing by such stockholders.

**Article XII**

The Corporation reserves the right to amend or repeal any provision contained in this Certificate of Incorporation in the manner prescribed by the laws of the State of Delaware and all rights conferred upon stockholders are granted subject to this reservation; provided, however, that notwithstanding any other provision of this Certificate of Incorporation, or any

provision of law that might otherwise permit a lesser vote or no vote, but in addition to any vote of the holders of any class or series of the stock of the Corporation, and, as applicable, such other approvals of the Board of Directors of the Corporation, as are required by law or by this Certificate of Incorporation: (i) the unanimous consent of Board of Directors then in office, and the affirmative vote of the holders at least a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation then entitled to vote, shall be required to amend or repeal Article IV, Section 2, Article IV, Section 5 or this clause (i) of Article XII; (ii) the affirmative vote of the holders of the greater of: (A) a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation then entitled to vote thereon, or (B) sixty percent (60%) of the voting power of the shares of capital stock present in person or represented by proxy at the stockholder meeting and entitled to vote thereon, shall be required to amend or repeal Article IV, Section 3 or this clause (ii) of Article XII; (iii) the consent of a majority of the members of the Board then in office, and the affirmative vote of the holders at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the issued and outstanding shares of capital stock of the Corporation then entitled to vote shall be required to amend or repeal Article IV, Section 4 and Article XI or this clause (iii) of Article XII; (iv) the unanimous consent of the Board of Directors then in office and the consent of at least sixty-six and two-thirds percent (66 2/3%) of the voting power of the issued and outstanding shares of capital stock of the Corporation shall be required to amend or repeal Article VI, Section 3, 5, 6 or 7 or this clause (iv) of Article XII; and (v) the consent of at least two-thirds of the members of the Board of Directors then in office and the affirmative vote of the holders of at least a majority of the voting power of the issued and outstanding shares of capital stock of the Corporation then entitled to vote shall be required to amend or repeal Article VI, Section 4 or this clause (v) of Article XII.



Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

Department of State: Division of Corporations

Allowable Characters

HOME

**Entity Details**

THIS IS NOT A STATEMENT OF GOOD STANDING

| | | | |
|---|---|---|---|
| File Number: | 4152954 | Incorporation Date / Formation Date: | 5/3/2006 (mm/dd/yyyy) |
| Entity Name: | AMAZON WEB SERVICES, INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | | | |
|---|---|---|---|
| Name: | CORPORATION SERVICE COMPANY | | |
| Address: | 251 LITTLE FALLS DRIVE | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19808 |
| Phone: | 302-636-5401 | | |

Additional information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov



THIS IS NOT A STATEMENT OF GOOD STANDING

| Entity Details | | |
|---|---|---|
| File Number: | 2012676 | Incorporation Date / Formation Date: | 3/19/2024 | (mm/dd/yyyy) |
| Entity Name: | CIRCLE INTERNET GROUP, INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| Name: | THE CORPORATION TRUST COMPANY |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | 302-658-7581 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[Submit]

[New Entity Search]



Delaware.gov                                                                                                   Governor | General Assembly | Courts | Elected Officials | State Agencies

Department of State: Division of Corporations

HOME                                                                                                                              Allowable Characters

|  | Entity Details |
|---|---|

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | 5460078 | Incorporation Date / Formation Date: | 1/27/2014 (mm/dd/yyyy) |
|---|---|---|---|
| Entity Name: | COINBASE GLOBAL, INC. | | |
| Entity Kind: | Corporation | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| Name: | CORPORATION SERVICE COMPANY | | |
|---|---|---|---|
| Address: | 251 LITTLE FALLS DRIVE | | |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19808 |
| Phone: | 302-636-5401 | | |

Additional information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[Submit]

[ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

Attachment LO



For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

Attachment 1 F



Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

Department of State: Division of Corporations

HOME

Allowable Characters

Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | 7430760 | Incorporation Date / Formation Date: | 5/21/2019 | (mm/dd/yyyy) |
| Entity Name: | ZAP SOLUTIONS, INC. | | | |
| Entity Kind: | Corporation | Entity Type: | General | |
| Residency: | Domestic | State: | DELAWARE | |

**REGISTERED AGENT INFORMATION**

| Name: | INCORPORATING SERVICES, LTD. |
| Address: | 3500 S DUPONT HWY |
| City: | DOVER | County: | Kent |
| State: | DE | Postal Code: | 19901 |
| Phone: | 302-531-0855 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

Submit

New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov